**MARK BRNOVICH**
**ARIZONA ATTORNEY GENERAL**

Anthony R. Napolitano
*Assistant Attorney General*
2005 N. Central Ave
Phoenix, AZ 85004-1592
Phone: (602) 542-8958
Joe.Kanefield@azag.gov
Anthony.Napolitano@azag.gov
ACL@azag.gov

*pro hac vice* forthcoming

*Attorneys for Plaintiff State of Arizona*

**AUSTIN KNUDSEN**
**MONTANA ATTORNEY GENERAL**

Kristin Hansen
*Lieutenant General*
David M.S. Dewhirst
*Solicitor General*
Christian B. Corrigan*
*Assistant Solicitor General*
215 N Sanders St.
Helena, MT 59601
Phone: (406)-444-2026
David.Dewhirst@mt.gov
Christian.Corrigan@mt.gov

*pro hac vice* forthcoming

*Attorneys for Plaintiff State of Montana*

**DAVE YOST**
**OHIO ATTORNEY GENERAL**

Benjamin M. Flowers (0095284)
*Ohio Solicitor General*
May Davis*
*Deputy Solicitor General*
30 E. Broad St., 17th Floor
Columbus, OH 43215
Phone: (614) 466-8980
Benjamin.Flowers@OhioAGO.gov
May.Davis@OhioAGO.gov

*pro hac vice* forthcoming

*Attorneys for Plaintiff State of Ohio*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| State of Arizona; State of Montana; and State of Ohio,<br><br>   Plaintiffs,<br><br>  v.<br><br>Joseph R. Biden, in his official capacity as President of the United States; United States Department of Homeland Security; United States of America; Alejandro Mayorkas, in his official capacity as Secretary of Homeland Security; Troy Miller, in his official capacity as Acting Commissioner of United States Customs and Border Protection; Tae Johnson, in his official capacity as Acting Director of United States Immigration and Customs Enforcement; and Ur Jaddou, in her official capacity as Director of U.S. Citizenship and Immigration Services,<br><br>   Defendants. | No. 3:21-cv-314<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. This is a suit to enforce bedrock requirements of immigration and administrative law.

2. On September 30, 2021, in a brazen display of contempt for Congress's statutory commands, Secretary Alejandro Mayorkas—Secretary of the Department of Homeland Security ("DHS")—announced a policy that abandons DHS's duties to enforce or implement entire swaths of immigration law. Exhibit A. Specifically, Defendants will no longer enforce immigration law against removable aliens, including the execution of final orders of removal, without some additional aggravating circumstance, such as that individual's participation in terrorism or espionage, despite statutory

2

mandates to act. As long as unauthorized aliens present in the United States prior to November 1, 2020, have not committed crimes related to terrorism and espionage, or do not pose egregious threats to public safety, they are not subject to deportation under this policy. And based on DHS data covering the periods before and after the issuance of similar but less far-reaching policies, on information and belief, a necessary consequence of DHS's policy is that individuals will be released into Plaintiff States' communities.

3. Arizona, as a border state, will be directly impacted by Defendants' decision to flout their legal obligations. Arizona's law enforcement community is particularly concerned that aliens who have been charged or convicted of crimes will be released as a result of DHS's September 30 Permanent Guidance. Moreover, Arizona's law enforcement community is particularly concerned that releasing individuals during the COVID-19 pandemic will further stress hospitals, jails, and other social services at the local and county level.

4. Montana will be directly impacted by Defendants' decision to abdicate their legal obligations. Montana's law enforcement community is particularly concerned that DHS's September 30 Permanent Guidance will exacerbate the serious drug trafficking problems associated with illegal immigration that have afflicted communities across the state. Drug trafficking and the resulting drug-related crime and drug use threaten public safety and put a strain on Montana's limited law enforcement resources.

5. Ohio will be directly impacted by Defendants' decision to rewrite the law and shield aliens, including criminal aliens, ordered removed from

ever being removed. This practice has incentivized, and will continue to incentivize, an unprecedented level of illegal border activity, including a record influx of fentanyl at the southern border, which is trafficked into Ohio communities. Ohio's law enforcement community must confront rising crime as aliens are released from criminal detention, and Ohio's social services will face stresses beyond those they are already facing because of the COVID-19 pandemic.

6. Federal law on the issue of enforcing removals is clear: "[W]hen an alien is ordered removed, the Attorney General *shall* remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a) (emphasis added). But, in Defendants' view, "shall" does not really mean "shall" or "must," but instead merely "may." In other words, despite a clear mandate of federal statutory law, Defendants believe that there are literally no constraints whatsoever on their authority, and they may release individuals, including those charged with or convicted of crimes, even when immigration courts have already ordered their removal from the United States.

7. To remove an alien within 90 days of a final order of removal, DHS must prioritize these aliens for apprehension and removal.

8. The new DHS policy also impacts multiple other key statutory duties and activities of DHS, the responsibilities of the States, and the aliens themselves, but the policy was not issued in accordance with the Administrative Procedure Act's ("APA") notice-and-comment requirement despite representing a massive, substantive change in DHS policy and action.

9. This challenged policy is called the "Guidelines for the Enforcement of Civil Immigration Law" (the "Permanent Guidance") by DHS, which was promulgated by a memorandum of the same name issued September 30, 2021, by Secretary Mayorkas, attached as Exhibit A.

10. The Permanent Guidance was issued after two previous related policies issued by DHS, the January 20 Memorandum and February 18 Memorandum, were called into question by litigation from multiple States and each of these predecessor policies was at least partially enjoined.

11. The Permanent Guidance represents an attempt by the Administration to unilaterally amend the immigration laws as applied to the vast majority of the removable or inadmissible aliens in this country without the required congressional act. The Constitution and controlling statutes prevent the executive branch from effecting such a seismic change to this country's immigration laws by executive fiat.

12. In addition to shielding the vast majority of aliens with final orders of removal from apprehension and removal, the Permanent Guidance also represents an attempt by DHS to abdicate its responsibilities under 8 U.S.C. § 1226(c)(1), which requires DHS to "take into custody" specified criminal aliens. As applied to aggravated felons, the Permanent Guidance is greater in scope than its predecessor policies, the January 20 Memorandum and February 18 Memorandum.

13. When U.S. Immigration and Customs Enforcement ("ICE") takes custody of an alien who is already in the custody of another law enforcement agency, it does so through a detainer request. 8 C.F.R. § 287.7.

14. Immigration detainers are notices that DHS issues to federal, state, and local law enforcement agencies to inform the agency that ICE

intends to assume custody of an individual in the other law enforcement agency's custody.

15. Detainers serve the public interest. They allow ICE officers to make immigration arrests in secure settings, preserve scarce government resources, and allow ICE to assume responsibility of criminal aliens before they have an opportunity to reoffend.

16. By requiring DHS to "take into custody," that is to issue detainers, for specified criminal aliens under 8 U.S.C. § 1226(c)(1), Congress preserved the public interest.

17. The Permanent Guidance fails to prioritize apprehension and detention of those aliens Congress identified as mandatory for DHS to keep in custody. This policy requires any eventual arrests (if they are made at all), to be made in communities at-large, using greater government resources, and allows these criminal aliens the opportunity to reoffend.

## PARTIES

18. Plaintiff State of Arizona is a sovereign state of the United States of America represented by Arizona Attorney General Mark Brnovich. Arizona sues to vindicate its sovereign, quasi-sovereign, and proprietary interests. The Attorney General is the chief legal officer of the State of Arizona and has the authority to represent the State in federal court.

19. Plaintiff State of Ohio is a sovereign state of the United States of America represented by Ohio Attorney General Dave Yost. The Attorney General is the chief legal officer of the State of Ohio and its chief law enforcement officer and has the authority to represent the State in federal court. Ohio sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

20.     Plaintiff State of Montana is a sovereign state of the United States of America represented by Montana Attorney General Austin Knudsen.  The Attorney General is the chief legal officer of the State of Montana, chief law enforcement officer, and director of the Montana Department of Justice, and has the authority to represent the State in federal court.  Montana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

21.     Plaintiffs Arizona, Ohio, and Montana are required to spend state monies on Emergency Medicaid, including for unauthorized aliens.  42 C.F.R. § 440.255(c).  Plaintiffs Arizona, Ohio, and Montana are also required to spend state monies on detention facilities.  On information and belief, the immigration moratorium will require Plaintiff States to spend at least some money on healthcare, detention, and other services that would otherwise not have to be spent.

22.     Defendant United States Department of Homeland Security is a federal agency.

23.     Defendant the United States of America is sued under 5 U.S.C. §§ 702–703 and 28 U.S.C. § 1346.

24.     Defendant Alejandro Mayorkas is the Secretary of Homeland Security and therefore the "head" of DHS with "direction, authority, and control over it." 6 U.S.C. § 112(a)(2).  Defendant Mayorkas is sued in his official capacity.

25.     Defendant Troy Miller serves as Acting Commissioner of U.S. Customs and Border Protection.  Defendant Miller is sued in his official capacity.

26. Defendant Tae Johnson serves as Acting Director of U.S. Immigration and Customs Enforcement. Defendant Johnson is sued in his official capacity.

27. Defendant Ur Jaddou serves as the Director for U.S. Citizenship and Immigration Services. Defendant Jaddou is sued in her official capacity.

**JURISDICTION AND VENUE**

28. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1346, and 1361, as well as 5 U.S.C. §§ 702-703.

29. The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201–2202.

30. Venue is proper within this federal district pursuant to 28 U.S.C. § 1391(e) because (1) Plaintiff State of Ohio resides in the district and no real property is involved and (2) a "substantial part of the events and omissions giving rise to the claim occurred" in this district—*i.e.*, the non-deportation of aliens and consequent release into Ohio communities.

## FACTUAL AND LEGAL BACKGROUND

### The Impact of Immigration on Plaintiff States

31.  States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). They are, however, limited in their ability to "engage in" their own immigration "enforcement activities." *Id.* at 410. The States thus rely significantly on the federal government to fulfill its duties under the immigration laws, particularly when Congress has created mandatory obligations or otherwise limited the federal government's discretion.

32.  As a result, there is little the States can do about the thousands of migrants, including criminal migrants, unlawfully present in their States with final orders of removal.

33.  The presence of these aliens in each State—who have already been afforded multiple opportunities to seek removal protections—violates each State's quasi-sovereign interest in its territory and the welfare of their citizens.

34.  The unlawful policy also costs the State millions, as explained in further detail below.

### Arizona

35.  As a border state, Arizona is acutely affected by modifications in federal policy regarding immigration. Arizona is required to expend its scarce resources when DHS fails to carry out its statutory duty to deport aliens as provided by law. This includes resources expended by Arizona's law enforcement community.

36.    DHS has previously admitted that there are over one million individuals with administratively final orders of removal in the United States.

37.    The September 30 Memorandum promulgating the Permanent Guidance admits that there are "approximately 11 million undocumented noncitizens" in the United States.  Ex. A at 2.

38.    Arizona bears substantial costs of incarcerating unauthorized aliens, which amounts to tens of millions of dollars each year, as reflected by Arizona's State Criminal Assistance Program (SCAAP) requests, the great majority of which are not reimbursed by the federal government.

39.    When DHS refuses to take custody of or remove criminal aliens with final orders of removal, Arizona bears the cost of community supervision for such criminal aliens who are released from jails and prisons after completion of the incarceration portion of their sentences but not removed from the United States.

40.    Any delay or pause in the removal of aliens subject to final orders of removal from the United States increases the unreimbursed costs to Arizona of continuing to incarcerate and supervise unauthorized aliens who commit crimes due to multiple factors including recidivism.

41.    The Permanent Guidance orders DHS to enforce immigration law based on a set of priorities similar to those set out in the January 20 Memorandum and February 18 Memorandum, which have historically led to severe reductions in the volume of enforcement activity, and so the Permanent Guidance will lead to significant internal restrictions on, and reductions of, enforcement and removal activity compared to pre-January 20, 2021, levels.

42.     By instituting the enforcement priorities as an agency-wide restriction on agent discretion to enforce the law, the Permanent Guidance encourages a greater influx of unauthorized aliens into Plaintiff States, further increasing law enforcement costs in Plaintiff States, including costs related to coordinated activity between federal and state law enforcement agencies in the pursuit of suspected unauthorized aliens.

43.     Federal law also requires that emergency medical services be provided to unlawfully present aliens.  42 C.F.R. § 440.255(c).

44.     Plaintiff States' emergency medical providers deliver millions of dollars in medical services to illegal aliens each year.  These costs are not fully reimbursed by the federal government or the aliens themselves.

45.     While these costs are impactful in typical years, the COVID-19 pandemic makes the potential for harm to Plaintiff States through additional emergency healthcare costs to unauthorized aliens exceptionally high.

46.     Any delay or pause in the removal of aliens subject to final orders of removal from the United States necessarily increases the number of unlawfully present aliens in Arizona who are subject to receiving such medical care at the expense of Plaintiff States' healthcare institutions.

47.     The Permanent Guidance will reduce the number of removals, and therefore will increase Plaintiff States' costs of providing emergency medical care to these individuals who would otherwise be removed. Additionally, by instituting the pause as an officially announced DHS policy, the Permanent Guidance encourages a greater influx of unauthorized aliens into Plaintiff States, further increasing the population of unauthorized

aliens for whom Plaintiff States must bear the cost of emergency medical care.

48.     The Permanent Guidance establishes a "Process for Reviewing Effective Implementation" "to ensure the rigorous review of [DHS] personnel's enforcement decisions throughout the first ninety (90) days of implementation of this guidance." Ex. A at 6. Such review process is likely to have a chilling effect on enforcement activities.

## Montana

49.     Plaintiff Montana is acutely affected by modifications in federal policy regarding immigration. Montana is required to stretch its scarce resources even further when DHS fails to carry out its statutory duty to deport aliens as required by law. This includes resources expended by Montana's law enforcement community to combat drug trafficking, drug-related crime, drug use, and drug-related deaths.

50.     Montana has approximately 4,000-5,000 illegal aliens living in the state.[1]

51.     In addition to the law-enforcement costs incurred by cooperating with DHS immigration enforcement, the State of Montana bears the costs of unauthorized aliens, including their U.S.-born children, and is forced to

---

[1] The number of illegal aliens is notoriously difficult to calculate. Several studies, however, estimate the number of illegal aliens in Montana to be in this approximate range. *See, e.g.*, *Unauthorized Immigrant Population Profiles*, Migration Policy Institute, https://www.migrationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles#MT (4,000); *U.S. unauthorized immigrant population estimates by state*, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (less than 5,000); *The Fiscal Burden of Illegal Immigration*, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (less than 6,000).

expend resources on education, healthcare, public assistance, and general government services.

52.     Because Montana has no state sales tax, many unauthorized aliens pay virtually no state taxes.  Therefore, the costs of all the public services they consume are borne by lawfully present taxpayers.

53.     Massive quantities of illegal drugs are transported into the United States across the southern border.  These drugs end up in many states, including Montana.

54.     Unauthorized aliens crossing the southern border and illegally present in the United States facilitate the trafficking of lethal drugs such as methamphetamine and heroin into Montana.

55.     The influx of illicit drugs, as well as the gangs and cartels that traffic it across the southern border, have led to a sharp increase in drug use and drug-related crime in Montana.

56.     The drug trafficking, drug-related crime, and drug use associated with illegal immigration are a direct threat to public safety in Montana's residents and communities.

### Ohio

57.     Plaintiff Ohio is also affected by the Permanent Guidance.  Ohio is required to stretch its scarce resources even further when DHS fails to carry out its statutory duty to deport aliens with final orders of removal as required by law.  The policy will create increased crime and drug trafficking in Ohio's communities, requiring additional expenditure by law enforcement.  In addition, by failing to deport aliens with final orders of removal and by driving increased illegal immigration, Ohio will be forced to expend limited

resources on education, healthcare, public assistance, and general government services.

58. By removing the likelihood of being apprehended and removed, the Permanent Guidance will further incentivize illegal activity already surging across the southern border, bringing crime and drugs to Ohio's communities.

59. Failure to enforce immigration law has already created devastating consequences. Fentanyl seizures are up 4,000 percent in one sector of the southern border,[2] and fentanyl seizures border-wide have similarly reached record levels. Fentanyl has a devastating impact on Ohio's citizens. The percentage of prohibited drugs containing fentanyl in Ohio has reached an all-time high in 2021.[3]

60. Ohio, according to a 2019 estimate, has 89,000 illegal migrants living in the state.[4]

61. According to the same estimate, half of this population is uninsured, two-thirds live below 200 percent of the poverty level, and 92 percent of school-aged children attend school.

62. Ohio schools spend more than $12,000 per pupil, on average, which it provides regardless of immigration status.[5]

---

[2] Gabe Gutierrez and Al Henkel, Fentanyl seizures at U.S. southern border rise dramatically, NBC (June 29, 2021), https://perma.cc/56P7-4X26.

[3] Fentanyl levels (and overdose death) remain high in Ohio in 2021, Harm Reduction Ohio (Apr. 28, 2021), https://perma.cc/9Z74-AF56.

[4] Profile of the Unauthorized Population: Ohio, Migration Policy Institute (last visited Nov. 9, 2021), https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/OH.

[5] Ohio Education by the Numbers, Thomas B. Fordham Institute (last visited Nov. 9, 2021), https://perma.cc/U53L-8JKW.

63.     Ohio pays the cost of emergency medical services for uninsured illegal immigrants, through the Emergency Medicaid program.

64.     Any delay or pause in the removal of aliens subject to final orders of removal from the United States increases the unreimbursed costs to Ohio of continuing to incarcerate and supervise unauthorized aliens who commit crimes due to multiple factors including recidivism.

## CLAIMS FOR RELIEF
## COUNT I
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)
### Contrary to 8 U.S.C. §§ 1226 and 1231

65.     The allegations in the preceding paragraphs are reincorporated herein.

66.     The Permanent Guidance requires DHS employees to forgo enforcement of final orders of removal against individuals who have been ordered removed but who do not meet the priority categories or who do not satisfy a sufficient number of aggravating factors under those categories.

67.     Federal statute requires that the "Attorney General shall take into custody any alien who" is inadmissible or deportable for any one of several specified reasons including but not limited to "having committed any offense covered in section 1182(a)(2)" of Title 8, having committed crimes of moral turpitude, an aggravated felony, or who has multiple criminal convictions "when the alien is released" from other law enforcement custody "without regard to whether the alien is released on parole, supervised release, or probation…." 8 U.S.C. § 1226(c)(1).

68.     8 U.S.C § 1226(c) only empowers Defendants to release such aliens as described in § 1226(c)(1) upon an individualized finding that the alien's circumstances qualify under a specific list of express conditions for such release, and does not provide Defendants any power to otherwise alter its command.  8 U.S.C. § 1226(c)(2).

69.     The Permanent Guidance therefore violates 8 U.S.C § 1226 by ordering DHS to fail to comply with its statutory duties to take into custody those aliens specified in that section.

70.     Federal statute requires "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days."  8 U.S.C. § 1231(a)(1)(A).

71.     Removal orders that do not fall under one of the Civil Immigration Enforcement Priorities will not be fulfilled within the required statutory period.

72.     8 U.S.C. § 1231 does not empower Defendants to alter the 90-day deadline, and compliance with the deadline may only be extended for specific reasons identified by Congress.  *See* 8 U.S.C. § 1231(a)(1)(C).

73.     The Permanent Guidance therefore violates 8 U.S.C. § 1231 by ordering DHS to fail to comply with its statutory duties to enforce final orders of removal.

74.     The Permanent Guidance therefore violates the APA, as they are both "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

## COUNT II

## Administrative Procedure Act, 5 U.S.C. § 706(2)(D)

## Lack of Notice and Comment

75.    The allegations in the preceding paragraphs are reincorporated herein.

76.    The Permanent Guidance is a rule that can be issued, if at all, only pursuant to notice-and-comment rulemaking under the APA.  5 U.S.C. § 553.

77.    The Permanent Guidance is not an interpretive rule, general statement of policy, nor is it a rule of agency organization, procedure, or practice otherwise exempt from notice-and-comment rulemaking.

78.    Thus, the Permanent Guidance must be "held unlawful and set aside" as it was promulgated "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

## COUNT III

## Administrative Procedure Act, 5 U.S.C. § 706(2)(A)

## Arbitrary and Capricious Agency Action

79.    The allegations in the preceding paragraphs are reincorporated herein.

80.    APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

81.    In addition to deprioritizing the apprehension and removal of criminal aliens with final orders of removal, the Permanent Guidance does not prioritize taking into custody criminal aliens convicted of drug offenses and criminal aliens convicted of crimes of moral turpitude.  Moreover, the

Permanent Guidance deprioritizes taking into custody even those criminal aliens deemed public safety threats—for example, those with multiple criminal convictions or aggravated felonies—if those aliens have avoided removal for a number of years, have a mental condition, or fit some other nebulous mitigating factor.

82.     The Permanent Guidance inserts hurdles and hesitation into DHS's nondiscretionary duty to "take into custody any alien" who has committed a crime of moral turpitude, committed a drug offense, has been convicted of an aggravated felony.  8 U.S.C. § 1226(c)(1).  As a practical matter, field officers will be required to engage in intensive investigation before taking into custody an alien deemed a public safety threat, limiting these officers' ability and discretion to enforce the immigration law as written.

83.     As a result of this limited ability and discretion to enforce the immigration law, among other effects of the Permanent Guidance, DHS will issue and act on fewer immigration detainers for criminal aliens already in custody of other law enforcement agencies.

84.     The Permanent Guidance does not discuss or evaluate the impact on States of a reduction in the issuance or carrying out of immigration detainers, including community supervision costs after the criminal alien is released, or the greater difficulty and reduced likelihood of success in apprehending criminal aliens in the communities into which they will be released compared to the ease and success of assuming custody directly from other law enforcement agencies.

85.     The Permanent Guidance does not discuss or evaluate the serious risk of recidivism among criminal aliens who are not detained.

Recidivism was a major concern animating Congress's decision to make detention mandatory under 8 U.S.C. § 1226(c)(1), and criminal aliens pose serious recidivism problems. *See Demore v. Kim*, 538 U.S. 510, 518–19 (2003).

86. The Permanent Guidance does not mention the effects of non-detention on likelihood of eventual removal, including the likelihood of non-detained aliens filing appeals to delay and ultimately allude deportation. *Id.* at 530 n.14.

87. The Permanent Guidance does not consider whether minimizing apprehension and removal, especially for criminal aliens, will contribute to the pull factor for illegal immigration across the southern border, further destabilizing the border, and leading to an influx of drugs, human trafficking, and other criminal activity.

88. Failure to consider important aspects of a problem renders an agency policy arbitrary and capricious. *See Michigan v. EPA*, 576 U.S. 743, 750 (2015).

89. The Permanent Guidance represents a sharp departure from DHS's policy prior to January 2021 and an unlawful continuation—indeed, a broadening—of DHS's twice-enjoined policy attempts since then. Because Defendants have not provided a reasoned justification for their sudden change in policy, the issuance of the Permanent Guidance is arbitrary and capricious.

90. There is no indication that Defendants considered the costs of adopting the Permanent Guidance, including the threats to public safety. This failure renders the resulting agency action arbitrary and capricious.

91.     There is also no indication that Defendants considered alternative approaches that would allow at least some additional removals to continue beyond the extremely limited exceptions in the Permanent Guidance.   This would include aliens charged or convicted of crimes, including crimes of moral turpitude and crimes involving controlled substances as defined in 21 U.S.C. § 802.  The Supreme Court recently held that a DHS immigration action was arbitrary and capricious where it was issued "'without any consideration whatsoever' of a [more limited] policy." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1912 (2020) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983)).  The same result should obtain here.

## COUNT IV

## Administrative Procedure Act, 5 U.S.C. § 706(2)(A)

## Pretextual Agency Action

92.     The allegations in the preceding paragraphs are reincorporated herein.

93.     The Memorandum and Permanent Guidance are simply an attempt to quickly paper over the sparse administrative record of the January 20 Memorandum and Interim Guidance without changing the substance of those policies as it relates to final orders of removal.

94.     The Permanent Guidance cannot cure the glaring legal defects in the previous underlying policies and thus must be remanded to DHS.  *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) (uncontested that decision resting on "pretextual basis" "warrant[s] a remand to the agency").

## COUNT V

## Administrative Procedure Act, 5 U.S.C. § 706(2)(B)

### Take Care Clause Violation

95. The allegations in the preceding paragraphs are reincorporated herein.

96. The U.S. Constitution requires that the President "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

97. The Permanent Guidance represents an abdication of multiple duties placed upon DHS to enforce U.S. immigration law, including clear statutory mandates.

98. The establishment of this abdication of duty as a DHS-wide policy exceeds the bounds of the agency's prosecutorial discretion, if any such discretion exists.

99. Defendants' issuance and implementation of the Permanent Guidance thus violates the President's constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

### PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment:

A. Declaring that the Permanent Guidance was issued in violation of 8 U.S.C. § 1231;

B. Declaring that the Permanent Guidance was issued without observance of procedure required by law;

C. Postponing the effective date of the Permanent Guidance pursuant to 5 U.S.C. § 705;

D. Vacating the Permanent Guidance and enjoining Defendants from applying it;

E.      Declaring that the pretextual nature of the Permanent Guidance warrants a remand to DHS;

F.      Declaring that the Permanent Guidance was issued in violation of the Take Care Clause of the United States Constitution, art. II, § 3;

G.      Awarding Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

H.      Granting any and all other such relief as the Court finds appropriate.

RESPECTFULLY SUBMITTED this 18th day of November, 2021.

**MARK BRNOVICH**
**ARIZONA ATTORNEY GENERAL**
Anthony R. Napolitano*
*Assistant Attorney General*
*Pro hac vice application forthcoming*
*Attorneys for Plaintiff Arizona*

**AUSTIN KNUDSEN**
**MONTANA ATTORNEY GENERAL**
Christian B. Corrigan*
*Assistant Solicitor General*
*Pro hac vice application forthcoming*
*Attorneys for Plaintiff State of Montana*

**DAVE YOST**
**OHIO ATTORNEY GENERAL**

By /s/ *Benjamin M. Flowers*

Benjamin M. Flowers** (0095284)
*Ohio Solicitor General*
May Davis*

22

*Deputy Solicitor General*
30 E. Broad St., 17th Floor
Columbus, OH 43215
Phone: (614) 466-8980
Benjamin.Flowers@OhioAGO.gov
May.Davis@OhioAGO.gov
\**Pro hac vice application forthcoming*
\*\**Trial Attorney*

*Attorneys for Plaintiff State of Ohio*