**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| STATE OF ARIZONA, STATE OF | : | |
| MONTANA, STATE OF OHIO | : | Case No. 3:21-cv-314 |
| *Plaintiffs*, | : | |
| | : | Judge Michael J. Newman |
| v. | : | |
| JOSEPH R. BIDEN, et al., | : | |
| *Defendants*. | : | |

---

**COMBINED MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN
SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

---

## MOTION FOR PRELIMINARY INJUNCTION

The "Permanent Guidance," *see Guidelines for the Enforcement of Civil Immigration Law* (attached as Ex. A), purports to free the federal government from carrying out its duties with respect to the immigration laws. The plaintiff States move under Federal Rule of Civil Procedure 65 for an order preliminarily enjoining the defendants from implementing or enforcing the Permanent Guidance. This relief is justified for the reasons discussed in more detail in the attached memorandum.

Dated: November 23, 2021

MARK BRNOVICH
Arizona Attorney General

Anthony R. Napolitano
*Assistant Attorney General*
2005 N. Central Ave
Phoenix, AZ 85004-1592
Phone: (602) 542-8958
Anthony.Napolitano@azag.gov
ACL@azag.gov

*pro hac vice* forthcoming

*Attorneys for Plaintiff State of Arizona*

DAVE YOST
Ohio Attorney General

*/s/ Benjamin M. Flowers*
Benjamin M. Flowers (0095284)
*Ohio Solicitor General*
May Davis*
*Deputy Solicitor General*
30 E. Broad St., 17th Floor
Columbus, OH 43215
Phone: (614) 466-8980
Benjamin.Flowers@OhioAGO.gov
May.Davis@OhioAGO.gov

*pro hac vice* forthcoming

*Attorneys for Plaintiff State of Ohio*

AUSTIN KNUDSEN
Montana Attorney General

Christian B. Corrigan*
*Assistant Solicitor General*
215 N Sanders St.
Helena, MT 59601
Phone: (406)-444-2026
Christian.Corrigan@mt.gov

*pro hac vice* forthcoming

*Attorneys for Plaintiff State of Montana*

# TABLE OF CONTENTS

                                                                                         **Page**

TABLE OF AUTHORITIES ................................................................................................. iiii

INTRODUCTION ................................................................................................................. 1

STATEMENT ....................................................................................................................... 2

LEGAL STANDARD ......................................................................................................... 12

ARGUMENT ...................................................................................................................... 12

    I.     The States Will Likely Prevail on the Merits of Their Claims....................................... 12

The Permanent Guidance is contrary to law, is arbitrary and capricious, and was issued without observance of procedure required by law. Under the Permanent Guidance, DHS officials are prevented from enforcing nearly all final orders of removal, in violation of 8 U.S.C. §1231(a)(1)(A), and from taking into custody most criminal aliens leaving criminal confinement, in violation of 8 U.S.C. §1226(c)(1). The Permanent Guidance fails to mention important aspects of the problem it exacerbates, including recidivism among criminal aliens and the vast burdens on state and local governments. In addition, the Permanent Guidance failed to comply with the APA's notice and comment requirements.

       A.     The Permanent Guidance is Contrary to Law ....................................................... 13

           1.     Contrary to 8 U.S.C. §1231(a)(1)(A) ............................................................. 13

The Immigration and Nationality Act provides that DHS "shall remove" an alien within 90 days following a final order of removal, subject to limited and defined exceptions. 8 U.S.C. §1231(a)(1)(A). Instead of complying with this directive, the Permanent Guidance works to prohibit immigration officers from apprehending or removing aliens with final orders of removal, unless the alien fits a priority category and the officers have engaged in onerous research and balancing procedures. This reworking of the statute has no basis in the text. And it is a wide departure from the Supreme Court's reading of the statute—which is also the "most natural reading" of the statute—under which "DHS must remove an alien within 90 days" except in circumstances specified by the statute itself. *Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2288 (2021).

           2.     Contrary to 8 U.S.C. §1226(c)(1) ................................................................... 14

Congress requires the apprehension and detention of certain classes of criminal and removable aliens.  8 U.S.C. §1226(c)(1). The Permanent Guidance has chosen an entirely different scheme by failing to prioritize the apprehension and detention of aliens with drug convictions, aliens with convictions of crimes of moral turpitude, and aliens with aggravated felonies.

       B.     The Permanent Guidance is Arbitrary and Capricious ......................................... 15

i

An agency's decision is arbitrary and capricious where it fails to engage in reasoned deci-sionmaking. *See Sierra Club v. United States Forest Serv.*, 828 F.3d 402, 407 (6th Cir. 2016). The Permanent Guidance fails this test. *First*, DHS failed to consider the risks of recidivism among non-detained criminal aliens. *Second*, DHS failed to consider the effects non-detention will have on future removal efforts. *Third*, DHS did not discuss the costs its policies will impose on the States. *Fourth*, the limited reasoning DHS provided is illogical, pretextual, and without legal basis.

C. DHS Violated the APA by Promulgating the Permanent Guidance without Complying with Notice-and-Comment Requirements ......................................... 20

The APA requires that an agency engage in notice and comment before promulgating a substan-tive rule. It is undisputed that DHS failed to do so. The Permanent Guidance affects rights and obligations—of ICE agents, of the States, and of aliens—and thus cannot squeeze into the lim-ited exception for interpretive rules.

D. The Permanent Guidance is Reviewable ................................................................ 25

The APA creates a "strong presumption in favor of judicial review." *INS v. St. Cyr*, 533 U.S. 289, 298 (2001). The actions at issue here are not committed to agency discretion, as Congress imposed a mandatory obligation on the agency to apprehend and remove certain criminal aliens with final orders of removal. Moreover, this suit challenges a blanket non-enforcement policy, not individualized discretionary decisions by immigration officers. Nor has Congress precluded judicial review, as the laws streamlining judicial review under the Immigration and Nationality Act pertain to the limited options individuals may pursue in challenging their removal orders.

II. The Plaintiffs States Will Suffer Irreparable Harm if an Injunction is not Granted ...... 28

The States must bear unavoidable, non-recoverable costs resulting from the incarceration, super-vised release, education, and medical expenses of aliens who would have been removed but for the Permanent Guidance. Unrecoverable economic harms constitute irreparable injury. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

III. A Preliminary Injunction Would Not Harm Defendants or the Public ......................... 30

DHS has no legitimate interest in the implementation of an unlawful policy that directly contra-dicts a naturalization statute enacted by Congress. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Congress has already balanced the public interest and mandated the removals that the Permanent Guidance effectively prohibits. An injunction against the Per-manent Guidance thus serves the public interest as set by Congress. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001).

CONCLUSION ................................................................................................................... 31

CERTIFICATE OF SERVICE .......................................................................................... 33

LOCAL RULE 65.1(B) CERTIFICATION ...................................................................... 34

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Abreu v. United States,*
   796 F. Supp. 50 (D.R.I. 1992) ..........................................................26

*AFL-CIO v. NLRB,*
   466 F. Supp. 3d 68 (D.D.C. 2020) ...................................................20

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
   522 U.S. 359 (1998) ........................................................................15

*Am. Hosp. Ass'n v. Bowen,*
   834 F.2d 1037 (D.C. Cir. 1987) ............................................21, 22, 24

*ANR Storage Co. v. FERC,*
   904 F.3d 1020 (D.C. Cir. 2018) .......................................................18

*Arizona v. DHS,*
   2021 WL 2787930 (D. Ariz. June 30, 2021) .......................................9

*Arizona v. United States,*
   567 U.S. 387 (2012) ..............................................................2, 15, 17

*Armstrong v. Bush,*
   924 F.2d 282 (D.C. Cir. 1991) ........................................................26

*Aulenback, Inc. v. Fed. Highway Admin.,*
   103 F.3d 156 (D.C. Cir. 1997) ........................................................25

*Azar v. Allina Health Servs.,*
   139 S. Ct. 1804 (2019) ..............................................................22, 23

*Batterton v. Marshall,*
   648 F.2d 694 (D.C. Cir. 1980) ........................................................20

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,*
   511 F.3d 535 (6th Cir. 2007) ..........................................................29

*Chhoeun v. Marin,*
   No. SACV 17-01898-CJC, 2018 U.S. Dist. LEXIS 132363 (C.D. Cal. Mar.
   26, 2018) .......................................................................................27

*Chrysler Corp. v. Brown,*
   441 U.S. 281 (1979) ........................................................................21

*Clark v. Martinez,*
    543 U.S. 371 (2005) .................................................................................13

*Cmty. Nutrition Inst. v. Young,*
    818 F.2d 943 (D.C. Cir. 1987) .................................................................23

*Coal. to Def. Affirmative Action v. Granholm,*
    473 F.3d 237 (6th Cir. 2006) ...................................................................31

*Crowley Caribbean Transp., Inc. v. Pena,*
    37 F.3d 671 (D.C. Cir. 1994) ...................................................................26

*Demore v. Kim,*
    538 U.S. 510 (2003) ...........................................................................16, 17

*Dep't of Comm. v. New York,*
    139 S. Ct. 2551 (2019) .......................................................................19, 29

*Dep't of Homeland Sec. v. Regents of the Univ. of Calif.,*
    140 S. Ct. 1891 (2020) ................................................................16, 17, 20

*Doe #1 v. Trump,*
    957 F.3d 1050 (9th Cir. 2020) .................................................................30

*Dyer v. Sec'y of HHS,*
    889 F.2d 682 (6th Cir. 1989) .............................................................22, 23

*Elec. Privacy Info. Ctr. v. DHS,*
    653 F.3d 1 (D.C. Cir. 2011) .....................................................................25

*First Nat'l Bank of Lexington, Tenn. v. Sanders,*
    946 F.2d 1185 (6th Cir. 1991) ......................................................... *passim*

*Heckler* v. *Chaney,*
    470 U.S. 821 (1985) .................................................................................26

*INS v. St. Cyr,*
    533 U.S. 289 (2001) .................................................................................25

*J.E.F.M. v. Lynch,*
    837 F.3d 1026 (9th Cir. 2016) .................................................................27

*Johnson v. Guzman Chavez,*
    141 S. Ct. 2271 (2021) .......................................................................13, 14

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) .................................................................................26

*Mach Mining, LLC v. EEOC*,
  575 U.S. 480 (2015)......................................................................................26

*Maine Cmty. Health Options v. United States*,
  140 S. Ct. 1308 (2020)..................................................................................13

*Martinez v. Larose*,
  968 F.3d 555 (6th Cir. 2020) ........................................................................13

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012)......................................................................................27

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014).....................................................................25

*Michigan v. EPA*,
  576 U.S. 743 (2015)......................................................................................18

*N.Y. Progress & Prot. PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013)..........................................................................30

*Nat'l Tour Brokers Ass'n v. United States*,
  591 F.2d 896 (D.C. Cir. 1978).......................................................................21

*Nielsen v. Preap*,
  139 S. Ct. 954 (2019)..............................................................................15, 24

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ........................................................................29

*Plyler v. Doe*,
  457 U.S. 202 (1982)................................................................................29, 30

*Sentara–Hampton Gen. Hosp. v. Sullivan*,
  980 F.2d 749 (D.C. Cir. 1992).......................................................................21

*Sierra Club v. United States Forest Serv.*,
  828 F.3d 402 (6th Cir. 2016) ........................................................................15

*Skurka Aerospace, Inc. v. Eaton Aerospace, L.L.C.*,
  781 F. Supp. 2d 561 (N.D. Ohio 2011)..........................................................13

*Spangler Candy Co. v. Tootsie Roll Indus., LLC*,
  372 F. Supp. 3d 588 (N.D. Ohio 2019)..........................................................12

*Sunrise Coop., Inc. v. United States Dep't of Agric.*,
  891 F.3d 652 (6th Cir. 2018) ........................................................................14

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) ..................................................................................18

*Texas v. United States*,
    515 F. Supp. 3d 627 (S.D. Tex. 2021) ......................................................................5

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ..................................................................................28

*United States v. City of Detroit*,
    329 F.3d 515 (6th Cir. 2003) ..................................................................................29

*United States v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001) ................................................................................................30

*United States v. Picciotto*,
    875 F.2d 345 (D.C. Cir. 1989) ...............................................................................25

*United States v. Stevenson*,
    676 F.3d 557 (6th Cir. 2012) ..................................................................................22

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ................................................................................................12

*Wilson v. Williams*,
    961 F.3d 829 (6th Cir. 2020) ..................................................................................30

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..............................................................................................12, 30

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ..........................................................................................24, 27

**Statutes and Constitutional Provisions**

U.S. Const. art. I, §8 ....................................................................................................30

8 C.F.R. §241.6 ..............................................................................................................3

8 C.F.R. §1003.7 ............................................................................................................3

8 C.F.R. §1003.14 ..........................................................................................................2

8 C.F.R. §1003.38 ..........................................................................................................3

8 C.F.R §1240.12 ...........................................................................................................3

8 C.F.R. §1241.1 ............................................................................................................3

42 C.F.R. §440.255 ..........................................................................................................29

5 U.S.C. §551 .............................................................................................................20, 21

5 U.S.C. §553 .............................................................................................20, 21, 23, 25

5 U.S.C. §702 ..................................................................................................................29

5 U.S.C. §706 ..............................................................................................1, 13, 15, 20

6 U.S.C. §112 .....................................................................................................................2

8 U.S.C. §1101 ..................................................................................................................5

8 U.S.C. §1103 ..................................................................................................................2

8 U.S.C. §1182 .............................................................................................................2, 18

8 U.S.C. §1225 ..................................................................................................................2

8 U.S.C. §1226 ...................................................................................................... *passim*

8 U.S.C. §1227 ..................................................................................................................2

8 U.S.C. §1229 ...............................................................................................................2, 3

8 U.S.C. §1231 ...................................................................................................... *passim*

8 U.S.C. §1252 ...............................................................................................................3, 27

**Other Authorities**

*DHS Budget Request Analysis: FY2022*, Congressional Research Service 13 (June 25, 2021) ........................................................................................................19

DOJ, Office of the Chief Immigration Judge, Immigration Court Practice Manual, §4.16 ...........................................................................................................3

*Measuring Recidivism*, National Institute of Justice (Feb. 20, 2008) ............................................29

## INTRODUCTION

Federal law provides that the federal government "*shall* remove" an alien within 90 days after a final order of removal. 8 U.S.C. §1231(a)(1)(A) (emphasis added). It also provides that the federal government "*shall* take into custody" certain classes of dangerous aliens, after they are released from criminal detention. 8 U.S.C. §1226 (c)(1) (emphasis added). Nonetheless, the Department of Homeland Security—"DHS," for short—issued "Permanent Guidance," *see* Ex. A, that effectively forbids the government from removing most aliens who have received final orders of removal. The same Permanent Guidance forbids federal officials from apprehending most criminal aliens covered by 8 U.S.C. §1226(c)(1).

There is little question that the Permanent Guidance is illegal—it either forbids, or imposes major roadblocks before, the fulfillment of a statutory duty. The only question is whether the Court should set aside the Permanent Guidance. It should. The Administrative Procedure Act, or "APA," *requires* Courts to set aside and vacate agency actions that are "arbitrary, capricious," or "otherwise not in accordance with law." 5 U.S.C. §706(2). The APA also requires setting aside agency actions found to be "without observance of procedure required by law." §706(2)(D). Here, the Permanent Guidance is not in accordance with law; DHS acted arbitrarily and capriciously by adopting the Guidance; and DHS failed to follow "procedure required by law" when announcing the Permanent Guidance, as it failed to engage in the notice-and-comment rulemaking the APA requires. *Id.* The Court should therefore set aside the Permanent Guidance. And because the Permanent Guidance will cause immense injuries to the State and the public interest if it is not enjoined pending the final disposition of this case, the Court should preliminarily enjoin its enforcement.

1

**STATEMENT**

**1.** Congress has charged the DHS Secretary with the administration and enforcement of U.S. immigration and naturalization laws. DHS's duties include arresting, processing, detaining, and ultimately removing individuals who are unlawfully present in the country. *See* Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. §1225 et seq.; Homeland Security Act, 6 U.S.C. §112; 8 U.S.C. §1103. States, including Ohio, Arizona, and Montana, depend on the federal government to perform these duties effectively. That is because they cannot do so themselves; the federal government, to the exclusion of the States, "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394–95 (2012).

U.S. Immigration and Customs Enforcement ("ICE"), part of DHS, is charged with the apprehension and removal of defined classes of aliens. Congress specified many classes of aliens who are removable from the United States, including aliens who enter illegally, commit certain crimes, violate the terms of their status (visa overstays), obtain admission through fraud or misrepresentation, vote unlawfully, become a public charge, and whose work would undermine wages or working conditions of American workers. *See generally* 8 U.S.C. §§1182(a), 1227(a).

The ordinary removal process commences when DHS issues a charging document, called a Notice to Appear. These notices are issued in immigration court, during ordinary removal proceedings at which the alien is afforded due process, including the right to present evidence and to cross-examine witnesses. 8 U.S.C. §1229(a), (b)(4); 8 C.F.R. §1003.14. (In addition, Congress has provided for aliens to apply for various forms of discretionary relief, such as asylum, cancellation of removal, and adjustment of status.) Notices to Appear must satisfy specific, statutory procedural requirements pertaining to both content and means of service. 8 U.S.C. §1229(a).

Following either a Master Calendar Hearing for uncontested cases, or an individual hearing for cases involving evidence, the immigration court renders a decision. The judge will issue an order of removal if he or she: (1) finds that the respondent alien is removable and (2) does not grant relief from removal. 8 C.F.R §1240.12. But the immigration court's determination does not immediately end the matter, as both DHS and the respondent alien have the right to appeal the court's decision to the Board of Immigration Appeals, commonly called the "BIA." DOJ, Office of the Chief Immigration Judge, Immigration Court Practice Manual, §4.16(h). Parties initiate appeals by filing a timely notice of appeal with the BIA. Alternatively, the immigration judge may certify a case to the BIA. 8 C.F.R. §§1003.7, 1003.38.

In general, an order providing for removal becomes a "final" order of removal after: (1) the BIA dismisses an appeal; (2) the respondent alien waives the right to appeal or allows the notice-of-appeal time limit to elapse; or (3) upon resolution or rejection of a certified case for review favorable to the government. 8 C.F.R. §§1003.7, 1241.1. Once a removal order becomes final, it becomes judicially reviewable, and the respondent alien may request a stay of the removal order pending review from a federal circuit court. 8 U.S.C. §1252(b). A respondent alien may also seek an administrative stay of removal, move to reopen removal proceedings, or apply for deferred action or forbearance. 8 C.F.R. §241.6. But these actions do not affect finality.

**2.** By merely defining the various classes of removable aliens and establishing the system by which such aliens may be ordered removed, *see* 8 U.S.C. §1229a, Congress *generally* left the determination of whether to apprehend or seek removal of specific aliens in the discretion of the DHS. But as the qualifier "generally" suggests, there are exceptions to this rule and thus limits on DHS's discretion. And in two respects relevant to this case—apprehension and removal of certain aliens—the immigration laws limit DHS's discretion.

Start with removal. DHS "*shall* remove" an alien within 90 days after a final order of removal, subject to limited and defined exceptions. 8 U.S.C. §1231(a)(1)(A) (emphasis added). Section 1231 allows for the removal period to be "extended … if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal." *Id.* §1231(a)(1)(C). Additionally, the removal period does not begin to run for imprisoned aliens until "the date the alien is released from detention or confinement." *Id.* §1231(a)(1)(B)(iii). DHS may stay the immediate removal of certain aliens if it decides that such "removal is not practicable or proper," or if the alien is needed to testify in a pending prosecution. *Id.* §1231(c)(2)(A).

Now consider apprehension. DHS "*shall* take into custody" certain classes of dangerous aliens, after they are released from criminal detention. 8 U.S.C. §1226(c)(1) (emphasis added). This process is effected through a detainer, which allows for the seamless transfer from criminal custody to ICE, and which protects the public from possible (and statistically likely) recidivism. Unlike arrests in the community at large, the detainer system does "not call[] on a lot of ICE resources," Ex. B at 14-15, and gives ICE the ability to go into correctional facilities, evaluate and discover alien inmates "they know or can know with ease are in detention or incarceration," and prepare for necessary enforcement operations on these individuals in the appropriate time. *Id*.

In sum, DHS "shall remove" most aliens with final orders of removal, 8 U.S.C. §1231(a)(1)(A), and it "shall take into custody" certain dangerous aliens, 8 U.S.C. §1226(c)(1). As for criminal aliens subject to both statutes—they have final orders of removal, and they are in criminal custody with a qualifying offense—the detainer system works to preserve a vast amount of ICE resources, as these aliens can be transferred to ICE and removed from the United States within hours.  Ex. B. at 16.

4

**3.** On President Biden's first day in office, the Acting Secretary of Homeland Security issued a Memorandum on "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities." The plaintiff States will refer to this as the "January 20 Memorandum." Section B of the January 20 Memorandum imposed "Interim Civil Enforcement Guidelines." These interim guidelines created three categories of priorities—national security, border security, and public safety—to guide all "discretionary" immigration enforcement decisions. Of note, aliens convicted of an "aggravated felony," as defined by 8 U.S.C. §1101(a)(43), were presumed public safety threats. And Section C imposed an "Immediate 100-Day Pause on Removals" outside of narrow categories. Ex. C. The Administration's stated rationale for suspending removals was prioritizing "limited resources." Ex. C at 3. Yet DHS provided no evidence or analysis to support this rationale and produced an administrative record that was only 7 pages long.

Six days after the January 20 Memorandum was issued, a federal court issued a temporary restraining order against Section C's removal moratorium. *Texas v. United States*, 515 F. Supp. 3d 627 (S.D. Tex. 2021). That night, ICE notified its employees that, "until further notice, in order to comply with the TRO, [ICE] employees should return to normal removal operations as prior to the issuance of the" January 20 Memorandum. Ex. D. On February 9, the Texas court extended its TRO through February 23, 2021. Ex. E. DHS never appealed the *Texas I* order, and it has since expired.

**4.** The Acting ICE Director then issued new "interim guidance" on February 18, again heavily restricting removals and again justifying the action with reference to "limited resources." Ex. F at 3. On its face, this "February 18 Memorandum" instituted a two-tier system. *First*, it established three "priority categories" nearly identical to those from the January 20 Memorandum. *Id.* at 4–5. Aliens in those categories are "presumed" to be proper subjects of enforcement action.

5

*Second*, the February 18 Memorandum provided that aliens outside the "priority" categories are "presumed" not to be proper subjects of enforcement action. *Id.* at 3–4. According to the February 18 Memorandum, "[a] civil enforcement or removal action that does not meet the above criteria for presumed priority cases will require preapproval" from supervisors. *Id.* at 5. Thus, honoring any existing detainer, imposing a new one, or carrying out a removal order on a "non-priority" alien would require preapproval from the Field Office Director or Special Agent in Charge. That hurdle, as a practical matter, prevented ICE officers from detaining criminal aliens who do not fit within the February 18 Memorandum's three categories. *See* Ex. R ¶36.

**5.** On September 30, the federal government issued the guidance at issue in this motion: the Permanent Guidance, entitled "Guidelines for the Enforcement of Civil Immigration Law." *See* Ex. A. The guidance is set to take effect on November 29, 2021, when it would supersede the earlier memoranda. *See* Ex. A at 6. However, it mandates that DHS and its component agencies implement several requirements "before the effective date of this guidance." *Id.* at 6.

The Permanent Guidance accomplishes two things relevant to this case. First, it identifies the same three priority enforcement categories found in the previous memoranda: threats to national security, threats to public safety, and threats to border security. *Id*. at 3–4. Second, it creates a research and evaluation requirement applicable even to those priority aliens who fall within the border-security and public-safety priority categories. That is, the Permanent Guidance implements several procedural hurdles before any enforcement action can be undertaken, even for aliens who present a threat to public safety:

> The decision how to exercise prosecutorial discretion can be complicated and requires investigative work. Our personnel *should not rely on the fact of conviction* or the result of a database search alone. Rather, our personnel should, to the fullest extent possible, obtain and review the entire criminal and administrative record and other

> investigative information to learn of the totality of the facts and cir-
> cumstances of the conduct at issue.

*Id.* at 4 (emphasis added). And the Permanent Guidance calls for a case-by-case review and bal-

ancing of myriad aggravating and mitigating facts and circumstances. *Id.* at 3-4. The same is true

for the priority category of border security. *Id.* (requiring an assessment of the "totality of the facts

and circumstances").

This framework applies even to aliens who already have final orders of removal, where

multiple procedural protections have been afforded, including opportunities to seek relief from

removal. And the extensive, subjective investigation requirement—even in its application to pri-

ority offenders—adds a significant burden to the enforcement process that will slow it down or

dissuade officers from even starting it. *See* Ex. R ¶46. The force of the entire onerous process

militates against the carrying out of Congress's statutory commands. And, far from preserving

resources, it imposes burdens on immigration officers who can no longer swiftly and safely effect

final orders of removal on the vast majority of removable criminal aliens being released from

criminal custody. Immigration officers, who previously had the authority to interrogate and arrest

aliens designated as removable by Congress, have been stripped of such discretion by the Perma-

nent Guidance.

As with the previous two memoranda, the Permanent Guidance fails to include the follow-

ing aliens in its priority-removal categories: criminal aliens convicted of drug offenses, criminal

aliens convicted of crimes of moral turpitude, and criminal aliens with final orders of removal.

Further, the Permanent Guidance declines to make aliens convicted of aggravated felonies a re-

moval priority, even though it *had* made these aliens an enforcement priority in earlier memoranda.

It says that, "[w]hether a noncitizen poses a current threat to public safety is not to be determined

according to bright lines or categories." Ex. A at 3. Instead, "mitigating factors that militate in

favor of declining enforcement action" would have to be considered against a smaller number of listed aggravating factors, although the Permanent Guidance warns that its lists of factors are "not exhaustive." *Id.* at 3-4. This is at odds with the Immigration and Nationality Act, including 8 U.S.C. §1226(c)(1), which lists criminal aliens convicted of drug crimes, crimes involving moral turpitude, and aggravated felonies among those that DHS "*shall* take into custody." (emphasis added).

The practical effect on enforcement by field officers is magnified by the Permanent Guidance's onerous back-end review processes, which involve the chain-of-command in every routine enforcement action. Under the Permanent Guidance, DHS will: (1) engage in a "rigorous review of [DHS] personnel's enforcement decisions throughout the first ninety (90) days" that should "involve the relevant chains of command," and "[l]onger-term review processes" after that; (2) collect "detailed, precise, and comprehensive data as to every aspect of the enforcement actions" taken under the guidance; and (3) establish a "fair and equitable case review process" allowing aliens "the opportunity to obtain expeditious review of the enforcement actions taken." Ex. A at 6.

Further, those DHS executives to whom the Permanent Guidance was directly addressed "will meet regularly to review the data, discuss the results to date, and assess whether we are achieving our goals effectively." *Id.* at 7. This, especially in light of the features laid out above, sends a clear message to field agents that they do not actually have discretion to enforce fully, or even modestly, the immigration laws. *Id.*; Ex. R ¶47.

**6.** The discussion above shows that the Permanent Guidance effectively instructs ICE enforcement agents to forgo "undertaking a large number of enforcement actions and will result in a significant increase in released detainers and the failure to issue detainers." Ex. R ¶48. And experience with the two prior memoranda indicate that the Permanent Guidance will indeed

demonstrably reduce ICE's fulfillment of its immigration enforcement duties. Arizona and Montana filed suit against DHS to challenge the January 20 and February 18 memoranda under the APA, obtaining discovery including the deposition of the acting director of ICE's Phoenix field office while the February 18 Memorandum was operational. *Arizona v. DHS*, 2021 WL 2787930, at *3, *10 n.14 (D. Ariz. June 30, 2021). The facts discovered in that case paint a dire picture of the even more-sweeping Permanent Guidance's likely consequences.

ICE published data, and provided discovery responses in *Arizona*, showing that the January 20 Memorandum Section B enforcement guidelines—expanded to removal priorities on February 4 and carried forward in the February 18 Memorandum—have resulted in a dramatic overall decrease in ICE enforcement. This decrease is on top of the prior substantial coronavirus-related decreases in 2020. ICE's book-ins by preceding month through April 24, 2021 (the latest data provided by ICE in discovery) are as follows:

| 10/20 | 11/20 | 12/20 | 01/21 | | 02/21 | 03/21 | 04/21 | | Total |
|-------|-------|-------|-------|---|-------|-------|-------|---|-------|
| 6,804 | 5,978 | 6,071 | 5,118 | | 1,985 | 2,343 | 2,156 | | 30,455 |

Ex. H at 6.

ICE also provided the number of removals through April 16, 2021 showing a dramatic drop in removals:

| 10/20 | 11/20 | 12/20 | 01/21 | | 02/21 | 03/21 | 04/21 | | Total |
|-------|-------|-------|-------|---|-------|-------|-------|---|-------|
| 10,367 | 5,840 | 5,886 | 5,732 | | 3,180 | 3,687 | 1,448 | | 36,140 |

Ex. H at 5-6.

The Washington Post similarly reported that the number of removals carried out by ICE in April "fell to the lowest monthly level on record": 2,962 according to preliminary data, and this is

"the first time the monthly figure has dipped below 3,000 … a 20 percent decline from March." Ex. I at 1. It further reported that "ICE has recorded about 37,000 [removals] during the past seven months, putting the agency on pace for fewer than 55,000 deportations for the 2021 fiscal year. It would be the first time that figure has fallen below 100,000." Ex. I at 1.

Because ICE has approximately 6,000 Enforcement and Removal Operations (ERO) officers, this dormant pace amounts to an average of 1 interior arrest per 2.5 months per officer, or 4–5 arrests per year. *See* Ex. J. "In private, ICE officials say their work is being essentially abolished through restrictions on their ability to make arrests and deportations." Ex. I at 1.

Testimony from Acting Phoenix ICE Director Albert Carter addressed the purported resource constraints and the effect of the Interim Guidance as follows.

***Purported Resource Constraints:*** Although the February 18 Memorandum cited "limited resources" as its rationale for limiting removals, Director Carter expressly confirmed he has sufficient monetary and other resources to effect his mission and carry out normal removal operations. Ex. K at 9. The administrative record was also completely bereft of any documents discussing the purported resource limitation rationale as it related to the removal policy, and the federal government did not point to a single document that could substantiate the February 18 Memorandum's asserted rationale. Ex. B at 35.

***ICE Arrests:*** Director Carter agreed there was a "big dropoff in ICE arrests" following the January 20 and February 18 memoranda. Ex. K at 8. He agreed with data showing 86% and 92% of ICE arrests in recent years were for aliens with criminal convictions or charges. Ex. K at 7, 15. Importantly, he testified that, other than the February 18 Memorandum's priorities, he could not think of any new factor that was in effect in February 2021 that could account for the sudden dropoff, including COVID-19. Ex. K at 9.

***ICE Removal of Criminal Aliens:*** Director Carter further testified that, although interior removals had already decreased substantially due to coronavirus, there was a further "big dropoff in removals" beginning in February 2021 as compared to previous months. Ex. K at 12.

Following the February 18 Memorandum, the district court found that of 325 unauthorized aliens with criminal convictions who would have been deported from Arizona before the February 18 Memorandum, only 7 were—roughly a 98% decrease in relevant removals of criminal aliens. Ex. B at 19-20. In discovery, DHS was unable to produce records showing more than 10 removals of individuals not one of the three priority categories in the roughly 50 days covered by their document production. Ex. B at 19-20, Ex. L at 4. Indeed, Director Carter testified that the February 18 Memorandum left officers with feelings of "hesitancy" and "confusion" where they "didn't want to bring any undue attention upon the field office for, you know, going outside the priorities." Ex. M at 19-20.

Even after becoming more accustomed to the February 18 Memorandum, Director Carter estimated that the volume of *requests* for preapproval to remove an alien who already had final orders of removal may have reached a maximum of 3 per day (just over 60 per month based on working days), a slim fraction of the over 300 fewer *actual* removals the Phoenix office has been conducting each month. Ex. M at 16.

There is no other apparent cause of this decrease in removals: Director Carter testified the "only factor" he could think of for the drop-off in February 2021 was the February 18 Memorandum's new enforcement "priorities" and he did not observe any other contributing factor. Ex. K at 12.

The Permanent Guidance makes no attempt to fix the glaring deficiencies hampering DHS's mission caused by its predecessor memoranda—indeed, it requires agents to further ignore

their statutory duties and adds more layers of formal review that will lead to hesitancy and confusion. This will doubtless lead to a similar—or worse—detrimental effect on immigration enforcement actions critical to public safety.

## LEGAL STANDARD

Plaintiffs seek a preliminary injunction under Rule of Civil Procedure 65(a) for the purpose of "preserv[ing] the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). As the moving party, a plaintiff can obtain a preliminary injunction by showing that (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I.    The States Will Likely Prevail on the Merits of Their Claims

The States are likely to succeed on the merits of their challenges to the Permanent Guidance. The Permanent Guidance prevents DHS officials from enforcing nearly all final orders of removal, directly contravening 8 U.S.C. §1231(a)(1)(A), which *requires* the federal to effectuate such orders within 90 days. In addition, the Permanent Guidance disregards entire categories of apprehension priorities dictated by Congress without any rationale, meaning it is arbitrary and capricious. Finally, the Permanent Guidance failed to comply with the APA's notice and comment requirements.

To satisfy this first and most important *Winter* factor, "'it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation.'" *Spangler Candy Co. v. Tootsie Roll Indus., LLC*, 372 F. Supp. 3d 588, 600 (N.D. Ohio 2019) (quoting *Six*

*Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997)). And "[i]f a party can show the likelihood of success on the merits of any of its claims, then the court may properly enter a preliminary injunction." *Skurka Aerospace, Inc. v. Eaton Aerospace, L.L.C.*, 781 F. Supp. 2d 561, 565 (N.D. Ohio 2011) (quoting *Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 781 (6th Cir. 2003)). Here, the States are likely to succeed on *all* of their claims

### A.     The Permanent Guidance is Contrary to Law

Under the APA, this Court "shall … set aside agency action" that is "not in accordance with law." 5 U.S.C. §706(2)(A). The Permanent Guidance fits the bill, as it is contrary to both 8 U.S.C. §1231(a)(1)(A) and 8 U.S.C. §1226(c)(1).

### 1.     Contrary to 8 U.S.C. §1231(a)(1)(A)

Start with the statute's text: "when an alien is ordered removed, the Attorney General *shall remove* the alien from the United States within a period of 90 days." 8 U.S.C. §1231(a)(1)(A) (emphasis added). The word "shall" generally connotes a mandatory obligation, not a discretionary option. *See Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1329 (2020). So the duty to remove aliens with removal orders is mandatory. In the Sixth Circuit's words, "§1231(a)(1)(A) *mandates* that … Attorney General *shall remove* the alien … within [the removal period].'" *Martinez v. Larose*, 968 F.3d 555, 561 (6th Cir. 2020) (emphasis added). That obligation has been transferred to the Secretary of Homeland Security. *See Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005). Now, "DHS must remove an alien within 90 days *unless* another subsection of §1231 specifically contemplates that the removal period can exceed 90 days." *Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2288 (2021).

The Permanent Guidance contravenes this mandatory command. Under the Permanent Guidance, DHS can remove aliens subject to final orders of removal *only if* the agency deems removal appropriate after undertaking the onerous procedure announced in the Permanent

Guidance, *see* Ex. A. at 4—a procedure with no basis in the statute at all. DHS's guidance thus gives the word "shall" no weight and no meaning. This is a wide departure from the Supreme Court's reading of the statute—which is also the "most natural reading" of the statute—under which "DHS must remove an alien within 90 days" except in circumstances specified by the statute itself. *Guzman Chavez*, 141 S. Ct. at 2288. Indeed, the language of §1231(a)(1)(A) is so "clear" that DHS's interpretations are not even entitled to deference. *See id*. at 2291 n.9.

Perhaps in an attempt to concede some limitations on DHS's actions, the Permanent Guidance asserts that its prioritization governs only the "apprehension and removal" of aliens, presumably recognizing that "detention" is mandatory for aliens "during the removal period." 8 U.S.C. §1231(a)(2); Ex. A at 3. But the statute clearly creates two mandatory actions: one, the alien "shall" be removed within 90 days; and two, the alien "shall" be detained during that period. 8 U.S.C. §1231(a)(1)(A); (a)(2). DHS cannot seriously claim that "shall" is mandatory in one part of the statute but not the other.

Congress has left discretion to DHS in many other provisions of the Immigration and Nationality Act. But where Congress uses specific language limiting that discretion, as here, administrative agencies must take the statute at its word. *See Sunrise Coop., Inc. v. United States Dep't of Agric.*, 891 F.3d 652, 654 (6th Cir. 2018).

## 2. Contrary to 8 U.S.C. §1226(c)(1)

Sometimes, the Immigration and Nationality Act makes detention of aliens discretionary. Section 1226(a), for example, states that "an alien *may* be arrested… pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. §1226(a) (emphasis added). But other times, the Act makes detention of aliens mandatory. Section 1226(c), for example, states that DHS "*shall* take into custody any alien who" has committed certain criminal offenses, including drug offenses and crimes of moral turpitude. *See id*. §1226(c)(1) (emphasis added).

While Section 1226(a) "gives the Secretary broad discretion as to" the detention of ordinary aliens, Section 1226(c)'s "job is to *subtract* some of that discretion when it comes to the arrest and release of criminal aliens." *Nielsen v. Preap*, 139 S. Ct. 954, 966 (2019). "The Secretary *must* arrest those aliens guilty of a predicate offense." *Id.*; *see also Arizona*, 567 U.S. at 456–57 (Alito, J., concurring in part and dissenting in part) (describing Section 1226(c) as leaving "the Executive no discretion but to take the alien into custody" "[i]n many, if not most, cases involving aliens who are removable for having committed criminal offenses").

By failing to include most criminal aliens listed in §1226(c)(1) as priorities for apprehension, ICE agents will not issue detainers and will not take into custody the vast majority of aliens that Congress required DHS to apprehend and detain. That is not in accordance with §1226(c)(1).

## B.    The Permanent Guidance is Arbitrary and Capricious

Even if the Permanent Guidance were consistent with the statute, DHS acted arbitrarily and capriciously by adopting it. And the APA requires that courts set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

Before proceeding further, some legal background. The prohibition on arbitrary and capricious actions means that agencies must engage in reasoned decisionmaking. "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). An agency's decision is arbitrary or capricious where the agency

> has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Sierra Club v. United States Forest Serv.*, 828 F.3d 402, 407 (6th Cir. 2016) (quoting *Nat'l Ass'n*

*of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)).

DHS did not engage in reasoned decisionmaking when it announced the Permanent Guidance. Recall that, under 8 U.S.C. §1226(c)(1), DHS "shall take into custody" an alien who is deportable or inadmissible for specific reasons. Relevant here, it shall take into custody aliens convicted of aggravated felonies, aliens with certain drug convictions, aliens with convictions of crimes of moral turpitude, and aliens engaged in or suspected of terrorism. 8 U.S.C. §1226(c)(1). Now recall that, despite this mandatory language, and despite this specific list, the Permanent Guidance has picked only terrorism as blanket grounds for prioritization for apprehension and removal. That choice is arbitrary, for at least four reasons.

*First*, DHS failed to consider the risks of recidivism among criminal aliens who are not detained. Recidivism was a major concern animating Congress's decision to make detention mandatory, and criminal aliens pose serious recidivism problems. *See Demore v. Kim*, 538 U.S. 510, 518–19 (2003). ICE itself agrees that detainers, which provide for the alien being moved from criminal custody to ICE custody, are central to avoiding recidivism. *See* Ex. N at 17 ("detainers ... allow[] ICE ERO to assume custody of criminal aliens before they have an opportunity to reoffend."). Yet the Permanent Guidance does not address recidivism at all. By "fail[ing] to consider ... important aspect[] of the problem" before it, DHS acted arbitrarily and capriciously. *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1910 (2020) (citation omitted).

*Second*, the Permanent Guidance ignores the effects that failure to detain—inextricably linked with the Permanent Guidance's non-apprehension policy—will have on future removal efforts. Congress found these considerations important enough to justify enacting mandates like Section 1226(c), but Defendants have disregarded them, illegally and without justification. As the Supreme Court noted in *Demore*, "[p]rior to the enactment of §1226(c), when the vast majority

of deportable criminal aliens were not detained during their deportation proceedings, many filed frivolous appeals in order to delay their deportation[s]." 538 U.S. at 530 n.14. Failing to apprehend (and thus to detain) criminal aliens will increase the number of "frivolous appeals" designed "to delay ... deportation." *Id.* But the Permanent Guidance provides no justification for incurring such costs.

Similarly, when Defendants release aliens into the United States, those aliens often abscond. ICE operates an "Alternatives to Detention" program "for a small subset of eligible aliens" who "must be thoroughly vetted" to determine whether they are "likely to comply with the terms of the program." Ex. O at 11. But even with all of those safeguards in place, the "absconder rate" was 26.9% for family units and 12.3% for individuals in 2019. *Id.* The absconder rate was even worse in 2020: 39% for family units and 21% for individuals. Ex. N at 12. For criminal aliens, absconding is even more likely. *See* Ex. R ¶37.

Once again, DHS failed to consider an important part of the problem before it, and thus acted arbitrarily and capriciously. *Regents of the Univ. of Cal.*, 140 S. Ct. at 1910.

*Third*, the Permanent Guidance does not discuss the costs that its policies will impose on States whatsoever. The Supreme Court has recognized that States "bear[] many of the consequences of unlawful immigration" and that "[t]he problems posed to the State by illegal immigration must not be underestimated." *Arizona*, 567 U.S. at 397, 398. Failing to discuss the impact on States is particularly egregious because DHS has previously acknowledged that border States are "directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing,or limiting immigration enforcement." Ex. S §II. And even non-border States, like Ohio, incur substantial costs from the non-enforcement of immigration laws. The States address those costs in greater detail below, in the irreparable-harm section.

*Fourth*, what little explanation the Permanent Guidance does provide cannot justify the policies chosen. The February 18 Memorandum prioritized aliens who have committed "aggravated felonies" given "Congress's prioritization of aggravated felonies for immigration enforcement actions." Ex. F at 4 n.6. And so it should have: Congress prioritized aggravated felonies by mandating detention of aliens who have committed such crimes, *see* 8 U.S.C. §1226(c)(1)(B) (citing 8 U.S.C. §1227(a)(2)(A)(iii)). Of course, Congress did the same for drug offenses and crimes of moral turpitude, *see id.* §1226 (c)(1)(A) (citing *id.* §1182(a)(2)(A)(i)), as well as aliens with final orders of removal, *see id.* §1231(a)(2). Now deviating from even that temporary recognition, the Permanent Guidance drops from its priority list aggravated felons, a mandatory detention category, while keeping terrorists on the priority list. *See id.* §1182(a)(3)(B); Ex. A at 3. DHS did so without explaining why it privileges one of Congress's designated categories for mandatory detention while discarding the rest. This is not reasoned decisionmaking.

The very reason the Permanent Guidance provides for prioritizing terrorism for apprehension and removal also supports prioritizing drug offenses, crimes of moral turpitude, aggravated felonies, and final orders of removal. These are all categories *Congress* has designated for mandatory detention. DHS's priorities are "paradoxical"in a way that "signals arbitrary and capricious agency action." *Sw. Elec. Power Co. v. EPA* , 920 F.3d 999, 1016 (5th Cir. 2019). And DHS provided no "'reasoned analysis' to justify the disparate treatment of regulated parties that seem similarly situated"—namely, other aliens categorically subject to mandatory detention. *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018).

Defendants must consider the relevant factors, which in this case include the States' expenses and costs stemming from Defendants' policies. Failing to consider important aspects of a problem renders that policy arbitrary and capricious. *See Michigan v. EPA*, 576 U.S. 743, 750

(2015) ("[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'").

Instead, the entirety of the rationale given by the Permanent Guidance is so irrelevant as to prove its pretextual nature: "We do not have the resources to apprehend and seek the removal of every one" of the more than 11 million illegal aliens in the United States. Ex. A. at 2. For one, if DHS honestly believed it suffered a resource constraint, it would not have requested less funding for U.S. Immigrations and Customs Enforcement in Fiscal Year 2022 than is currently appropriated. *See DHS Budget Request Analysis: FY2022*, Congressional Research Service 13 (June 25, 2021), https://perma.cc/3KVA-7ZUN (requesting reduced detention funding by 1,500 individuals). More importantly, the rationale is unrelated to the specific, limited categories of aliens at issue here—aliens who have committed specified crimes in Section 1226(c)(1), and who have received final orders of removal under Section 1231(a)(1)(A). For these aliens, ICE *preserves* resources by taking custody of and removing these aliens through the detainer system. The Permanent Guidance thus reveals a "significant mismatch" between the decision DHS made and the rationale DHS provided. *Dep't of Comm. v. New York*, 139 S. Ct. 2551, 2575 (2019).

Nor can the Permanent Guidance's reference to "groups" of Congressional leaders' failed attempts to "pass legislation that would provide a path to citizenship" somehow overcome existing legislation in the U.S. Code, which mandates that criminal aliens with final orders of removal be taken into custody and removed. Ex. A at 2. DHS wants to enforce laws Congress has rejected rather than the laws Congress has adopted and previous Presidents have signed. Such a rationale is as irrational as it is dangerous to our constitutional system.

Perhaps because the Permanent Guidance did not consider any of the issues listed above, it also did not consider more limited policies that would have retained congressionally mandated apprehension and detention of criminal aliens and aliens with final orders of removal. The absence

19

of aggravated felons is especially glaring because this category was included as a priority in the first two memoranda. The Supreme Court recently held that a DHS immigration action was arbitrary and capricious because it was issued "'without any consideration whatsoever' of a [more limited] policy." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1912 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983)). Here, the Permanent Guidance "shows no cognizance" of the "possibility" of focusing on high-priority aliens, without also devastating field agents' ability to do their jobs. *Id.* at 1912 n.6.

### C. DHS Violated the APA by Promulgating the Permanent Guidance without Complying with Notice-and-Comment Requirements

Under the APA, this Court "shall . . . hold unlawful and set aside agency action" that fails to observe "procedure required by law." 5 U.S.C. §706(2)(D). The Permanent Guidance was issued without notice and comment, as required by the APA. *See* 5 U.S.C. §553. This Court must therefore set it aside.

**1.** The APA requires that, before an agency promulgates a rule, it first provides notice in the Federal Register, along with the opportunity for the public to provide comment. *Id.* at §706(b), (c). The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. §551(4). The Act thus "broadly defines an agency rule to include nearly every statement an agency may make." *Batterton v. Marshall*, 648 F.2d 694, 700 (D.C. Cir. 1980); *see also id.* ("The breadth of this definition cannot be gainsaid."); *see also AFL-CIO v. NLRB*, 466 F. Supp. 3d 68, 88 (D.D.C. 2020) ("an agency rule is essentially *presumed* to be substantive for the purpose of the notice-and-comment requirement"). The purpose of the notice-and-comment process "is to enable[] the agency promulgating the rule to educate itself before establishing … procedures which have a

substantial impact on those regulated." *Nat'l Tour Brokers Ass'n v. United States*, 591 F.2d 896, 902 (D.C. Cir. 1978).

In general, all rules that affect "individual rights and obligations," also called substantive or legislative rules, must be promulgated through notice and comment. *See, e.g.*, *Chrysler Corp. v. Brown*, 441 U.S. 281, 301–02 (1979). A limited set of agency actions may forego notice and comment. First, "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. §553(b). Second, substantive rules where the agency has shown good cause that notice and comment is "impracticable, unnecessary, or contrary to the public interest." *Id.*

**2.** It is undisputed that the Permanent Guidance was not issued through the notice-and-comment procedure. Therefore, if the Guidance is a "rule," and if it does not fit within the narrow category of rules for which notice and comment is not required, it was illegally issued. Here, there is no serious dispute that it is a "rule," since the Permanent Guidance is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. §551(4). The only question is whether it falls within any of the exceptions to the notice-and-comment process. It does not, especially when one keeps in mind that "Congress intended the exceptions to §553's notice and comment requirements to be narrow ones." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987).

*The Permanent Guidance is not merely interpretive.* Interpretive rules do not promulgate policy—they "merely clarify or explain existing law or regulations and go to what the administrative officer thinks the statute or regulation means." *First Nat'l Bank of Lexington, Tenn. v. Sanders*, 946 F.2d 1185, 1189 (6th Cir. 1991) (quotations omitted); *see also Sentara–Hampton Gen. Hosp.*

21

*v. Sullivan*, 980 F.2d 749, 759 (D.C. Cir. 1992) ("the 'interpretative rule' exception was designed to provide agencies with a degree of flexibility where 'substantive rights are not at stake'" (citations omitted)). In deciding whether a rule is interpretive or substantive, labels make no difference. "Agencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019). "[C]ourts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice-and-comment demands apply." *Id.* "Substantive rules are 'rules that *implement* the statute.'" *United States v. Stevenson*, 676 F.3d 557, 564 (6th Cir. 2012) (quoting *Chrysler Corp.*, 441 U.S. at 302 n.31). Substantive rules also "effect a change in existing law or policy." *Bowen*, 834 F.2d at 1045 (quotation omitted). "If a pronouncement implements a statute by enacting a legislative-type rule affecting individual rights and obligations, it is likely to be a substantive rule." *Dyer v. Sec'y of HHS*, 889 F.2d 682, 685 (6th Cir. 1989).

The Permanent Guidance is not an interpretive rule. Just like the January 20 and February 18 memoranda, the Permanent Guidance creates a policy with widespread effect, effectively prohibiting enforcement actions against the vast majority of aliens not lawfully present in the United States. And the Guidance *makes* policy rather than clarifying some preexisting approach. The non-removal policy, for example, halts standard DHS removal operations and formalizes nearly blanket non-compliance with the 90-day removal provisions of 8 U.S.C. §1231. *See First Nat'l Bank*, 946 F.2d at 1189 (policy is not interpretive if it "establish[es] [a] new procedures or rules."). As an official announcement that DHS will cease complying with the statute directing one of its primary operations, the removal of aliens who have been ordered removed from the United States, the Permanent Guidance cannot be classified as "interpretive" of that statute. Rather it "'change[s]

existing rights and obligations' [or] institute[s] a new procedure" and thus is a substantive rule that cannot escape the APA's notice and comment requirements. *Id.* (citations omitted); 5 U.S.C. §553.

Nor is the agency's policy toward criminal aliens listed in §1226(c)(1) merely interpretive. Criminal aliens will be released into communities under a blanket policy not to issue detainers, except in limited circumstances bearing little relation to the statute. For one, it is impossible to say that an agency action "interprets" a statute where its action belies the statute. In addition, the criminal alien release policy has a substantive effect on the obligations of state and local law enforcement authorities, on community resources, and on the aliens themselves.

*The Permanent Guidance is not a general statement of policy.* "[A] 'general statement of policy' is one that does not impose any rights and obligations." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987). Thus, a statement is "likely to be considered binding if it narrowly circumscribes administrative discretion in all future cases, and if it finally and conclusively determines the issues to which it relates." *Dyer*, 889 F.2d at 685.

The Permanent Guidance cannot be considered a general statement of policy because it establishes a binding presumption on the agency's activity going forward. *Azar*, 139 S. Ct. at 1812. Consider first the Permanent Guidance's non-removal policy. It expressly declines to prioritize apprehending and removing aliens with final orders of removal. It thus functions as a statement *directing* specific DHS operations with an effective date on November 29, 2021. If an alien does not fall within a prioritized category—national security, public safety, and border security—it is nearly certain that that the individual will not be apprehended and removed in accordance with federal law. Further, the Permanent Guidance limits what DHS officials can do in terms of removal. It will have a substantial effect. For the February 18 Memorandum, the reduction of likelihood of removal of criminal aliens was at least 95%. *See supra* 11. And, unlike the February 18

23

Memorandum, the Permanent Guidance creates a presumption against removal for all aliens with a final order of removal that do not fall into one of the three categories. *Compare* Ex. F at 3 (discussing factors for pursuing actions "that fall[] outside the [priority] criteria") *with* Ex. A at 2-4 (stating "The fact an individual is a removable noncitizen therefore should not alone be the basis of an enforcement action against them" and then setting out enforcement priorities without further discussion of non-priority cases). It thus establishes a "binding norm" for removals going forward. *See Bowen*, 834 F.2d at 1046.

Now consider the Permanent Guidance's rules regarding enforcement of 8 U.S.C. §1226(c)(1), which says that the executive branch *must* "take into custody" aliens who have committed certain serious crimes. "[T]he Secretary's obligation to" detain criminal aliens pursuant to §1226(c)(1) applies "as soon as covered aliens [are] released from criminal custody." *Preap*, 139 S. Ct. at 969. Section 1226(c) "mandates detention of certain criminal aliens during the removal proceedings and for the subsequent 90-day removal period." *Zadvydas v. Davis*, 533 U.S. 678, 698 (2001). Section 1226(a) does "give[] the Secretary broad discretion as to" the detention of ordinary aliens. *Preap*, 139 S. Ct. at 966. Nevertheless, §1226(c)'s "job is to *subtract* some of that discretion when it comes to the arrest and release of criminal aliens." *Id.*

The Permanent Guidance imposes rights and obligations with respect to this statutory command because, in most cases, it bars immigration offices from enforcing it—in other words, it *bars* them from apprehending, and thus taking into custody and detaining, aliens who would otherwise fall within 8 U.S.C. §1226(c)(1). *See supra* 7-12. Because the Guidance has binding force, it is not a general statement of policy.

*The Permanent Guidance is not limited to internal agency organization.* For similar reasons, the policies established in the Permanent Guidance do not address agency organization,

24

procedure, or practice. "Procedural rules … are primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties." *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) (quotations omitted). "In general, a procedural rule does not itself alter the rights or interests of parties." *Elec. Privacy Info. Ctr. v. DHS*, 653 F.3d 1, 5 (D.C. Cir. 2011) (quotation marks and citation omitted). And procedural rules do not impose "new substantive burdens." *Aulenback, Inc. v. Fed. Highway Admin.*, 103 F.3d 156, 169 (D.C. Cir. 1997). At a minimum, the policy regarding the non-removal of aliens with final orders of removal effectively grants this entire class—persons who prior to the Permanent Guidance (and its "temporary" predecessors) had no right to remain in the United States, especially not after the statutory removal period—an illegal blanket extension on their removal order, which must otherwise have been executed within 90 days. *See* 8 U.S.C. §1231(a)(1)(A). This is no mere internal efficiency measure but a substantive rule with widespread impact on numerous private—as well as state and local—interests.

 *The Permanent Guidance does not provide good cause to forego notice-and-comment.* Finally, DHS also cannot avail itself of the APA's good-cause exception. To do so, DHS would have needed to have "incorporate[d] the [good cause] finding and a brief statement of reasons therefor in the rules issued." 5 U.S.C. §553(b)(3)(B). It did not do so here, precluding any reliance on that exception. *United States v. Picciotto*, 875 F.2d 345, 348 (D.C. Cir. 1989).

  **D. The Permanent Guidance is Reviewable**

 In similar past cases, the federal government has argued that its policies are immune from judicial review. This Court should reject that argument.

 The APA creates a "strong presumption in favor of judicial review." *INS v. St. Cyr*, 533 U.S. 289, 298 (2001). The subject of Permanent Guidance is not committed to agency discretion by law. To the contrary, the mandatory nature of §1231(a)(1)(A) and §1226(c)(1) *deprive* the

federal government of any discretion on the matters at issue. *See Heckler* v. *Chaney*, 470 U.S. 821, 832-33 (1985). Where "enforcement provisions leave *no* discretion to determine which cases to pursue, the [agency's] enforcement decisions are not committed to agency discretion by law." *Armstrong v. Bush*, 924 F.2d 282, 295 (D.C. Cir. 1991).

Even if the text of §1231 or §1226 did not actually displace all discretion, whatever discretion remains is not so boundless as to be completely unreviewable under the APA. As the Supreme Court has made clear, the committed-to-agency-discretion exception only applies in the "rare circumstances where the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting *Chaney*, 470 U.S. at 830). The Supreme Court thus "applies a 'strong presumption' favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015). Thus even if §1231(a)(1)(A) does not, for example, require DHS to *succeed* in removing aliens with final orders of removal within 90 days, it certainly creates a "standard" against which the Court can evaluate DHS's policy, rendering this lawless agency action reviewable. The failure to even attempt to meet the standard demonstrates that Plaintiffs are likely to succeed on the merits.

A broad nonenforcement policy, as opposed to an agent's individualized decision, is generally reviewable because "an agency's pronouncement of a broad policy against enforcement poses special risks that it 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994) (quoting *Chaney*, 470 U.S. at 833 n.4); *see also Abreu v. United States*, 796 F. Supp. 50 (D.R.I. 1992) (INS "abrogates its statutory duty by delaying

deportation hearings until the expiration of a prison term") (citing 8 U.S.C. §1252(i) (1988)). DHS's wholesale exemption of nearly all final orders of removal is just such a policy.

Nor has Congress expressly precluded judicial review here. To be sure, numerous immigration laws *do* preclude review. For example, 8 U.S.C. §1252(a)(5) and §1252(b)(9) limit the options that *individuals* may pursue in challenging their removal. *See J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016). Other provisions provide interpretive rules that limit the availability of suit. For example, 8 U.S.C. §1231(h) says: "Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." 8 U.S.C. §1231(h). In light of that language, no individual could claim that 8 U.S.C. §1231 confers a legally enforceable entitlement. (The phrase "any party" in that statute refers to refers to aliens involved in removal proceedings. As a result, "[s]ection 1231(h)'s bar is irrelevant" to APA claims brought by States, because States do "not bring any claims under that section." *See Chhoeun v. Marin*, No. SACV 17-01898-CJC, 2018 U.S. Dist. LEXIS 132363, at *17 n.3 (C.D. Cal. Mar. 26, 2018).)

There is nothing in the immigration laws that frees DHS from having to comply with the APA simply because its challenged actions involve flouting duties under §1231. *See Zadvydas*, 533 U.S. at 687. If Congress had wanted to bar APA review notwithstanding the presumption of reviewability, it would have been much clearer.

One final point on reviewability. Courts have interpreted the APA to include a prudential standing requirement. This requirement means that parties may bring an APA claim only if their "interests" are "arguably within the zone of interests to be protected or regulated by the statute" at issue. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quotation omitted). That requirement is satisfied here. The interests the States seek to

27

protect fall directly within the zone of interests of the INA. *See Texas v. United States*, 809 F.3d 134, 163 (5th Cir. 2015) (quoting *Arizona*, 567 U.S. at 397 ("The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States," which "bear[] many of the consequences of unlawful immigration.")). This "[r]eflect[s] a concern that 'aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates.'" *Id.* (quoting 8 U.S.C. §1601).

Because Congress had not foreclosed the availability of APA relief in this context, and because the States have prudential standing to sue, the challenged action is reviewable.

## II.   The Plaintiffs States Will Suffer Irreparable Harm if an Injunction is not Granted

The States will suffer injuries under the Permanent Guidance similar to those ongoing injuries they have already established under the February 18 Memorandum, and such injuries are likely to occur during the period before the appeal is decided. These injuries include unavoidable, non-recoverable costs resulting from incarceration, supervised release, education, and medical expenses the States must bear in connection with removable aliens DHS will not remove because of the Permanent Guidance. Relative to the *status quo* before January 2021, the Permanent Guidance will lead to an increase in the sheer number of illegal aliens—both with and without criminal convictions—who will remain in the United States unremoved. And statistically, a larger population of illegal aliens in a State will force that State to expend more resources on them. The U.S. District Court for the District of Arizona found that Plaintiff State of Arizona would experience costs including an "increase in community supervision costs, both already suffered and likely to arise in the near future," which were "'causally linked' to the [February 18 Memorandum]" and its resultant decrease in removals. Ex. P at 12-13. And as time passes, "unremoved noncitizens" continue to be "added to the ranks of those under community supervision, which almost certainly

increase the overall cost to Arizona." *Id.* at 13. The Permanent Guidance, in many ways more expansive in impact than the February 18 Memorandum, will continue these costs.

It is well established that unrecoverable economic harms constitute irreparable injury. *See, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages.") (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007)). And "an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Tenke Corp.*, 511 F.3d at 550 (quoting *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)). The States have no avenue of recovering damages from the federal government. *United States v. City of Detroit*, 329 F.3d 515, 520 (6th Cir. 2003) (Under the APA, the government has only "waived its immunity with respect to non-monetary claims"); 5 U.S.C. §702. Any injury is therefore irreparable.

In any event, the Supreme Court has held that a State may assert injuries based on "the predictable effect of Government action on the decisions of third parties." *Dept. of Comm.*, 139 S. Ct. at 2565-66. In addition to increased supervised release costs, Plaintiffs will suffer direct law enforcement costs (including costs of reincarcerating repeat offenders) and crime-based injuries because of the Permanent Guidance's non-removal policy and inevitable recidivism among criminal aliens released into communities. Generally, among released prisoners, 68% are re-arrested within 3 years, 79% within 6 years, and 83% within 9 years. *See Measuring Recidivism*, National Institute of Justice (Feb. 20, 2008), https://perma.cc/SC94-FKPQ. The release of criminal aliens under the Permanent Guidance makes it virtually certain that Plaintiffs will incur additional costs of recidivism. Additionally, Plaintiffs are required by federal law to include unauthorized aliens in their Emergency Medicaid programs, 42 C.F.R. §440.255(c), and the Supreme Court in *Plyler v.*

*Doe* required that States provide public education to school-age unauthorized aliens. 457 U.S. 202, 230 (1982). The Permanent Guidance's severe reduction in removals will thus force Plaintiffs to incur the costs of providing such services.

### III. A Preliminary Injunction Would Not Harm Defendants or the Public

Since the government is a party, the final two *Winter* factors, the balance of the equities and public interest, merge. *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Both factors favor an injunction pending appeal.

As set forth above, the Permanent Guidance will impose considerable burdens on the States. Conversely, Defendants will not be harmed by an injunction maintaining the prior status quo. *See, e.g.*, *Doe #1 v. Trump*, 957 F.3d 1050, 1068-69 (9th Cir. 2020) (explaining that there is a "lack of irreparable harm to the United States" due to a delay in immigration policy implementation by injunction). The Constitution vests Congress with the enumerated power "[t]o establish an uniform Rule of Naturalization." U.S. Const. art. I, §8. DHS has no legitimate interest in the implementation of an unlawful policy that directly contradicts a naturalization statute enacted by Congress. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). In any event, when the January 20 Memorandum was enjoined in the Texas case, for example, DHS merely experienced a "return to normal removal operations." Ex. D, Ex. Q

Where Plaintiffs face irreparable harm without an injunction, while DHS faces none if the *status quo* is maintained, the public interest and balance of equities favor granting the preliminary injunction. *E.g., Doe #1*, 957 F.3d at 1069. Moreover, Congress itself has already balanced the public interest here in Section 1231(a)(1)(A) and mandated the removals that the Permanent Guidance effectively prohibits. An injunction against that unlawful near-complete prohibition thus serves the public interest as set by Congress. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) ("[A] court sitting in equity cannot 'ignore the judgment of

Congress, deliberately expressed in legislation.'" (citation omitted)). Thus these final factors also support this Court's issuance of an injunction against the Permanent Guidance.

In the end, "the public interest lies in a correct application" of the law and the will of the people being effected "in accordance with … law." *Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006). Enjoining the illegal Permanent Guidance will serve that end.

## CONCLUSION

Plaintiffs respectfully request that the Court issue a preliminary injunction preventing Defendants from implementing the Permanent Guidance.

Dated: November 23, 2021

DAVE YOST
Ohio Attorney General

MARK BRNOVICH
Arizona Attorney General

*/s/ Benjamin M. Flowers*
Benjamin M. Flowers (0095284)
*Ohio Solicitor General*

Anthony R. Napolitano
*Assistant Attorney General*
2005 N. Central Ave
Phoenix, AZ 85004-1592
Phone: (602) 542-8958
Anthony.Napolitano@azag.gov
ACL@azag.gov

May Davis*
*Deputy Solicitor General*
30 E. Broad St., 17th Floor
Columbus, OH 43215
Phone: (614) 466-8980
Benjamin.Flowers@OhioAGO.gov
May.Davis@OhioAGO.gov

*\*pro hac vice* forthcoming

*\*pro hac vice* forthcoming

*Attorneys for Plaintiff State of Arizona*

*Attorneys for Plaintiff State of Ohio*

AUSTIN KNUDSEN
Montana Attorney General

Christian B. Corrigan*
*Assistant Solicitor General*
215 N Sanders St.
Helena, MT 59601
Phone: (406)-444-2026
Christian.Corrigan@mt.gov

*pro hac vice* forthcoming

*Attorneys for Plaintiff State of Montana*

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2021, a copy of the foregoing was filed electroni-

cally. Notice of this filing will be sent to all parties for whom counsel has entered an appearance

by operation of the Court's electronic filing system. Parties may access this filing through the

Court's system. I further certify that a copy of the foregoing pleading and the Notice of Electronic

Filing will be served by ordinary U.S. mail upon all parties for whom counsel has not yet entered

an appearance electronically, at the following addresses:

Vipal J. Patel
Acting United States Attorney for the
Southern District of Ohio
U.S. Attorney's Office
303 Marconi Boulevard, Suite 200
Columbus, OH 43215

Civil-Process Clerk
Office of the United States Attorney for the
Southern District of Ohio
303 Marconi Boulevard, Suite 200
Columbus, OH 43215

Joseph Biden
U.S. Attorney's Office
303 Marconi Boulevard, Suite 200
Columbus, OH 43215

Alejandro Mayorkas
Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, DC 20528-0525

Tae Johnson
U.S. Immigration and Customs Enforcement
500 12th St SW
Washington, DC 20536

Merrick Garland
Attorney General
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Joseph Biden
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, DC 20528-0525

Troy Miller
U.S. Customs and Border Protection
1300 Pennsylvania Avenue
Suite 4.4-B
Washington, D.C. 20229

Ur Jaddou
U.S. Citizenship and Immigration Services
20 Massachusetts Ave., N.W.
Washington, D.C. 20529-2140

/s/ Benjamin Flowers
BENJAMIN FLOWERS (0095284)
Solicitor General

## LOCAL RULE 65.1(B) CERTIFICATION

I hereby certify that on November 23, 2021, I served a copy of the complaint, this motion,

and all other filings in this case by email on the defendants' attorney at the following email address:

> Matthew J. Horwitz
> Civil Chief
> United States Attorney for the
> Southern District of Ohio
> Matthew.Horwitz@usdoj.gov


*/s/ Benjamin Flowers*
BENJAMIN FLOWERS (0095284)
Solicitor General