**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**DAYTON DIVISION**

---

**STATE OF ARIZONA, et al.**

Plaintiffs,

v.

**JOSEPH R. BIDEN, et al.**

Defendants.

Case No. 3:21cv00314
The Honorable Michael J. Newman

---

**DEFENDANTS' COMBINED MOTION TO DISMISS OR,**
**IN THE ALTERNATIVE, FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**
**AND MEMORANDUM IN SUPPORT THEREOF**

The Court lacks jurisdiction over the claims in Plaintiffs' Complaint, which fail to state a claim in any event. For these and the reasons set out in more detail in the attached memorandum, Defendants move to dismiss the Complaint. In the alternative, and as also set out in the attached memorandum, Defendants are entitled to judgment as a matter of law on the basis of the administrative record, and the Court should enter judgment for Defendants.

Dated: December 27, 2021        Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Michael F. Knapp*
MICHAEL F. KNAPP
  CA Bar No. 314104
Trial Attorney
ADAM D. KIRSCHNER
  IL Bar. No. 6286601
Senior Trial Counsel
BRIAN C. ROSEN-SHAUD
  ME Bar No. 006018
KUNTAL CHOLERA
  DC Bar No. 1031523
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 353-9265
Fax: (202) 616-8460
Email: Michael.F.Knapp@usdoj.gov

EREZ REUVENI
  CA Bar No. 264124
Assistant Director
U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Email: Erez.R.Reuveni@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### DAYTON DIVISION

**STATE OF ARIZONA, et al.**

       Plaintiffs,

v.

**JOSEPH R. BIDEN, et al.**

       Defendants.

Case No. 3:21cv00314
The Honorable Michael J. Newman

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

# TABLE OF CONTENTS

SUMMARY ....................................................................................................................... 1

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 2

I.      Statutory Framework ............................................................................................... 2

II.     Interim Guidance on Immigration Enforcement .................................................... 5

III.    The Secretary's September Guidance ..................................................................... 8

IV.   Procedural Background ......................................................................................... 11

LEGAL STANDARDS .................................................................................................... 12

ARGUMENT .................................................................................................................... 13

I.      The States Cannot Succeed On The Merits. ......................................................... 14

      A.    The States cannot establish standing, let alone irreparable harm. ........................ 14

      B.    The States cannot clear three additional threshold obstacles to their claims. ....... 19

             1.    The challenged action is "committed to agency discretion by law." ........ 19

             2.    The challenged action is not "final agency action" subject to
APA review ............................................................................................... 23

             3.    Congress has precluded judicial review of these types of decisions. ....... 25

                    a.    APA challenges to DHS's application of enforcement
priorities are precluded from review. .............................................. 25

                    b.    The States' § 1226(c) challenge is specifically precluded from
review. .............................................................................................. 27

                    c.    The States' § 1231(a)(1) challenge is likewise specifically
precluded. ......................................................................................... 28

      C.    The States' APA claims fail on the merits. ........................................................... 30

             1.    The September Guidance is not "contrary to law." ................................... 30

                    a.    The September Guidance does not violate § 1231(a). .................. 31

                    b.    The September Guidance does not violate § 1226(c). .................. 33

i

2.    DHS's new enforcement guidance is a reasonable effort to prioritize limited resources in enforcing immigration laws................................... 34

3.    DHS's internal guidance on enforcement prioritization is exempt from notice and comment. ........................................................ 39

4.    The States fail to state a viable claim under the Take Care Clause. ......... 42

II.   The Harm to the Executive from an Injunction Restraining Core Article II Authority Would Outweigh Any Harm to the States from the Guidance and Such an Injunction Would Undermine the Public Interest. ....................................... 43

III.  Any Relief Ordered Should Be Narrow........................................................... 45

CONCLUSION.................................................................................................................... 47

# TABLE OF AUTHORITIES

## CASES

*Adefemi v. Gonzales,*
    228 F. App'x 415 (5th Cir. 2007) ................................................................................ 32

*Aguilar v. ICE,*
    510 F.3d 1 (1st Cir. 2007) ......................................................................................... 26

*Air Brake Sys., Inc. v. Mineta,*
    357 F.3d 632 (6th Cir. 2004) ..................................................................................... 24

*Ali v. Fed. Bureau of Prisons,*
    552 U.S. 214 (2008) .................................................................................................. 28

*Amini v. Oberlin Coll.,*
    259 F.3d 493 (6th Cir. 2001) ..................................................................................... 13

*Anderson v. Kelley,*
    12 F.3d 211 (6th Cir. 1993) ....................................................................................... 12

*Arizona v. DHS*
    No. 21-cv-00186, 2021 WL 2787930 (D. Ariz. June 30, 2021) ......................................*passim*

*Arizona v. United States,*
    567 U.S. 387 (2012) .................................................................................................*passim*

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................................................. 13

*Ayuda, Inc. v. Reno,*
    7 F.3d 246 (D.C. Cir. 1993) ...................................................................................... 26

*Baker v. Carr,*
    369 U.S. 186 (1962) .................................................................................................. 42

*Bangura v. Hansen,*
    434 F.3d 487 (6th Cir. 2006) ..................................................................................... 13

*Batterton v. Marshall,*
    648 F.2d 694 (D.C. Cir. 1980) ................................................................................ 5, 41

*Bennett v. Spear,*
    520 U.S. 154 (1997) ........................................................................................ 3, 23, 30

*Block v. Community Nutrition Inst.,*
    467 U.S. 340 (1984) ........................................................................................ 3, 25, 26

*Brogan v. United States,*
    522 U.S. 398 (1998) .................................................................................................. 29

*Buchholz v. Meyer Njus Tanick, PA*,
   946 F.3d 855 (6th Cir. 2020) ........................................................................................ 2, 16

*Burlington Truck Lines v. United States*,
   371 U.S. 156 (1962) .......................................................................................................... 36

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) .......................................................................................................... 45

*Camp v. Pitts*,
   411 U.S. 138 (1973) .......................................................................................................... 36

*Carnick v. United States*,
   No. 07-12802, 2008 WL 785290 (E.D. Mich. Mar. 24, 2008) ....................................... 12

*Chhoeun v. Marin*,
   No. SACV 17-01898-CJC, 2018, U.S. Dist. LEXIS 132363,
   2018 WL 1941756 (C.D. Cal. Mar. 26, 2018) .......................................................... 28, 29

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979) .......................................................................................................... 39

*Clapper v. Amnesty Int'l, Inc.*,
   568 U.S. 398 (2013) .......................................................................................................... 15

*Clark v. Stone*,
   998 F.3d 287 (6th Cir. 2021) ........................................................................................ 2, 15

*Crane v. Johnson*,
   783 F.3d 244 (5th Cir. 2015) ............................................................................................ 27

*Crawford v. United States Dep't of Treasury*,
   868 F.3d 438 (6th Cir. 2017) ............................................................................................ 17

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
   No. 2:17-CV-372, 2021 WL 855938 (S.D. Ohio Mar. 8, 2021) ................................. 44, 45

*D.T. v. Sumner Cnty. Sch.*,
   942 F.3d 324 (6th Cir. 2019) ............................................................................................ 12

*Dalton v. Specter*,
   511 U.S. 462 (1994) ....................................................................................................... 5, 43

*Demore v. Kim*,
   538 U.S. 510 (2003) ..................................................................................................... 27, 28

*Dep't of Homeland Sec. v. New York*,
   140 S. Ct. 599 (2020), *denying modification*, 140 S. Ct. 2709 (2020) .......................... 47

*Digital Realty Tr., Inc. v. Somers*,
   138 S. Ct. 767 (2018) ........................................................................................................ 29

iv

*Dyer v. Sec'y of Health & Hum. Servs.*,
  889 F.2d 682 (6th Cir. 1989) ......................................................................................... 40, 41

*FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021).......................................................................................... 13, 34, 39

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) ........................................................................................................ 36

*Florida v. United States*,
  No. 8:21-CV-541-CEH-SPF, 2021 WL 1985058 (M.D. Fla. May 18, 2021),
  *vacated as moot* (11th Cir. Dec. 14, 2021) ............................................................ 3, 8, 20, 23

*Fraihat v. U.S. Immigr. & Customs Enf't*,
  445 F. Supp. 3d 709 (C.D. Cal. 2020), *rev'd*, 16 F.4th 613 (9th Cir. 2021) ......................... 44

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ........................................................................................................ 15

*Friendship Materials, Inc. v. Mich. Brick, Inc.*,
  679 F.2d 100 (6th Cir. 1982) ............................................................................................ 12

*Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*,
  807 F.3d 806 (6th Cir. 2015) ............................................................................................ 12

*Gun Owners of Am., Inc. v. Garland*,
  992 F.3d 446 (6th Cir. 2021), *vacated on other grounds*,
  ---F.4th---, 2021 WL 5755300 (6th Cir. Dec. 3, 2021)......................................................... 46

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ................................................................................................. *passim*

*Hernandez-Avalos v. INS*,
  50 F.3d 842 (10th Cir. 1995) ....................................................................................... 28, 30

*Hosseini v. Johnson*,
  826 F.3d 354 (6th Cir. 2016) ............................................................................................ 23

*Hudson v. Hudson*,
  475 F.3d 741 (6th Cir. 2007) ............................................................................................ 21

*J.E.F.M. v. Lynch*,
  837 F.3d 1026 (9th Cir. 2016) .......................................................................................... 26

*Jama v. DHS*,
  760 F.3d 490 (6th Cir. 2014) ..................................................................................... 3, 23, 24

*Jama v. ICE*,
  543 U.S. 335 (2005) ................................................................................................. *passim*

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018)............................................................................................... 3, 4, 28

v

*Johnson v. Guzman Chavez*,
  141 S. Ct. 2271 (2021) ........................................................................................... 31

*Kentucky v. Yellen*,
  ---F. Supp. 3d---, 2021 WL 4394249 (E.D. Ky. Sept. 24, 2021) ........................... 47

*KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*,
  710 F. Supp. 2d 637 (N.D. Ohio 2010) ................................................................. 45

*Landon v. Plasencia*,
  459 U.S. 21 (1982) .................................................................................................. 5

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) .............................................................................................. 30

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ................................................................................. 5, 19, 39, 40

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973) ........................................................................................... 2, 15

*Little Traverse Lake Prop. Owners Ass'n v. Nat'l Park Serv.*,
  883 F.3d 644 (6th Cir. 2018) ................................................................................. 13

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .............................................................................................. 15

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) .............................................................................................. 29

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) .............................................................................................. 34

*Martinez v. Larose*,
  968 F.3d 555 (6th Cir. 2020), *reh'g en banc denied*, 980 F.3d 551 (6th Cir. 2020) .................. 22, 23, 31

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) .............................................................................................. 30

*Mathews v. Diaz*,
  426 U.S. 67 (1976) ........................................................................................... 20, 32

*McCormick v. Miami Univ.*,
  693 F.3d 654 (6th Cir. 2012) ................................................................................. 13

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ............................................................................. 41

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1866) ............................................................................... 5, 42

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ................................................................................................. 5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................................. 36

*Nat'l Mining Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014) ............................................................................... 24

*Nielsen v. Preap*,
  139 S. Ct. 954 (2019) ................................................................................. 22, 28, 34

*Niz-Chavez v. Garland*,
  141 S. Ct. 1474 (2021) ........................................................................................... 27

*Ohio Pub. Int. Rsch. Grp., Inc. v. Whitman*,
  386 F.3d 792 (6th Cir. 2004) ........................................................................... 19, 20

*Parsons v. U.S. Dep't of Just.*,
  878 F.3d 162 (6th Cir. 2017) ............................................................................. 3, 24

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) ................................................................................................. 40

*Reno v. American-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) ........................................................................................*passim*

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ............................................................................................... 14

*Sure-Tan, Inc.* v. *NLRB*,
  467 U.S. 883 (1984) ........................................................................................... 2, 15

*Texas v. United States*,
  14 F.4th 332 (5th Cir. 2021), *vacated en banc* (5th Cir. Nov. 30, 2021) ............ 3, 8, 27, 31, 46

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015), as revised (Nov. 25, 2015),
  *aff'd by equally divided court*, 136 S. Ct. 2271 (2016) ......................................... 46

*Texas v. United States*,
  No. 6:21-cv-00016, 2021 WL 3683913 (S.D. Tex. Aug. 19, 2021) ......................... 8

*The Wilderness Soc'y v. Norton*,
  434 F.3d 584 (D.C. Cir. 2006) ............................................................................... 24

*Thompson v. N. Am. Stainless, LP*,
  562 U.S. 170 (2011) ............................................................................................... 29

*Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*,
  525 F. Supp. 3d 850 (W.D. Tenn. 2021), *aff'd*, 5 F.4th 666 (6th Cir. 2021) ......... 13

vii

*Town of Castle Rock v. Gonzales,*
 545 U.S. 748 (2005) .............................................................................................*passim*

*Town of Chester v. Laroe Estates, Inc.,*
 137 S. Ct. 1645 (2017)............................................................................................. 46

*United States v. Fausto,*
 484 U.S. 439 (1988) ........................................................................................... 25, 26

*United States v. Gonzales,*
 520 U.S. 1 (1997) ..................................................................................................... 28

*United States v. Ritchie,*
 15 F.3d 592 (6th Cir. 1994) ...................................................................................... 12

*United States v. Vasquez-Benitez,*
 919 F.3d 546 (D.C. Cir. 2019)................................................................................. 32

*Washington v. Reno,*
 35 F.3d 1093 (6th Cir. 1994) .................................................................................... 45

*Wayte v. United States,*
 470 U.S. 598 (1985) ................................................................................................. 20

*Wells v. Astrue,*
 No. 09-32-GWU, 2009 WL 3400911 (E.D. Ky. Oct. 20, 2009) ............................. 40

*Whitmore v. Arkansas,*
 495 U.S. 149 (1990) ................................................................................................. 14

*Wooten v. Hogsten,*
 No. 6:11-CV-00190-KSF, 2012 WL 1598080 (E.D. Ky. May 7, 2012) ................. 41

*Zadvydas v. Davis,*
 533 U.S. 678 (2001) ............................................................................................. 4, 32

**STATUTES**

5 U.S.C. § 553 ................................................................................................... 5, 39, 41

5 U.S.C. § 701 ............................................................................................... 2, 3, 19, 25

5 U.S.C. § 702 .......................................................................................................... 29

5 U.S.C. § 704 ..................................................................................................... 19, 23

5 U.S.C. § 706 ..................................................................................................... 36, 42

6 U.S.C. § 202 ............................................................................................. 4, 5, 21, 27

8 U.S.C. § 1101 ........................................................................................................ 3, 29

8 U.S.C. § 1103 ................................................................................................. 21

8 U.S.C. § 1182 ................................................................................................. 18

8 U.S.C. § 1187 ................................................................................................... 2

8 U.S.C. § 1225 ................................................................................................... 2

8 U.S.C. § 1226 ........................................................................................... *passim*

8 U.S.C. § 1228 ................................................................................................... 2

8 U.S.C. § 1229 ..................................................................................... 2, 25, 27

8 U.S.C. § 1229a ................................................................................................ 2, 3

8 U.S.C. § 1231 ........................................................................................... *passim*

8 U.S.C. § 1252 ..................................................................................... 3, 25, 26

28 U.S.C. § 547 ................................................................................................. 31

## UNITED STATES CONSTITUTION

U.S. Const. art. II, § 3 ..................................................................................... 42

## REGULATIONS

8 C.F.R. § 239.1 ................................................................................................. 2

8 C.F.R. § 287.7 ................................................................................................. 4

8 C.F.R. § 1003.6 ............................................................................................... 3

8 C.F.R. § 1208.31 ............................................................................................. 2

8 C.F.R. § 1240.12 ............................................................................................. 3

8 C.F.R. § 1240.15 ............................................................................................. 3

## OTHER AUTHORITIES

*Black's Law Dictionary* (11th ed. 2019) ....................................................... 28

H.R. Rep. 104-469 (conf. rep.) (1996) .................................................... 21, 29

ICE Policy No. 10074.2: Issuance of Immigration Detainers by ICE Immigration Officers,
    https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf ................................. 5

U.S. Customs and Border Protection, Drug Seizure Statistics,
    https://www.cbp.gov/newsroom/stats/drug-seizure-statistics .............................................. 18

# SUMMARY

*Pages 1-13:* The Secretary of Homeland Security is responsible for allocating the Department of Homeland Security's limited resources in a manner that best protects the nation and promotes its interests and values. Consistent with that responsibility and with Congress's charge—and with the historical practice of Presidential administrations dating back decades—the Secretary has established enforcement priorities to guide his subordinates in carrying out their duties. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 396 (2012). Arizona, Montana, and Ohio now seek to usurp the Secretary's duty and authority. The relief the States seek would effectively scrap the Secretary's prioritization framework and force local DHS officials to devise their own patchwork prioritization schemes—which months of Departmental experience and data from operating under the previous guidance indicate could potentially *decrease* immigration enforcement actions directed toward the most dangerous individuals. The States' claims are not subject to judicial review, meritless, and contrary to the public interest.

The Plaintiff States challenge the Secretary's September 2021 Guidance under the Administrative Procedure Act (APA), asserting that the September Guidance (1) is contrary to two provisions of the INA, 8 U.S.C. § 1231(a)(1) and § 1226(c), (2) was required to undergo public notice and comment, (3) is arbitrary and capricious, (4) is "pretextual," and (5) is inconsistent with the President's duty to "take Care that the Laws be faithfully executed." *See* Compl. ¶¶ 65-99, PAGEID 15-21. The Court should deny the States' motion and grant Defendants' motion to dismiss or for judgment on the administrative record for multiple, independent reasons.

*Pages 13-19*: The States cannot prevail on the merits. Four legal principles prevent the Court from reaching the substance of their claims at all. First, the States cannot establish Article III standing, because they cannot show any injury that is fairly traceable to the September Guidance or would be redressed by its rescission. The States contend that the Guidance will lead to less enforcement, which will lead to a larger population of noncitizens in the States, which in turn will lead to a growing drain on state resources. PI Mem. 28, PAGEID 91. But as a threshold matter, a litigant "lacks a judicially cognizable interest in the prosecution or nonprosecution of another."

1

*Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see also Sure-Tan, Inc.* v. *NLRB*, 467 U.S. 883, 897 (1984) (third parties "have no judicially cognizable interest in procuring enforcement of the immigration laws."). In any event, this theory of injury impermissibly rests on speculation. *See Clark v. Stone*, 998 F.3d 287, 294 (6th Cir. 2021). The States have proffered no evidence suggesting that the number of noncitizens whose arrest or removal may be deferred under the September Guidance—and who are, or will be, located in the Plaintiff States—will exceed the number that may be arrested and/or removed due to the September Guidance's priority categories. Nor have the States submitted evidence that those noncitizens whose arrest or removal is deferred will consume more state resources than those whose arrest or removal is accelerated because of the Guidance (*e.g.*, those likely to pose a threat to public safety). Further, the States cannot rest a claim to standing on self-inflicted injuries, such as their decisions to place individuals in supervised release. *See Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020). And even crediting any one of these theories of injury, the States cannot show how an order setting aside the September Guidance would redress their injury: under any circumstance the Department will not be able to pursue all immigration violations and necessarily must prioritize among them. The States cannot show that the resulting scheme would redress their injuries.

*Pages 19-23*: Second, the States' claims, all under the APA, cannot "clear the hurdle" of 5 U.S.C. § 701(a)(2), which precludes review of certain classes of agency action, including enforcement decisions. *Heckler v. Chaney*, 470 U.S. 821, 828 (1985). Enforcement decisions are largely committed to the Executive because they require a "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise" and are generally "unsuitab[le] for judicial review." *Id.* at 831. The States fail to rebut this presumption of unreviewability. Although two statutory provisions related to immigration enforcement use the word "shall," the Supreme Court has long held that the word "shall" does not displace the "deep-rooted nature of law-enforcement discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005). Indeed, context and precedent confirm that neither provision the States rely on imposes a judicially enforceable mandate. Far from an abdication, the challenged policy expressly commits to "enforce

immigration law to the best of our ability" and "does not compel an action to be taken or not taken" but instead "leaves the exercise of prosecutorial discretion to the judgment of [DHS] personnel."

*Pages 23-25*: Third, the September Guidance does not constitute "final agency action" within the meaning of the APA, and the States' five APA claims therefore cannot proceed. An agency action is not "final" for purposes of the APA if it does not alter legal rights or obligations. *Bennett v. Spear*, 520 U.S. 154, 178 (1997). The Guidance does not alter any individual or entity's legal rights or obligations. Noncitizens subject to removal under § 1231(a)(1) or to detention under § 1226(c) remain so after the September Guidance; their immigration status is not changed. Even if the September Guidance affects later agency action, agency action is not final when, as it here, its effect on legal rights is "contingen[t] on future administrative action." *Jama v. DHS*, 760 F.3d 490, 496 (6th Cir. 2014). Nor, even if they were substantiated, would the States' theories of injury support a conclusion that the September Guidance alters their legal rights; such harms "are not legal consequences if they stem from independent actions taken by third parties." *Parsons v. U.S. Dep't of Just.*, 878 F.3d 162, 168 (6th Cir. 2017). Neither does the September Guidance alter DHS employees' legal obligations. Subordinate agency employees are required to follow the directives of their supervisors; that those directives may change from time to time does not change the employees' legal rights. Regardless, the September Guidance leaves enforcement decisions to officers' discretion and expressly does not compel or prohibit any enforcement action.

*Pages 25-30*: Fourth, the structure of the INA, as well as specific provisions within it, preclude judicial review in this context. Under 5 U.S.C. § 701(a)(1), a statutory scheme that provides for judicial review to certain types of plaintiffs under certain conditions implicitly precludes review at the behest of other types of plaintiffs. *See Block v. Community Nutrition Inst.*, 467 U.S. 340, 345 (1984). The INA is replete with provisions narrowly circumscribing judicial review to specific circumstances; § 1252(b)(9), for example, is an "unmistakable zipper clause" that means "no judicial review in deportation cases unless this section provides judicial review." *Reno v. American-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 482-83 (1999). This reticulated review scheme precludes review here. Moreover, § 1226(e) expressly precludes review

over discretionary determinations under § 1226, such as the decisions implicated by the September Guidance, and § 1231(h) is explicit that § 1231 cannot be enforced by "any party."

*Pages 30-34*: Next, even if the States could overcome these four, independent threshold bars to their claims, they would fail at the merits. First, the September Guidance is not contrary to either § 1231(a)(1) or § 1226(c). As explained, neither of those statutes creates a judicially enforceable mandate that displaces the Executive's longstanding and deep-rooted discretion in enforcement matters. *See Castle Rock*, 545 U.S. at 761. Judicial opinions that describe the statutes in mandatory terms arise in contexts far removed from this, and none grapples with doctrines of enforcement discretion or the specific aspects of immigration enforcement that demand still greater discretion. *See, e.g.*, *AADC,* 525 U.S. at 483; *Arizona,* 567 U.S. at 396; *Jama v. ICE*, 543 U.S. 335, 348 (2005). In any event, even if those statutes did create a mandatory duty, the September Guidance would not violate it, as nothing in the guidance prohibits removal within the 90-day period or precludes detention of noncitizens covered by § 1226(c). And nothing in either § 1231 or § 1226 precludes the Secretary from adopting and implementing national enforcement guidelines; indeed, Congress separately directed him to do so. *See* 6 U.S.C. § 202(5).

*Pages 34-39*: Second, the September Guidance easily satisfies the deferential standard of arbitrary and capricious review. Resource limitations preclude complete enforcement, and the Secretary reasonably prioritized for enforcement those who pose a threat to national security, public safety, or border security. Under the Guidance's flexible approach, line officers must exercise their judgment in light of all the circumstances, while more senior officers with a broader view of enforcement assess trends to ensure quality and consistency. The policy is amply supported by consideration of numerous factors after months of study. The States purport to identify a number of factors the Secretary failed to consider, but the administrative record demonstrates that the Secretary considered each factor—and refutes the States' claim that the Guidance is "pretextual." It is irrelevant that the States might have weighed these factors differently or adopted a different policy. The Secretary's policy choice survives arbitrary and capricious review so long as it is rational and based on a consideration of the relevant factors.

4

*Pages 39-42*: Third, internal-facing policies like the Guidance do not require notice and comment. That requirement does not apply to "general statements of policy," 5 U.S.C. § 553(b)(A), which are actions that, like the September Guidance, "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power," *Lincoln*, 508 U.S. at 197. The Guidance does not adopt any categorical rules and leaves line officers to make case-by-case decisions based on all the facts. To the extent that the Guidance changes internal agency procedures, it is still exempt from notice-and-comment requirements because it is, in that respect, a procedural rule "primarily directed toward improving the efficient and effective operations of an agency." *Batterton v. Marshall*, 648 F.2d 694, 702 n. 34 (D.C. Cir. 1980).

*Pages 42-43*: Fourth, the States' Take Care claim fails as a matter of law. "[T]he duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1866). The States' claim collapses into their claim that the Guidance exceeds statutory authority and thus is flatly negated by the Supreme Court's admonishment in *Dalton v. Specter* that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." 511 U.S. 462, 473 (1994).

*Pages 43-47*: Finally, the equities weigh against any injunction. Enjoining the September Guidance would severely encroach on a core Executive function, *see AADC*, 525 U.S. at 489, and would result in inefficient and ineffective enforcement, *cf. Landon v. Plasencia*, 459 U.S. 21, 34 (1982). An injunction would also harm the public. Experience with the interim priorities showed that prioritizing public safety led to increased enforcement against aggravated felons. The public interest is not served by forcing the Department to abandon a policy that prioritizes the arrest and removal of dangerous noncitizens. Weighed against these substantial constitutional and practical harms is only an unquantified but at most small fiscal harm to the States. Such harm, even if substantiated, does not warrant an injunction. In any event, any relief ordered by the Court should be tailored to redress only the harms that are substantiated, and should in no event be nationwide in scope. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010).

## INTRODUCTION

In early 2021, at the start of the new Administration, the Department of Homeland Security ("DHS") and U.S. Immigration and Customs Enforcement ("ICE") adopted interim immigration enforcement priorities to focus their limited enforcement resources on those noncitizens who posed the greatest threats to national security, to border security, and to public safety. These interim priorities remained in effect while the Department reviewed its policies and practices, including performance under the interim priorities, in service of developing a revised immigration enforcement priority system. After conducting listening sessions with dozens of groups, reviewing enforcement data and historical and litigation materials, and carefully considering the issue, the Secretary of Homeland Security issued a new "memorandum [that] provides guidance for the apprehension and removal of noncitizens." *See Guidelines for the Enforcement of Civil Immigration Law* at 1 (Sept. 30, 2021) ("September Guidance"), ECF No. 4-1, PAGEID 98. The September Guidance retains the three priorities of national security, border security, and public safety, but gives greater discretion to line officers to assess "the individual and the totality of the facts and circumstances," including aggravating and mitigating factors, in determining whether an individual "poses a current threat to public safety." *Id.* at 3, PAGEID 100. Further, unlike the interim enforcement priorities, the September Guidance contains no supervisory pre-approval requirement for officers to take certain enforcement actions. *Id.* at 5-6, PAGEID 102-103.

The States of Arizona and Montana previously brought suit in the District of Arizona, arguing that DHS's interim enforcement priorities conflicted with two statutory provisions that, in their view, unconditionally require the arrest, detention, and removal of entire classes of noncitizens. The District Court for the District of Arizona denied the States' motion for preliminary injunction and granted Defendants' motion to dismiss, concluding that the Secretary's prioritization of immigration enforcement actions was committed to his discretion and not subject to a challenge under the Administrative Procedure Act (APA). *See Arizona v. DHS*, No. CV-21-00186, 2021 WL 2787930, at *10 (D. Ariz. June 30, 2021). Arizona and Montana's appeal is currently pending in the Ninth Circuit.

Arizona and Montana, now joined by Ohio, again sue to enjoin the Secretary's enforcement priorities. At bottom, the States ask this Court to issue an injunction based on an extraordinary interpretation of two provisions of the Immigration and Nationality Act ("INA")—8 U.S.C. §§ 1226(c) and 1231(a)—which would mean that every administration has violated those provisions since their enactment in 1996. They revive essentially the same arguments already rejected by the *Arizona* court, and those arguments fail here for the same reasons, as well as other reasons not reached by the *Arizona* court. First, the States cannot establish an Article III injury (much less irreparable harm) fairly traceable to the September Guidance or that would be redressed by the relief they seek. Second, three threshold barriers to any action under the APA each independently bars their claims. Third, the States' arguments fail on the merits. Fourth, the States' speculative fiscal injury, even if demonstrated, does not warrant an order setting aside the Secretary's guidance to his subordinates intended to promote public safety and national interests. The Court should deny the States' motion for a preliminary injunction and dismiss their Complaint.

## BACKGROUND

### I.    Statutory Framework

The INA establishes the framework for arresting, detaining, and removing noncitizens who are unlawfully present in or otherwise removable from the United States. A "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012).[1]

The removal process typically begins when DHS, in its discretion, initiates a removal proceeding against a noncitizen. *See* 8 U.S.C. § 1229(a); 8 C.F.R. § 239.1; *see also, e.g.*, 8 U.S.C. §§ 1225(b)(1), 1228(b), 1187(b)(2), 1231(a)(5); 8 C.F.R. § 1208.31(e) (setting out "expedited" proceedings for certain cases). DHS has discretion both to initiate proceedings and to choose which charges of removability to pursue, *see* 8 U.S.C. § 1229a(a)(2), and an immigration judge ultimately determines whether the noncitizen is removable on those grounds, and if so, whether to enter an

---

[1] Internal quotation marks and citations are omitted throughout this brief, unless otherwise indicated.

order of removal, *see* 8 U.S.C. § 1229a(a); 8 C.F.R. § 1240.12. A noncitizen subject to such a removal order may file an appeal before the Board of Immigration Appeals ("BIA"), 8 C.F.R. §§ 1003.1(b), 1240.15, and the removal order is stayed pending the appeal, 8 C.F.R. § 1003.6(a). If the BIA dismisses the appeal, the noncitizen may then petition for review in a federal court of appeals and request a further stay of removal pending review. 8 U.S.C. § 1252(a)(5). Once an order of removal is final, *see id.* § 1101(a)(47)(B), and absent a stay, the noncitizen is subject to removal, *see id.* §§ 1231(a)(1)(A), (a)(1)(B)(ii). "At each stage" of this removal process, "the Executive has discretion to abandon the endeavor." *Reno v. American-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 483 (1999).

This case concerns 8 U.S.C. §§ 1226 and 1231. As multiple courts have recently held, these statutes "do not eliminate immigration officials' 'broad discretion' to decide who should face enforcement action in the first place." *Texas v. United States*, 14 F.4th 332, 337 (5th Cir. 2021) (quoting *Arizona*, 567 U.S. at 396), *vacated en banc* (5th Cir. Nov. 30, 2021). Rather, they "address a separate question: the custodial status of individuals who are facing removal proceedings [*i.e.*, § 1226] or who have been [ordered] removed [*i.e.*, § 1231]." *Id*; *see also Arizona v. DHS*, 21-cv-186, 2021 WL 2787930, at *10 (D. Ariz. June 30, 2021); *Florida v. United States*, No. 8:21-CV-541-CEH-SPF, 2021 WL 1985058, at *9 (M.D. Fla. May 18, 2021), *vacated as moot* (11th Cir. Dec. 14, 2021).

Section 1226 sets forth the framework for "arresting and detaining" noncitizens present in the United States once removal proceedings have commenced. *Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018). Section 1226 "distinguishes between two different categories of aliens." *Id.* Section 1226(a) applies generally to all removable noncitizens and allows the government "to issue warrants for their arrest and detention pending removal proceedings." *Id.* at 846. Section 1226(c) specifically covers noncitizens "who fall[] into one of [several] enumerated categories involving

criminal offenses and terrorist activities," *id.*, and notes that DHS "shall take" these noncitizens "into custody . . . when [they are] released" from criminal confinement. 8 U.S.C. § 1226(c)(1).[2]

Once a removal order becomes final, § 1231(a) sets out DHS's detention authority within and beyond a "removal period." 8 U.S.C. § 1231(a). Section 1231 sets the "removal period" of 90 days that begins when the removal order becomes "administratively final," judicial review staying the removal concludes, or the noncitizen "is released from [criminal or non-immigration] detention or confinement," whichever comes latest. *Id.* § 1231(a)(1)(B)(i)-(iii). Section 1231(a)(2) authorizes detention during the removal period and mandates it for noncitizens removable on certain criminal and terrorism-related grounds. *Id.* § 1231(a)(2). Congress, however, "doubt[ed]" that "all reasonably foreseeable removals could be accomplished" within the 90-day period, *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001), and so § 1231 permits—but does not require—detention and removal after the expiration of the removal period. *Id.*; *see* 8 U.S.C. § 1231(a)(1)(C), (a)(6); *cf. Zadvyadas*, 533 U.S. at 682 ("Based on our conclusion that indefinite detention of aliens in the former category would raise serious constitutional concerns, we construe the statute to contain an implicit 'reasonable time' limitation, the application of which is subject to federal-court review."). Generally, beyond the removal period, noncitizens with final orders of removal may be released on an order of supervision. 8 U.S.C. § 1231(a)(3).

To take custody of removable noncitizens, DHS may use a number of enforcement tools, including immigration detainer requests. Through a detainer, DHS notifies a State or locality that DHS intends to take custody of a removable noncitizen detained by the State or locality upon his or her release, and asks the State or locality to (1) notify DHS of the noncitizen's release date; and (2) hold the noncitizen for up to 48 hours, until DHS can take custody. *See* 8 C.F.R. §§ 287.7(a) (describing notification of release), 287.7(d) (describing temporary detention request); ICE Policy

---

[2] This provision also states that DHS "may release [these] alien[s]" in circumstances not relevant here. 8 U.S.C. § 1226(c)(2). The States are not claiming that noncitizens apprehended under § 1226(c) would be released due to DHS's September Guidance, which does not even address detention, and so § 1226(c)(2) is not implicated in this case.

No. 10074.2: Issuance of Immigration Detainers by ICE Immigration Officers ¶ 2.7, *available at* https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf (last visited Dec. 27, 2021) ("ICE Policy No. 10074.2"). Since April 2, 2017, ICE detainers are accompanied by a signed administrative warrant of arrest issued under 8 U.S.C. §§ 1226 or 1231(a), and may be issued only as to noncitizens arrested for criminal offenses and whom immigration officers have probable cause to believe are removable. *See* ICE Policy No. 10074.2 ¶¶ 2.4-2.6. The 2017 policy further provides that should ICE officers determine not to take custody of a noncitizen, the officers must immediately rescind the detainer. *Id.* ¶ 2.8.

## II. Interim Guidance on Immigration Enforcement

DHS and its predecessor agencies have never had sufficient resources to pursue every immigration violator. Thus, for decades, DHS and its predecessors have issued guidance to focus the use of its limited resources according to agency policy and priorities. *See, e.g.*, Legal Op. of Sam Bernsen (July 15, 1976), ECF No. 27-3, PAGEID 464 (AR DHSP_00000022); Meissner Memo. (Nov. 17, 2000), ECF No. 27-4, PAGEID 472 (AR DHSP_00000030); Morton Memo (June 30, 2010), ECF No. 27-5, PAGEID 485 (AR DHSP_00000043). And when Congress established the Department of Homeland Security, it specifically authorized the Secretary of Homeland Security to develop "national immigration enforcement policies and priorities." 6 U.S.C. § 202(5).

On January 20, 2021, then-Acting Secretary of Homeland Security David Pekoske exercised his discretion and authority to refocus DHS's efforts to a narrower set of priorities than under the previous administration. *See* Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* (Jan. 20, 2021) ("Pekoske Memo"), ECF No. 27-9, PAGEID 507 (AR DHSP_00000065). The Pekoske Memo made note of DHS's inherent resource limitations and the "significant operational challenges" it faces due to the COVID-19 pandemic, and, in light of these considerations, called upon DHS "components to conduct a review of policies and practices concerning immigration enforcement." *Id.* at 1. Consistent with longstanding historical practice,

Acting Secretary Pekoske instructed DHS components to develop recommendations concerning, among other things, "policies for prioritizing the use of enforcement personnel, detention space, and removal assets" and "policies governing the exercise of prosecutorial discretion." *Id.* at 2, PAGEID 508.

The Pekoske Memo also adopted two interim measures. First, the Pekoske Memo directed DHS to focus its enforcement efforts on individuals implicating (1) national security, (2) border security, or (3) public safety. *Id.* At the same time, it expressly authorized enforcement activities outside of those categories. *Id.* at 3, PAGEID 509. Second, the Pekoske Memo paused most removals for 100 days while DHS reviewed its policies. *Id.* The District Court for the Southern District of Texas preliminarily enjoined this second measure, and it has since expired on its own terms, thus mooting those claims. *Texas v. United States*, 21-cv-0003, ECF No. 93 (S.D. Tex. May 20, 2021) (stipulated dismissal).

On February 18, 2021, ICE issued a memorandum to operationalize the enforcement priorities in the Pekoske Memo. *See* Memorandum from Tae Johnson, Acting Dir. of U.S. Immigration and Customs Enf't*, Interim Guidance: Civil Immigration Enforcement and Removal Priorities* (Feb. 18, 2021) (the "ICE Interim Guidance"), ECF No. 27-10, PAGEID 512 (AR DHSP_00000070). The ICE Interim Guidance confirmed that "ICE operates in an environment of limited resources" and "necessarily must prioritize" certain "enforcement and removal actions over others" in order to "most effectively achieve" its "critical national security, border security, and public safety mission." *Id.* at 2-3, PAGEID 513-514. The ICE Interim Guidance then catalogued the three priority groups identified in the Pekoske Memo, as slightly modified, and reiterated that the interim priorities do not "prohibit the arrest, detention, or removal of any noncitizen." *Id.* at 3, PAGEID 514. Enforcement actions outside the presumed priorities could proceed when warranted by the circumstances, and generally subject to approval of the Field Office Director.

While the Pekoske Memo and the ICE Interim Guidance (collectively "the Interim Guidance") were in effect, DHS was able to shift resources to both focus on those posing greater public safety threats and other important agency missions, such as border security. For example,

"[b]etween February 18 and August 31, 2021, ICE arrested 6,046 individuals with aggravated felony convictions compared to just 3,575 in the same period in 2020." *See* Memorandum Regarding Conclusions Drawn from "AART" Data (Sept. 24, 2021) ("AART Data Memo"), ECF No. 27-15, PAGEID 537 (AR DHSP_00000108). Likewise, "field offices became more liberal in authorizing [other priority] cases"—"sexual assault and other sex offenses; DUIs; and assault, particularly domestic violence"—"as time [went] by." *Id*. In fact, Field Office Directors approved over 90% of "other priority" cases, with "requests to pursue an action against a noncitizen with a conviction for a sex offense [] approved at a rate greater than 99%." *Id*. at 3, PAGEID 539. At the same time, ICE "surged personnel to support southwest border operations." *Id*. at 2, PAGEID 538; *see also* Declaration of Peter B. Berg ¶ 18 ("Berg Decl."), ECF No. 27-31, PAGEID 600 (AR DHSP_00006035) (identifying approximately 300 ICE officers "detailed to the Southwest Border to support CBP operations."). The Interim Guidance was rescinded on November 29, 2021, when the September Guidance (discussed below) became effective.

Four lawsuits were brought to challenge the Interim Guidance. In the District of Arizona, the States of Arizona and Montana challenged both the 100-day pause on removals and ICE's interim prioritization guidance. *See* Compl., *Arizona v. DHS*, 21-cv-186, ECF No. 1 (D. Ariz. Feb. 3, 2021); Am. Compl., *Arizona*, 21-cv-186, ECF No. 12 (D. Ariz. Mar. 8, 2021). On June 30, 2021, an Arizona district court granted Defendants' motion to dismiss Arizona and Montana's suit and denied their motion for preliminary injunction, finding that immigration enforcement priorities are committed to agency discretion and, therefore, not subject to judicial review. *See Arizona*, 2021 WL 27872930, at *10 ("While [the States] may not agree with this prioritization scheme, the States' allegations in their Amended Complaint do not 'rise to a level that would indicate' that the Government is *abdicating* its responsibility to remove noncitizens with final orders of removal from the United States."). The Ninth Circuit has twice denied Arizona's and Montana's motions for an injunction pending appeal; the appeal, and Defendants' motion to dismiss the appeal as moot, remain pending. *See Arizona v. United States*, Case No. 21-16118 (9th Cir. July 30, 2021, and Sept. 3, 2021).

The State of Florida also sued unsuccessfully to enjoin the Interim Guidance. A Florida district court denied Florida's motion for preliminary injunction, holding that the Interim Guidance is not final agency action and, in any event, is committed to agency discretion. *See Florida*, 2021 WL 1985058, at *9. Florida voluntarily dismissed its appeal when the September Guidance became effective. *Florida v. United States*, No. 21-11715 (Dec. 14, 2021) (dismissing appeal). Texas and Louisiana sued in a district court in Texas, similarly seeking to enjoin the Interim Guidance. After the district court initially granted the preliminary injunction, *Texas v. United States*, No. 6:21-cv-00016, 2021 WL 3683913 (S.D. Tex. Aug. 19, 2021), the Fifth Circuit largely stayed that injunction pending appeal in a unanimous published decision. *Texas*, 14 F.4th at 332. After the Interim Guidance was rescinded by the September Guidance, the en banc Fifth Circuit vacated the stay, *Texas*, No. 21-40618 (Nov. 30, 2021), and Defendants filed a consent motion to dismiss the appeal as moot, *Texas*, No, 21-40618 (Dec. 6, 2021). Finally, several Texas sheriffs and counties, as well as a federation claiming ICE officers as members, filed a separate suit in a Texas district court to enjoin the Interim Guidance. *Coe v. Biden*, No. 3:21-cv-168 (S.D. Tex. filed July 1, 2021). That motion remains pending, and Defendants have filed a motion to dismiss the action.[3]

### III. The Secretary's September Guidance

On September 30, 2021, the Secretary issued the memorandum at issue here, "Guidelines for the Enforcement of Civil Immigration Law." *See* September Guidance, PAGEID 98. The seven-part "memorandum provides guidance for the apprehension and removal of noncitizens." *Id*. at 1. The first part explains the foundational principle of the exercise of prosecutorial discretion. *See, e.g., id.* at 2, PAGEID 99 (underscoring how it is "well established in the law that federal government officials have broad discretion to decide who should be subject to arrest, detainers, removal proceedings, and the execution of removal orders"). The next part provides the substantive provisions prioritizing national security, public safety, and border security. *Id*. at 3-4, PAGEID

---

[3] Texas and Louisiana, as well as the Texas counties and sheriffs, now challenge the September Guidance as well. No decision has issued in either case.

100-101. The third part seeks to ensure that DHS exercises its "discretionary authority in a way that protects civil rights and civil liberties." *Id*. at 5, PAGEID 102. Fourth, the September Guidance guards against the "use of immigration enforcement as a tool of retaliation." *Id*. Fifth, through training, data collection, and quality review mechanisms, DHS seeks to ensure that line officers apply the September Guidance with integrity and quality while leaving "the exercise of prosecutorial discretion to [the line officers'] judgment." *Id*. at 5-6, PAGEID 102-103. Sixth, the September Guidance set November 29, 2021, as the effective date, which also served to rescind the Pekoske Memo and the ICE Interim Guidance. *Id*. at 6-7, PAGEID 103-104. And, last, the September Guidance contains a statement that it confers no "right or benefit." *Id*. at 7, PAGEID 104.

For the substantive provisions in Part II, the September Guidance maintains the three categories from the Interim Guidance—national security, public safety, and border security—but the September Guidance functions in a distinctively different manner. *See id*. at 3-4, PAGEID 100-101. Rather than creating presumed priority categories or assigning the Field Office Director responsibility to pre-approve certain enforcement actions, as the Interim Guidance did, the September Guidance largely avoids "bright lines or categories" and instead "requires an assessment of the individual and totality of the facts and circumstance." *Id*. at 3, PAGEID 100. With this as the backdrop, the September Guidance then includes a non-exclusive list of aggravating factors (*e.g.*, "the gravity of the conviction and sentence imposed" or "the sophistication of the criminal offense") and mitigating factors (*e.g.*, "military service" or "time since an offense and evidence of rehabilitation"). *Id*. Leaving discretion primarily to line officers, the September Guidance emphasizes that "[t]he overriding question is whether the noncitizen poses a current threat to public safety." *Id*. at 4, PAGEID 101. Likewise, for border security, the September Guidance underscores that "[DHS] personnel should evaluate the totality of the facts and circumstances and exercise their judgment accordingly." *Id*.

In developing the September Guidance, the Secretary and DHS received input from a wide range of individuals and groups. *See* Administrative Record Index, ECF No. 27-1, at PAGEID

436. In particular, the "Department officials engaged in multiple discussions with leadership from ICE, USCIS, and CBP, as well as ICE personnel in the multiple field locations;" and "with external stakeholders, including law enforcement groups, state and local government representatives, and non-governmental entities, including immigrant advocacy organizations." *See* Significant Considerations in Developing Updated Guidelines for the Enforcement of Civil Immigration Law, at 10 ("Considerations Memo"), ECF No. 27-2, PAGEID 443 (AR DHSP_00000001).[4] "These conversations helped the Department evaluate its interim immigration enforcement and removal priorities and properly understand and consider the various interests of both internal and external stakeholders, thereby ensuring that the Department's development of new priorities was informed by all of the relevant evidence and interests." *See id.* The Secretary also considered the views of numerous members of Congress,[5] state and local officials,[6] and the issues raised by numerous entities—including Arizona and Montana—in litigation over the Interim Priorities.[7]

---

[4] The administrative record documents additional details on these outreach meetings. *See* Memorandum regarding Stakeholder Outreach in Furtherance of Department Civil Immigration Enforcement Guidance (Sept. 17, 2021), ECF No. 27-11, PAGEID 519 (AR DHSP_00000090) (identifying approximately 30 groups, including the National Sheriffs' Association and the Southwest Border Sheriffs' Coalition, and noting the Secretary's personal engagement with ICE personnel; ICE Field Office Directors, Special Agents in Charge, and Assistant Directors; members of the academic community; immigrant advocacy organizations; and domestic violence advocates and specialists); Memorandum from Cammilla Wamsley, Principal Policy Advisor, Listening Sessions for Final Priorities, ECF No. 27-12, PAGEID 524 (AR DHSP_00000095) (Field Office Directors and Special Agents in Charge); Memorandum regarding DHS Enforcement Priorities Stakeholder Outreach April 6-9, 2021, ECF No. 27-13, PAGEID 526 (AR DHSP_00000097) (Local Government and Law Enforcement Groups); Memorandum regarding DHS Enforcement Priorities Stakeholder Outreach April 14-May 20, 2021, ECF No. 27-14, PAGEID 531 (AR DHSP_00000102) (Governmental and Non-Governmental Organizations).

[5] *See, e.g.*, July 6, 2021 Ltr. From U.S. Rep. Andy Biggs, ECF No. 27-20, PAGEID 551 (AR DHSP_00002261); May 14, 2021 Ltr. From U.S. Rep. Alexandria Ocasio-Cortez, ECF No. 27-26, PAGEID 531 (AR DHSP_00002290).

[6] *E.g.*, May 28, 2021 Ltr. from Ill. Att'y Gen. Kwame Raoul, ECF No. 27-19, PAGEID 548 (AR DHSP_00002258); Aug. 26, 2021 Ltr. from Fla. Gov. Ron DeSantis, ECF No. 27-21, PAGEID 554 (AR DHSP_00002270); Feb. 3, 2021 Ltr. from Collier Cnty., Fla. Sheriff Kevin J. Rambosk, ECF No. 27-25, PAGEID 565 (AR DHSP_00002281).

[7] *See* AR Index, ECF No. 27-1 at PAGEID 439-442, item nos. 64-120 (listing litigation documents, including briefs and declarations filed by states and other plaintiffs, that were considered in developing the September Guidance).

Further, DHS summarized the key aspects informing the Secretary's guidance. *See id.* Besides emphasizing the various inputs the Secretary and the Department received from "internal and external stakeholders," the experiences in "the implementation of the" Interim Guidance, and "the Secretary's own experience" including his 12 years as a federal prosecutor, and over 7 years in senior roles at the Department of Homeland Security, DHS also addressed other key "considerations informing the guidelines." *Id*. at 2, PAGEID 444. In doing so, DHS explained the role of prosecutorial and enforcement discretion in the immigration context (including its history and resource limitations necessitating enforcement discretion), *id*. at 2-8, PAGEID 444-450; the current Administration's approach to immigration-enforcement priorities (including the Interim Guidance, the litigation challenging that guidance, and the listening sessions both to evaluate that Interim Guidance and to develop the September Guidance), *id*. at 8-11, PAGEID 450-453; and the key considerations underscoring the September Guidance (including public safety, deconfliction, impact on states, resources, statutory mandates, and alternative approaches), *id*. at 11-21, PAGEID 453-463.

## IV. Procedural Background

On November 18, 2021, Arizona and Montana, along with Ohio, filed a Complaint in this Court challenging the September Guidance under the Administrative Procedure Act. *See* Compl. The States moved for a preliminary injunction on November 23, 2021. *See* ECF No. 4, PAGEID 55.[8] In their preliminary injunction motion, the States pursue three claims: (1) a claim that the September Guidance is contrary to law, specifically 8 U.S.C. § 1226(c) and 8 U.S.C. § 1231(a)(1); (2) an arbitrary and capricious claim; and (3) a notice-and-comment claim. *See id*. The States' Complaint includes two additional claims: (4) the September Guidance is "pretextual" and therefore invalid; and (5) the September Guidance violates the Take Care clause and is therefore "contrary to constitutional . . . power." Defendants file this brief in opposition to the States' motion

---

[8] On December 6, 2021, this Court denied Defendants' motion to transfer this action to the District of Arizona, *see* ECF No. 17, PAGEID 398.

for preliminary injunction and in support of Defendants' motion to dismiss or, in the alternative, for judgment on the administrative record.[9]

## LEGAL STANDARDS

"Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019). "In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success." *Anderson v. Kelley*, 12 F.3d 211 (6th Cir. 1993). "But even the strongest showing" on the merits cannot "eliminate the irreparable harm requirement," which "is indispensable." *D.T.*, 942 F.3d at 326–27 (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100 (6th Cir. 1982)).

A motion to dismiss under Rule 12(b)(1) tests the Court's jurisdiction to hear the action. The plaintiff, as the party invoking the Court's jurisdiction, bears the burden of proving it. *Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015). A motion under Rule 12(b)(1) may be either facial—where the complaint itself, taking well-plead factual allegations as true, fails to plead jurisdictional facts—or factual—where jurisdiction turns on a disputed fact that the Court must resolve. *See id.* On the latter type of motion, the Court "is not bound to accept as true the allegations of the complaint as to jurisdiction," *Carnick v. United States*, No. 07-12802, 2008 WL 785290, at *1 (E.D. Mich. Mar. 24, 2008). Instead, the Court must "weigh the evidence and satisfy itself as to the existence of its power to hear the case." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). Defendants make both a facial attack, as to the jurisdictional elements of the APA, and also a factual attack, challenging the sufficiency of Plaintiffs' evidence, presented with their motion for preliminary injunction, to establish standing.

---

[9] Defendants served the administrative record on the States on December 7, 2021, *see* Notice, ECF No. 21 at PAGEID 416, and have filed excerpts thereof in advance of this brief, *see* Administrative Record, ECF No. 27.

A motion under 12(b)(6) challenges the legal sufficiency of the complaint. In evaluating the motion, a court assumes "the veracity of [the plaintiff's] well-pleaded factual allegations and determine[s] whether the plaintiff is entitled to legal relief as a matter of law." *McCormick v. Miami Univ.*, 693 F.3d 654, 658 (6th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). But although "the court primarily considers the allegations in the complaint, . . . matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).

Finally, "[w]hen reviewing agency action" on the merits, "the district court sits as an appellate tribunal, and the question before it is a question of law, and only a question of law." *Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*, 525 F. Supp. 3d 850, 856–57 (W.D. Tenn. 2021), *aff'd*, 5 F.4th 666 (6th Cir. 2021). "The task of the reviewing court is to apply the appropriate APA standard of review, to the agency decision *based on the record the agency presents to the reviewing court*." *Little Traverse Lake Prop. Owners Ass'n v. Nat'l Park Serv.*, 883 F.3d 644, 657 (6th Cir. 2018) (emphasis in original). Review under the APA is highly deferential to the agency's considered judgment. *See FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). "An agency decision is arbitrary and capricious if the agency fails to examine relevant evidence or articulate a satisfactory explanation for the decision." *Bangura v. Hansen*, 434 F.3d 487, 502 (6th Cir. 2006).

## ARGUMENT

The Court should deny the States' motion for a preliminary injunction and should dismiss the Complaint and enter judgment for Defendants because the States cannot prevail on the merits. First, the States lack standing, because they have not substantiated an injury that is fairly traceable to the September Guidance or redressable by an order setting it aside. Second, their challenges, which are all brought under the APA, fail at three thresholds to such claims: the establishment of enforcement priorities is committed to agency discretion by law; the September Guidance is not "final agency action" within the meaning of the APA; and the structure and provisions of the INA

13

preclude review. And if the Court does reach the merits, it should enter judgment for Defendants. The September Guidance does not violate any provision of the INA; the Secretary considered the relevant factors and acted reasonably on the information before him; notice and comment is not necessary for general statements of policy or internal procedural rules; and the States' Take Care claim fails as a matter of law.

To the extent the Court concludes that the States are likely to prevail—contrary to Supreme Court precedent and decades of historical practice—it still should neither enter a preliminary injunction nor vacate the September Guidance. The harm to the Executive and to the public from such an action would vastly outweigh any minor fiscal harm to the States. Indeed, any relief to the States at final judgment would be limited to remand without vacatur. In any event, were the Court to grant an injunction, it should limit such injunction to those States the Court concludes have demonstrated standing. The Court should deny the States' motion and dismiss the Complaint.

## I. The States Cannot Succeed On The Merits.

The States cannot establish a likelihood of success on the merits. As an initial matter, they lack standing and, correspondingly, cannot show irreparable harm. But even if the States could establish standing, their claims are without merit. They fail to clear several APA threshold limitations and, regardless, cannot prevail even if they were to overcome those fatal limitations. Given that the States cannot succeed on the merits, this Court should deny the States' motion on that basis alone and dismiss the Complaint.

A. *The States cannot establish standing, let alone irreparable harm.*

To establish standing to "seek injunctive relief, a plaintiff must show that" it "is under threat of suffering" an "actual and imminent" injury caused by "the challenged action," and that "a favorable judicial decision will prevent" that injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The "threatened injury must be *certainly impending* to constitute injury in fact"; allegations of "possible future injury do not satisfy . . . Art. III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis added). "[W]hen the plaintiff is not [itself] the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more

difficult to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Additionally, to establish redressability, a plaintiff must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

The States fail to establish that the September Guidance has inflicted, or will "certainly" inflict, any injury upon the States. The States rely on two speculative injury theories. First, they assert that the September Guidance will result in a net increase in noncitizens within the States who should have been apprehended and/or removed under two statutory provisions—§§ 1226(c) and 1231(a)—and that these individuals will then commit crimes and thus impose crime-related costs on the States.

As a threshold matter, a litigant "lacks a judicially cognizable interest in the prosecution or nonprosecution of another," and cannot rest standing on claims of perceived underenforcement. *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see id.* (a party "lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution"). Similarly, a party has "no judicially cognizable interest in procuring enforcement of the immigration laws" against someone else. *Sure-Tan, Inc.* v. *NLRB*, 467 U.S. 883, 897 (1984). That is sufficient to defeat the States' assertion of standing.

And regardless, this theory is deficient because it piles one layer of speculation onto another. *Cf. Clapper v. Amnesty Int'l Inc.*, 568 U.S. 398, 414 (2013) (a "speculative chain of possibilities does not establish that" an injury "is certainly impending"); *Clark v. Stone*, 998 F.3d 287, 294 (6th Cir. 2021) ("Speculative allegations of possible future injury are not sufficient"). Even assuming that the September Guidance will result in a net reduction in enforcement actions against those covered by sections 1226(c) and 1231(a) in the plaintiff States, the States' theory assumes, with no support, that the noncitizens spared from enforcement actions due to the September Guidance will commit more crimes—and, specifically, will commit crimes that require *more* state resources—than those who will now be apprehended due to the September Guidance's prioritization framework. *See* September Guidance at 8-9, PAGEID 103-104. Relevant data,

15

however, suggests the opposite—that focusing resources through a prioritization framework will enable DHS to take action against a greater number of noncitizens who pose a more significant threat to public safety. For example, while the Interim Guidance was in effect, it resulted in *more* arrests of noncitizens convicted of aggravated felonies. *See* Considerations Memo at 17, PAGEID 459 (from February 18 to August 21, 2021, "ICE . . . arrested 6,046 individuals with [aggravated felony] convictions compared to just 3,575 in the same period in 2020"); Berg Decl. ¶¶ 15-16, PAGEID 600 (AR DHSP_00006035). Likewise, in furtherance of the Interim Guidance, ICE was able to direct some resources to better assist with the Department's border security priorities. *See id*. ¶ 18, PAGEID 601 (AR DHSP_00006036) (noting that ICE "detailed" approximately 300 ICE officers "to the Southwest Border to support CBP operations").

To support their theory, Plaintiffs refer to the District of Arizona's conclusion that Arizona had standing to challenge the Interim Guidance because it "present[ed] evidence" that it "place[d] at least four noncitizens with criminal convictions on community supervision . . . who, but for the Interim Guidance, would have been [removed]." *Arizona*, 2021 WL 2787930, at *7. But, as explained above, the States cannot establish that any increase in costs relating to supervised release will exceed the costs that the States will *not* incur due to the September Guidance's focus on those noncitizens most likely to pose a threat to public safety. And, in any event, any such costs would be self-inflicted; the States would be *choosing* to place certain noncitizens spared from enforcement actions under the September Guidance under supervised release. *See Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020) ("But if the plaintiff caused his own injury, he cannot draw a connection between that injury and the defendant's challenged conduct.").[10] Accordingly, the States' alleged "crime" theory does not establish their standing to challenge the September Guidance.

The States also allege that the September Guidance will cause more noncitizens to reside in the States and enroll in public health and education benefits, thus imposing costs on the States.

---

[10] Having filed within the Sixth Circuit, the States must accept any differences in governing law.

But it is entirely speculative whether the September Guidance will lead to a net increase in State populations; the Secretary specifically directed line officers to focus efforts on arresting and removing noncitizens who arrive or arrived after November 2020, while also focusing on national security and public safety threats. To assert, as the States do, that this prioritization scheme will result in an increase in state populations is both rank speculation and contrary to logic, given the guidance to focus on noncitizens arriving after November 2020. And this theory of injury suffers from similar defects as the States' crime theory of injury. *See* PI Mem. at 41-43. The States again rely on an unsupported assertion that those who will be spared from imminent enforcement actions will choose to utilize public health care and education resources to a degree greater than those who would otherwise have remained in the States and utilized their resources, but for the September Guidance. The States provide no supporting evidence for this theory. They make little attempt to show that the specific noncitizens whose arrest or removal may be deferred under the September Guidance are more likely to (and will), for example, require medical care, will be unable to finance this medical care, and will specifically choose to rely on public health resources as a result.

Moreover, the injury theories for Plaintiffs Ohio and Montana are distinctly inadequate. See *Crawford v. United States Dep't of Treasury*, 868 F.3d 438, 457 (6th Cir. 2017) ("Each plaintiff has the burden clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute"). Unlike Arizona—a "border state" that allegedly is "acutely affected by modifications in federal [immigration] policy," Compl. ¶ 35, PAGEID 9—neither Ohio nor Montana claims to be uniquely "affected" by any change in immigration policy, and neither alleges that it has witnessed an increase in the number of noncitizens present in its State since the interim priorities went into effect. Further, although Ohio and Montana allege that they suffer harms from drug trafficking facilitated by certain noncitizens, *see* Compl. ¶¶ 54, 59, PAGEID 13-14, they do not—and cannot—tie these harms to the September Guidance. They do not show that the September Guidance will result in decreased immigration enforcement against those trafficking in drugs, much less that any specific drugs trafficked by any who are spared from enforcement actions due to the September Guidance will ultimately end up in Ohio and Montana in particular.

Indeed, this theory of harm is illogical. The September Guidance prioritizes border security and specifically focuses enforcement efforts on those who arrived after November 2020— including those who smuggle drugs cross the border. While the Interim Guidance was in place DHS was able to surge additional resources to the border, *see* Berg Decl. ¶ 18, PAGEID 601 (AR DHSP_00006036), and there is nothing in the September Guidance that will hinder prevention of ongoing cross-border threats. Indeed, DHS's recent massive efforts to stem the flow of fentanyl and other dangerous drugs into the United States are well documented.[11] Moreover, the public safety prioritization allows DHS to focus its efforts on the most dangerous criminals, as demonstrated during the Interim Priorities, *see* Berg Decl. ¶ 16, PAGEID 600 (AR DHSP_00006035); AART Data Memo, PAGEID 537 (AR DHSP_00000108). An order setting aside the September Guidance would not redress the States' asserted harm, and indeed might increase the flow of drugs by forcing the agency to treat fentanyl trafficking the same way it treats check-kiting or any other "crime involving moral turpitude." *See, e.g.*, PI Mem. at 18, PAGEID 81 (arguing that DHS must prioritize crimes of moral turpitude to the same extent it prioritizes aggravated felonies); *see also* 8 U.S.C. § 1226 (c)(1)(A) (cross-referencing *id.* §1182(a)(2)(A)(i)). Thus, the Court, at a minimum, should dismiss Ohio and Montana from this suit.[12]

Finally, the States cannot show that there is a "substantial likelihood" that a court order that DHS abandon the September Guidance would redress their alleged injuries. Due to resource constraints, *every* Administration must prioritize certain enforcement actions over others; the only question is *how* it prioritizes. *See Arizona*, 567 U.S. at 396 ("A principal feature of the removal system is the broad discretion exercised by immigration officials. . . . Federal officials . . . must decide whether it makes sense to pursue removal at all" based on the "equities of an individual case."). The States make no attempt to show that, if the Court enjoins the September Guidance,

---

[11] *See, e.g.*, U.S. Customs and Border Protection, Drug Seizure Statistics, https://www.cbp.gov/newsroom/stats/drug-seizure-statistics (tool for comparing CBP drug seizure statistics) (last accessed Dec. 27, 2021).

[12] Should the Court dismiss Ohio as a plaintiff, it should reconsider its decision not to transfer the matter to the District of Arizona.

the resulting prioritization scheme would result in a decrease in crime levels within their States, or a decrease in the number of noncitizens who use health care or education resources at the States' expense.

Accordingly, none of the States' injury theories is sufficient to establish standing, much less an irreparable harm sufficient to justify the extraordinarily relief they seek here.

B.   *The States cannot clear three additional threshold obstacles to their claims.*

The APA imposes several restrictions on suits challenging an agency's execution of its mission. Three of those limitations each independently bars the States' claims here. First, immigration enforcement priorities are not subject to judicial review because such determinations are "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). Second, the September Guidance is not "final agency action" subject to review under the APA because it does not alter anyone's (much less the States') legal rights or obligations. *See id.* § 704. Third, numerous provisions of the INA narrowly circumscribe the mechanisms and procedures for judicial review of immigration policies and thereby "preclude judicial review" under the APA. *See id.* § 701(a)(1).

1.   The challenged action is "committed to agency discretion by law."

The APA precludes review of certain categories of administrative decisions that "traditionally" have been regarded as unsuitable for judicial review. *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993); *see* 5 U.S.C. § 701(a)(2). One such category which has long been recognized as unreviewable includes decisions concerning enforcement. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985). "Pursuant to § 701(a)(2) of the APA, an administrative agency's decision not to invoke an enforcement mechanism is not subject to judicial review." *Ohio Pub. Int. Rsch. Grp., Inc. v. Whitman*, 386 F.3d 792, 797 (6th Cir. 2004). As the Supreme Court has explained, an agency "generally cannot act against each technical violation of the statute it is charged with enforcing." *Chaney*, 470 U.S. at 831. And the agency "is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities" because such decisions inherently require "a complicated balancing of a number of factors which are peculiarly within [the

Executive's] expertise," including how "agency resources are best spent on this violation or another," and which enforcement actions "best fit[] the agency's overall policies." *Id.* at 831-32.

Thus, the Executive's "broad discretion" in enforcement decisions is "particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607 (1985). "[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831; *see also, e.g.*, *Ohio Pub. Int. Rsch. Grp., Inc.*, 386 F.3d at 797. And the reasons for judicial modesty in this sphere "are greatly magnified in the deportation context," *AADC*, 525 U.S. at 490, where every decision "implicate[s] our relations with foreign powers and require[s] consideration of changing political and economic circumstances," *Jama v. ICE*, 543 U.S. 335, 348 (2005) (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)). As district courts in Florida and Arizona have concluded in rejecting two other recent challenges to DHS's immigration enforcement priorities, such policies are therefore not subject to judicial review. *See Florida*, 2021 WL 1985058, at *10; *Arizona*, 2021 WL 2787930, at *11.[13]

Contrary to the States' contention, this presumption of unreviewability is not rebutted by the presence of the word "shall" in two provisions of the INA. *See* PI Mem. at 25-26, PAGEID 88-89. For one, neither statute provides any guidance on how, given the agency's limited resources, it is to prioritize among the many cases that fall within their ambit. For another, and as the Supreme Court has long held, the "deep-rooted nature of law-enforcement discretion" persists "even in the presence of seemingly mandatory commands" that use the word "shall." *Castle Rock*, 545 U.S. at 761. In *Castle Rock*, for example, a statute provided that law enforcement "shall arrest . . . or . . . seek a warrant" for the arrest of any violator of a restraining order, but the Supreme Court rejected the notion this imposed a mandatory duty because to be "a true mandate of police

---

[13] As discussed above, a Texas district court concluded that the interim priorities were reviewable and enjoined them; a Fifth Circuit panel largely stayed that injunction, concluding that they likely were not reviewable. After the interim priorities were rescinded, the en banc Fifth Circuit vacated the stay. *See supra* at 8.

action would require some stronger indication" of legislative intent than the bare "shall." *Id.*; *see also, e.g.*, *Hudson v. Hudson*, 475 F.3d 741 (6th Cir. 2007) ("But seemingly mandatory statutes, such as this one, and police discretion coexist frequently.").

So too here. Nothing provides the "stronger indication" necessary to displace enforcement discretion. Quite the opposite: The statutory and practical context here confirm that neither § 1226(c) nor § 1231(a)(1) imposes an enforceable mandate. *See AADC*, 525 U.S. at 490 (observing that principles of judicial restraint are "greatly magnified in the deportation context"); *Jama*, 543 U.S. at 348 (similar). Resource constraints, relations with local and foreign authorities, and the fundamental difficulty of determining *ex ante* whether a particular noncitizen's status triggers the statutory criteria all make it practically impossible to remove every noncitizen within 90 days of a removal order becoming "final" or to detain every noncitizen who falls within the wide ambit of § 1226(c). Other statutory provisions underscore the Secretary's retained discretion, such as Congress's express direction that the Secretary establish "national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and that he "establish such regulations; . . . issue such instructions; and perform such other acts *as he deems necessary* for carrying out his authority" under the statute, 8 U.S.C. § 1103(a)(3) (emphasis added); *see also id.* § 1103(a)(1). Many provisions of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), of which § 1231 and § 1226 are a part, "are aimed at protecting the Executive's discretion from the courts—indeed, that can fairly be said to be the theme of the legislation." *AADC*, 525 U.S. at 486–87; *see also infra* section I.B.3 (explaining the Congress separately precluded judicial review). And in the few places where Congress sought to displace the Executive's inherent discretion, it was explicit. *See, e.g.*, 8 U.S.C. § 1231(a)(2) ("under no circumstance").

Legislative history also confirms that in § 1231, Congress set 90 days for removal of a noncitizen as a "target," not a strict deadline, *see* H.R. Rep. 104-469, pt. 1, at 160, (conf. rep.) (1996) and the Supreme Court has already explained that, while in § 1226 Congress "exhort[ed]" the Secretary to act quickly, that did not mean that "Congress wanted the deadline *enforced by*

21

*courts.*" *Nielsen v. Preap*, 139 S. Ct. 954, 969 & n.6 (2019) (emphasis in original).[14] Simply put, Congress has not displaced the Executive's longstanding discretion to choose which are the most important cases to pursue. *See AADC*, 525 U.S. at 483 (in post-IIRIRA case, observing that "the Executive has discretion to abandon the endeavor" at any stage of the removal process); *Arizona*, 567 U.S. at 396 (in post-IIRIRA case, observing a "principal feature of the removal system is the broad discretion exercised by immigration officials"). The Secretary's exercise of that discretion embodied in the September Guidance is unreviewable, and this Court therefore lacks jurisdiction.

Nor do the States defeat the presumption of nonreviewability by misbranding the policy as a "broad nonenforcement policy." PI Mem. at 26-27, PAGEID 89-90. To be sure, in *Chaney* the Supreme Court reserved judgment on whether its holding would apply when "the agency has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. at 833 n.4. But the policy at hand is quite evidently not such a policy. Nothing in the policy exempts any noncitizen or class of noncitizens from removal or arrest; it simply provides guidance to line officers on how to weigh the totality of circumstances to decide whether to pursue enforcement in a particular case. The recent experience with the Interim Guidance demonstrates the efficacy of a prioritization scheme, as it permitted DHS to increase enforcement actions against aggravated felons even in the face of severely limited free detention capacity. *See* Berg Decl. ¶ 10-12, 16, PAGEID 597 (AR DHSP_00006032-35); AART Data Memo, PAGEID 537 (AR DHSP_00000108). In adopting the September Guidance, the Secretary recognized that DHS does "not have the resources to apprehend and seek the removal

---

[14] Courts, including the Supreme Court, have sometimes described § 1231 or § 1226 in terms of a mandate. *See, e.g.*, *Martinez v. Larose*, 968 F.3d 555, 561 (6th Cir. 2020). But those cases arose in wholly different contexts—generally detainees seeking relief, not a party seeking to compel government compliance. They did not decide, as the issue was not remotely implicated, whether the statutes impose a *judicially enforceable* duty on the Secretary. Indeed, *Preap* stands for just the opposite: the statutes are mandatory in the sense that a court must abide them when adjudicating a challenge by a noncitizen, not in the sense that courts can compel the Secretary's compliance. 139 S. Ct. at 969 & n.6. Thus, while those cases generally say nothing at all about whether a party can compel enforcement under § 1226(c) or § 1231(a)(1), the Supreme Court's statement that comes closest to the issue rejects the idea of judicial enforcement.

of" all removable noncitizens, but reiterated the Department's "commitment to enforce immigration law to the best of our ability."[15]

    2.    <u>The challenged action is not "final agency action" subject to APA review.</u>

Only "final agency action" is subject to judicial review under the APA. 5 U.S.C. § 704; *see Jama*, 760 F.3d at 495; *Martinez v. Larose*, 968 F.3d 555, 563 (6th Cir. 2020). Like the Interim Guidance, the September Guidance is not "final agency action" because it does not create or alter legal "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997); *see Florida*, 2021 WL 1985058, at *9 (holding that Interim Guidance was not "final agency action" because (among other reasons) it did not alter legal rights or obligations).

The September Guidance does not alter any person or entity's legal rights or obligations. Noncitizens with no legal right to remain in the United States have no legal right to remain, just as before. Noncitizens subject to arrest and detention remain subject to arrest and detention, just as before. Nothing in the September Guidance exempts, or purports to exempt, any person or class of persons from enforcement. Indeed, the guidance is explicit that it does not "create any right or benefit." September Guidance at 7, PAGEID 98. Thus, noncitizens cannot invoke the September Guidance to avoid removal or obtain release from detention. Instead, it is only later actions by government officials—culminating in a final order of removal, for example—that determine any noncitizen's legal rights. *See, e.g.*, *Hosseini v. Johnson*, 826 F.3d 354, 362 (6th Cir. 2016) (denial of application for change in status was final agency action because it affected legal "right to live permanently in the United States" and "the right to apply for and be granted naturalization"). That these later actions might be guided to some degree by the September Guidance does not mean that the September Guidance itself affects legal rights. To the contrary, "[a]n agency action is not final

---

[15] The States cite to partial data related to the now-rescinded interim priorities. *See* PI Mem. at 9-11, PAGEID 72-74; *cf.* AART Summary Memo, PAGEID 537 (AR DHSP_00000108) (assessing national data for longer period). The new policy that is the subject of this litigation differs in significant respects that the States elide. But in any event, the District Court for the District of Arizona, faced with the exact same data, has already rejected precisely the argument Arizona and Montana, now joined by Ohio, renew here. *See Arizona v. DHS*, 2021 WL 2787930, at *10 (D. Ariz. June 30, 2021).

if it does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action." *Jama*, 760 F.3d at 496.

Nor does the September Guidance alter legal rights or obligations for any other person or entity. The policy certainly does not affect the States' legal rights or obligations; DHS does not regulate the States, and the policy does not purport to impose, or relieve them of, any duties or obligations. *Cf. Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 641 (6th Cir. 2004) ("An agency's determination of 'rights or obligations' generally stems from an agency action that is directly binding on the party seeking review, such as an administrative adjudication (like a recall proceeding) or legislative rulemaking, both of which did not happen here."). The States may have other pre-existing legal duties—such as to provide education or medical benefits to certain noncitizens—but those legal obligations exist independent of the September Guidance. To the extent the States contend that they will be harmed by the policy because of increased costs—a point Defendants dispute, *see supra* section I.A—it is settled law in the Sixth Circuit that "harms caused by agency decisions are not legal consequences if they stem from independent actions taken by third parties." *Parsons*, 878 F.3d at 168; *see also id.* at 169 ("[P]ractical consequences are not legal harms that can transform [a] Report[ ] into a final agency order and trigger our jurisdiction."). And, more broadly, "adverse economic effects accompany many forms of indisputably non-final government action." *Air Brake Sys., Inc.*, 357 F.3d at 645. That the States may incur additional expenses does not mean that the September Guidance determines their legal rights or obligations.

And agency guidance is not final where it does not create legal rights for, or impose legal obligations on, third parties, even where that guidance provides "instruction[s] to [agency] staff," *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (Kavanaugh, J.). So long as the agency retains the discretion to alter or revoke the guidance at will—as DHS has expressly done here—the guidance is nonfinal notwithstanding any expectation that rank-and-file officers will comply with the guidance while it is in effect. *Cf. The Wilderness Soc'y v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006) (explaining that a particular guidance document did not create rights or obligations because "the agency's top administrators clearly reserved for themselves unlimited

24

discretion to order and reorder all management priorities," even though adherence was generally "mandatory" for rank-and-file staff). Moreover, the September Guidance is explicit that it "does not compel an action to be taken or not taken" but instead "leaves the exercise of prosecutorial discretion to the judgment of [DHS] personnel." September Guidance at 5, PAGEID 96.

       3.   Congress has precluded judicial review of these types of decisions.

Consistent with the broad discretion afforded DHS in immigration enforcement, Congress enacted "*many* provisions . . . aimed at protecting the Executive's discretion from the courts." *AADC*, 525 U.S. at 486. Those provisions preclude judicial review in this case.

       a.   *APA challenges to DHS's application of enforcement priorities are precluded from review.*

An action cannot proceed under the APA when other statutes preclude judicial review. 5 U.S.C. § 701(a)(1). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block*, 467 U.S. at 345. A detailed mechanism for review of some claims by some plaintiffs is "strong evidence that Congress intended to preclude [other types of plaintiffs] from obtaining judicial review." *United States v. Fausto*, 484 U.S. 439, 448 (1988).

Congress has set out a detailed statutory review scheme for claims pertaining to the INA. *See* 8 U.S.C. § 1252; *id.* § 1229. That review scheme is the exclusive means of judicial review and precludes statutory claims that do not fall within its parameters. *See, e.g.*, *id.* § 1252(a)(5) ("For purposes of this chapter, in every provision that limits or eliminates judicial review or jurisdiction to review, [those terms] include . . . review pursuant to any other provision of law (statutory or nonstatutory)"). Section 1252(b)(9) channels judicial review of all "decisions and actions leading up to or consequent upon final orders of deportation," including "non-final order[s]," into one proceeding exclusively before a court of appeals. *AADC*, 525 U.S. at 483, 485. A separate—and even more limited—scheme governs judicial review of expedited orders of removal. *See* 8 U.S.C. § 1252(a)(2)(A); *id.* § 1252(e). These provisions circumscribe district court jurisdiction over "*any*

issue—whether legal or factual—arising from *any* removal-related activity," which "can be reviewed *only* through the [statutorily defined] process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1029–31 (9th Cir. 2016); *see Aguilar v. ICE*, 510 F.3d 1, 9 (1st Cir. 2007) (similar). That includes "policies-and-practices challenges," *J.E.F.M.*, 837 F.3d at 1035, arising from any "action taken or proceeding brought to remove an alien," 8 U.S.C. § 1252(b)(9), whether or not the challenge is to an actual final order of removal or whether there even is a final order at all, *J.E.F.M.*, 837 F.3d at 1032. Thus, § 1252(b)(9) is an "unmistakable 'zipper' clause" that means "no judicial review in deportation cases unless this section provides judicial review." *AADC*, 525 U.S. at 482-83.

The claims here "arise[] from" "action[s] taken or proceeding[s] brought to remove an alien." 8 U.S.C. § 1252(b)(9). The States challenge what they allege to be DHS's practice regarding (1) detention of certain noncitizens "pending a decision" on removal, *id.* § 1226(c); and (2) removal of noncitizens with final orders of removal, *id.* § 1231(a)(1). Because § 1252 provides the sole mechanism for review of *all* "decisions and actions leading up to or consequent upon final orders of deportation," *AADC*, 525 U.S. at 485, and because the States cannot invoke § 1252, their claims necessarily fail.

As Justice Scalia explained in *Fausto*, when Congress provides for review by specific plaintiffs, but not by others, the excluded plaintiffs cannot obtain judicial review. 484 U.S. at 448. In *Block*, for example, Congress provided a specific review scheme for "dairy handlers" but said nothing at all about "consumers." 467 U.S. at 346-47. This did not mean that milk consumers could resort to the APA to challenge the agency action; it meant they could not challenge the action at all. *Id.* at 347. That is precisely what Congress did here. By providing a detailed and limited review scheme for noncitizens' claims, Congress has implicitly precluded claims by other persons or entities, including by these the States, under the APA or otherwise. *Cf. Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (holding that organizational plaintiff could not challenge INS policies "that bear on an alien's right to legalization").

      b.   *The States' § 1226(c) challenge is specifically precluded from review.*

In addition, Congress expressly precluded judicial review over the States' § 1226 claim. Congress provided that the Secretary's "discretionary judgment regarding the application of this section shall not be subject to review." 8 U.S.C. § 1226(e). Here, the Secretary's determinations under § 1226(c) are discretionary since he may detain a noncitizen under § 1226—under either (a) or (c)—only "pending a decision" on removal. Detention authority is thus contingent on the Secretary's separate, predicate, and discretionary decision to commence removal proceedings in the first instance, by issuing a notice to appear. *See id.* § 1229(a); *Crane v. Johnson*, 783 F.3d 244, 249 (5th Cir. 2015); *cf. Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1482 (2021) ("A notice to appear serves as the basis for commencing a grave legal proceeding" and "is like an indictment in a criminal case"). Thus, even crediting a judicially enforceable mandate in § 1226(c) to detain certain noncitizens "pending a decision" on removal, that mandate would not disrupt the Executive's "'broad discretion' to decide who should face enforcement action in the first place." *Texas*, 14 F.4th at 337 (quoting *Arizona*, 567 U.S. at 396).

The policy the States challenge here—which does not dictate which noncitizens DHS may detain, and expressly does not apply to detention determinations, but instead simply establishes internal procedures that help DHS target its resources—is still deeper within the Secretary's discretion. Put otherwise, Congress vested the Secretary with discretion to decide who to pursue for removal in the first instance, 8 U.S.C. § 1229(a), and derivatively who to detain pending removal, *id.* § 1226(a); Congress also vested the Secretary with authority to set "national immigration enforcement polices and priorities," 6 U.S.C. § 202(5); and Congress also provided that such decisions "shall not be subject to judicial review," 8 U.S.C. § 1226(e). The Court therefore lacks jurisdiction to review the Secretary's discretionary decision to structure immigration enforcement priorities as he has here.

To be sure, the Supreme Court has held that § 1226(e) does not preclude a habeas petitioner from challenging either the constitutionality of the statutory scheme or that his detention is not authorized by that scheme. *See Demore v. Kim*, 538 U.S. 510, 517 (2003). That is so because

Congress must speak more clearly when it seeks to preclude constitutional claims or habeas review. *Id.* In subsequent cases, a plurality of the Court similarly found jurisdiction over constitutional challenges to the statutory framework or to claims contending that detention was *not* authorized by that framework. *Preap*, 139 S. Ct. at 962 (plurality); *Jennings*, 138 S. Ct. at 841 (plurality). *But see Preap*, 139 S. Ct. at 974-75 (Thomas, J., concurring in part) (finding that § 1226(e) bars even those claims); *Jennings*, 138 S. Ct. at 857 n.6 (Thomas, J., concurring in part) (same). Here, the States' APA claims are neither constitutional claims nor habeas claims; nor are they arguing that the Secretary lacks the power to detain certain noncitizens under § 1226(c). The "text of the statute contains no [related] exception" for APA claims, *Preap*, 139 S. Ct. at 975 (Thomas, J., concurring in part). Because the claims here do not implicate the special rules of construction related to constitutional and habeas claims, § 1226(e) precludes review.

c. *The States' § 1231(a)(1) challenge is likewise specifically precluded.*

Section 1231 similarly precludes judicial review of the States' challenge based on that section. Congress provided, in no uncertain terms, that "[n]othing in [§ 1231] shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States." 8 U.S.C. § 1231(h). Section 1231 is simply not subject to judicial enforcement, by the States or by "any party." Section 1231(h), like its statutory ancestor, "makes clear that Congress intended that *no one* be able to bring suit to enforce" it. *Hernandez-Avalos v. INS*, 50 F.3d 842, 844 (10th Cir. 1995) (holding that, under the same zone of interests test applicable to APA actions, a plaintiff could not enforce the statute).

The States' resist the straightforward and plain meaning of the term "any party" as meaning *any* party. *See* PARTY, *Black's Law Dictionary* (11th ed. 2019); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218–19 (2008) ("[R]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'") (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)). Instead, they insist that the phrase "any party" means only noncitizens "involved in removal proceedings." PI Mem. at 27, PAGEID 90. The sole support they provide for this atextual reading is an out-of-circuit district court decision, *Chhoeun v. Marin*, No. SACV 17-01898-CJC,

28

2018 U.S. Dist. LEXIS 132363, 2018 WL 1941756 (C.D. Cal. Mar. 26, 2018), which the States quote for the proposition that "'[s]ection 1231(h)'s bar is irrelevant' to APA claims brought by States, because States do 'not bring any claims under that section.'" PI Mem. at 27, PAGEID 90 (quoting *Chhoeun*, 2018 WL 1941756, at * 17n.3). But *Chhoeun* has nothing to do with claims by a State, does not purport to interpret the term "any party," and instead merely observes that § 1231(h) does not bar claims not trying to enforce § 1231's terms. It provides no support for the States' argument.

In any event, such an interpretation is belied by statutory structure and purpose. The provision is not limited to "parties to removal proceedings." And the provision conspicuously uses the term "any party" in § 1231(h) instead of "the alien," as is used throughout the rest of § 1231 to refer to the noncitizen in a removal proceeding. *See* 8 U.S.C. § 1101(a)(3) (defining "alien"); *see also Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 777 (2018). Further, the conference report for the legislation in which Congress enacted § 1231(h) notes that the provision "is intended, *among other things*, to prohibit the litigation of claims by aliens who have been ordered removed from the U.S. that they be removed at a particular time or to a particular place." *See* H.R. Rep. No. 104-828, at 219 (emphasis added). "[I]t is not, and cannot be, our practice to restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy—even assuming that it is possible to identify that evil from something other than the text of the statute itself." *Brogan v. United States*, 522 U.S. 398, 403 (1998). Accordingly, although § 1231(h) certainly does preclude a noncitizen in a removal proceeding from enforcing any provision of § 1231, § 1231(h) is not limited to that scenario.

Finally, for similar reasons, the States do not come within the relevant zone of interests to pursue an APA claim premised on § 1231. An APA plaintiff must show that it is "aggrieved . . . within the meaning of a relevant statute," 5 U.S.C. § 702, meaning the plaintiff "may not sue unless he 'falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint,'" *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177 (2011) (quoting *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 883 (1990)); *see also Match-*

*E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). Whether a plaintiff is within the zone of interests is answered "using traditional tools of statutory interpretation" to decide if the particular plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127-28 (2014).

Those ordinary tools provide a straightforward answer: By providing that the terms of § 1231 could not be enforced by "any party against the United States or its agencies or officers or any other person," § 1231(h), Congress made clear that no one—not the States or anyone else— was "authorized to sue" to enforce its terms, *Lexmark*, 572 U.S. at 128. The States are mistaken to point to the broader interests protected by the INA as the relevant focus. The zone-of-interests test is assessed "not by reference to the overall purpose of the Act in question," but "by reference to the particular provision of law upon which the plaintiff relies." *Bennett*, 520 U.S. at 175-76. And, as just explained above, Congress was clear that *no entity* can enforce § 1231, and therefore no entity is within the "zone of interests" of § 1231. *See* 8 U.S.C. § 1231(h); *Hernandez-Avalos*, 50 F.3d at 844.

C. *The States' APA claims fail on the merits.*

1. The September Guidance is not "contrary to law."

Even if judicial review of the States' claims were not barred, they would fail on the merits. The States principally contend that DHS has a non-discretionary duty to remove all noncitizens who are subject to final orders of removal under § 1231(a)(1)(A) and to apprehend all noncitizens who have committed certain criminal offenses under § 1226(c)(1). PI Mem. at 13-15, PAGEID 76-78. Neither section displaces DHS's traditional prosecutorial discretion to decide which noncitizens to bring enforcement actions against. The statutes oblige DHS not to release (with limited exceptions) certain noncitizens who have already been arrested and taken into custody, while the Department is pursuing their removal or during the removal period. The September Guidance does not govern detention determinations at all, and so that obligation does not apply. Even if the statutes contained broader mandates, the September Guidance would not violate them

because it simply establishes guidelines for DHS officers to exercise their discretion, and it does not prohibit DHS from removing or taking custody of any noncitizen.

a.   *The September Guidance does not violate § 1231(a).*

The States' argument that the September Guidance violates § 1231(a)(1) fails because the provision does not create a mandatory duty for the Secretary to remove every noncitizen subject to a final order of removal within 90 days. Rather, as with any statute providing for enforcement, even one using the word "shall," the Executive retains the inherent discretion to choose which cases to pursue. *See Castle Rock*, 545 U.S. at 761. Thus, the statute providing that the U.S. Attorney "shall [] prosecute for all offenses against the United States," 28 U.S.C. § 547, does not strip him of all prosecutorial discretion.

Neither of the cases that the States cite, *Johnson v. Guzman Chavez*, 141 S. Ct. 2271 (2021) and *Martinez v. Larose*, 968 F.3d 555 (6th Cir. 2020), *reh'g en banc denied*, 980 F.3d 551 (6th Cir. 2020), stands for the proposition that the Secretary must remove noncitizens in the removal period within 90 days. Those cases arose in a wholly different context—detainees seeking relief, not a party seeking to direct executive enforcement practices. To be sure, those cases sometimes described the statutes as "mandatory," but they did not decide, as the issue was not remotely implicated, whether the statutes impose a *judicially enforceable* duty on the Secretary. It is not plausible that, without briefing and without acknowledgment, those courts silently adjudicated the wholly separate and constitutionally significant issue of a court's power to compel the executive to allocate its limited enforcement resources in a particular manner, sweeping aside longstanding doctrines concerning enforcement discretion both in the face of a statute using the word "shall," *see Castle Rock*, 545 U.S. at 748, and in the immigration context, *see AADC*, 525 U.S. at 483; *Arizona*, 567 U.S. at 396; *see also Texas*, 14 F.4th at 338-39.

The States make much of the fact that DHS interprets § 1231(a)(2) differently than § 1231(a)(1). PI Mem. at 14, PAGEID 77. But Congress used different language in the two provisions. The first sentence of § 1231(a)(2) mirrors § 1231(a)(1): "During the removal period, the [Secretary] shall detain" the noncitizen. Neither that sentence nor § 1231(a)(1) is mandatory.

The second sentence of § 1231(a)(2), by contrast, contains unmistakably mandatory language: "*Under no circumstance* during the removal period shall" certain terrorist and criminal noncitizens be released. 8 U.S.C. § 1231(a)(2) (emphasis added). DHS has thus long understood § 1231(a)(2) to require DHS to continue to detain those specified noncitizens during the removal period, once arrested. Consistent with DHS's understanding, the Supreme Court has explained that § 1231(a) only "mandates detention of *certain criminal aliens*" during the removal period. *Zadvydas*, 533 U.S. at 698 (emphasis added). Were it otherwise, then DHS would have to detain every noncitizen during the removal period, even if removal ultimately proved impossible or were inconsistent with agency priorities or the national interest, and even if the agency determined that detention was unnecessary to effectuate the removal. "Removal decisions . . . implicate our relations with foreign powers and require consideration of changing political and economic circumstances." *Jama*, 543 U.S. at 348 (quoting *Mathews*, 426 U.S. at 81). Congress thus intended for DHS to retain flexibility to account for the "dynamic nature of relations with other countries," *Arizona*, 567 U.S. at 397; "to avoid removals that are likely to ruffle diplomatic feathers, or simply to prove futile," *Jama*, 543 U.S. at 348; and to avoid wasting limited detention resources on noncitizens whose detention is .[16] A corollary of that necessary flexibility is the authority to prioritize which cases DHS will pursue for actual removal, and accordingly those noncitizens that DHS will take into custody and detain pending removal. And, interpreting "shall" to mean "must" in this context would render the

---

[16] To name just two examples: a noncitizen generally cannot be removed without procuring travel documents from his or her native country, but many countries refuse to issue such travel documents until a noncitizen's judicial appeals are fully exhausted, which often is years after release from state or local custody. *See, e.g.*, *Adefemi v. Gonzales*, 228 F. App'x 415, 416 (5th Cir. 2007) (per curiam). Even with travel documents, removal may be inappropriate because "[t]he foreign state may be mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return." *Arizona*, 567 U.S. at 396-97. But were the States correct, then DHS must detain such noncitizens even though foreign affairs concerns mean there is "no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701. Section 1231(a)(2) does not require that perverse result, which would raise serious constitutional concerns. *Id.* at 699-700; *see also United States v. Vasquez-Benitez*, 919 F.3d 546, 552 (D.C. Cir. 2019).

truly mandatory command in the second sentence of § 1231(a)(2) to be superfluous to the first sentence of that provision. The Court should not adopt such an unsupported reading of the statute.

But even if § 1231(a)(1) did impose an enforceable mandate, the September Guidance would not violate it. The Guidance does not prohibit any removal action. It simply directs DHS officials to prioritize removals (and other enforcement actions) when justified by the circumstances, namely when a noncitizen presents a current threat to public safety, border security, or national security. That the total number of removals fluctuates from month to month, including in response to changing enforcement priorities, does not mean that the new enforcement priorities—which expressly authorize removal in every case where it is justified—violate any statutory duty. Nothing in § 1231 even arguably precludes DHS from prioritizing removals to focus on the most important cases.

### b. *The September Guidance does not violate § 1226(c).*

The States' second argument that the September Guidance violates § 1226(c)(1) fails because the September Guidance does not govern decisions related to detention and release. *See* September Guidance at 1. Rather, the "memorandum provides guidance for the apprehension and removal of noncitizens." *Id.* The States' arguments about § 1226(c) are therefore inapposite because the September Guidance does not touch upon detention, the sole action mandated in some circumstances by § 1226(c)(2).[17]

The States are wrong to suggest that § 1226(c)(1) requires DHS to take enforcement action against certain classes of noncitizens. *See* PI Mem. at 15, PAGEID 78. As discussed above, the use of the word "shall" in § 1226(c)(1) does not overcome DHS's prosecutorial discretion to determine which noncitizens should be subject to enforcement action. *See supra* section I.B.1. The decision to take an enforcement action—including a decision to arrest or issue a notice to appear

---

[17] Section 1226(c)(2) provides that, once covered criminal noncitizens are arrested, detained, and in removal proceedings, DHS may release them "only if" narrow exceptions are met. Similar to the distinction discussed above between subsections (a)(1) and (a)(2) in § 1231, § 1226(c)(2) contains truly mandatory language, whereas the mere "shall" in § 1226(c)(1) does not make apprehension mandatory.

in the first instance—is committed to agency discretion and, therefore, any decision not to arrest a noncitizen is not a statutory violation. *See id.*

And even if § 1226(c)(1) did create a duty to take custody of noncitizens, the September Guidance still would not violate it. The September Guidance does not prohibit the arrest of any noncitizen. It merely prioritizes enforcement actions against certain noncitizens based on public safety, border security, and national security considerations. Immigration officers may still arrest any noncitizen they determine to be a worthy use of resources, guided by aggravating and mitigating circumstances. *See* September Guidance, PAGEID 98. The Supreme Court in *Preap* recognized that, in § 1226(c), Congress did not expect DHS to immediately arrest all noncitizens covered by that provision. *See* 139 S. Ct. at 969; *see also id.* at 973 (Kavanaugh, J., concurring). Indeed, in *Preap* some plaintiffs were arrested "several years" after they were released from state criminal confinement. *Id.* at 961. The Guidance is not contrary to law.

2. <u>DHS's new enforcement guidance is a reasonable effort to prioritize limited resources in enforcing immigration laws.</u>

The States also cannot establish that the September Guidance is arbitrary and capricious. "Judicial review under [the arbitrary-and-capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 141 S. Ct. at 1158. "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.*; *see also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) ("the reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment"). Here, Defendants reached a reasonable decision based on the relevant factors.

In issuing the September Guidance, the Secretary determined that DHS does not "have the resources to apprehend and seek the removal of every one of [the more than 11 million undocumented or otherwise removable noncitizens in the United States]," and he therefore, emphasized the "need to exercise our discretion and determine whom to prioritize for immigration

34

enforcement action." *See* September Guidance at 2, PAGEID 99. Indeed, citing two Supreme Court decisions of the last quarter century, the Secretary noted that it "is well established in the law that federal government officials have broad discretion to decide who should be subject to arrest, detainers, removal proceedings, and the execution of removal orders." *Id*. (referring to *Arizona* and *AADC*). With this backdrop, the Secretary concluded that DHS should prioritize those who pose the greatest risk to national security, border security, and public safety. *See* September Guidance at 3-4, PAGEID 100-101; *id*. at 2, PAGEID 99 (recognizing that the majority of noncitizens who could be subject to removal have been contributing members of our communities for years); *see also Arizona*, 567 U.S. at 396 ("Discretion in the enforcement of immigration law embraces immediate human concerns.").

But in articulating whom to prioritize, the Secretary still ensured that those categories were flexible enough for officers to take the totality of circumstances into consideration in undertaking enforcement actions. In particular, the Secretary's September Guidance instructs line officers to make an "assessment of the individual and the totality of the facts and circumstances," based on aggravating and mitigating factors, in determining whether an individual "poses a current threat to public safety." September Guidance at 3, PAGEID 100. Thus, in this context, officers must "exercise their judgment accordingly," with the understanding that "[t]he decision how to exercise prosecutorial discretion can be complicated and requires investigative work." *Id*. at 4, PAGEID 101. Further, while "the guidance leaves the exercise of prosecutorial discretion to the judgment of [DHS] personnel," the September Guidance also seeks to "ensure the quality and integrity of [DHS's] civil immigration enforcement actions, and to achieve consistency in the application of our judgments," by relying on training, a review process, data collection, and individual case review. *Id*. at 5-6, PAGEID 102-103. This comprehensive, and yet flexible, system, is a reasonable determination of how best to exercise long-recognized enforcement discretion in the immigration context.

The Secretary's memorandum on its face is thus sufficient to survive arbitrary and capricious review. *See*, *e.g.*, *Chaney*, 470 U.S. at 842 (Marshall, J., concurring) ("a decision not to

enforce that is based on valid resource-allocation decisions will generally not be arbitrary, [and] capricious") (quoting 5 U.S.C. § 706(2)(A)); *AADC*, 525 U.S. at 490-91 (discussing factors that may go into enforcement decisions). Nevertheless, in a lengthy memorandum summarizing the considerations informing the Secretary's memorandum, DHS further explained the basis for the September Guidance. *See* Consideration Memo (explaining the various inputs from internal and external groups, the role of prosecutorial and enforcement discretion in the immigration context, the current Administration's approach, and key considerations underscoring the September Guidance—including public safety, deconfliction, impact on states, resources, statutory mandates, and alternative approaches). DHS thus "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," including a "rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

The arguments the States make in support of their arbitrary and capricious claim are refuted by the administrative record, which reflects DHS's comprehensive review of all the relevant factors. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). First, the States claim that Defendants did not consider "the risks of recidivism among criminal aliens who are not detained." *See* PI Mem. at 16, PAGEID 79. But in its memorandum explaining the significant consideration underlying the September Guidance, DHS noted that the Guidance does address this concern "by calling for a context-specific consideration of aggravating and mitigating factors, the seriousness of an individual's criminal record, the length of time since the offense, and evidence of rehabilitation," and that "[t]hese factors are to be weighed in each case to assess whether a noncitizen poses a current threat to public safety, including through a meaningful risk of recidivism." *See* Considerations Memo at 12, PAGEID 454; *see also id.* at 13, PAGEID 455 (describing factors related to recidivism). DHS also assessed academic research indicating that

undocumented immigrants were generally less likely to recidivate than others, and noted that likelihood of recidivism alone is a poor indicator of risk to public safety, since some crimes, even if repeated, are less of a danger than others. *Id.* at 13, PAGEID 455; *see also* Michael T. Light, et al., *Comparing crime rates between undocumented immigrants, legal immigrants, and native-born US citizens in Texas*, Proceedings of the Nat'l Acad. of Sciences of the USA (Dec. 12, 2020), PAGEID 578 (AR DHSP_00002494).

Next, the States argue that DHS did not address how non-detention will inhibit removal later. *See* PI Mem. at 16-17, PAGEID 79-80. Again, the Considerations Memo addressed this issue: "This criticism is based on the misconception that if the Department did not prioritize its enforcement efforts—or if it prioritized enforcement in some different way—a significantly greater number of people could be arrested, detained, moved through removal proceedings, and processed for removal." *See* Considerations Memo at 17, PAGEID 459. Rather, the agency explained, "[r]esource limitations make that an impossibility, as has been the case since the Department was formed (and before that as well)," and described how "such an approach ignores the reality that the Department's overall safety and security mission is not best served by simply pursuing the greatest overall number of enforcement actions but is rather best advanced by directing resources to prioritize enforcement against those noncitizens who most threaten the safety and security of the Nation." *Id*. DHS considered its experience operating under previous priority regimes, including under the policies during the previous administration, which largely did away with specific priorities. *See* Markowitz Historical Guidance Analysis Mem. (AR DHSP_00002294) at 8-9. As DHS observed, the less focused efforts of the priority policy in effect from 2017-2020 resulted in a large increase in *total* monthly interior removals, but a *reduction* in "interior removals for individuals with the most serious convictions." *Id.* at 9 (AR DHSP_00002302).

The States' remaining critiques similarly fail in light of the administrative record. The States suggest that DHS did not consider the impact of the September Guidance on the States. *See* PI Mem. at 17, PAGEID 80. But the Considerations Memo discussed the matter at length and

devoted an entire subsection to the subject: "*Impact on States*," *see* Considerations Memo at 14-17, PAGEID 456-459. DHS considered the views of numerous members of congress representing numerous states,[18] views of various state officials,[19] and the concerns raised by States in litigation over the Interim Guidance.[20] Likewise, the States argue that Defendants did not justify why aggravated felons are no longer considered presumptively public safety threats, *see* PI Mem. at 18, PAGEID 81. But, in the Considerations Memo, DHS explained that "[i]n the Department's engagements with internal and external stakeholders, including with the ICE workforce, concerns were raised about whether the focus on individuals convicted of 'aggravated felonies' was both over- and under-inclusive." *See* Considerations Memo at 12, PAGEID 454 (finding that "[t]he aggravated felony definition can be challenging to administer in many instances" and it "is an imperfect proxy for severity of offense"). Finally, the States argue that there is no rational reason for the policy that the agency did develop. *See* PI Mem. at 18-20, PAGEID 81-83. As explained above, however, the Secretary determined that DHS does not "have the resources to apprehend and seek the removal of every one of [the more than 11 million undocumented or otherwise removable noncitizens in the United States]," and, therefore, emphasized the "need to exercise our discretion and determine whom to prioritize for immigration enforcement action." *See* September

---

[18] *E.g.*, Feb. 17, 2021 Ltr. from U.S. Reps. James Comer and Jim Jordan, ECF No. 27-17, PAGEID 542 (AR DHSP_00002243); Mar. 11, 2021 Ltr. from U.S. Rep Dan Bishop, ECF No. 27-18, PAGEID 546 (AR DHSP_00002256); July 6, 2021 Ltr. From U.S. Rep. Andy Biggs, ECF No. 27-20, PAGEID 551 (AR DHSP_00002261); Apr. 26, 2021 Ltr. from U.S. Rep. Pat Fallon, ECF No. 27-22, PAGEID 559 (AR DHSP_00002275); Mar. 3, 2021 Ltr. from U.S. Rep Mike Thompson, ECF No. 27-23, PAGEID 561 (AR DHSP_00002277); Feb. 19, 2021 Ltr. From U.S. Sen. Rick Scott, PAGEID 563 (AR DHSP_00002279); May 14, 2021 Ltr. From U.S. Rep. Alexandria Ocasio-Cortez, PAGEID 569 (AR DHSP_00002290); Apr. 15, 2021 Ltr. from U.S. Sen. Cory A. Booker, PAGEID 573 (AR DHSP_00002321).
[19] *E.g.*, May 28, 2021 Ltr. from Ill. Att'y Gen. Kwame Raoul, PAGEID 548 (AR DHSP_00002258); Aug. 26, 2021 Ltr. from Fla. Gov. Ron DeSantis, PAGEID 554 (AR DHSP_00002270); Feb. 3, 2021 Ltr. from Collier Cnty., Fla. Sheriff Kevin J. Rambosk, PAGEID 565 (AR DHSP_00002281).
[20] AR Index, ECF No. 27-1 at PAGEID 439-441, item nos. 64, 65, 67, 69, 71, 72, 75, 77, 79, 82, 85, 88, 89 (Arizona and Montana's litigation documents concerning Interim Guidance); AR Index, ECF No. 27-1 at PAGEID 441-442, item nos. 96, 97, 99, 100, 103, 105 (Florida's litigation documents concerning Interim Guidance); AR Index, ECF No. 27-1 at PAGEID 442, item nos. 106, 107, 109, 110, 113, 118 (Texas's litigation documents concerning Interim Guidance).

Guidance at 2, PAGEID 99. With this backdrop in mind, the Secretary devised guidance that takes into account national security, public safety, and border security, while still ensuring that the officers on the ground consider the totality of the circumstances when taking enforcement actions.

The States' Complaint also raises a separate claim that the September Guidance is "pretextual" and "simply an attempt to quickly paper over the sparse administrative record of the January 20 Memorandum and Interim Guidance without changing the substance of those policies as it relates to final orders of removal." Compl. ¶ 93, PAGEID 20. The States present no evidence for this claim, and it is refuted by the extensive administrative record, formed after the Secretary himself, as well as other senior DHS officials, toured the country to receive input from numerous stakeholders, and assessed data from months of operating under the Interim Guidance.[21] Moreover, this claim ignores the numerous and substantial changes between the Interim Guidance and the September Guidance—including the elimination of preapproval requirements and the adoption of a more flexible approach to the priority framework.

It may be that the States disagree with the way the Secretary balanced these issues. But it is not the States' (or the judiciary's) role to determine enforcement policy for the Department of Homeland Security. *See Prometheus Radio Project*, 141 S. Ct. at 1158. At bottom, the Secretary expressly considered each factor that the States contend he should have, and concluded that the policy he adopted was appropriate in light of those factors.

3. DHS's internal guidance on enforcement prioritization is exempt from notice and comment.

The September Guidance is likewise exempt from the APA's notice-and-comment requirement. This requirement does not apply to "general statements of policy," 5 U.S.C. § 553(b)(A), which "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power," *Lincoln*, 508 U.S. at 197 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)). By contrast, rules that must generally be adopted through notice

---

[21] *See, e.g.*, AART Summary Memo, PAGEID 537 (AR DHSP_00000108); OPLA PD Conclusion Mem., PAGEID 541 (AR DHSP_00002240).

and comment are those that have the force and effect of law and create legally enforceable rights or obligations. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Here, the September Guidance is quintessentially a policy statement: It announces how DHS components will determine whether to pursue (or forbear from) enforcement—a decision "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831. But it does not alter the rights or obligations of any person, nor does it create a binding norm on any individual enforcement decision.

*Lincoln* itself underscores that agency guidance on matters of agency discretion is exempt from notice-and-comment requirements. In that case, the Supreme Court held a pronouncement of the exercise of discretion is a general statement of policy. In particular, the Supreme Court emphasized that "[w]hatever else may be considered a 'general statemen[t] of policy,' the term surely includes an announcement like the one before us, that an agency will discontinue a discretionary allocation of unrestricted funds from a lump-sum appropriation." *See Lincoln*, 508 U.S. at 196-97. The sense of this result is evident when applied to the policy at issue here. There is a "deep-rooted" tradition of enforcement discretion, *Castle Rock*, 545 U.S. at 761, especially when it comes to decisions in the immigration enforcement context, *see AADC*, 525 U.S. at 483; *Arizona*, 567 U.S. at 396; *Jama*, 543 U.S. at 348. The September Guidance concerns decisions related to the apprehension and removal of noncitizens, and the initiation of removal proceedings in the first instance—the core of prosecutorial discretion. *See* September Guidance at 1, PAGEID 98 ("This memorandum provides guidance for the apprehension and removal of noncitizens."). Guidance on how to exercise that discretion is not subject to notice-and-comment requirements.

Thus, the September Guidance merely advises the public how DHS will exercise its discretion. It thus is properly viewed as a "general statement of policy" not subject to notice and comment: "A policy statement is a pronouncement that simply advises the public what the agency's prospective position on an issue is likely to be." *See Dyer v. Sec'y of Health & Hum. Servs.*, 889 F.2d 682, 685 (6th Cir. 1989); *see also Wells v. Astrue*, No. 09-32-GWU, 2009 WL 3400911, at *4 (E.D. Ky. Oct. 20, 2009). A statement is "likely to be considered binding"—and

40

therefore subject to notice-and-comment requirements—"if it narrowly circumscribes administrative discretion in all future cases, and if it finally and conclusively determines the issues to which it relates." *Dyer*, 889 F.2d at 685. But under the September Guidance, agency officials are instructed to consider individual facts and consider the totality of the circumstances of each particular case. *Contra* Pls.' Mem. 23-24, PAGEID 86-87 (contending that the September Guidance creates a binding presumption against enforcement actions notwithstanding that the guidance expressly states the opposite). In fact, the Secretary has made that individualized assessment a central underpinning of the entire guidance. *See* September Guidance at 3-4, PAGEID 100-101 (instructing line officers to make an "assessment of the individual and the totality of the facts and circumstances," in consideration of aggravating and mitigating factors, and that officers must "exercise their judgment accordingly"). Accordingly, the September Guidance is a general statement of policy exempt from notice-and-comment requirements.

Similarly, even if it were binding in some fashion, the September Guidance would be only a procedural rule, still exempt from notice and comment.[22] Procedural rules are "rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b). They are "primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties." *Batterton*, 648 F.2d at 702 n.34, *accord Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014). Procedural rules "do not themselves alter the rights or interests of parties, although [they] may alter the manner in which the parties present themselves or their viewpoints to the agency." *Batterton,* 648 F.2d at 707; *see also Wooten v. Hogsten*, No. 6:11-CV-00190-KSF, 2012 WL 1598080, at *5 (E.D. Ky. May 7, 2012) ("Interpretive, or 'procedural,' rules do not themselves shift the rights or interests of the parties, although they may change the way in which parties present themselves to the agency."). By its very nature, general

---

[22] The States argue that the September Guidance should not be considered an interpretive rule. *See* PI Mem. at 21-23, PAGEID 84-86. The Court need not address that issue because, to the extent the matter is even reviewable, the September Guidance is exempt from notice and comment as a general statement of policy or, alternatively, as a procedural rule.

guidance for the exercise of prosecutorial discretion does not affect anyone's rights and obligations. And the September Guidance explicitly states it does not affect anyone's rights. *See* September Guidance at 7, PAGEID 104 ("This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter."). Indeed, under the Guidance any individual enforcement decision must be evaluated based on the totality of the circumstances. Rather than establish any binding rules, the Guidance simply establishes internal considerations for how the agency is to exercise its discretion, and procedures for internal review.

Accordingly, the States' notice-and-comment claim fails on the merits.

4.   The States fail to state a viable claim under the Take Care Clause.

The Court should dismiss the States' claim that the September Guidance violates the Take Care Clause, U.S. Const. art. II, § 3, because it violates §§ 1226(c) and 1231(a)(1)(A). *See* Compl. ¶¶ 95-99, PAGEID 21. The States raise this claim as an APA claim, *see* 5 U.S.C. § 706(2)(B), but it fails for all the same reasons given above: the States lack standing and they cannot surpass numerous APA thresholds. Most fundamentally, enforcement discretion is a core Executive power. *See Chaney*, 470 U.S. at 832 (recognizing "that an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed'" (quoting U.S. Const. art. II, § 3)).

Should the Court reach the merits of this contention, however, it should dismiss it for failure to state a claim. The Take Care Clause cannot a furnish basis for affirmative relief in an Article III court. For the Judicial Branch to superintend how the President performs his executive functions would express a "lack of the respect due" to the Nation's highest elected official. *Baker v. Carr*, 369 U.S. 186, 217 (1962). Indeed, the Supreme Court has recognized that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction. *Mississippi*, 71 U.S. at 499. The

42

States' claim collapses into their claim that the Guidance exceeds statutory authority, and thus is flatly negated by the Supreme Court's admonishment in *Dalton v. Specter* that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." 511 U.S. at 473. And as demonstrated above, the Secretary's guidance—far from being incompatible with the statute—is firmly supported by foundational principles concerning the exercise of enforcement discretion, as long recognized by the Supreme Court. *See, e.g., Arizona*, 567 U.S. at 396 ("A principal feature of the removal system is the broad discretion exercised by immigration officials. . . . Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all.").

## II. The Harm to the Executive from an Injunction Restraining Core Article II Authority Would Outweigh Any Harm to the States from the Guidance and Such an Injunction Would Undermine the Public Interest.

For the reasons given above, the Court should deny the States' motion for a preliminary injunction and should dismiss the Complaint. But even if the Court were to conclude otherwise, it should still deny an injunction, and should remand without vacatur. Put simply, the States have not and cannot establish that they will suffer an injury that outweighs the harm that their requested relief inflicts on the Defendants and the public interest. As discussed above, the States cannot show any injury, much less irreparable harm. *See supra* section I.A. Their requested injunction, however, would impose a significant burden on the United States, and so the Court should deny the States' motion. As a panel of the Fifth Circuit recently noted: "The injury to the executive's daily exercise of this historic discretion is irreparable in the basic sense of the word; there is no way to recover the time when its exercise of discretion is being enjoined during the pendency of the appeal." *See Texas*, 14 F.4th at 341.

Such an injury also extends to the public. The September Guidance allows DHS to focus on individuals who pose the greatest threat to the public. With the Interim Guidance, the agency successfully focused its efforts according to the priorities, nearly doubling enforcement actions against aggravated felons, while also shifting resources to the border. *See, e.g.,* AART Data Memo, PAGEID 537 ("Between February 18 and August 31, 2021 ICE arrested 6,046 individuals

with aggravated felony convictions compared to just 3,575 in the same period in 2020."); *see also* Berg Decl. ¶ 18, PAGEID 601 (identifying approximately 300 ICE officers "detailed to the Southwest Border to support CBP operations"). Enjoining or vacating the September Guidance will prevent from Executive from continuing its sensible efforts to focus on the most pressing dangers.

Likewise, limiting DHS's ability to prioritize removals poses a number of practical problems given its resource constraints. DHS lacks the resources, including appropriated funds and bedspace, to both detain all noncitizens the States contend DHS is obligated to detain, and also protect the public by detaining and removing those individuals DHS identifies as presenting threats to public safety. *See* Berg Decl. ¶¶ 9-19, PAGEID 597-601; Decker Decl. ¶¶ 7-8, ECF No. 27-30, PAGEID 589-590; Declaration of Monica Burke ¶¶ 6-11, ECF No. 27-32, PAGEID 607-08 (AR DHSP_00006075- AR DHSP_00006076). Further, "[a]bsent clear priorities, [DHS] immigration officers may be left with only very general guidance—or no guidance at all—on the exercise of their discretion." Decker Decl. ¶ 12, PAGEID 592; *see also* Berg Decl. ¶ 20, PAGEID 602. Likewise, "[a]ny potential policy or operational confusion due to an injunction could additionally harm ICE's relationship with state and local stakeholders." *See, e.g.*, Decker Decl. ¶ 13, PAGEID 592. In particular, it would cause confusion for the agency to ping-pong between different guidance. Here, the agency has already spent months training its workforce on the September Guidance, and, indeed, by the time the Court hears argument on these motions, DHS will have been operating under the September Guidance for several weeks. *See* September Guidance at 6, PAGEID 103. Finally, such an injunction might conflict with Defendants' other obligations, including those imposed under court order. *See, e.g., Fraihat v. U.S. Immigr. & Customs Enf't*, 445 F. Supp. 3d 709 (C.D. Cal. 2020) (imposing limits on detention capacity), *rev'd*, 16 F.4th 613 (9th Cir. 2021) (mandate pending as of December 27, 2021). Given these practical realities, an injunction would not be appropriate even if the Court considered the States likely to succeed on the merits. Rather, "remand without vacatur" would be a more appropriate remedy at final judgment, given that vacatur or an injunction would have "disruptive consequences." *Ctr. for*

*Biological Diversity v. U.S. Forest Serv.*, No. 2:17-CV-372, 2021 WL 855938, at *1-4 (S.D. Ohio Mar. 8, 2021); *see also KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 710 F. Supp. 2d 637, 658 (N.D. Ohio 2010) (noting that "notwithstanding the APA's dictate that" a court should "set aside unconstitutional agency action, the proper remedy," certain circumstances may be to "remand to [the agency], without vacatur").

Whether to grant an injunction, even if a movant meets the burden to show both irreparable harm and a likelihood of success, is fundamentally a matter of equity. Defendants maintain that the States have demonstrated neither irreparable harm nor a likelihood of success on the merits. But regardless, the States' dubious claims of harm are monetary only. *See* PI Mem. at 28-30, PAGEID 91-93. Any harm to the States from the September Guidance pales in the face of the certain harm an injunction would impose on the Executive and the likely harm to the public and is inadequate to warrant the injunctive relief the States seek.

Ultimately, although the States disagree with DHS's prioritization of certain public safety threats and its utilization of its limited resources, the federal government—not any individual State—is charged with enforcing immigration laws. An injunction that interferes with that Constitutional and Congressional arrangement is unwarranted. At a minimum, if the Court is inclined to provide some form of equitable relief, it should stay that relief for a period of thirty days to allow the government to secure relief from the Court of Appeals or Supreme Court. Otherwise, the Court's order would risk a seesaw effect, where the government has to oscillate between different guidance documents based on competing judicial decrees.

## III.  Any Relief Ordered Should Be Narrow.

"[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994); *see Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("the scope of injunctive relief is dictated by the extent of the violation established'). Accordingly, even if this Court were to grant the States a preliminary injunction, it should limit the injunction. It should refuse the States' request to issue a

nationwide injunction and, instead, it should limit any injunction to the Plaintiff States that have standing.

Here, especially in light of denials of preliminary injunctions in other jurisdictions on the Interim Guidance and the pending challenges to the September Guidance in other district courts, this Court should limit any injunction to Ohio and, at most, to Arizona, Montana, and Ohio. As a general matter, nationwide relief that would affect those who are not parties to this case that have established standing would exceed this Court's authority under Article III and violate longstanding equitable doctrine. "Article III of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.'" *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). The Sixth Circuit recently provided guidance to a district court on the proper scope of injunctive relief in a challenge to a nationwide federal policy. *Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446, 474 (6th Cir. 2021), *vacated on other grounds* ---F.4th---, 2021 WL 5755300, (6th Cir. Dec. 3, 2021).[23] Because the federal defendants in that case had prevailed in other courts outside of the Sixth Circuit, the panel directed that the injunction "may not exceed the bounds of the four states within the Sixth Circuit's jurisdiction and, of course, encompasses the parties themselves." *Id.* at 474. A nationwide injunction was improper in that case because the Sixth Circuit did not want to "create an absurd situation in which the ATF must prevail in every single case brought against the Final Rule in order for its interpretation to prevail." *Id.* Although some courts have granted nationwide injunctions in the immigration context on the theory that immigration policy must be uniform, *see, e.g.*, *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *as revised* (Nov. 25, 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016), that argument carries no weight here, where the effect of an injunction would be to eliminate national uniformity in favor of ad hoc prioritization schemes set at the local level.

---

[23] The panel opinion was recently vacated on other grounds. The panel opinion still has substantial persuasive value on the appropriate scope of injunctive relief.

To grant a nationwide injunction here would fly in the face of the Sixth Circuit's analysis and would make Justice Gorsuch's warning a reality: "If a single successful challenge is enough to stay the challenged rule across the country, the government's hope of implementing any new policy could face the long odds of a straight sweep, parlaying a 94-to-0 win in the district courts into a 12-to-0 victory in the courts of appeal." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600-01 (2020) (Gorsuch, J. concurring), *denying modification*, 140 S. Ct. 2709 (2020). In the end, Article III and equitable principles, including respect for sister courts also evaluating challenges to this policy, dictate that any injunction should be no broader than necessary to address the purported harm that would occur absent a preliminary injunction. If the Court decides to issue an injunction, it should join other district courts in the Sixth Circuit by limiting its relief to the Plaintiff states. *See Kentucky v. Yellen*, ---F. Supp. 3d---, 2021 WL 4394249, at *9 (E.D. Ky. Sept. 24, 2021). And if it determines that only some State Plaintiffs have standing, the injunction should be so limited.

## CONCLUSION

For the reasons stated herein, the States' motion for a preliminary injunction should be denied. The Court should dismiss the Complaint or, in the alternative, grant judgment to Defendants. If the Court does issue an injunction, it should stay its order for 30 days to permit Defendants to seek appellate relief.

Dated: December 27, 2021                    Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Acting Assistant Attorney General

                                            BRIGHAM J. BOWEN
                                            Assistant Branch Director

                                             /s/Michael F. Knapp
                                            MICHAEL F. KNAPP
                                              CA Bar No. 314104
                                            Trial Attorney
                                            ADAM D. KIRSCHNER
                                              IL Bar. No. 6286601
                                            Senior Trial Counsel
                                            BRIAN C. ROSEN-SHAUD
                                              ME Bar No. 006018
                                            KUNTAL CHOLERA
                                              DC Bar No. 1031523
                                            Trial Attorneys
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            Tel: (202) 353-9265
                                            Fax: (202) 616-8460
                                            Email: Michael.F.Knapp@usdoj.gov
                                                   Adam.Kirschner@usdoj.gov
                                                   Brian.C.Rosen-Shaud@usdoj.gov
                                                   Kuntal.Cholera@usdoj.gov

                                            Mailing Address:
                                            Post Office Box 883
                                            Washington, D.C. 20044

                                            Courier Address
                                            1100 L Street NW, Room 11020
                                            Washington, D.C. 20005

                                            EREZ REUVENI
                                              CA Bar No. 264124
                                            Assistant Director
                                            U.S. Department of Justice
                                            Civil Division, Office of Immigration Litigation
                                            P.O. Box 868, Ben Franklin Station
                                            Washington, D.C. 20044
                                            Email: Erez.R.Reuveni@usdoj.gov

                                            *Counsel for Defendants*

                                            48

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically

(via CM/ECF) on December 27, 2021.

/s/ Michael F. Knapp
MICHAEL F. KNAPP