**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**DAYTON DIVISION**

|  |  |
|---|---|
| **STATE OF ARIZONA, et al.**<br><br>        Plaintiffs,<br><br>v.<br><br>**JOSEPH R. BIDEN, et al.**<br><br>        Defendants. | Case No. 3:21cv00314<br>The Honorable Michael J. Newman |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF**
**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR JUDGMENT ON THE**
**ADMINISTRATIVE RECORD**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 1

I.      The States grossly mischaracterize the policy they challenge. ......................................... 1

II.     The September Guidance is consistent with law. ................................................. 5

        A.      The September Guidance does not violate any conceivable duty in the INA. ................................................................................................. 5

        B.      The statutes do not create any judicially enforceable duty. ................................... 6

III.    The September Guidance is not subject to judicial review. ................................................. 9

        A.      Enforcement prioritization is committed to the Secretary's discretion. ................ 9

        B.      The September Guidance is not final agency action under the APA .................... 11

        C.      Judicial review is precluded by "other statutes." .................................. 13

IV.     The States lack standing ............................................................................. 17

V.      DHS's explanation is not pretextual. ......................................................... 22

VI.     The Secretary considered the relevant factors and adequately explained his decision. ............................................................................................... 25

VII.    Enforcement priorities do not require notice-and-comment. ........................................... 28

VIII.   There is no valid claim under the Take Care Clause. ....................................... 31

IX.     Remand without vacatur would be the appropriate remedy. ............................................ 32

CONCLUSION ................................................................................................ 32

## TABLE OF AUTHORITIES

Cases

*Ali v. Fed. Bureau of Prisons*,
   552 U.S. 214 (2008)..................................................................................................... 16

*Am. Hosp. Ass'n v. Bowen*,
   834 F.2d 1037 (D.C. Cir. 1987) .................................................................................... 31

*Arizona v. DHS*,
   21-00186-PHX-SRB, 2021 WL 2787930 (D. Ariz. June 30, 2021).................................. 8, 10

*Arizona v. United States*,
   567 U.S. 387 (2012)........................................................................................... 6, 14, 21

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
   785 F.3d 710 (D.C. Cir. 2015) ................................................................................. 12, 13

*Ayuda, Inc. v. Reno*,
   7 F.3d 246 (D.C. Cir. 1993) .......................................................................................... 14

*Babbitt v. Farm Workers*,
   442 U.S. 289 (1979)...................................................................................................... 18

*Bar MK Ranches v. Yuetter*,
   994 F.2d 735 (10th Cir. 1993) ...................................................................................... 30

*Barrios Garcia v. DHS*,
   14 F.4th 462 (6th Cir. 2021) .................................................................................. 10, 11

*Bennett v. Spear*,
   520 U.S. 154 (1997)...................................................................................................... 17

*Biden v. Missouri*,
   No. 21A240, 2022 WL 120950 (U.S. Jan. 13, 2022) ......................................................... 25

*Block v. Cmty. Nutrition Inst.*,
   467 U.S. 340 (1984)...................................................................................................... 14

*Bostock v. Clayton Cnty.*,
   140 S. Ct. 1731 (2020).................................................................................................. 16

*Brogan v. United States*,
   522 U.S. 398 (1998)...................................................................................................... 16

*Burlington Truck Lines v. United States*,
    371 U.S. 156 (1962) ............................................................................................. 26

*Campos v. INS*,
    62 F.3d 311 (9th Cir. 1995) ................................................................................. 17

*Chicago v. Morales*,
    527 U.S. 41 (1999) ................................................................................................. 6

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) ............................................................................................. 29

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ............................................................................................. 25

*Crawford v. U.S. Dep't of Treasury*,
    868 F.3d 438 (6th Cir. 2017) ............................................................................... 19

*Crowley Caribbean Transp. v. Pena*,
    37 F.3d 671 (D.C. Cir. 1994) ............................................................................ 9, 10

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
    452 F.3d 798 (D.C. Cir. 2006) ............................................................................. 12

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
    No. 2:17-cv-372, 2021 WL 855938 (S.D. Ohio Mar. 8, 2021) .............................. 32

*Dalton v. Spencer*,
    511 U.S. 462 (1994) ............................................................................................. 32

*Daniels v. Woodbury Cty., Iowa*,
    742 F.2d 1128 (8th Cir. 1984) ............................................................................. 21

*De Beers Consol. Mines v. United States*,
    325 U.S. 212 (1945) ............................................................................................. 32

*Demore v. Kim*,
    538 U.S. 510 (2003) ............................................................................................. 14

*Dep't of Com. v. New York*,
    139 S. Ct. 2551 (2019) .................................................................................. *passim*

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ......................................................................................... 15

iii

*Dolic v. Barr*,
    916 F.3d 680 (8th Cir. 2019) ........................................................................ 4

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ..................................................................................... 23

*FCC v. Prometheus Radio Project*,
    141 S. Ct. 1150 (2021) ................................................................................. 25

*FERC v. Electric Power Supply Ass'n*,
    577 U.S. 260 (2016) ..................................................................................... 28

*Garcia v. Johnson*,
    No. 14-CV-01775-YGR, 2014 WL 6657591  (N.D. Cal. Nov. 21, 2014)............... 16

*Gonzaga Univ. v. Doe*,
    536 U.S. 273 (2002) ..................................................................................... 17

*Gutierrez de Martinez v. Lamagno*,
    515 U.S. 417 (1995) ....................................................................................... 6

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................................. 9, 10

*Hernandez-Avallos v. INS*,
    50 F.3d 842 (10th Cir. 1995) ........................................................................ 17

*Hussaini v. Lynch*,
    644 F. App'x 403 (6th Cir. 2016) .................................................................. 12

*In re Aiken County*,
    725 F.3d 255 (D.C. Cir. 2013) ........................................................................ 7

*J.E.F.M. v. Lynch*,
    837 F.3d 1026 (9th Cir. 2016) ...................................................................... 15

*Jama v. ICE*,
    543 U.S. 335 (2005).......................................................................................... 7

*Jama v. Dep't of Homeland Sec.*,
    760 F.3d 490 (6th Cir. 2014) ....................................................................... 13

*JEM Broad. Co. v. FCC*,
    22 F.3d 320 (D.C. Cir. 1994) ........................................................................ 31

iv

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018)............................................................................................. 14

*Kentucky v. Biden*,
    No. 21-6147, 2022 WL 43178 (6th Cir. Jan. 5, 2022)........................................... 21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)............................................................................................... 16

*Lincoln v. Vigil*,
    508 U.S. 182 (1993)............................................................................................... 29

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973)............................................................................................... 19

*Mach Mining LLC v. EEOC*,
    575 U.S. 480 (2015)............................................................................................... 11

*Madison-Hughes v. Shalala*,
    80 F.3d 1121 (6th Cir. 1996) .................................................................................. 9

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989)............................................................................................... 25

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)............................................................................................... 22

*Mathews v. Diaz*,
    426 U.S. 67 (1976)................................................................................................... 7

*Matter of Tavdidishvili*,
    27 I&N  (BIA 2017)................................................................................................ 4

*Meyer v. Brown & Root Const. Co.*,
    661 F.2d 369 (5th Cir. 1981) ................................................................................ 21

*Michigan v. Thomas*,
    805 F.2d 176 (6th Cir. 1986) .......................................................................... 12, 16

*Milner v. Dep't of Navy*,
    562 U.S. 562 (2011)............................................................................................... 16

*Mississippi v. Johnson*,
    71 U.S. 475 (1866)................................................................................................. 32

*Motor Vehicle Mfrs. Ass'n of U.S., Inc.  v. State Farm Mut. Auto. Ins., Co.,*
    463 U.S. 59 (1983).................................................................................... 24, 26, 27

*National Railroad Passenger Corp. v. Morgan,*
    536 U.S. 101 (2002)........................................................................................ 6

*Nielsen v. Preap,*
    139 S. Ct. 954 (2019)............................................................................... *passim*

*Parsons v. DOJ,*
    878 F.3d 162 (6th Cir. 2017) ........................................................................ 13

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015)........................................................................................ 29

*Polyweave Packaging, Inc. v. Buttigieg,*
    No. 4:21-CV-00054-JHM, 2021 WL 4005616 (W.D. Ky. Sept. 2, 2021) .............................. 10

*Reno v. American-Arab Discrimination Comm., ("AADC"),*
    525 U.S. 471 (1999)................................................................................ 6, 7, 14

*Richbourg Motor Co. v. United States,*
    281 U.S. 528 (1930)........................................................................................ 6

*Rotkiske v. Klemm,*
    140 S. Ct. 355 (2019)..................................................................................... 6

*RSM, Inc. v. Buckles,*
    254 F.3d 61 (4th Cir. 2001) ........................................................................... 31

*Saginaw Cnty. v. STAT Emergency Med. Servs., Inc.,*
    946 F.3d 951 (6th Cir. 2020) ......................................................................... 22

*Schmidt v. Lessard,*
    414 U.S. 473 (1974)...................................................................................... 21

*Sealed Pet'r v. Sealed Resp.,*
    829 F.3d 379 (5th Cir. 2016) ......................................................................... 16

*Sherwood v. Tenn. Valley Auth.,*
    590 F. App'x 451 (6th Cir. 2014) ................................................................... 30

*Smith v. City of Hammond, Indiana,*
    388 F.3d 304 (7th Cir. 2004) ......................................................................... 32

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ................................................................................ 18, 22

*Sure-Tan, Inc.* v. *NLRB*,
    467 U.S. 883 (1984) .................................................................................... 19

*Texas v. United States*,
    14 F.4th 332 (5th Cir. 2021), *vacated en banc*, 2021 WL 5578015 (Nov. 30, 2021) ............. 7, 8

*Town of Castle Rock v. Gonzales*,
    545 U.S. 748 (2005) ............................................................................... 6, 7, 8

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ................................................................................. 6

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ................................................................................ 20

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) ...................................................................................... 6

*U.S. Army Corps of Engineers v. Hawkes Co.*,
    578 U.S. 590 (2016) .................................................................................. 13

*United States v. Fausto*,
    484 U.S. 439 (1988) .................................................................................. 14

*United States v. Pacheco-Alvarez*,
    227 F. Supp. 3d 863 (S.D. Ohio 2016) ............................................................... 12

*Warth v. Seldin*,
    422 U.S. 490 (1975) .................................................................................. 19

*Washington v. Reno*,
    35 F.3d 1093 (6th Cir. 1994) ......................................................................... 20

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) .................................................................................. 18

**Constitutional Provisions**

U.S. Const. Art. II, § 1, cl. 1 ............................................................................. 6

U.S. Const. Art. II, § 3 ....................................................................................... 6

**Statutes**

5 U.S.C. § 553 ................................................................................................ 28

5 U.S.C. § 701 ........................................................................................... 13, 14

6 U.S.C. § 202 ........................................................................................... *passim*

8 U.S.C. § 1103 ............................................................................................ 6, 11

8 U.S.C. § 1182 .................................................................................................. 4

8 U.S.C. § 1184 ................................................................................................ 11

8 U.S.C. § 1226 ......................................................................................... *passim*

8 U.S.C. § 123l .......................................................................................... *passim*

Colo. Rev. Stat. § 18-6-803.5 ........................................................................... 7

Missouri Rev. Stat. § 570.120 ........................................................................... 4

**Other Authorities**

1 Richard J. Pierce, Jr., Administrative Law Treatise § 6.3 (5th ed. 2010) (Pierce) ................... 29

Census Bureau, Quick Facts, https://www.census.gov/quickfacts/OH ........................................ 20

Executive Order 12,291 ........................................................................................... 12

H.R. Rep. 104-469, pt. 1 (conf. rep.) (1996) .................................................................... 7

U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal
   Operations Report ("2019 ICE Report"), https://perma.cc/E3MS-DLE .............................. 2, 3

U.S. Immigration and Customs Enforcement Fiscal Year 2020 Enforcement and Removal
   Operations Report ("2020 ICE Report"), https://perma.cc/WG7U-TUEQ ............................ 24

**SUMMARY**

*Pages 1-4:* In the September Guidance, the Secretary of Homeland Security directed his subordinates to focus enforcement efforts on threats to national security, threats to public safety, and threats to border security. He identified a number of factors that officers should account for when making case-by-case, individualized enforcement decisions based on the totality of the facts and circumstances. He reiterated the Department's continued commitment to enforcing immigration laws and emphasized that his guidance does not preclude or require any specific enforcement action, but instead leaves discretion to line officers' considered judgment. The Secretary's guidance follows in a long line of similar guidance over the past decades, including during the previous Administration, and is consistent with the Secretary's explicit statutory authority to "establish national immigration enforcement policies and priorities." 6 U.S.C. § 202(5). The States' characterization of this commonsense guidance as wholly novel and out of step with past practice badly misses the mark.

*Pages 5-6*: The September Guidance is entirely consistent with the Immigration and Nationality Act ("INA"). Even assuming that 8 U.S.C. § 1226(c) and § 1231(a)(1) do create certain judicially enforceable mandates, the guidance would not violate them. The Secretary was explicit that his guidance does not prohibit any enforcement action, but rather leaves decisions to the individual discretion of line officers, based on the totality of the circumstances. Congress expressly charged the Secretary with setting enforcement priorities, and he has done so.

*Pages 6-9*: Neither § 1226(c) nor § 1231(a)(1) creates any judicially enforceable mandates in any event. The word "shall," as used in those provisions, does not impose an enforceable mandate. The Supreme Court has rejected such simplistic reasoning repeatedly, and has emphasized that, especially in the context of a statute relating to law enforcement, a bare statutory "shall" does not displace the prosecutorial discretion inherent to the exercise of executive power. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005). The concerns motivating that doctrine are especially heightened in the context of immigration enforcement, which touches on a broader range of concerns, such as foreign policy, than even ordinary law enforcement. *See, e.g.*, *Reno v.*

1

*American-Arab Discrimination Comm. ("AADC")*, 525 U.S. 471, 490 (1999); *see also Jama v. ICE*, 543 U.S. 335, 348 (2005). Cases that have described the statutes in mandatory terms have arisen in entirely different contexts, and indeed in *Preap*, for example, the Supreme Court expressly rejected the argument that § 1226(c) imposed a judicially enforceable mandate on the Executive. *Nielsen v. Preap*, 139 S. Ct. 954, 969 n.6 (2019).

*Pages 9-11*: The setting of enforcement priorities is an area traditionally committed to an agency's discretion—it requires the balancing of numerous practical and policy-related factors and is uniquely unsuited to judicial review. Such decisions are presumptively unreviewable. *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). Here, Congress expressly assigned the Secretary authority to establish priorities without cabining his discretion. *See* 6 U.S.C. § 202(5). The States' reliance on cases where courts found sufficient standards to evaluate the agency's action have no bearing here, as they did not arise in the enforcement context and involved explicit statutory language that provided meaningful standards for review. Nor is the States' characterization of the September Guidance as an abdication of statutory duty remotely persuasive. The September Guidance offers guidelines for line officers in the exercise of their enforcement discretion; it in no way prohibits enforcement but instead directs it toward the agency's priorities.

*Pages 11-13*: The September Guidance is not "final agency action" reviewable under the APA because it does not affect "rights and obligations." The September Guidance expressly leaves individual enforcement decisions to line officers' discretion based on the totality of the circumstances. *Cf. Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015). In addition, the guidance is explicit that it does not create rights or obligations. The agency's characterization of its own action is entitled to weight, and is a strong indication that the enforcement guidance is not final agency action. *Cf. Michigan v. Thomas*, 805 F.2d 176, 187 (6th Cir. 1986). The States themselves concede that any obligations they incur arise only when later action is taken, but it is well established that "[a]n agency action is not final if it does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future

2

administrative action." *Jama v. DHS*, 760 F.3d 490, 496 (6th Cir. 2014); *see also Parsons v. DOJ*, 878 F.3d 162, 168 (6th Cir. 2017).

*Pages 13-17*: Whether judicial review under the APA is barred under 5 U.S.C. § 701(a)(1) requires consideration not only of specific statutory provisions but also statutory context and the statutory structure as a whole. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). In *Block*, as here, Congress had established a specific review scheme that permitted certain actions to be challenged by certain plaintiffs. And, again as here, that specific and reticulated review scheme precluded review under the APA. None of the stronger presumptions in favor of judicial review—as arise in the context of habeas or constitutional challenges—applies here. The States entirely fail to engage with this doctrinal analysis, preferring to focus only on the scope of specific statutory provisions.

The States' arguments with respect to the specific statutory provisions are misplaced. First, the Supreme Court has indicated that § 1252(b)(9) would preclude suits, like this one, that challenge "the process by which . . . removability will be determined." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (omission in original, citation omitted). Second, § 1226(e) bars review of the Executive's "discretionary judgment regarding the application of" § 1226. That provision contains no exception for APA challenges. *See, e.g.*, *Preap*, 139 S. Ct. at 974-75 (Thomas, J., concurring in part). Third, the States' attempt to limit the term "any party" in § 1231(h) to only certain parties is entirely atextual and inconsistent with the Sixth Circuit's analysis of substantively identical language in other contexts. *Michigan*, 805 F.2d at 187. Section 1231(h) clearly indicates Congress's intent that § 1231 not be enforced against the Executive.

*Pages 17-22*: The States fail to establish standing. They cannot show that they have been injured by the September Guidance. The States fail to show that DHS's policy of prioritizing public safety threats imposes more costs on them than a contrary policy that does not prioritize public safety threats. They do not show that those whose removal or arrest is deferred under the guidance will use more state resources than those whose removal or arrest is prioritized. The States' reliance

3

on "quasi-sovereign" interests is misplaced, *see Kentucky v. Biden*, No. 21-6147, 2022 WL 43178, at *8-9 (6th Cir. Jan. 5, 2022), because the States have no legitimate interest in regulating immigration enforcement, *see Arizona v. United States*, 567 U.S. 387, 401-02 (2012).

Nor do the States show that, to the extent that they have been injured, a court order vacating the September Guidance would redress that harm. Indeed, the States concede that they are content with the Department continuing to "exercis[e] basic judgment in line with these priorities, as the agency has done for years," so long as the agency also "[m]erely acknowledge[s] that Congress created mandatory priorities." Combined Reply in Supp. of Prelim. Inj. and Mem. Opposing Dismissal at 44, ECF No. 34, PAGEID 914 ("Pls.' Opp."). Such relief cannot redress any injury the States allege.

*Pages 22-25*: Agency action may be set aside as pretextual only if the agency's stated reasons for acting as it did are wholly contrived. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2571 (2019). The States utterly fail to meet this standard, failing even to identify an unstated "real" reason, much less to show that the stated reasons are contrived.

*Pages 25-28*: The Secretary adequately explained his decision and considered the relevant factors. The States suggest that the Secretary failed to consider certain factors, but in fact their argument is simply that they would have weighed the factors differently. But weighing those factors, especially in the face of uncertainty, was for the Secretary alone, and is not subject to judicial second-guessing. *See Dep't of Com.*, 139 S. Ct. at 2570 ("the choice between reasonable policy alternatives in the face of uncertainty [is] the Secretary's to make"); *see also Biden v. Missouri*, No. 21A240, 2022 WL 120950, at *4 (U.S. Jan. 13, 2022).

*Pages 28-31*: The September Guidance is a "general statement of policy"—a statement that "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power," *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993)—and is accordingly exempt from notice-and-comment procedures, *see* 5 U.S.C. § 553(b). The States contend that the September Guidance is a binding rule because it restricts officers' discretion. But the guidance expressly leaves discretion with the line officer, and does not create legally enforceable rights or obligations

4

that would require notice and comment. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). The States' discussion of the scope of the Secretary's informal interactions with various groups is both wrong and, more importantly, irrelevant to the question whether notice and comment is required.

*Pages 31-32*: The States do not dispute that the Supreme Court has rejected constitutional claims premised on statutory violations. *See Dalton v. Spencer*, 511 U.S. 462, 473 (1994); *see also Mississippi v. Johnson*, 71 U.S. 475, 499 (1866). Instead, the States insist that those doctrines do not apply to suits against the President's subordinates and suggest that the Supreme Court's invitation for further briefing on the question in 2016 allows this Court to disregard *Dalton* and the like. Those arguments are without merit; *Dalton* controls until the Supreme Court itself says otherwise, and bars the States' Take Care Clause claim.

*Page 32*: Remand without vacatur is the appropriate remedy when the agency can cure any defects and vacatur would be disruptive. If the Court concludes that the agency failed to satisfy the APA's requirements, it should remand to DHS to cure those defects but should not vacate the September Guidance.

**INTRODUCTION**

People may reasonably disagree about the best way to prioritize immigration enforcement efforts. But neither the States nor the Court has authority to set those priorities. Instead, Congress vested that discretion in the Secretary of Homeland Security. The States' claims thus fail at the threshold. And, on the merits, the States' claims cannot be reconciled with controlling precedent and decades of unbroken practice. Plaintiffs' claims should be dismissed.

**ARGUMENT**

The States renew the same erroneous arguments they made in their motion for a preliminary injunction. In doing so, they first draw a caricature of the September Guidance that in no way resembles the actual policy. They proceed from there to twist the law to fit their political or policy objectives, without regard to the obvious reality that it is the Secretary of Homeland Security—appointed by the President, confirmed by the Senate, and vested with broad statutory authority to "establish national immigration enforcement policies and priorities"—who alone must make these policy judgments. The Court should reject the States' novel attempts to upset the constitutional balance and should enter judgment for Defendants.

**I.     The States grossly mischaracterize the policy they challenge.**

In the September Guidance, the Secretary of Homeland Security recognized the need to prioritize enforcement efforts, given resource limitations and the vast number of noncitizens potentially subject to enforcement actions. Otherwise, the Department might fritter away resources on marginal cases at the expense of actions that more effectively promote the national interest.

The States mischaracterize this approach both as a departure from past practice and also as somehow unfaithful to various statutes. It is neither. They erroneously describe the guidance variously as "an abdication of enforcement responsibility," Pls.' Opp. at 1, ECF No. 34, PAGEID 872, as "strip[ping] officers of their discretion," *id.* at 13, PAGEID 883, as "placing a stamp of disapproval on enforcement activities," *id.* at 23-24, PAGEID 893-94, as "deeming [statutes] inoperative," *id.* at 24, PAGEID 894, and as "a broad nonenforcement policy," *id.* at 33, PAGEID 903.

1

These descriptions are impossible to square with the actual policy the States challenge, which expressly commits to enforcing the immigration laws, expressly commits discretion to line officers, and expressly preserves authority to pursue any enforcement action. *See* Sept. Guidance at AR2, 5, ECF No. 4-1, PAGEID 99, 102. Immigration officials have operated under various priority schemes for decades. *See* Considerations Memo at AR2-5, ECF No. 27-2, PAGEID 444-47 (discussing the Executive's exercise of immigration enforcement discretion dating back over a century); Defs.' Combined Mot. to Dismiss at 5, ECF No. 29, PAGEID 695 ("Defs.' Mem.") (collecting examples). In the previous administration, for example, Secretary Kelly prioritized enforcement for a different (and much broader) range of noncitizens, but still preserved "the individual, case-by-case decisions of immigration officers." Kelly Mem. at AR62, ECF No. 27-8, PAGEID 504. And, just like Secretary Mayorkas's guidance, Secretary Kelly's guidance did not "exempt[] or exclude[] any specified class or category" from enforcement. *Id.*; *see* Sept. Guidance at AR3, ECF No. 4-1, PAGEID 100 (enforcement "is not to be determined according to bright lines or categories"). The September Guidance follows in a long line of Secretarial guidance setting immigration enforcement priorities, consistent with express statutory authority. *See* 6 U.S.C. § 202(5).

The States cite favorably to a U.S. Immigration and Customs Enforcement ("ICE") report on detention from the prior administration to support their argument that the September Guidance represents a broad departure from past practice. *See, e.g.*, Pls.' Opp. at 14, ECF No. 34, PAGEID 884 (citing U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report at 12 ("2019 ICE Report"), https://perma.cc/E3MS-DLEP). That the States would rely so heavily on that report is surprising, as it reinforces that DHS must prioritize its resources to meet current challenges, and that prioritization always requires tradeoffs. As that report notes, in that year (mostly 2019) ICE reduced its "interior arrests," including its enforcement as to convicted criminals, because circumstances required that it "redirect its enforcement

personnel and detention capacity" to border security. 2019 ICE Report at 3.[1] ICE accordingly focused its "limited resources" still available to its "public safety mission" on noncitizens that "have extensive criminal histories with multiple convictions or pending charges," whom ICE deemed have a more "recidivist nature." *Id.* at 12. Quite similarly, the September Guidance recognizes DHS's limited resources and directs DHS officials to prioritize enforcement actions against "current threat[s] to public safety," taking account of "the gravity of the offense," and the existence of "a serious prior criminal record." Sept. Guidance at AR3, ECF No. 4-1, PAGEID 100. There is nothing novel about DHS prioritizing more serious threats over less serious threats to public safety. A contrary policy would be deeply troubling—and would betray the Secretary's responsibility to promote public safety.

The States' argument embraces a fantasy that DHS could arrest, detain, and remove every noncitizen described in two statutory provisions. It cannot. Sections 1226(c) and 1231(a)(1) cover categories of noncitizens far in excess of DHS's capacity to detain. *See* Declaration of Peter B. Berg ¶ 10 (AR6032-34), ECF No. 27-31, PAGEID 597-99 ("Berg. Decl.") (explaining the mismatch between DHS's detention capacity and the number of noncitizens subject to § 1226(c) and § 1231(a)); *see also id.* at ¶ 22 (AR6037), PAGEID 603 (describing difficulty of determining § 1226(c) status).

DHS therefore cannot detain every noncitizen subject to those provisions, and even to attempt to do so would preclude DHS from using resources on other important priorities, including other threats to public safety. *See* Berg Decl. ¶ 14 (AR6032-34), ECF No. 27-31, PAGEID 597-

---

[1] *See also id.* at 6 ("This shift [to a border security mission] has forced ERO to balance its public safety mission in the interior with support for CBP operations at the Southwest Border, and ERO's corresponding adjustment of resources has come at a significant cost to other operational areas. As the detained population has grown, ERO officers have had to be redeployed across the country to assist with detained docket management. These temporary deployments and reassignments have come at a significant cost to ERO's interior enforcement and public safety efforts."); *id.* at 12 ("Thus, while ERO continues to conduct enforcement in the interior of the United States, in light of its limited resources and the sheer volume of aliens attempting to enter the country, the agency has had to balance its support for border security with its interior public safety mission."); *id.* at 17 ("ICE detainers issued in FY 2019 decreased slightly (by seven percent) from those issued in FY 2018. Like other decreases in interior enforcement activity, this was impacted by the diversion of resources to the Southwest Border as well as limited detention space.").

99. Section 1226(c)(2) includes within its scope noncitizens with convictions for a wide range of crimes, some more serious than others. *See* 8 U.S.C. § 1182(a)(2)(A)(i)(I)-(II) (inadmissible if convicted of "a crime involving moral turpitude" or law "relating to a controlled substance"); *see id.* § 1226(c) (incorporating § 1182(a)(2) by reference). It includes, of course, some noncitizens convicted of grave crimes like murder and kidnapping. It can also include, on the other end of the spectrum, noncitizens convicted of crimes like passing a bad check. *See, e.g.*, *Dolic v. Barr*, 916 F.3d 680 (8th Cir. 2019) (explaining that passing a bad check in violation of Missouri Rev. Stat. § 570.120 is a crime involving moral turpitude). Nor does § 1226(c) address the full range of threats to public safety or other national interests that the Department must consider in enforcing federal immigration laws. Section 1226(c) does not include, for example, some very serious convictions. *See Matter of Tavdidishvili*, 27 I&N 142 (BIA 2017) (holding that criminally negligent homicide is not a crime involving moral turpitude). And it does not extend to removable noncitizens who are credibly accused, but not convicted, of domestic battery—or indeed those credibly accused but not convicted of *any* crime. In these cases, detention pending removal proceedings might be readily justifiable on public safety grounds, but would be authorized only under § 1226(a), not § 1226(c). Section 1231(a)(1), on the other hand, applies to *all* noncitizens with final removal orders, without regard to whether they have been convicted of any criminal offense or present any threat to public safety.

Faced with this reality, the Secretary chose to target his limited resources on the most serious threats to public safety, national security, and border security. The Secretary emphasized that "[w]e do not lessen our commitment to enforce immigration law to the best of our ability," and that the guidance "does not compel an action to be taken or not taken," but instead "leaves the exercise of prosecutorial discretion to the judgment of our personnel." Sept. Guidance at AR2, 5, ECF No. 4-1, PAGEID 99, 102. The States' hyperbolic descriptions bear no resemblance to the policy they challenge.

4

## II.    The September Guidance is consistent with law.

### A.    *The September Guidance does not violate any conceivable duty in the INA.*

Congress expressly charged the Secretary of Homeland Security with "establishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5). In the September Guidance the Secretary did just that: he directed his officers on how to decide which of millions of potential enforcement actions to pursue, while emphasizing that the guidance "does not compel an action to be taken or not taken." Sept. Guidance at AR5, ECF No. 4-1, PAGEID 102.

The States contend that § 1226(c)(1) imposes a judicially enforceable mandate to immediately arrest and detain any noncitizen that falls within its ambit, and that § 1231(a)(1) imposes a similar mandate to remove all noncitizens within 90 days of a removal order becoming final. As explained below, neither assertion is true. But even if they were, nothing in the September Guidance would violate such mandates. Nothing in the guidance prohibits DHS from detaining any noncitizen subject to § 1226(c), or from removing within 90 days any noncitizen with a final order of removal. *See* Sept. Guidance at AR5, ECF No. 4-1, PAGEID 102 ("The civil immigration enforcement guidance does not compel an action to be taken or not taken."). Rather, it is the inherent limits on DHS resources—the literal impossibility—that prevents DHS from detaining or removing every noncitizen subject to enforcement action under either § 1226(c) or § 1231(a)(1). Vacating the September Guidance would do nothing to alleviate these resource constraints.

The States contend that the September Guidance "strips" DHS's officers' "statutory authority" and their "discretion" to remove noncitizens within the ambit of § 1231 and prevents them from taking into custody noncitizens "convicted of murder, rape, or sexual abuse of a minor." Pls.' Opp. at 6, 13, ECF No. 34, PAGEID 876, 883. Not so. For one, the September Guidance (just like the Kelly Memorandum in effect for most of the previous administration) "leaves the exercise of prosecutorial discretion to the judgment of [DHS] personnel." Sept. Guidance at AR5, ECF No. 4-1, PAGEID102. And for another, the Secretary specifically directed his personnel to prioritize those who present a threat to public safety, taking into particular account the gravity of the offense of conviction. *Id.* at 3, PAGEID 100.

5

The September Guidance simply recognizes the reality of limited resources, and offers discretion on how to act in the face of it. Because DHS cannot remove everyone, it must decide who among those that it *could* remove it in fact *will* remove. The authority to prioritize in the face of limited resources is inherent to the executive power, *see* U.S. Const. Art. II, § 1, cl. 1; *id.* Art. II, § 3, and expressly conferred on the Secretary by statute, 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a). *See also AADC*, 525 U.S. at 483-84; *Arizona*, 567 U.S. at 396. *Cf. TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021) ("[T]he choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)."). Nothing in the September Guidance violates the INA.

> B.    *The statutes do not create any judicially enforceable duty.*

Neither § 1226(c)(1) nor § 1231(a)(1) creates any judicially enforceable duty in any event. The States principally rest their argument on the use of the word "shall" in each of those statutes. This blithe insistence ignores decades of settled law regarding statutory construction in the context of prospective government action. *See Castle Rock*, 545 U.S. at 761. The word "shall" always derives its meaning from context. *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 n.9 (1995) ("Though 'shall' generally means 'must,' legal writers sometimes use, or misuse, 'shall' to mean 'should,' 'will,' or even 'may.'"); *Richbourg Motor Co. v. United States*, 281 U.S. 528, 534 (1930) (similar). The States' preferred context, evidently, involves statutes of limitations—they cite *Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019) (statute of limitations did not allow for discovery rule); *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (same); and *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (plaintiff must file within statutory filing timelines). Those cases are far afield, and they are of no help interpreting "shall" in *this* context.

Instead, the Court should look to the Supreme Court's holding in *Castle Rock*, which unmistakably counsels that the use of the word "shall" does not displace law enforcement's inherent discretion to prioritize or to decline to enforce in particular circumstances. 545 U.S. at 761; *see also Chicago v. Morales*, 527 U.S. 41, 49 n.8 (1999) (statute indicating that police "shall

order" dispersal did not displace enforcement discretion). That instruction is all the more potent in the context of immigration enforcement, where the concerns warranting judicial deference to Executive enforcement decisions are "greatly magnified." *AADC*, 525 U.S. at 490; *see also Jama*, 543 U.S. at 348 (immigration enforcement "implicate[s] our relations with foreign powers and require[s] consideration of changing political and economic circumstances" (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976))).

The States attempt to rebut the teaching of *Castle Rock* by setting up and tearing down a strawman. *See* Pls.' Opp at 8, ECF No. 34, PAGE ID 878. Defendants have not argued that *Castle Rock* "disallows" or "bar[s]" legislatures from establishing mandatory enforcement duties— although such laws would raise serious constitutional concerns in the federal context, *see In re Aiken County*, 725 F.3d 255, 263 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("In light of the President's Article II prosecutorial discretion, Congress may not mandate that the President prosecute a certain kind of offense or offender.").[2] What *Castle Rock* says is that it takes much more than using the word "shall" to displace the otherwise inherent and longstanding discretion of enforcement officials.

The States insist that a "stronger indication" exists here because Congress used both "may" and "shall" in alternate places in the INA. But that was just as true of the statute at issue in *Castle Rock*. *See Castle Rock*, 545 U.S. at 775 (Stevens, J., dissenting); Colo. Rev. Stat. §§ 18-6-803.5(3)(d), (6)(a)-(b), (7), (9); *see also Texas v. United States*, 14 F.4th 332, 339 (5th Cir. 2021), *vacated en banc*, 2021 WL 5578015 (Nov. 30, 2021). The States point to bits of legislative history, but that history is mixed, *see, e.g.*, H.R. Rep. 104-469, pt. 1, at 160, (conf. rep.) (1996) (describing § 1231(a) as setting a "target" for removal), and in any event much stronger legislative history was

---

[2] Nor may *Castle Rock* fairly be read to turn solely on questions of substantive due process. *Contra* Pls.' Opp. at 8, ECF No. 34, PAGEID 878. The Supreme Court interpreted the state statute and held that it did not create a judicially enforceable mandate, and only then, as an aside, noted its doubt that "[e]ven if" the statute mandated enforcement the respondent still might have a "property" interest within the meaning of the Fourteenth Amendment. *See* 545 U.S. at 766-67.

deemed insufficient in *Castle Rock*, *see* 545 U.S. at 759 n.6 (quoting legislative history); *see also id.* at 779-84 (Stevens, J., dissenting) (same).

The States evidently have difficulty imagining how Congress might have been clearer, but, as Defendants pointed out, *see* Defs.' Mem. at 31-32, ECF No. 29, PAGEID 721-22, Congress was perfectly clear *in these same sections* when it wanted to displace executive discretion, *see* 8 U.S.C. § 1226(c)(2) (DHS may take certain actions "only if" certain conditions are met); *id.* § 1231(a)(2) (DHS may take certain actions "under no circumstances"). DHS's interpretation of § 1226 and § 1231 does not render any part of them superfluous. DHS has consistently understood those sections to restrict DHS's authority to *release* certain noncitizens that it has already detained. *See* Considerations Memo at AR18-19, ECF No. 27-2, PAGEID 460-61; *see also* Meissner Mem. at AR32, ECF No. 27-4, PAGEID 474 (similar analysis from 2000). The States ignore the numerous courts that have applied *Castle Rock* to these precise statutes, concluding that they do not displace the discretion inherent to law enforcement. *See Arizona v. DHS*, No. CV-21-00186-PHX-SRB, 2021 WL 2787930, at *9 (D. Ariz. June 30, 2021) ("Interpreting § 1231(a)(1)(A) to mandate the removal of a noncitizen within 90 days is irreconcilable with § 1231(a)(3)'s provisions for supervision of noncitizens not removed within 90 days."); *Texas*, 14 F.4th at 338.

The States again point to various cases that describe the statutes in mandatory terms. But none of these cases contemplated judicial enforcement of a mandate against the Executive. *See* Defs.' Mem. at 31, ECF No. 29, PAGEID 721; *see Texas*, 14 F.4th at 338 (distinguishing *Guzman Chavez* on this basis). Those courts did not decide, as the issue was not remotely implicated, whether § 1231(a) or § 1226(c) impose a *judicially enforceable* duty on the Secretary. Rather, each arose in the context of a detainee challenging his detention, and it is not plausible that the Supreme Court discarded its longstanding precedent on discretion in immigration enforcement and the persistence of enforcement discretion in the face of a statutory "shall" without acknowledgment. Indeed, in *Preap*, on which the States rely, *see* Pls.' Opp. at 6, ECF No. 34, PAGEID 876, the Supreme Court went out of its way to *reject* the contention that any duty in § 1226(c) was judicially enforceable. The Supreme Court explained that even if "Congress does not draft legislation *in the*

*expectation* that the Executive will blow through the deadlines it sets" that does not mean "that Congress wanted the deadline *enforced by courts.*" *Preap,* 139 S. Ct. at 969 n.6 (emphasis in original). The Supreme Court accordingly *refused* to enforce § 1226(c) against the Executive. And, as discussed further below, it is similarly clear that Congress did not want § 1231 enforced against the Executive: Congress expressly provided that "[n]othing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." 8 U.S.C. § 1231(h).

### III.  The September Guidance is not subject to judicial review.

### A.  *Enforcement prioritization is committed to the Secretary's discretion.*

Certain fields have "traditionally been committed to agency discretion." *Chaney*, 470 U.S. at 832. Enforcement decisions are one such area, where the agency must conduct "a complicated balancing of a number of factors which are peculiarly within its expertise," including deciding "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.* Because an "agency generally cannot act against each technical violation of the statute it is charged with enforcing" courts generally leave it to the agency "to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 321-32; *see Madison-Hughes v. Shalala*, 80 F.3d 1121, 1126 (6th Cir. 1996) (applying *Chaney* to an enforcement policy).

These principles preclude judicial review here. The Secretary is expressly vested with the authority to set "national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and it is his task, without judicial interference, to assess the "many variables" that go into such analysis. The States do not meaningfully engage with this presumption of nonreviewability that applies. Their only retort is to decree the September Guidance a "broad nonenforcement policy." *See* Pls.' Opp. at 33-34, ECF No. 34, PAGEID 903-04 (citing *Crowley Caribbean Transp. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994)). But the case on which they rely (which held the challenged action unreviewable) was discussing the reserved question in *Chaney* whether an otherwise unreviewable

policy would become reviewable if the agency "consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities. *See Crowley*, 37 F.3d at 677 (quoting *Chaney*, 470 U.S. at 833 n.4). The September Guidance does not even approach that category. *Cf. Arizona*, 2021 WL 2787930 at *10 (rejecting Arizona and Montana's contention that the Interim Guidance was reviewable as an "abdication" of statutory duty); AART Summary Data, ECF No. 27-15, at AR108, PAGEID 537 (summarizing enforcement actions under Interim Guidance). The Secretary reiterated DHS's "commitment to enforce immigration laws to the best of our ability," Sept. Guidance at AR2, ECF No. 4-1, PAGEID 99, and expressly advised that his guidance "does not compel an action to be taken or not taken," *id.* at AR5, PAGEID 102. Whether to enforce in a particular circumstance is left to the "judgment of our personnel." *Id.*; *cf. Polyweave Packaging, Inc. v. Buttigieg*, No. 4:21-CV-00054-JHM, 2021 WL 4005616, at *12–13 (W.D. Ky. Sept. 2, 2021) (appeal docketed) ("These DOT enforcement procedures are closely tied to the prototypical type of unreviewable agency action: the decision not to institute enforcement proceedings."). The presumption of nonreviewability therefore applies with full force.

Instead of seriously disputing the presumption, the States contend that the standard that applies in the absence of the presumption—the absence of meaningful statutory criteria—is not met. But the States' arguments fail even under that standard. The States reference the Sixth Circuit's decision in *Barrios Garcia v. DHS*, 14 F.4th 462 (6th Cir. 2021), where the court held that the terms "pending" and "bona fide" provided sufficient statutory standards by which to judge DHS's alleged failure to issue work authorization to certain nonimmigrants while their applications were pending. *Id.* at 481; *see* Pls.' Opp. at 32-33, ECF No. 34, PAGEID 902-03. But that case is of no help to the States. As that court recognized, issuing work authorizations is unlike the enforcement context discussed in *Chaney* because it concerns a process for the conferral of a government benefit. *Barrios Garcia*, 14 F.4th at 482-83. Nor does the relevant statute under which the Secretary acted here—6 U.S.C. § 202(5)—contain any comparable standard. Indeed, that statute, which provides that the Secretary is responsible for "[e]stablishing national immigration enforcement policies and priorities," mirrors the example given by the Sixth Circuit, *see Barrios*

*Garcia*, 14 F.4th at 481 ("Imagine if § 1184(p)(6) read 'the DHS Secretary may grant work authorization to noncitizens.'"). Nothing in § 1231, for example, tells the Secretary how to set those priorities—how to decide who among millions to pursue for removal first.

The States misleadingly quote from the Supreme Court's decision in *Mach Mining LLC v. EEOC*, 575 U.S. 480 (2015), to buttress their mistaken contention that no standard at all is standard enough for judicial review. *See* Pls.' Opp. at 33, ECF No. 34, PAGEID 903. There, the Supreme Court held that the statutory term "informal methods of conference, conciliation, and persuasion" provided a standard (albeit a deferential one) for reviewing EEOC's attempts at pre-lawsuit conciliation. The specific statutory words "conference, conciliation, and persuasion" (words that the States omit from their discussion) "necessarily involve communication between parties, including the exchange of information and views." *Mach Mining*, 575 U.S. at 488. That case offers no support for the States' contentions here.

The States next point to the transition period Congress enacted to govern in the first two years after it enacted the IIRIRA. There "would have been no need" for the transition period, the States insist, if § 1226(c) and § 1231(a) were not judicially enforceable. But the Supreme Court in *Preap* rejected this exact line of reasoning. 139 S. Ct. at 969 & n.6 (rejecting the contention that the transition period "enacted along with § 1226(c) would have been superfluous if § 1226(c) did not call for immediate arrests, since those [transition] rules authorized delays in § 1226(c)'s implementation while the Government expanded its capacities").

The establishment of enforcement priorities is a quintessential function of the Executive, and Congress committed that discretion as to immigration enforcement to the Secretary. 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a). The States may not like the priorities that the Secretary has adopted, but it is his decision to make, unencumbered by interference from the States or from the judiciary.

> **B.** *The September Guidance is not final agency action under the APA.*

Regardless, the Secretary's enforcement priorities are not "final agency action" under the APA. The States contend that the September Guidance affects "rights and obligations" because it "denies discretion" to line officers. That contention is belied by the text of the guidance itself,

11

which expressly commits the discretion to make case-by-case determinations, based on all the circumstances, to DHS's line officers. *See, e.g.*, Sept. Guidance at AR3, ECF No. 4-1, PAGEID 100 (enforcement based on "totality of the facts and circumstances"); *id.* at AR4, PAGEID 101 ("[O]ur personnel must evaluate the individual and the totality of the facts and circumstances and exercise their judgment accordingly"); *id.* at AR5, PAGEID 102 ("[T]his guidance leaves the exercise of prosecutorial discretion to the judgment of our personnel."); *compare*, Kelly Memo. at AR62, ECF No. 27-8, PAGEID 504 (leaving discretion to line officers). Because the guidance does not dictate the outcome in any particular case, it does not eliminate line officers' discretion. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015) (agency guidance to safety inspectors "on what to look for" was not "final agency action" because it "preserves the aviation safety inspectors' discretion" in "an individual case," "even if [it] arguably inclines aviation safety inspectors towards certain outcomes").

Moreover, although not dispositive, the way an agency characterizes its own actions is highly relevant to whether it creates rights or obligations. *See, e.g.*, *id.* at 717 (citing *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006)). The "no right or benefit" language in the memorandum is not, as Plaintiffs would have it, mere boilerplate. Courts—including the Sixth Circuit—regularly hold that such provisions preclude legal challenges based on the relevant order or regulation. In *Michigan v. Thomas*, 805 F.2d 176 (6th Cir. 1986), the Sixth Circuit addressed an Executive Order that contained nearly identical language. The court firmly endorsed the government's claim that, based on that language, the Executive Order was not judicially enforceable: "Given this clear and unequivocal intent that agency compliance with Executive Order 12,291 not be subject to judicial review, we hold that the Order provides no basis for rejecting the EPA's final action. The Order was intended 'to improve the internal management of the Federal government' and not to confer rights judicially enforceable in private litigation." *Id.* at 187; *see also Hussaini v. Lynch*, 644 F. App'x 403, 408 (6th Cir. 2016) (DHS's Morton Memo created no enforceable rights); *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 893 n.11 (S.D. Ohio 2016) (same).

12

In no way do these guidelines change any person or entity's legal rights or obligations. For noncitizens subject to removal, their legal status remains unchanged, and they have no right to remain in the United States just as before. The September Guidance does not create any safe harbors from enforcement or identify any conduct which is newly unlawful. *Cf. U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (identifying two ways agency action might be deemed final). And the September Guidance does not even purport to regulate the States. The practical effects that flow from the guidance does not render it "final" for purposes of the APA. *See Parsons v. DOJ*, 878 F.3d 162, 168 (6th Cir. 2017); *Ass'n of Flight Attendants*, 785 F.3d at 718 ("An agency pronouncement is not deemed a binding regulation merely because it may have some substantive impact, as long as it leave[s] the administrator free to exercise his informed discretion."). Nor, even if the preexisting requirements to provide medical care or to supervise parole could constitute "legal effects" of DHS's enforcement decisions, would those obligations derive from the September Guidance. *Cf. Hawkes*, 578 U.S. at 598 (agency action is final if it has "*direct* and appreciable legal consequences" (emphasis added)). Indeed, the States *concede* that these obligations occur only upon later events—when "a detainer is not executed and a criminal alien is released." Pls.' Opp. at 37, ECF No. 34, PAGEID 907. The States then further conflate the causation inquiry for standing with the question of whether an agency action is final under the APA. These are distinct inquiries—otherwise, the standing inquiry would always answer the rights and obligations inquiry. And as the Sixth Circuit has made clear, "[a]n agency action is not final if it does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action." *Jama*, 760 F.3d at 496. Defendants contest that a particular nonenforcement decision would constitute final agency action, but for purposes of this action, it is enough to accept the States' concession and dismiss their suit.

C. *Judicial review is precluded by "other statutes."*

In *Block v. Community Nutrition Institute*, the Supreme Court explained, and demonstrated, that whether a particular claim is precluded by other statutes under § 701(a)(1) requires a search not just for express language precluding review, but an inquiry into the statutory structure and

legislative context. 467 U.S. 340, 345 (1984). In *Block*, no statute expressly precluded review, but the Supreme Court nonetheless found that APA review was unavailable because the statutory structure channeled claims by certain parties through an administrative process. *Id.* at 346-47. This process, the court held, precluded claims outside of it.

Here, Congress has similarly established a robust review process for claims related to immigration enforcement. To broadly permit claims outside this process would upset the statutory scheme and ignore Congress's evident intent to carefully circumscribe judicial review in the immigration enforcement context. *Cf. id.* at 348; *United States v. Fausto*, 484 U.S. 439, 448-450 (1988). APA claims challenging immigration enforcement are therefore precluded. *See* 5 U.S.C. § 701(a)(1); *cf. Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) ("It follows then, that an organizational plaintiff could not undermine the statutory scheme by suing to challenge 'generic' INS policies or statutory interpretations that bear on an alien's right to legalization."). The Supreme Court has found exceptions for constitutional claims and claims (like habeas) challenging detention, in light of the much stronger presumptions in favor of judicial review that apply in those contexts. *See, e.g.*, *Demore v. Kim*, 538 U.S. 510, 517 (2003); *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (plurality opinion); *Preap*, 139 S. Ct. at 962 (plurality opinion). This case does not implicate those presumptions, and so, under the ordinary analysis set forth in *Block*, the States' claims are precluded.

The States do not engage with *Block*, or its requirement that courts consider not just specific statutory provisions but also statutory structure and context. *Cf.* Defs.' Mem. at 25-26, ECF No. 29, PAGEID 715-16. The structure here—reflected in many provisions—speaks to Congress's desire to "protect[] the Executive's discretion from the courts." *AADC*, 525 U.S. at 486. So too, the context. "A principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona,* 567 U.S. at 396. Immigration enforcement touches on many concerns, including foreign policy, and judicial review outside the narrow structure Congress established would be improper. *AADC*, 525 U.S. at 484-86; *see* Considerations Memo at AR6, ECF No. 27-2, PAGEID 448. And that is especially so in the context of enforcement priorities,

14

which are the special province of the executive. Under the correct doctrinal analysis, set forth in *Block*, the States cannot pursue this challenge under the APA.

Rather than confront that doctrinal inquiry, the States focus individually on three specific statutory provisions that form part of the overall statutory scheme. Section 1252(b)(9), the States contend, does not apply to a challenge to policies. *See* Pls.' Opp. at 39, ECF No. 34, PAGEID 909. Not so: the Supreme Court has identified three circumstances where it applies, including challenges to "the process by which . . . removability will be determined." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1907 (omission in original, citation omitted). The States' principal contention is that the September Guidance changes the process for deciding who to remove—squarely within § 1252(b)(9). *See also J.E.F.M. v. Lynch*, 837 F.3d 1026, 1035 (9th Cir. 2016) (section 1252(b)(9) bars "policies-and-practices challenges").

Section 1226(e) bars review of the States' claims to the extent they relate to § 1226. The Secretary's discretionary decisions—such as his decision to institute enforcement priorities to guide arrests and removal—are not subject to judicial review insofar as they implicate § 1226. The States insist that § 1226(e) proscribes review only of individual enforcement decisions. But that view of the statute appears only in plurality opinions, *e.g.*, *Preap*, 139 S. Ct. at 962 (plurality op.), and such a limitation appears nowhere in the statute, *see id.* at 974-75 (Thomas, J., concurring in part), which by its terms applies broadly to the government's "judgment"—not just its enforcement decisions—"regarding the application of" § 1226. And, as is apparent in § 1252, which covers policies and procedures, Congress contemplated that some such challenges would arise outside the context of specific enforcement actions.

As to § 1231(h), the States advance a series of counterintuitive arguments. First, they contend that they can bring their claim that the September Guidance violates § 1231—that is, they can seek to enforce § 1231 through an APA action—because they are not bringing a claim "under" § 1231. But the States cannot enforce § 1231 in an APA action (or any other action) because—as § 1231(h) provides—"nothing" in § 1231 is "legally enforceable by any party against the United States." The Sixth Circuit has interpreted essentially identical language in an Executive Order to

15

reflect a "clear and unequivocal intent that agency compliance with [the order] not be subject to judicial review." *Michigan*, 805 F.2d at 187. Here, § 1231 similarly reflects *Congress's* "clear and unequivocal intent that agency compliance with" *the statute* "not be subject to judicial review."[3]

The States next renew their argument that the term "any party" in § 1231(h) doesn't include parties like *them*, but only means "the alien in a removal proceeding." Pls.' Opp. at 41, ECF No. 34, PAGEID 911. But the States have no answer to the ordinary meaning of "any party," the "expansive meaning" of the word "any," *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218–19 (2008), or the contrast between "any party" in § 1231(h) and the narrower term "the alien" used throughout the rest of § 1231. Instead, the States rely on a bit of legislative history indicating that one purpose of the provision was to preclude suits by noncitizens with final orders of removal. But the States ignore both language in that very same sentence of legislative history—"among other things"—and also the Supreme Court's repeated admonition that it is not the judiciary's function "to restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy," *Brogan v. United States*, 522 U.S. 398, 403 (1998); *see also Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020). Indeed, courts should reference legislative history only "to clear up ambiguity, not create it." *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011).

Defendants separately pressed the related argument that Congress did not want any plaintiff to sue to enforce § 1231, and so the States (like any other plaintiff) are outside the zone of interests of the statute. *See* Defs.' Mem. at 29-30, ECF No. 29, PAGEID 719-20. The zone-of-interests test requires an inquiry into whether the particular plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127-28 (2014). To answer the zone-of-interests inquiry, the States erroneously invite the Court to look to Congress's "overall purposes" in the INA as a whole. *See* Pls.' Opp at 42, ECF

---

[3] The States cite one case where they assert that a court "enforced" § 1231, but that case focused on a challenge to a denial of a claim for asylum under 8 U.S.C. § 1158. *See Sealed Pet'r v. Sealed Resp.*, 829 F.3d 379, 383 (5th Cir. 2016). Courts also hear challenges to the application of regulations implementing the Convention Against Torture. *See, e.g., Garcia v. Johnson*, No. 14-CV-01775-YGR, 2014 WL 6657591, at *5 n.3 (N.D. Cal. Nov. 21, 2014).

No. 34, PAGEID 912. But "the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question," but instead "by reference to the particular provision of law upon which the plaintiff relies." *Bennett v. Spear*, 520 U.S. 154, 175–76 (1997). "It is difficult to understand how" the States "could have failed to see this from [the Supreme Court's] cases." *Id.* at 176. And looking to § 1231, Congress was unequivocal that it did not want "any party" to sue to "enforce[]" its terms "against the United States." 8 U.S.C. § 1231(h).

The States are no doubt correct that § 1231 does not create "rights" that are "enforceable directly from the statute itself." Pls.' Opp. at 41, ECF No. 34, PAGEID 911 (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002)). But as the Ninth Circuit has explained, Congress added § 1231(h) (or, more specifically, its statutory predecessor before recodification) specifically to preclude efforts to enforce the statute *indirectly*, either through the APA or a mandamus action. *See Campos v. INS*, 62 F.3d 311, 314 (9th Cir. 1995) (explaining that the statute must do more than bar a direct cause of action because no court had ever inferred a direct cause of action under the statute). The States' attempt to distinguish the Tenth Circuit's decision holding that "no one can satisfy the zone of interests test" is unavailing: although that case arose in a mandamus posture, the court specifically said that it was applying the same zone-of-interests test that would apply in an APA action. *See Hernandez-Avallos v. INS*, 50 F.3d 842, 844-45 (10th Cir. 1995).

Whether § 1231(h) is understood as an independent limit on jurisdiction, as part of the *Block* jurisdictional analysis, as a limit on the zone of interests, or as a limit applied at the merits, the effect is the same: the States cannot prevail on any claim that the September Guidance violates § 1231.

## IV.  The States lack standing.

The States have failed to show that any Plaintiff State has standing to challenge the September Guidance. The States have not shown that the September Guidance "certainly" has inflicted, or will inflict, any injury upon the Plaintiff States. Indeed, the States effectively concede that they do not expect, or want, any change should they prevail; they seek an injunction that compels DHS to "[m]erely acknowledg[e] that Congress created mandatory priorities" while

permitting DHS to continue "exercising basic judgment in line with these priorities, as the agency has done for years." Pls.' Opp. at 44, ECF No. 34, PAGEID 914. What the States seek, evidently, is simply an advisory opinion on the meaning of two provisions of the INA. That is not a proper function of the judiciary, and this Court should reject the States' invitation to ignore the strictures of Article III.

To establish standing to "seek injunctive relief, a plaintiff must show that" it "is under threat of suffering" an "actual and imminent" injury caused by "the challenged action," and that "a favorable judicial decision will prevent" that injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The "threatened injury must be *certainly impending* to constitute injury in fact"; allegations of "possible future injury do not satisfy . . . Art. III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)) (emphasis added).

The States largely rely on a single theory: that the September Guidance will result in increased crime, and increased crime-related costs, in the Plaintiff States. But again, this theory relies on an elaborate, speculative chain of events. The States do not dispute that for the September Guidance to inflict any injury upon them, (i) it would have to result in fewer enforcement actions against noncitizens who are or will be located in the Plaintiff States and who are covered by sections 1226(c) and 1231(a)(1), (ii) those precise noncitizens will then commit crimes in the Plaintiff States, and (iii) those crimes will have to impose greater costs than the crimes that *would have* been committed by those who will now be apprehended and removed due to the September Guidance's focus on noncitizens likely to pose a threat to public safety and those who arrived in the United States after November 2020.

The States provide no evidence or factual support to establish any step of this injury theory. Instead, they first assert that ICE has generally "cut back on taking custody of criminal aliens." Pls.' Opp. at 27, ECF No. 34, PAGEID 897. But even assuming this were true, not all crimes impose the same costs. As noted in the motion to dismiss—and as the States do not dispute—due to the priority framework in the Interim Guidance, ICE was able to arrest more noncitizens convicted of aggravated felonies. *See* Considerations Memo at AR17, ECF No. 27-2, PAGEID

18

459 (from February 18 to August 21, 2021, "ICE . . . arrested 6,046 individuals with [aggravated felony] convictions compared to just 3,575 in the same period in 2020"); Berg Decl. ¶¶ 15-16 (AR6035), ECF No. 27-31, PAGEID 600. The States have presented no evidence to support the counterintuitive conclusion that the agency's policy that focuses on the most serious threats to public safety will result in more crime than a policy that does not.

The States also briefly reiterate their second injury theory, namely that the September Guidance will increase the number of noncitizens using "emergency medical services, schooling, and other social services" in the Plaintiff States. Pls.' Opp. at 28, ECF No. 34, PAGEID 898. But this injury theory fails for the same reason: the States fail to show that the September Guidance will result in fewer enforcement actions against those noncitizens who not only reside in the Plaintiff States but will also utilize State resources. Moreover, the States' evident belief that DHS is statutorily required to focus its resources on those with criminal convictions and with final orders of removal would mean that DHS would have to deprioritize recent arrivals—quite possibly increasing the States' noncitizen populations. Thus, the Plaintiff States have all failed to establish a "certain" injury tied to the September Guidance, or redressable by an order setting it aside.[4]

Further, the States' injury theory is especially inadequate with respect to Ohio and Montana. "Each plaintiff has the burden 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 457 (6th Cir. 2017) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). Here, the States themselves acknowledge that Arizona is situated differently from Ohio and Montana. *See* Compl.

---

[4] This is consistent with the principle that a litigant "lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see also Sure-Tan, Inc.* v. *NLRB*, 467 U.S. 883, 897 (1984) (third parties "have no judicially cognizable interest in procuring enforcement of the immigration laws."). In response, the States argue that, in *Linda R.S.*, "prosecution would not have affected the plaintiff financially." Pls.' Opp. at 28, ECF No. 34, PAGEID 898. But that was the plaintiff's precise theory of injury in that case, 410 U.S. at 618, and the broad principle laid out in *Linda R.S.*—that a party may not sue to insist on the prosecution of another—stands apart from any failure of proof as to causation. To the contrary, the Supreme Court canvassed its "prior decisions" and found that they "consistently h[e]ld that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S.*, 410 U.S. at 619.

19

¶ 35, ECF No. 1, PAGEID 9 (alleging that Arizona is a "border state" that allegedly is "acutely affected by modifications in federal [immigration] policy," but making no comparable allegations about Ohio and Montana). Plaintiffs do not even argue that either Ohio or Montana have witnessed a surge in noncitizen populations following the implementation of the September Guidance, nor do they argue that either State is generally vulnerable to changes in immigration policy. Indeed, the States principally argue, citing to *Trump v. Hawaii*, that the standing of Ohio and Montana is irrelevant, since they may both allegedly rely on Arizona's standing. *See* Pls.' Resp. at 26, ECF No. 34, PAGEID 896 (citing 138 S. Ct. 2392, 2416 (2018)). But in *Trump v. Hawaii*, the Supreme Court merely reiterated the noncontroversial principle that a Court may issue a form of relief so long as one plaintiff has standing to seek it. 138 S. Ct. at 2416 ("At least one plaintiff must have standing to seek each form of relief requested in the complaint."). The Court did not, however, state that if one party has standing, any other party may tag along, regardless of whether it also has standing to seek any relief. Any relief entered by the Court must be limited to redressing the injuries established; if Ohio and Montana do not have standing they are not entitled to relief. *See Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994). The States also note that Ohio and Montana respectively have noncitizen populations of roughly 89,000 and 4,000. But these numbers are miniscule—89,000, for example, represents less than 1% of Ohio's population[5]—and regardless, the States present no evidence indicating that these numbers have been materially affected by the September Guidance. Thus, Ohio and Montana especially have failed to make the requisite showing and thus, at a minimum, the Court should dismiss them from this case.

But even if the States had established an injury tied to the September Guidance, they fail to show that a favorable decision by the Court could redress that injury. Due to resource constraints, DHS inevitably has to prioritize enforcement actions against some noncitizens over others. *See* Considerations Memo at AR5-8, ECF No. 27-2, PAGEID 447-50. Thus, if the Court enjoins or sets aside some portion of the September Guidance, DHS would have to resort to some

---

[5] *See* https://www.census.gov/quickfacts/OH (the 2021 population estimate for Ohio is 11,780,017).

other prioritization framework, and there is no indication that the resulting framework would redress the States' alleged injuries. In response, the States appear to argue that a Court order may remedy their alleged injuries if it requires DHS to apprehend all noncitizens covered by §§ 1226(c) and 1231(a)(2). *See* Pls.' Opp. at 30-31, ECF No. 34, PAGEID 900-01. The States, however, do not even assert that DHS has the resources to apprehend all of those noncitizens. Indeed, DHS does not even know the identity of all noncitizens in the United States who currently fall under those provisions. *See* Decker Decl. ¶ 8 (AR5783), ECF No. 27-30, PAGEID 590 (DHS "determin[es] whether [an] individual is subject to 8 U.S.C. § 1226(c)(1) or 8 U.S.C. § 123l(a)(2)" only after it apprehends a noncitizen and determines whether "probable cause exists as to removability"); Berg Decl. ¶ 22 (AR6038), ECF No. 27-31, PAGEID 603 ("determin[ing] whether a noncitizen is covered by or subject to § 1226(c) prior to a decision whether to take the noncitizen into custody . . . would be exceedingly burdensome or, in some instances, impossible to accomplish"). Thus, even if the Court issued the States' requested injunction, DHS would inevitably, due to resource constraints, have to adopt some prioritization framework at some level, and the States make no attempt to demonstrate that it would redress their alleged injury.[6]

The States make a last-ditch effort to allege a new type of harm to support standing: an injury to their "quasi-sovereign" interests as states. *See* Pls.' Opp. at 31, ECF No. 34, PAGEID 901. This theory is identical to their crime theory, and fails for the same reasons. Nor does the Sixth Circuit's analysis in *Kentucky v. Biden* help the States. *See id.* (citing *Kentucky v. Biden*, ___ F.4th ___, 2022 WL 43178, at *8-9 (6th Cir. Jan. 5, 2022)). There the court found a state had standing based on allegations that the federal action "threatens to override [state] policies" and had "intruded upon an area traditionally left to the states." *Kentucky*, 2022 WL 43178, at *9. Here, by contrast, the States have no cognizable interest in regulating immigration. *See Arizona*, 567 U.S.

---

[6] The States' proposal that the Court enjoin DHS to "act in conformance with" law, Pls.' Opp. at 31, ECF No. 34, PAGEID 901, would not comport with the specificity requirements of Rule 65. *See Daniels v. Woodbury Cty., Iowa*, 742 F.2d 1128, 1134 (8th Cir. 1984); *Meyer v. Brown & Root Const. Co.*, 661 F.2d 369, 373 (5th Cir. 1981); *see also Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

at 401–02 ("Federal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders.").

Given that the States cannot establish the requisite standing requirements, they suggest that those requirements do not apply to States. *See* Pls.' Resp. at 31-32, ECF No. 34, PAGEID 901-02 (citing to *Massachusetts v. EPA*, 549 U.S. 497 (2007) and arguing that States are given "special solicitude" with respect to standing). But "[i]n holding that the States' claims of injury deserve 'special solicitude in [the] standing analysis' . . . the Supreme Court did not abandon the constitutional baseline;" "[a] government still must show that it suffers an 'actual or imminent'" injury.[7] *Saginaw Cnty. v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 957 (6th Cir. 2020) (quoting *Massachusetts*, 549 U.S. at 520) (Sutton, J.). The States have failed to meet that burden here.

## V.   DHS's explanation is not pretextual.

The States contend that the Secretary's September Guidance must be set aside because the explanation he gave for it is pretextual. They are wrong. The Secretary explained that 1) the agency has inadequate resources to pursue every immigration offense, 2) it is accordingly necessary to establish priorities to focus the agency's efforts, and 3) focusing on national security, public safety, and border security best advanced the national interest. He recognized that each case presented different circumstances and that an individualized, case-by-case approach was best. He emphasized that the Executive's enforcement decisions needed to be guided by considerations not just of public safety, but also of justice and humanitarian concerns. He set enforcement guidelines accordingly. *See* Sept. Guidance at AR2, ECF No. 4-1, PAGEID 99.

In *Department of Commerce v. New York*, the Supreme Court held that agency action must be set aside when the reason the agency gives for taking agency action is wholly contrived. *See*

---

[7] The States also argue that they have suffered a procedural injury because DHS did not issue the September Guidance following a notice-and-comment process. *See* Pls.' Opp. at 31, ECF No. 34, PAGEID 901. But for standing, a party cannot simply assert that it was deprived of a procedural right. It must also show that the violation of that procedural right resulted in some concrete injury. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("But deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right in vacuo—is insufficient to create Article III standing.").

139 S. Ct. at 2576. The Supreme Court narrowly circumscribed this holding. A court "may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Id.* at 2573. And a court "may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Id.* Rather, it is perfectly ordinary, and perfectly legitimate under the APA, for agency decisions to be "informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others)." *Id.* Under this standard, an agency's decision can be set aside only when "the sole stated reason" for the agency action is "contrived." *Id.* at 2575.

The States offer two reasons that they think the Secretary's stated reasons were not genuine. First, the States contend that DHS requested fewer resources for 2022, and so it cannot be that limited resources were a reason for the priority scheme. *See* Pls.' Opp. at 14, ECF No. 34, PAGEID 884. But the States do not contest that DHS in fact has limited resources, that DHS would have limited resources irrespective of whether its budget request is adopted, and that, in the face of those limited resources, DHS cannot pursue all immigration violators. There is no "mismatch" between the Secretary's reason—that limited resources mean DHS must choose, at some level, which violations to pursue—and the Secretary's action—establishing priorities to guide that choice.

Second, the States contend that an *unstated* reason—"that ICE previously failed to focus on dangerous aliens"—is not in fact true. Pls.' Opp. at 14, ECF No. 34, PAGEID 884. The States do not explain how an unstated reason could be pretextual—the premise of which is that the *stated* reason is not the real one. But what the States really mean is that they disagree with the Secretary's implicit judgment that the previous policy should be changed. On that score, there is no question that the Secretary's action—changing the policy—aligns with the reason—he thought the policy should be changed. *Cf. FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[An agency] need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the

23

conscious change of course adequately indicates."); *Motor Vehicle Mfrs. Ass'n of U.S., Inc.  v. State Farm Mut. Auto. Ins., Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations. As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration.").

In any event, the statistics the States cite do not paint the full picture. While it is true that in 2020 "92 percent of interior removals had criminal charges," U.S. Immigration and Customs Enforcement Fiscal Year 2020 Enforcement and Removal Operations Report at 4 ("2020 ICE Report"), https://perma.cc/WG7U-TUEQ, the four largest categories of criminal violation—each constituting roughly the same proportion and cumulatively accounting for over half of all violations—were for DUIs, drug offenses, immigration violations, and non-DUI traffic offenses. And the evidence before the Secretary showed that by prioritizing aggravated felons, DHS was indeed able to increase the number of actions taken against aggravated felons.[8] *See* AART Summary Data at AR108, ECF No. 27-15, PAGEID 537. The States dispute the lesson to be drawn from this data by suggesting that the COVID-19 pandemic ended after 2020. Sadly, the pandemic continues to severely hamper ICE operations and continues to endanger its workforce.

The States have not come close to showing that the Secretary's stated reasons—including his reference to humanitarian concerns—were not genuine. At most (and even that is a stretch), the States have *alleged* (not shown) that the Secretary also had some additional unstated reasons for pursuing the guidance. But the Supreme Court left no ambiguity: "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated

---

[8] The States prefer an undefined "serious crimes" metric drawn from a blog post. Pls.' Opp. at 15, ECF No. 34, PAGEID 885. But the States ignore the lesson that the data from the Interim Guidance teaches: prioritization works. The Secretary abandoned the "aggravated felony" category in the September Guidance because he determined it did not adequately align with public safety, and instead directed ICE to focus on public safety broadly defined, taking into account (among other things) the seriousness of the offense. *See* Considerations Memo at AR12, ECF No. 27-2, PAGEID 454.

reasons." *Dep't of Com.*, 139 S. Ct. at 2573. The Court should dismiss the States' claim that the September Guidance rests on a pretextual explanation.

## VI. The Secretary considered the relevant factors and adequately explained his decision.

Likewise, the States' efforts to argue that DHS did not give due consideration to "important aspects" of immigration enforcement is belied by the record. *Contra* Pls.' Opp. at 16-21, ECF No. 34, PAGEID 886-91. Just because the States do not agree with DHS's conclusions does not mean that DHS did not consider relevant factors in devising guidance that balances public safety, resource limitations, and the need to operate in a fair and just manner. Rather, as the Supreme Court just reaffirmed last month, "the role of courts in reviewing arbitrary and capricious challenges is to 'simply ensur[e] that the agency has acted within a zone of reasonableness.'" *Biden v. Missouri*, 142 S. Ct. 647, 654 (2022) (quoting *FCC* v. *Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)). Courts must especially defer to agency actions that "call[] for value-laden decisionmaking and the weighing of incommensurables under conditions of uncertainty." *Dep't of Com.*, 139 S. Ct. at 2571; *id.* at 2570 ("the choice between reasonable policy alternatives in the face of uncertainty [is] the Secretary's to make"). Here, there can be no dispute that DHS acted within a zone of reasonableness in issuing enforcement guidance that undoubtedly require value-laden decisionmaking and the weighing of incommensurables. A plaintiff's dispute with an underlying policy does not make an agency action arbitrary and capricious. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)) ("the reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment").

As the States acknowledge, Defendants explained the considerations underlying the guidance in a lengthy memorandum. *See* Pls.' Opp. at 16-21, ECF No. 34, PAGEID 886-91 (citing Considerations Memo). But instead of accepting the reality that Defendants engaged with a variety of topics, Plaintiffs try at a series of pin pricks on the points where they disagree. That is not how the APA works. Rather, as long DHS "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," including a "rational connection between the facts found and the choice

made," then any arbitrary and capricious claim must be rejected. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). DHS did so here. But, regardless, Plaintiffs' needling does not break the skin.

First, the States argue that Defendants did not consider the question of recidivism. *See* Pls.' Opp. at 17-18, ECF No. 34, PAGEID 887-88. But they then acknowledge that the Considerations Memo is replete with discussion of recidivism. *Id.*; *see also* Defs.' Mem. at 36-37, ECF No. 29, PAGEID 726-27 (identifying DHS's discussion of recidivism). The States' complaint is simply that it does not agree with the way DHS addressed this factor, not that DHS did not address it. *Compare* Considerations Memo at AR13, ECF No. 27-2, PAGEID 455 (noting that "the United States Sentencing Commission [] demonstrates that reconviction rates drop off significantly for individuals who are crime-free for 5 years post-release, those sentenced to 6 months or less of imprisonment, and those who were 40 or older when released"), *with* Pls.' Opp. at 17, ECF No. 34, PAGEID 887 (relying on a 1986 study to suggest that the risk of recidivism is high for all criminal immigrants). The States make no quarrel with DHS's determination that "[w]here status information has been made available—including in the state of Texas itself—the evidence indicates that undocumented noncitizens are less likely to recidivate," Considerations Memo at AR13, ECF No. 27-2, PAGEID 455, or that addressing recidivism in the context of public safety requires asking about the nature of the crime that might be repeated, *id.* ("it is a mistake to assume that the threat that an individual poses to public safety can be reduced to simply the question of whether the individual is likely to recidivate"). Given this discussion on recidivism, the States' argument that DHS did not consider recidivism is simply not true, and that the States might have resolved these issues differently is of no legal import. *See Dep't of Com.*, 139 S. Ct. at 2569 ("We may not substitute our judgment for that of the Secretary, but instead must confine ourselves to ensuring that he remained within the bounds of reasoned decisionmaking." (citations and quotation marks omitted)).

Second, the States claim that DHS has failed to consider the effect, including on resources, of lodging fewer detainers. *See* Pls.' Opp. at 18-19, ECF No. 34, PAGEID 888-89. But, again, this

is a policy debate, not an argument that the Secretary's guidance is arbitrary and capricious. Nothing in the Secretary's guidance prevents the lodging of detainers, although detainers will presumably now be lodged consistent with the enforcement priorities. DHS expressly considered whether such an approach would increase costs over time, and found the contention unpersuasive. *See* Considerations Memo at AR17, ECF No. 27-2, PAGEID 459. Citing the Fifth Circuit's unanimous panel decision staying the preliminary injunction of the Interim Guidance, DHS had noted its long-recognized discretion to "cancel a detainer and choose not to pursue removal of such an individual in the first place." *Id*. at AR18, PAGEID 460. And, DHS concluded, "the Department's overall safety and security mission is not best served by simply pursuing the greatest overall number of enforcement actions but is rather best advanced by directing resources to prioritize enforcement against those noncitizens who most threaten the safety and security of the Nation." *Id*. at AR17, PAGEID 459. To achieve this end, the Secretary decided that a totality of circumstances approach is best. *See* Sept. Guidance, ECF No. 4-1, PAGEID 98.

Third, in the context of whether DHS properly considered the impact of its policy on the States, the States again confuse their disagreement with the Secretary's policy judgment with a failure to consider a factor. *See* Pls.' Opp. at 19-20, ECF No. 34, PAGEID 889-90; *cf. State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. There can be no dispute that DHS considered the impact on the States after devoting several pages on that topic in the Considerations Memo. *See* Considerations Memo at AR14-17, ECF No. 27-2, PAGEID 456-59. The States' first argument takes the form of a rhetorical question indicating that they cannot conceive how it is possible that the September Guidance might be beneficial to the states: "How?" *See* Pls.' Opp. at 20, ECF No. 34, PAGEID 890. DHS answered that question in its Consideration Memo. For example, it noted that "the Department heard from multiple stakeholder engagements, including with law enforcement partners and local government officials, a civil immigration enforcement framework that lacks clear priorities is likely to increase fear and sow mistrust between noncitizens and government," and that "[s]uch an environment can breed 'hesitancy in accessing services, relief, and even vaccines during the COVID-19 pandemic.'" Considerations Memo at AR16, ECF No.

27-2, PAGEID 458 (quoting E-mail from Nora Preciado, Director, Immigrant Affairs, to Kamal Essaheb, Counselor to the Secretary, DHS (Sept. 23, 2021, 05:42), AR_DHSP_00002324). Further, DHS noted, "states and localities benefit from civil immigration enforcement policies that are more likely to lead to the arrest and removal of individuals who are threats to public safety." *Id*. The States also deride DHS's observation that its obligation to "the national interest" would outweigh any marginal and difficult-to-quantify harm to the States, Pls.' Opp. at 20, ECF No. 34, PAGEID 890, but, again, this is simply a policy disagreement, not a basis to set aside the Secretary's considered judgment, *see* Considerations Memo at AR16, ECF No. 27-2, PAGEID 458; *cf. Dep't of Com.*, 139 S. Ct. at 2571 ("And the evidence before the Secretary hardly led ineluctably to just one reasonable course of action. It called for value-laden decisionmaking and the weighing of incommensurables under conditions of uncertainty. The Secretary was required to consider the evidence and give reasons for his chosen course of action. He did so. It is not for us to ask whether his decision was 'the best one possible' or even whether it was 'better than the alternatives.'" (quoting *FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 292 (2016)).

Finally, the States claim that DHS's action is arbitrary and capricious because it prioritized national security but did not prioritize what the States claim is otherwise statutorily mandated. *See* Pls Opp. at 21, ECF No. 34, PAGEID 891. But that is just a repackaging of their statutory arguments. As Defendants have explained, the States' statutory arguments are incorrect and DHS should be given discretion in its "value-laden decisionmaking" and its "weighing of incommensurables" in light of its limited resources. *Dep't of Com.*, 139 S. Ct. at 2571. This Court should reject the States' arbitrary and capricious argument as nothing more than a policy dispute, and enter judgment for Defendants on that claim.

**VII. Enforcement priorities do not require notice-and-comment.**

The States argue that law enforcement agencies must undergo notice-and-comment procedures each time they issue internal guidance on how to exercise prosecutorial discretion. The Court should reject this contention. Indeed, "general statements of policy," 5 U.S.C. § 553(b)(A), which "advise the public prospectively of the manner in which the agency proposes to exercise a

discretionary power," *Lincoln*, 508 U.S. at 197 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)), are exempt from notice and comment. An agency is not required to use such procedures when changing its general enforcement policies because to do so would hamper the exercise of the agency's discretion and prevent it from responding to changing circumstances. *See* 1 Richard J. Pierce, Jr., Administrative Law Treatise § 6.3, at 424-25 (5th ed. 2010) (Pierce). Prohibiting senior officials from announcing policies that guide rank-and-file agents, without first following notice-and-comment procedures, also "would create horrible incentives." *Id*. at 424 ("If agencies are allowed to establish policies that limit the discretion of their employees only through use of the expensive and time-consuming notice and comment procedure, they rarely will choose to limit the discretion of their employees charged with enforcement and prosecutorial responsibilities."). But that is essentially what Plaintiffs are seeking in this case.

In particular, the States argue that the September Guidance is a legislative rule because noncitizens who do not pose a public safety risk are not considered priorities for enforcement. *See* Pls.' Opp. at 21-22, ECF No. 34, PAGEID 891-92. But providing guidance on enforcement that leaves the ultimate decision to a line officer's individualized discretion is not "binding" so as to require notice and comment. The September Guidance "does not compel an action to be taken or not taken," but "[i]nstead . . . leaves the exercise of prosecutorial discretion to the judgment of [DHS] personnel." Sept. Guidance at AR5, ECF No. 4-1, PAGEID 102. Rather, the Secretary instructed personnel to "evaluate the individual and the totality of the facts and circumstances and exercise their judgment accordingly." *Id*. at AR4, PAGEID 101. Indeed, under the Interim Guidance, which relied on bright line categorizations rather than a totality of circumstances approach contained in the September Guidance, 90% of requests for "other priority" enforcement actions were approved, and they made up the second largest category of enforcement actions. *See* AART Summary Data at AR108, 110*,* ECF No. 27-15, PAGEID 537, 539. Establishing enforcement priorities does not create legally enforceable rights or obligations, *see Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015), and thus is exempt from notice-and-comment.

The States contest the enforcement guidance's status as a general statement of policy with two additional arguments. First, they argue that the September Guidance violate 8 U.S.C. §§ 1226 and 1231, and therefore changes legal rights. *See* Pls.' Opp. at 22, 24. But this repackaging of their statutory arguments misses the mark, and not just because it is wrong. *See supra* part II; *see also* Considerations Memo at AR18-19, ECF No. 27-2, PAGEID 460-61 (explaining how DHS's "updated *Guidelines for the Enforcement of Civil Immigration Law* are fully consistent with [the] constraints [8 U.S.C. §§ 1226 and 1231] and do not purport to override them"). DHS has *always* had to prioritize its enforcement actions, and DHS employees have always had to execute their duties consistent with, and subject to, instructions from superiors.

Second, the States try to rely on quotations pulled from a newspaper article to argue that some of the organizations that disagree with the policy DHS adopted also disagreed with a given description of the agency's outreach to outside groups. *See* Pls.' Opp. at 22-23, ECF No. 34, PAGEID 892-93. But, "[a]bsent clear evidence to the contrary, the reviewing court assumes the agency has properly designated the administrative record." *Sherwood v. Tenn. Valley Auth.*, 590 F. App'x 451, 459–60 (6th Cir. 2014) (citing *Bar MK Ranches v. Yuetter,* 994 F.2d 735, 740 (10th Cir. 1993) ("the designation of the Administrative Record, like any established administrative procedure, is entitled to a presumption of administrative regularity")). Nor does the news article actually appear to contradict the administrative record. The article specifically recounts a "July 8 meeting" that the outside group attended and reports only that the discussion of enforcement priorities was limited and that a lengthier discussion was deferred indefinitely. ECF 34-1, Exhibit T, at 2, PAGEID 920. One group "confirmed an April meeting" but asserts that there was "no give and take" in discussing the enforcement priorities, and another asserts that the discussion was focused on the border, but that the Secretary had not considered a document they separately submitted. *Id.* If the Secretary did not consider the document, it was properly excluded from the administrative record. And the same administrative record reflects sheriffs groups' suggestion "that ICE should expand enforcement, particularly along the border" and "implement a kind of arrest quota." Stakeholder Outreach Mem. at AR92, ECF No. 27-11, PAGEID 521. Regardless,

Defendants' outreach merely goes to robustness of the administrative record, not the notice-and-comment claim. Defendants are not arguing that its outreach to disparate groups is in lieu of notice and comment, given that the Secretary's general statement of policy is not subject to notice-and-comment requirements at all.

This Court should also give no credence to the States' critiques of Defendants' arguments that, in the alternative to being a general statement of policy, the Secretary's guidance is a procedural rule exempt from notice and comment. For this argument, Plaintiffs merely regurgitate their argument as to standing, that the guidance will have downstream effects on the States. *See* Pls.' Opp. at 23, ECF No. 34, PAGEID 893. But downstream effects of procedural rules or rules of agency organization do not change their fundamental character. As the D.C. Circuit has noted, "[o]f course[] procedure impacts on outcomes and thus can virtually always be described as affecting substance, but to pursue that line of analysis results in the obliteration of the distinction that Congress demanded." *JEM Broad. Co. v. FCC*, 22 F.3d 320, 326–27 (D.C. Cir. 1994) (citation omitted). The September Guidance does not alter the rights of regulated entities, and so was at most procedural rule not subject to notice and comment. *See RSM, Inc. v. Buckles*, 254 F.3d 61, 69 (4th Cir. 2001) (agency "need not engage in notice-and-comment-rulemaking each time it delegates authority within its own ranks"); *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1050 (D.C. Cir. 1987) (collecting cases rejecting notice-and-comment challenges to enforcement policies). This Court should enter judgment for Defendants on the States' notice-and-comment claim.

## VIII. There is no valid claim under the Take Care Clause.

The September Guidance sets out enforcement priorities so that DHS can best discharge its immigration enforcement mission. It reiterates the agency's commitment to enforcing the immigration laws. What it certainly does not do is violate the Take Care Clause.

The States raise this claim as an APA claim, and so it fails for the same reason their other APA claims are not reviewable. Their contention, in any event, is simply a rehash of their argument that the September Guidance is contrary to law. But the Supreme Court has rejected the viability of such claims, holding that "claims simply alleging that the President has exceeded his statutory

authority are not 'constitutional' claims." *Dalton v. Spencer*, 511 U.S. 462, 473 (1994); *see also Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1866) (Take Care Clause "is purely executive and political" and not subject to judicial direction). The States do not dispute these precedents, but seek to distinguish them on the ground that they did not involve subordinate officials—no wonder, as the Take Care Clause is directed at the President—and because once, five years ago, the Supreme Court sought briefing on the question (but never reached it). This Court is bound by decisions of the Supreme Court, not the tea leaves of requests for briefing. The Court should dismiss the States' Take Care Clause claim.

## IX.  Remand without vacatur would be the appropriate remedy.

If the Court determines that the September Guidance does not comply with the strictures of the APA, it should remand without vacatur. That is the appropriate course when the agency can cure the error and vacatur would be disruptive. *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 2:17-cv-372, 2021 WL 855938, at *1-4 (S.D. Ohio Mar. 8, 2021).[9] Setting aside the Secretary's enforcement guidance would cause confusion for DHS officials and would undermine the Secretary's efforts to promote the national interest and protect public safety. *See* Defs.' Mem. at 43-45, ECF No. 29, PAGEID 733-35; *see also* Decker Decl. ¶¶ 12-13 (AR5785), ECF No. 27-30, PAGEID 592; Berg Decl. ¶ 20 (AR6037), ECF No. 27-31, PAGEID 602.

## CONCLUSION

For the reasons stated herein and in Defendants' earlier briefing, the States' motion for a preliminary injunction should be denied, and the Court should dismiss the Complaint or, in the alternative, grant judgment to Defendants. If the Court does issue an injunction, it should stay its order for 30 days to permit Defendants to seek appellate relief.

---

[9] Because remand without vacatur is the most relief the States would be entitled to on final judgment, a preliminary injunction would be unwarranted. *See De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) (preliminary relief must be "of the same character as that which may be granted finally"); *see also Smith v. City of Hammond, Indiana*, 388 F.3d 304, 307 (7th Cir. 2004) (preliminary relief is "merely a way station to final relief").

Dated: February 1, 2022     Respectfully submitted,

             BRIAN M. BOYNTON
             Acting Assistant Attorney General

             BRIGHAM J. BOWEN
             Assistant Branch Director

             */s/Michael F. Knapp*
             MICHAEL F. KNAPP
              CA Bar No. 314104
             Trial Attorney
             ADAM D. KIRSCHNER
              IL Bar. No. 6286601
             Senior Trial Counsel
             BRIAN C. ROSEN-SHAUD
              ME Bar No. 006018
             KUNTAL CHOLERA
              DC Bar No. 1031523
             Trial Attorneys
             United States Department of Justice
             Civil Division, Federal Programs Branch
             Tel: (202) 353-9265
             Fax: (202) 616-8460
             Email: Michael.F.Knapp@usdoj.gov
              Adam.Kirschner@usdoj.gov
              Brian.C.Rosen-Shaud@usdoj.gov
              Kuntal.Cholera@usdoj.gov

             <u>Mailing Address</u>:
             Post Office Box 883
             Washington, D.C. 20044

             <u>Courier Address</u>
             1100 L Street NW, Room 11020
             Washington, D.C. 20005

             EREZ REUVENI
              CA Bar No. 264124
             Assistant Director
             U.S. Department of Justice
             Civil Division, Office of Immigration Litigation
             P.O. Box 868, Ben Franklin Station
             Washington, D.C. 20044
             Email: Erez.R.Reuveni@usdoj.gov

             *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically

(via CM/ECF) on February 1, 2022.

/s/ Michael F. Knapp
MICHAEL F. KNAPP

34