UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

STATE OF ARIZONA, *et al.*,

      Plaintiffs,                              Case No. 3:21-cv-314

vs.

JOSEPH R. BIDEN, *et al.*,                 District Judge Michael J. Newman
                                        Magistrate Judge Peter B. Silvain, Jr.

      Defendants.

---

**ORDER: (1) DENYING DEFENDANTS' MOTION TO DISMISS (DOC. NO. 29); (2) GRANTING THE STATES' MOTION FOR A PRELIMINARY INJUNCTION (DOC. NO. 4); AND (3) ENJOINING ENFORCEMENT OF THE PERMANENT GUIDANCE (DOC. NO. 4-1) AS DESCRIBED HEREIN**

---

Plaintiffs, the States of Arizona, Montana, and Ohio (collectively, the "States"), bring this action to prevent the Department of Homeland Security ("DHS")[1] from implementing civil immigration enforcement guidance they say is unlawful. Doc. Nos. 1, 1-1. Two motions are now before the Court: The States' motion for a preliminary injunction and DHS's motion to dismiss or, alternatively, for judgment on the pleadings. Doc. Nos. 4, 29. Both motions are fully briefed, and the Court heard oral argument from the parties on February 16, 2022. Doc. No. 42. The motions are now ripe for review.

The Constitution vests "the executive Power" in the President of the United States. U.S. Const. art. II, § 1, cl. 1. Inherent in that executive power is the President's "vast share of responsibility for the conduct of our foreign relations." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)). This includes significant authority over immigration, *U.S. ex rel.*

---

[1] For ease of reference, the Court will collectively refer to Defendants as DHS.

*Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950), and discretion to exclude unlawfully present individuals from the country, *see Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 483 (1999) ("At each stage [of the removal process] the Executive has discretion to abandon the endeavor"). At times that discretion is near plenary. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 396 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials").

But Congress, too, has "broad power over naturalization and immigration." *Demore v. Kim*, 538 U.S. 510, 521 (2003) (quoting *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976)). Congress exercised that authority by establishing procedures for DHS to follow when removing unlawfully present individuals from the United States. *See, e.g.*, 8 U.S.C. § 1227 (setting forth "classes of deportable aliens"); 8 U.S.C. § 1229a (describing how removal proceedings must be conducted).[2] Sometimes Congress's instructions are permissive (DHS "may" take a certain action). But, at other points, Congress has mandated DHS "shall" take specific steps to carry out removals. *See* 8 U.S.C. §§ 1226(c)(1) (DHS "shall take into custody" noncitizens with certain criminal convictions) and 1231(a)(1)(A) (DHS "shall remove" within 90 days noncitizens with final orders of removal).

The States sue because they believe DHS skirted Congress's immigration enforcement mandates when it issued a policy that prioritizes certain high-risk noncitizens for apprehension and removal. DHS contends that seemingly mandatory statutes must be read flexibly to permit efficient law enforcement. At bottom, that is what this dispute is about: can the Executive displace clear congressional command in the name of resource allocation and enforcement goals? Here, the answer is no. *See, e.g.*, *Util. Air Grp. v. E.P.A.*, 573 U.S. 302, 327 (2014) ("Under our system

---

[2] The Court uses "noncitizen" to refer to persons "not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).

of government, Congress makes laws and the President, acting at times through agencies like EPA, 'faithfully execute[s]' them" (quoting U.S. Const., art. II, § 3) (citing *Medellín v. Texas*, 552 U.S. 491, 526–27 (2008))); *Youngstown*, 343 U.S. at 587 ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker"). For that reason, and those given below, the Court will preliminarily enjoin application of DHS's immigration enforcement policy.

## I. Background

DHS spent 2021 revising its approach to civil immigration enforcement. Doc. Nos. 4-1, 27-9, 27-10. Action came in the form of three guidance documents that instruct DHS officers on how to exercise their immigration enforcement authority. Doc. Nos. 4-1, 27-9, 27-10; *see also* Doc. No. 27-2 (summarizing steps taken by DHS to craft and issue immigration enforcement guidance). The States seek to block the third iteration of the guidance—DHS Secretary Alejandro N. Mayorkas's September 30, 2021 Guidelines for the Enforcement of Civil Immigration Law (the "Permanent Guidance"). Doc. No. 1 at PageID 15–22; Doc. No. 4; Doc. No. 4-1. An overview of the statutory framework governing enforcement and removal, as well as the administrative process that produced the Permanent Guidance, follows.

### A. Statutory History

In the 1990s, Congress lost confidence in the ability of the Immigration and Naturalization Service ("INS"), later DHS, to "deal with increasing rates of criminal activity by aliens." *Demore*, 538 U.S. at 518 (first citing *Criminal Aliens in the United States: Hearings before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs*, 103d Cong., 1st Sess. (1993); and then citing S. Rep. No. 104–48, p. 1 (1995)). The Senate Committee of Governmental Affairs declared in 1995 that "America's immigration system [was] in disarray and

criminal aliens . . . constitute a vexing part of the problem." S. Rep. No. 104-48, at 1; *see also* S. Rep. No. 104-249, at 3 (1996).

Criminal alien abscondment prior to removal was one of Congress's main concerns. A Senate report lamented, "[d]espite previous efforts in Congress to require detention of criminal aliens while deportation hearings are pending, many who should be detained are released on bond." S. Rep. No. 104-48, at 2. Before 1996, "[t]he Attorney General . . . had broad discretion to conduct individualized bond hearings and to release criminal aliens from custody during their removal proceedings when those aliens were determined not to present an excessive flight risk or threat to society." *Demore*, 538 U.S. at 519 (citing 8 U.S.C. § 1252(a)). Congress was concerned with this procedure because "[u]ndetained criminal aliens with deportation orders often abscond upon receiving a final notification from the INS that requires them to voluntarily report for removal." S. Rep. No. 104-48, at 2. Indeed, this shifted a "heav[y] burden[]" to the states, forcing them to expend "scarce criminal justice resources" to apprehend, prosecute, incarcerate, and supervise criminal aliens. *Id.* at 6, 9. Congress thought the burden could "be lessened if the INS detained more criminal aliens." *Id.* at 4.

Congress also wanted to see expeditious removals. *See* S. Rep. 104-249, at 7 ("Aliens who violate U.S. immigration law should be removed from this country as soon as possible"); S. Rep. 104-48, at 23–24. Criminal aliens posed significant costs to the states and federal government when they were not quickly removed. *See, e.g.*, S. Rep. 104-48, at 9–10 (noting the increasing costs of illegal immigration to the states due to the low level of deportations); H.R. Rep. 104-469, at 160 (stating that when noncitizens are not removed, "the resources expended to identify, apprehend, and provide a hearing to a deportable alien are all too often wasted"). Particularly, deportable noncitizens were more likely to be arrested if not detained and not quickly removed.

4

*See Hearing on H.R. 3333 before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary*, 101st Cong., 1st Sess., 54, 52 (1989).

Two concerns animated Congress's eventual action: (1) criminal aliens' high abscondment rates; and (2) the significant cost criminal alien recidivism imposed on the states and federal government. *See* S. Rep. No. 104-48, at 7–10, 21–30; *Demore*, 538 U.S. at 518–20; *Zadvydas v. Davis*, 533 U.S. 678, 713–15 (2001) (Kennedy, J., dissenting). This led to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") and the two statutory provisions relevant in this case. Pub. L. 104-208, 110 Stat. 3009 (1996).

One—8 U.S.C. § 1226(c)—concerns the mandatory detention of "a subset of deportable criminal aliens pending a determination of their removability." *Demore*, 538 U.S. at 522. 8 U.S.C. § 1226(c) works in tandem with § 1226(a). Subsection (a)—entitled "Arrest, detention, and release"—provides that

> On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General--
>
> (1) may continue to detain the arrested alien; and
>
> (2) may release the alien on-- [bond or conditional parole]

8 U.S.C. § 1226(a). Subsection (c), however, renders "criminal aliens" ineligible[3] for release pending removal proceedings:

> **(c) Detention of criminal aliens**
>
> **(1) Custody**
>
> The Attorney General shall take into custody any alien who--

---

[3] Absent application of a limited exception for release to assist a law enforcement investigation. 8 U.S.C. § 1226(c)(2).

       (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

       (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

       (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentenced to a term of imprisonment of at least 1 year, or

       (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

The offenses cross-referenced in § 1226(c)(1)(A)–(C) generally refer to crimes of "moral turpitude," aggravated felonies, controlled substance distribution, and multiple felony convictions. 8 U.S.C. §§ 1226(c)(1)(A)–(C).  Subsection (D) covers noncitizens suspected or conviction of "terrorist activities."  8 U.S.C. § 1226(c)(1)(D).

Section 1231 deals with the custodial status of noncitizens before their removal.  Generally, "[e]xcept as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days."  8 U.S.C. § 1231(a)(1)(A).

       During the removal period [*i.e.*, the 90-day period after which the removal order became final], the Attorney General shall detain the alien.  Under no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible under section 1182(a)(2) or 1182(a)(3)(B) of this title or deportable under section 1227(a)(2) or 1227(a)(4)(B) of this title.

8 U.S.C. 1231(a)(2).  Both 8 U.S.C. §§ 1226 and 1231 fit into a broader noncitizen removal ecosystem.

### B.    Immigration Enforcement Framework

Congress charged DHS with implementing the Immigration and Nationality Act ("INA") and IIRIRA provisions governing the removal of noncitizens.  8 U.S.C. §§ 1221–32; *see also* 6 U.S.C. § 251 (vesting the authority to administer the "Border Patrol program" and the "detention and removal program" in the DHS Secretary).  "The usual removal process," *Dep't of Homeland Sec. v. Thuraissigiam*, --- U.S. ---, 140 S. Ct. 1959, 1964 (2020), begins with service of a Notice to Appear on a noncitizen, a charging document setting forth the basis for removability.  8 U.S.C. § 1229(a) (explaining the requirements for a valid Notice to Appear); 8 C.F.R. § 239.1(a) (identifying who may issue a Notice to Appear); 8 C.F.R. § 1003.13 ("Charging document means the written instrument which initiates a proceeding before an Immigration Judge. . . . For proceedings initiated after April 1, 1997, these documents include a Notice to Appear").[4]  A noncitizen "may be charged with any applicable ground of inadmissibility under [8 U.S.C. § 1182(a)] . . . or any applicable ground of deportability under [8 U.S.C. § 1127(a)]."  8 U.S.C. § 1229a(a)(2).  An immigration judge decides whether the noncitizen is removable, 8 U.S.C. § 1229a(a), and, if so, may issue a removal order, 8 C.F.R. § 1240.12(c).  The noncitizen can appeal the removal order to the Board of Immigration Appeals ("BIA"), thereby staying execution of the removal order.  8 C.F.R. § 1240.15 ("[A]n appeal shall lie from a decision of an immigration judge to the [BIA]"); 8 C.F.R. § 1003.6 ("[T]he decision in any proceeding under this chapter from which an appeal to the [BIA] may be taken shall not be executed during the time allowed for the filing of an appeal").  *See generally* 8 C.F.R. § 1003.1 (describing the BIA).[5]  An unfavorable BIA decision may be appealed to a federal court of appeals.  8 U.S.C. § 1252(a)(5); *see also* 8 U.S.C.

---

[4] Congress did provide for expedited removal in certain circumstances not relevant here.  8 U.S.C. § 1187(b)(2); 8 U.S.C. § 1225(b)(1); 8 U.S.C. § 1228(b); 8 U.S.C. § 1231(a)(5); 8 C.F.R. § 1208.16(e).
[5] Alternatively, the noncitizen could file a motion to reconsider or reopen the removal proceedings before the immigration judge.  *See* 8 U.S.C. §§ 1229a(c)(6) and (7).

§ 1252(b)(3)(B) ("Service of the petition on the officer or employee does not stay the removal of an alien pending the court's decision on the petition, unless the court orders otherwise"). A removal order becomes final upon the latest of (1) "[t]he date the order of removal becomes administratively final"; (2) "[i]f the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order"; and (3) "[i]f the alien is detained or confined" outside the immigration process, the date of the alien's release. 8 U.S.C. § 1231(a)(1)(B). Absent a stay, the noncitizen is subject to deportation. 8 U.S.C. § 1231(a)(1)(A) (providing that "when an alien is ordered removed, the [Secretary] shall remove the alien from the United States within a period of 90 days").

Immigration and Customs Enforcement ("ICE") and its Enforcement and Removal Operations ("ERO") staff use the detainer system to apprehend noncitizens in state or local custody. 8 C.F.R. § 287.7(a) ("A detainer serves to advise another law enforcement agency that [DHS] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien"). A detainer may only issue if the ICE officer finds probable cause that the noncitizen is removable. *See* U.S. Immigration & Customs Enforcement, *Issuance of Immigration Detainers by ICE Immigration Officers* 2 (Apr. 2, 2017), https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf ("ICE Detainer Policy"). The detainer asks the state or local authority to either (1) inform ICE of the noncitizen's release date; or (2) hold the noncitizen for up to 48 hours following the noncitizen's release until ICE can take custody. 8 C.F.R. §§ 287.7(a), (d).[6] Detainers must be accompanied by an arrest warrant issued under 8 U.S.C. § 1226 or § 1231. A Notice to Appear typically issues after ICE

---

[6] If ICE cannot take custody of the noncitizen 48 hours after their state or local custodial term ends, the ICE officer is instructed to cancel the detainer. *See* ICE Detainer Policy, at 3.

8

takes custody of the noncitizen. *See, e.g.*, *Texas v. United States*, 14 F.4th 332, 337 (5th Cir. 2021), *vacated on reh'g en banc*, No. 21-40618 (5th Cir. Nov. 30, 2021).

"Section 1226 generally governs the process of arresting and detaining that group of aliens pending their removal." *Jennings v. Rodriguez*, --- U.S. ---, 138 S. Ct. 830, 837 (2018) (citing 8 U.S.C. § 1226). Generally, "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Noncitizens may be released on bond at the DHS Secretary's discretion "[e]xcept as provided in subsection (c)." 8 U.S.C. § 1226(a). Section 1226(c) provides that "'the [Secretary] shall take into custody any alien' who falls into one of several enumerated categories involving criminal offenses and terrorist activities." *Jennings*, 138 S. Ct. at 837 (quoting 8 U.S.C. § 1226(c)(1)). Noncitizens in custody under § 1226(c) may be released "only if the [Secretary] decides . . . that release of the alien from custody is necessary" for witness-protection purposes and "the alien satisfies the [Secretary] that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding." *Id.* (quoting 8 U.S.C. § 1226(c)(2)). Section 1226 governs noncitizen detention until a deportation order becomes final and the removal period begins. *See, e.g.*, *Johnson v. Guzman Chavez*, --- U.S. ---, 141 S. Ct. 2271, 2284 (2021).

Criminal aliens detained under § 1226(c) can challenge their detention before an immigration judge in a so-called *Joseph* hearing. *See Jennings*, 138 S. Ct. at 838 n.1. Review, however, is limited. *See id.* ("At a *Joseph* hearing, that person 'may avoid mandatory detention by demonstrating that he is not an alien, was not convicted of the predicate crime, or that the [Government] is otherwise substantially unlikely to establish that he is in fact subject to mandatory detention'" (quoting *Demore*, 538 U.S. at 514 n.3)).

Noncitizen custody and removal are governed by 8 U.S.C. § 1231 once a removal order becomes final. Section § 1231(a) provides that "the Attorney General shall remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A). Detention is mandatory during the removal period. 8 U.S.C. § 1231(a)(2). But several circumstances may prolong the removal period. *See, e.g.*, *Guzman Chavez*, 141 S. Ct. at 2281. "The removal period shall be extended" beyond the initial 90-days if the noncitizen "fails or refuses" to obtain travel documents or otherwise frustrates their removal. 8 U.S.C. § 1231(a)(1)(C). Noncitizens remaining in the United States beyond the 90-day removal period may be released subject to supervision requirements. 8 U.S.C. § 1231(a)(3).[7]

## C.   DHS Shifts Its Immigration Enforcement Priorities

DHS asserts that Congress endowed the agency with significant discretion to determine when, how, and whether to pursue removal. Doc. No. 27-2 at PageID 444–47; Doc. No. 29 at PageID 709. The Permanent Guidance now under challenge is DHS's effort to calibrate its officers' exercise of that discretion. Doc. No. 4-1 at PageID 99–100; Doc. No. 27-2 at PageID 450–51. The States believe DHS overstates the extent of its discretion because 8 U.S.C. §§ 1226(c) and 1231 impose a mandatory duty on DHS to detain certain noncitizens and timely deport those with final removal orders. Doc. No. 4 at PageID 76–78. Their view is that the Permanent Guidance neglects these commands and arbitrarily disregards the harms of nonenforcement. *Id.* at PageID 76–83. An examination of DHS's decision making—and the several other lawsuits aimed at it— is therefore necessary.

---

[7] A "post-removal period" beings when, under 8 U.S.C. § 1231(a)(6), the noncitizen is detained beyond the 90-day period or released under supervision if the noncitizen is "(1) inadmissible, (2) removable as a result of violations of status requirements, entry conditions, or the criminal law, or for national security or foreign policy reasons, or (3) a risk to the community or unlikely to comply with the removal order." *Guzman Chavez*, 141 S. Ct. at 2281 (citing 8 U.S.C. § 1231(a)(6)).

### 1.    January 20 Memo

On January 20, 2021, DHS Acting Secretary David Pekoske issued a department-wide memorandum entitled, "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities" (the "January 20 Memo"). Doc. No. 27-9. Section A ordered DHS's chief of staff to "coordinate a Department-wide review of policies and practices concerning immigration enforcement." *Id.* at PageID 508. Section B instructed staff to focus their civil immigration enforcement efforts on noncitizens who present a threat to national or border security or public safety. *Id.* at PageID 508–09. Section C announced a 100-day pause on all removals of noncitizens with a final order of deportation. *Id.* at PageID 509–10. The January 20 memo applied not only

> to the decision to issue, serve, file, or cancel a Notice to Appear, but also to a broad range of other discretionary enforcement decisions, including: whom to stop, question, and arrest; whom to detain and release; whether to settle, dismiss, or appeal, or join in a motion on a case; and whether to grant deferred action or parole.

*Id.* at PageID 508. In short, DHS intended these principles to apply to all decisions ERO officials make.

A challenge to the January 20 Memo arose in short order. Arizona and Montana sued DHS in the District of Arizona to block its enforcement. Complaint, *Arizona et al. v. U.S. Dep't of Homeland Sec. et al.*, No. 2:21-cv-186 (D. Ariz. Feb. 3, 2021), *appeal pending*, No. 21-16118 (9th Cir.). Texas, however, beat them to the punch and secured an injunction of the 100-day pause in the Southern District of Texas. *Texas v. United States*, 515 F. Supp. 3d 627, 631 (S.D. Tex. 2021). DHS did not appeal the injunction. Doc. No. 27-10 at PageID 514.

### 2.    Interim Guidance

Acting ICE Director Tae D. Johnson issued updated guidance to ICE staff on February 18, 2021 ("Interim Guidance"). Doc. No. 27-10. Noncitizens who presented national or border

security or public safety threats were now presumed to be removable. *Id.* at PageID 515–16. Acting Director Johnson provided certain criteria for ICE staff to evaluate whether a noncitizen posed a risk to public safety, such as the "extensiveness, seriousness, and recency of the criminal activity" and mitigating factors like "personal and family circumstances" and "ties to the community." *Id.* at PageID 516. The Interim Guidance clarified that no prior approval was necessary for presumed enforcement or removal cases but was required for all other noncitizens. *Id.* at PageID 516–17. Acting Director Johnson noted the Interim Guidance would control until the DHS Secretary issued permanent enforcement guidelines. *Id.* at PageID 511. Like the January 20 Memo, the Interim Guidance was to guide all ERO decisions made throughout the enforcement process. *Id.* at PageID 512 ("[The Interim Guidance] applies to all [ICE] Directorates and Program Offices, and it covers enforcement actions, custody decisions, the execution of final orders of removal, financial expenditures, and strategic planning").

Arizona and Montana folded the Interim Guidance into their lawsuit. *Arizona*, No. 2:21-cv-186, Doc. Nos. 12, 13. But the district court denied the States' motion for a preliminary injunction upon concluding the Interim Guidance was not subject to judicial review under the APA. *Arizona v. Dep't of Homeland Sec.*, No. 21-cv-00186, 2021 WL 2787930, at *11 (D. Ariz. June 30, 2021). Arizona and Montana's Ninth Circuit appeal remains pending. Notice of Appeal, *Arizona*, No. 2:21-cv-186, Doc. No. 92 (D. Ariz. June 30, 2021).[8]

Texas, again, prevailed where Arizona and Montana did not. The Southern District of Texas enjoined the Interim Guidance on September 15, 2021. *Texas v. United States*, --- F. Supp. 3d ---, 2021 WL 3683913, at *2 (S.D. Tex. Sept. 15, 2021). After the district court clarified the

---

[8] DHS argued in its motion to transfer this case to the District of Arizona that Arizona and Montana were simultaneously challenging the same policy in two different circuits. Doc. No. 7 at PageID 371–72. This Court disagreed, in part because the order on appeal in the Ninth Circuit concerns the Interim Guidance. Doc. No. 17 at PageID 406–07.

scope of its injunction, the Fifth Circuit stayed the injunction in part. *Texas*, 14 F.4th at 341–42. The *en banc* court however vacated the panel decision and granted review. *Texas et al. v. United States et al.*, No. 21-40618 (5th Cir. Nov. 30, 2021). The Fifth Circuit has since granted DHS's motion for voluntary dismissal of the appeal. *Texas*, No. 21-40618 (5th Cir. Feb. 11, 2022).[9]

### 3.    Permanent Guidance

The September 30, 2021 Permanent Guidance retained the Interim Guidance's priority categories ((1) public safety and (2) border and (3) national security threats) but introduced two key differences. *Compare* Doc. No. 4-1, *with* Doc. No. 27-10. First, it expanded the aggravating and mitigating factors ERO officers must weigh when assessing whether a noncitizen poses a public safety risk. Doc. No. 4-1 at PageID 100–01. Officers are instructed to evaluate the gravity of the noncitizen's criminal offense and sentence imposed; the harm caused; the sophistication of the crime; whether a firearm or dangerous weapon was used; and whether the noncitizen has a "serious" criminal record. *Id.* at PageID 100. Officers also must weigh certain mitigating factors before commencing enforcement proceedings, such as: age; length of presence in the United States; the noncitizen's mental or physical health; status as a victim of, or witness to, a crime; the impact deportation would have on the noncitizen's family; military service; evidence of rehabilitation; or expungement. *Id.* at PageID 100–01. These "factors are not exhaustive." *Id.* at PageID 101. The Permanent Guidance instructs enforcement agents to "evaluate the individual and the totality of the facts and circumstances" leaving "the exercise of prosecutorial discretion to [their] judgment." *Id.* at PageID 101, 102. Like the January 20 Memo and Interim Guidance, the Permanent Guidance anticipates these factors to influence ERO decisions throughout the

---

[9] Before the district court, Texas and Louisiana amended their complaint to incorporate the Permanent Guidance. Amended Complaint, *Texas et al.*, No. 6:21-cv-16, Doc. No. 109 (S.D. Tex. Oct. 22, 2021). A bench trial concerning the Permanent Guidance was held on February 22 and 23, 2022.

"apprehension and removal" process. *Id.* at PageID 100. ERO staff are admonished to not "rely on the fact of conviction . . . alone" when making enforcement decisions. *Id.* at PageID 101.

Noncitizens are no longer presumed to be an enforcement or removal priority if they meet the Permanent Guidance's criteria. *Id.* at PageID 100–01. Nor is preapproval necessary before ERO personnel institute enforcement or removal proceedings against a noncitizen who does not meet a priority category. *Compare id.*, *with* Doc. No. 27-10 at PageID 516–17. Upon the Permanent Guidance's November 29, 2021 effective date, DHS withdrew the January 20 Memo and Interim Guidance. Doc. No. 4-1 at PageID 103.

DHS largely structured the Permanent Guidance in response to the Southern District of Texas's order enjoining enforcement of the Interim Guidance. *Texas*, 2021 WL 3683913, at *64. The Texas district court, in part, blocked the Interim Guidance after finding DHS failed to consider important factors like criminal alien recidivism, *id.* at *47, and costs to the states, *id.* at *48–49, and overstated its purported resources constraints, *id.* at *48, in devising the policy. All told, the Texas district court believed DHS failed to "rationally explain and connect the basis for the [Interim] Guidance." *Id.* at *51 (cleaned up).

DHS sought to address each deficiency through a memorandum issued alongside the Permanent Guidance (the "Considerations Memo"). Doc. No. 27-2 at PageID 454 ("The updated guidance addresses the district court's concern [of recidivism] by calling for a context-specific consideration of aggravating and mitigating factors, the seriousness of an individual's criminal record, the length of time since the offense, and evidence of rehabilitation"). It first laid out the resources constraints that plague the agency. *Id.* at PageID 447–50. According to DHS, while removal proceedings have increased by 400% from 2010 to 2011, case completion rates have

remained flat. *Id.* at PageID 448. Same with its detention capacity. *Id.* DHS claimed that it can detain only about 1% of noncitizens in removal proceedings or subject to removal orders. *Id.*

DHS thinks that prioritization schemes lead to optimal resource allocation. *Id.* at PageID 459. For example, between February and August 2021, DHS arrested 6,046 noncitizens convicted of aggravated felonies compared to just 3,575 during the same period in 2020. *Id.* This efficiency, DHS explained, allowed it to surge more resources to the southwest border. *Id.*

DHS still believes that a totality of the circumstances assessment is appropriate to determine whether a noncitizen presents a public safety risk. *Id.* at PageID 455. Citing a study finding no relationship between an increase in immigration and crime, DHS dismissed the Texas district court's finding that it is "well [] established" that criminal aliens pose a high recidivism risk. *Id.* (quoting *Texas*, 2021 WL 3683913, at *47); *see also* Doc. No. 27-29. DHS explained that it wants its officers to be free to weigh a variety of circumstances to determine whether a noncitizen truly presents a public safety risk. Doc. No. 27-2 at PageID 459.

The Considerations Memo also addressed the Permanent Guidance's possible impact on states. *Id.* at PageID 456. DHS found downstream effects of illegal immigration on states and localities "extremely difficult to quantify" due to the countless factors at play. *Id.* at PageID 456–58. While it acknowledged that "second-order effects . . . clearly occur," it found that any negative financial impact on state and local governments to be insignificant. *Id.* at PageID 457. DHS believes its "long history" of shifting enforcement policies taught states and localities not to rely too heavily on one enforcement regime over another. *Id.* at PageID 458. Marginal fiscal effects aside, DHS contends that prioritization schemes produce more benefits than costs. *Id.*

### D.    Procedural History

The States seeks a preliminary injunction of the Permanent Guidance for three reasons: (1) the policy is contrary to 8 U.S.C. §§ 1226(c)(1) and 1231(a)(1)(A); (2) DHS's decision was

arbitrary and capricious, 5 U.S.C. § 706(2)(A); and (3) DHS violated the APA by not engaging in notice-and-comment rule making, 5 U.S.C. § 553. Doc. No. 4. Two more claims round out their complaint: (1) the Permanent Guidance is pretextual agency action to remedy the allegedly deficient January 20 Memo and Interim Guidance, 5 U.S.C. § 706(2)(A); and (2) the policy violates Article II's Take Care Clause, U.S. Const. art. II, § 3. Doc. No. 1. The States only seek a preliminary injunction based on Claims I–III. Doc. No. 4.

DHS's motion to dismiss and opposition to the motion for a preliminary injunction contend several threshold barriers blunt the States' challenges. Doc. No. 29. It asserts that the judicial review of the Permanent Guidance is prohibited because (1) it was a product of the agency's discretion; (2) it does not constitute "final agency action"; and (3) Congress explicitly precludes challenges to DHS's policies unrelated to enforcement and removal proceedings. Doc. No. 29 at PageID 709–20. Even if the States did secure APA review, DHS contends they lack standing to assert their claims. *Id.* at PageID 704–09. DHS alternatively seeks judgment on the administrative record, urging that its actions were consistent with the relevant statutes, reasonable, and that the Permanent Guidance was exempt from notice-and-comment. *Id.* at PageID 720–32.

The Court will address the motions in turn.

## II.    Legal Standards

DHS makes both a facial and factual attack on the Court's subject matter jurisdiction to hear this case. Doc. No. 29 at PageID 702–03; *see McCormick v. Miami Univ.*, 693 F.3d 654, 658 (6th Cir. 2012) ("Challenges to subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) are categorized as either a facial attack or a factual attack"). "A facial attack on the subject-matter jurisdiction questions merely the sufficiency of the pleading." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (quoting *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1995)). The Court accepts the allegations in

the complaint as true against a facial attack.  *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012).

A factual attack requires the court to "weigh evidence to confirm the existence of the factual predicates for subject-matter jurisdiction." *Id.* (citations omitted).  The Court does not presume the veracity of the complaint against a factual attack.  *Global Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015).  The burden to prove subject matter jurisdiction remains with the party asserting it.  *See Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1045 (6th Cir. 2015).

To survive a Rule 12(b)(6) motion, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  A complaint need not have "detailed factual allegations, but the complaint must contain more than conclusions and an unsubstantiated recitation of the necessary elements of a claim." *McCormick*, 693 F.3d at 658 (citing *Twombly*, 550 U.S. at 555).  The Court assumes the "veracity of well-pleaded factual allegations and determine whether the plaintiff is entitled to legal relief as a matter of law." *Id.* (citing *Iqbal*, 556 U.S. at 679).

The Court must balance the following factors before issuing a preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (*en banc*) (citations omitted).  "These factors are not prerequisites, but are factors that are to be balanced against each other." *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021) (quoting *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir.

2002)). "In addition to demonstrating a likelihood of success on the substantive claims, a plaintiff must also show a likelihood of success of establishing jurisdiction." *Id.* (quoting *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018)).

## III. Jurisdiction and Judicial Review

### A. Standing

"Article III's restriction of the judicial power to Cases and Controversies is properly understood to mean cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process." *Uzuegbunam v. Preczewski*, --- U.S. ---, 141 S. Ct. 792, 798 (2021) (quotation marks omitted) (quoting *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774 (2000)). Thus, "to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." *Dep't of Com. v. New York*, --- U.S. ---, 139 S. Ct. 2551, 2565 (2019). "To have standing, a plaintiff must allege (1) an injury in fact (2) that's traceable to the defendant's conduct and (3) that the courts can redress." *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–61 (1992)).

"Each plaintiff has the burden 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 457 (6th Cir. 2017) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). Yet if one plaintiff has standing, then the Court "need not consider whether the other [plaintiffs] . . . [have] standing to maintain the suit." *Mays v. LaRose*, 951 F.3d 775, 782 (6th Cir. 2020) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977)). Standing "cannot be 'inferred argumentatively from averments in the pleadings.'" *Crawford*, 868 F.3d at 457 (quoting *FW/PBS, Inc. v. City of Dall.*, 493 U.S. 215, 231 (1990)). "[R]ather, [it] 'must affirmatively appear in the record.'" *FW/PBS*, 493 U.S. at 231 (quoting *Mansfield C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 392 (1884)).

As explained below, the States have standing to challenge the Permanent Guidance.  First, the States are entitled to special solicitude in the standing analysis.  The APA affords them a chance to vindicate their quasi-sovereign interest in effective immigration enforcement.  Second, the States allege a concrete, particularized monetary injury in the form of increased expenditures on noncitizens.  Third, the States show these costs are fairly traceable to the Permanent Guidance because it will lead to more otherwise detainable or removable noncitizens within their borders.  Finally, the States prove redressability because DHS may reconsider the Permanent Guidance if the Court enjoins it.

### 1.      Special Solicitude

The States are entitled to "special solicitude" in the Court's standing analysis.  *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).  In *Massachusetts*, the Supreme Court recognized special solicitude turns on two factors: (1) whether Congress provided the state with a procedural right to relief and (2) whether the state seeks to vindicate its "quasi-sovereign interest[]."  *Id.* ("Given [the right to challenge agency rule-making] and Massachusetts' stake in protecting its quasi-sovereign interests, the Commonwealth is entitled to special solicitude in our standing analysis"); *see also Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022) ("As our Court, other circuits, and the Supreme Court have all recognized, states have a variety of sovereign and quasi-sovereign interests that they validly may seek to vindicate in litigation").  If a party meets both factors and is entitled to special solicitude, then they have standing "without meeting all the normal standards for redressability and immediacy."  *Massachusetts*, 549 U.S. at 517–18 (quoting *Lujan*, 504 U.S. at 572 n.7).  Special solicitude is apt when states have relinquished their "sovereign prerogatives" to the federal government to regulate certain conduct.  *Id.* at 519; *cf. Arizona*, 567 U.S. at 397 ("The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States").

19

"Quasi-sovereign interests" include "public or governmental interests that concern the state as a whole." *Massachusetts*, 549 U.S. at 520 n.17 (2007) (quoting R. Fallon et al., *Hart & Wechsler's The Federal Courts and the Federal System* 289 (5th ed. 2003); and citing *Missouri v. Illinois*, 180 U.S. 208, 240–41 (1901)). However, a state "still must show that it suffers an 'actual or imminent' invasion of a judicially cognizable interest" to have standing. *Saginaw Cnty. v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 957 (6th Cir. 2020) (quoting *Massachusetts*, 549 U.S. at 517). A state "likely ha[s] standing to contest" conduct that affects their independent sovereign or quasi-sovereign interests. *Kentucky*, 23 F.4th at 601.

Sovereign interests might be at stake when a federal law threatens to preempt state law. *Id.* at 598 (first citing *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 232–33 (6th Cir. 1985); then citing *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 442–43 & n.1 (D.C. Cir. 1989); and then citing *Texas v. United States* ("*DAPA*"), 809 F.3d 134, 153(5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016)). Or "when [states] believe that the federal government has intruded upon areas traditionally within states' control." *Id.* (first citing *DAPA*, 809 F.3d at 153; and then citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)). Moreover, "damage [to a] state['s] econom[y]" and harm to its citizens' well-being implicates a state's standing to sue in its quasi-sovereign capacity. *Id.* at 599.

The States meet the first requirement. The APA provides the States with a broad procedural right to challenge agency action. 5 U.S.C. § 702. Courts have recognized that—when it comes to immigration policy—states have a procedural right to challenge "DHS's affirmative decision to set guidelines." *DAPA*, 809 F.3d at 152; *see also Texas v. Biden* ("*MPP*"), 20 F.4th 928, 970 (5th Cir. 2021) (citing 5 U.S.C. § 702) (concluding that Texas had a procedural right under the APA to challenge agency action), *cert. granted*, *Biden v. Texas*, --- U.S. ---, 2022 WL 497412 (Feb. 18,

20

2022).  The States allege they are "suffering legal wrong because of agency action" under the APA, so they meet this requirement.  5 U.S.C. §§ 702, 704; *cf. Massachusetts*, 549 U.S. at 516–17.

The States also meet the second requirement.  Detention and removal of criminal aliens requires federal-state cooperation.  Doc. No. 4-15 at PageID 302–04; Doc. No. 4-18 at PageID 344; *see also* ICE Detainer Policy, at 2.  A removable noncitizen might go undetected until arrested for, and convicted of, a state criminal offense.  Doc. No. 4-15 at PageID 302–04.  DHS relies on state law enforcement officers to not only fulfill detainers against criminal aliens, but also to investigate, prosecute, detain, and supervise them.  *Id.*; Doc. No. 27-8 at PageID 503–04.  The States must expend these public-safety and law enforcement resources regardless of the rate at which DHS detains and removes criminal aliens.  Doc. No. 1 at PageID 9–15.

In that way, the States share the cost of immigration enforcement with the federal government.  Doc. No. 4-15 at PageID 302–04; Doc. No. 4-18 at PageID 344; Doc. No. 27-8 at PageID 503–04.  Criminal aliens might be subject to a term of state imprisonment followed by a judge-imposed term of supervised release.  Doc. No. 4-18 at PageID 344; *see also Arizona*, 2021 WL 2787930, at *7.  The States pay to impose this sentence until DHS takes custody.  *Arizona*, 2021 WL 2787930, at *7 (explaining Arizona's per-criminal supervision cost).  If DHS chooses to detain and remove fewer criminal aliens, the cost of further post-release supervision, and possible recidivism, falls on the States.  *Id.*  Though DHS suggests that increased supervision costs are, at most, a self-imposed injury, Doc. No. 29 at PageID 706, this ignores the essential first-line-of-defense role that the States play in immigration enforcement.  Assuming for the purposes of this motion to dismiss that the Permanent Guidance has caused a net decrease in DHS's detention and removal of criminal aliens, the States will invariably bear a greater portion of the federal/state

cost-sharing inherent to immigration enforcement. Doc. No. 1 at PageID 9–15. The States' quasi-sovereign interests in immigration enforcement are, therefore, strong. *See, e.g.*, *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 601 (recognizing the states' authority to "exercise . . . sovereign power over individuals" within their borders); *see also Saginaw Cnty.*, 946 F.3d at 957 (noting states can sue the federal government when "the State does not have its usual recourse to state law and state enforcement proceedings to vindicate its interests").

The States are entitled to special solicitude. Thus, they have a reduced burden to show redressability and imminence. *See Massachusetts*, 549 U.S. at 517–18. Because "no prudential bar prevents the states from suing the United States to vindicate their . . . quasi-sovereign interests," the Court must next consider whether the states "have also shown 'the irreducible constitutional minim[a]' to establish Article III standing." *Kentucky*, 23 F.4th at 601 (alterations in original) (quoting *Lujan*, 504 U.S. at 560).[10]

### 2. Injury[11]

The States allege a concrete, particularized injury. To prove an injury-in-fact, "the claimant must establish the 'invasion of a legally protected interest' that is 'concrete and

---

[10] At times, the Sixth Circuit has expressed skepticism about the modern concept of state standing, noting that federal courts previously could not adjudicate state-led lawsuits that did not provide a basis for justiciability at common law, *i.e.*, property or contract rights. *See Saginaw Cnty.*, 946 F.3d at 956 (citing Ann Woolhandler & Michael G. Collins, *State Standing*, 81 Va. L. Rev. 387, 392–93 (1995)); *see also Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 286–89 (1888); *Georgia v. Stanton*, 73 U.S. (6 Wall.) 50, 73–77 (1867) (finding "sovereignty interests" nonlitigable). While the Supreme Court has trended towards a historical, traditional approach to deciding whether an injury is justiciable, *see Spokeo*, 578 U.S. at 339, and when finding certain elements of standing, *see, e.g.*, *Uzuegbunam*, 141 S. Ct. at 797–800, neither it nor the Sixth Circuit have indicated whether they wish to bar states from vindicating an injury to their quasi-sovereign interests, *see, e.g.*, *Massachusetts*, 549 U.S. at 517–20.

[11] DHS argues the States have not suffered an injury because there is "'no judicially cognizable interest in procuring enforcement of the immigration laws' against someone else." Doc. No. 29 at PageID 705 (quoting *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984)). True, "a *private citizen* lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S. v. Richard D*, 410 U.S. 614, 619 (1973) (emphasis added) (first citing *Younger v. Harris*, 401 U.S. 37, 42 (1971); then citing *Bailey v. Patterson*, 369 U.S. 31, 33 (1962); and then citing *Poe v. Ullman*, 367 U.S. 497, 501 (1961)). But this does not preclude the *States* from litigating in their quasi-

particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Gerber*, 14 F.4th at

505–06 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)).  A particularized injury "must

affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1.  "A 'concrete'

injury is one that 'actually exist[s].'" *Gerber*, 14 F.4th at 506 (quoting *Spokeo*, 578 U.S. at 339)

(alterations in original).  "[C]ourts should assess whether the alleged injury to the plaintiff has a

'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in

American courts" when determining concreteness. *TransUnion LLC v. Ramirez*, --- U.S. ---, 141

S. Ct. 2190, 2204 (2021) (quoting *Spokeo*, 578 U.S. at 341).  Traditional, concrete harms include

"monetary harms." *Id.* at 2205.

The States identify three categories of expenditures affected by DHS's enforcement

priority scheme: (1) public safety; (2) health care; and (3) education.  Doc. No. 1 at PageID 9–15;

Doc. No. 34 at PageID 895–901.  According to the States, none of this spending is discretionary.

Doc. No. 1 at PageID 9–15.  Local law enforcement must respond to crimes allegedly committed

by noncitizens; federal law requires Emergency Medicaid dollars to be spent on noncitizen care[12];

and public schools must enroll noncitizen children.  Doc. No. 34 at PageID 895–901.

More previously removable noncitizens in their jurisdiction means the States must devote

more resources to these categories. *Id.*  The States show that, in December 2021, DHS detained

fewer noncitizens with criminal convictions or pending charges per day (4,296) compared to

December 2019 (16,388) and December 2020 (10,336).  Doc. No. 34 at PageID 897.  This

---

sovereign or sovereign capacity. *See Kentucky*, 23 F.4th at 598–601.  Whether the States have standing
depends on if they have suffered an injury-in-fact. *See Saginaw Cnty.*, 946 F.3d at 957.

[12] 42 C.F.R. § 440.255(c) (Emergency Medicaid for noncitizens); Ohio Admin. Code 5160:1-5-06 (2021)
(same); Mont. Code Ann. § 1-1-411 (2022), *invalidated by Mont. Immigrant Just. All. v. Bullock*, 371 P.3d
430, 446 (Mont. 2016) (finding Montana's statute that denied certain state services to illegal aliens
preempted and invalid).

difference, the States believe, will cause a net increase in law enforcement expenditures. *Id.* at PageID 897–98

DHS thinks this harm is speculative. Doc. No. 29 at PageID 705. It points to data showing that arrest of noncitizens with aggravated felonies actually increased in between February and August 2021 (6,046) compared to the same period in 2020 (3,575). *Id.* at PageID 706. DHS contends a targeted enforcement approach saves the States money in the long run because it increases the odds the worst offenders will be taken in DHS custody. *Id.*

But the States have plausibly shown these costs have accrued, and will continue to do so, even if the priority shift generates some offsetting benefit. *See, e.g.*, *Markva v. Haveman*, 317 F.3d 547, 557–58 (6th Cir. 2003) (grandparents had standing to sue over requirement that they pay more for Medicaid benefits than similarly situated parents even though their other welfare benefits outweighed this harm); *cf. Massachusetts*, 549 U.S. at 523–25 (Massachusetts's injury from global warming was concrete even though China's and India's pollution might offset domestic pollution). This financial impact is a "tangible" one. *TransUnion*, 141 S. Ct. at 2204. In the District of Arizona litigation over the Interim Guidance, for example, Arizona identified noncitizens with criminal convictions who were placed on state supervision after DHS lifted their detainers under the Interim Guidance. *Arizona*, 2021 WL 2787930, at *7. A decrease in detention and removal of criminal aliens will invariably lead to similar results in Montana and Ohio. Doc. No. 1 at PageID 9–15.

An aggregate decline in removals will also cause the States to devote more emergency Medicaid and educational resources to noncitizens than they otherwise would have. *Id.*; see *Arizona*, 2021 WL 2787930, at *7. The States allege that, since the enforcement priority shift began with the January 20 Memo, DHS has only removed 18,713 individuals from January to July

24

2021 compared to 186,089 during the same period in 2019. Doc. No. 34 at PageID 885; *see also* Doc. No. 4-8 at PageID 178–79; Doc. No. 4-11 at PageID 203–04. Fewer detentions and removals increase the number of noncitizens eligible to receive state assistance. *Cf. MPP*, 20 F.4th at 970 (concluding Texas had demonstrated injury-in-fact by showing a reverse of DHS's MPP program policy would make more noncitizens eligible to receive a driver's license); *Pennsylvania v. President United States*, 930 F.3d 543, 561–64 (3d Cir. 2019) (finding states sufficiently alleged injury when they showed that an agency's contraceptive mandate would increase reliance on States' services), *overruled on other grounds by Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, --- U.S. ---, 140 S. Ct. 2367 (2020).

Considering (1) the downward trend in removals under the Permanent Guidance and its predecessor policies; (2) the plausible increase in public expenditures due to a rise in the States' respective noncitizen populations; and (3) the mandatory nature of the States' law enforcement duty and public benefit laws, the States have demonstrated a plausible, "certainly impending, or . . . substantial risk" of harm. *See Dep't of Com.*, 139 S. Ct. at 2565 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)) (finding that states could challenge census bureau for including a question about country of residence because it would undercount noncitizen residences, which would lead to less federal funding). Thus, the States have identified a concrete, particular injury-in-fact.

### 3. Traceability

The States' injury is traceable to the Permanent Guidance. "Standing requires 'a causal connection between the injury and the conduct complained of' which means that the injury is 'fairly . . . trace[able] to the challenged action of the defendant,' not some 'independent action of some third party.'" *Garland v. Orlans, PC*, 999 F.3d 432, 440–41 (6th Cir. 2021) (alterations in original) (quoting *Lujan*, 504 U.S. at 560). "At the pleading stage, the plaintiff's burden of

'alleging that their injury is "fairly traceable"' to the defendant's challenged conduct is 'relatively modest[.]'" *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020) (alteration in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 171 (1997)). Although "[a] self-inflicted injury, by definition is not traceable to anyone but the plaintiff[,]" even "harms that flow 'indirectly from the action in question'" satisfy traceability. *Id.* (quoting *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003)).

When DHS pulls back immigration enforcement, the States pick up some of the cost. Doc. No. 1 at PageID 9–15. "The causal chain is easy to see." *MPP*, 20 F.4th at 972 (citing *Massachusetts*, 549 U.S. at 523). As the *Arizona* district court found in litigation over the Interim Guidance, it is inevitable that a decrease in detainer executions will force states to expend resources on post-release supervision that, but for the Permanent Guidance, DHS would provide through its detention program. *Arizona*, 2021 WL 2787930, at *7.

DHS argues that this is a self-inflicted injury because the States do not have to impose community supervision. Doc. No. 29 at PageID 706. True enough. But DHS misses that, prior to the Permanent Guidance, DHS would have detained at least some of the noncitizens it will now release. The States must now step in when DHS does not. *Cf. Dep't of Com.*, 139 S. Ct. at 2566 (reasoning that a "predictable" effect of agency policy makes the harm more than speculative).[13] Such an injury is fairly traceable to the Permanent Guidance.

---

[13] DHS relies on *Buchholz v. Meyer Njus Tanick, P.A.*, 946 F.3d 855 (6th Cir. 2020), where a debtor who allegedly suffered an injury over fear that he would be subject to legal action if he did not pay in response to a debt collector's letters. Doc. No. 29 at PageID 706. It argues the States' alleged injury is similar because any increase in spending related to noncitizens is at their discretion. *Id. Buccholz*, however, is distinguishable. Because the debtor in that case did not pay his debts and "[feared] the consequences of his delinquency," the Sixth Circuit found that his injury was purely self-inflicted. *Id.* at 867. In contrast, DHS triggered the causal chain that led to the States' harm when it enacted the Permanent Guidance. *See, e.g.*, *Libertarian Nat'l Comm., Inc. v. FEC*, 924 F.3d 533, 537–39 (D.C. Cir. 2019) (traceability requirement was satisfied when political party chose to place excess escrow amount in segregated fund available for specific purposes after Federal Election Committee forbade a political party from placing it into their

4.        **Redressability**

The States' injury is redressable.  To be redressable, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotation omitted).  Thus, "[a]n injury is redressable if a judicial decree can provide 'prospective relief' that will 'remove the harm.'" *Doe v. DeWine*, 910 F.3d 842, 850 (6th Cir. 2018) (quoting *Warth*, 422 U.S. at 505).  Under the APA, when a litigant has a procedural right to sue, that litigant proves redressability if "there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts*, 549 U.S. at 518 (first citing *Lujan*, 504 U.S. at 573 n.7; and then citing *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002)).

DHS argues that enjoining the Permanent Guidance would not necessarily return State spending to prior levels.  Doc. No. 29 at PageID 708–09.  DHS—due to resource constraints—must necessarily prioritize certain enforcement actions over others.  *Id.*  It insists that the States cannot show any other combination of priorities could reduce crime in their jurisdictions or limit the number of noncitizens relying on public services.  *Id.*

The Court disagrees.  If the Court enjoins the Permanent Guidance, then DHS may reconsider enacting a similar policy or resume removals at its previous pace.  *Cf. Massachusetts*, 549 U.S. at 518.  Any revision to the priority categories would necessarily be less under-inclusive than the Permanent Guidance.  The "harms that allegedly flow" from DHS's policy might then dissipate.  *Kentucky*, 23 F.4th at 601.

---

general fund).  The injury here was not purely self-inflicted because the States' devotion of extra criminal justice, healthcare, and Emergency Medicaid expenditures is "the predictable effect of Government action." *Dep't of Com.*, 139 S. Ct. at 2565; *see also* 13A Wright, Miller, & Cooper, Federal Practice & Procedure § 3531.5 (3d ed. 2014) ("Standing is defeated only if it is concluded that the injury is so completely due to the plaintiff's own fault as to break the causal chain").

Therefore, the Court finds the States have standing to bring their claims.  It must now address whether the States can obtain judicial review under the APA.

### B.      Judicial Review Under the APA

"The Administrative Procedure Act embodies a 'basic presumption of judicial review,' and instructs reviewing courts to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Dep't of Com.*, 139 S. Ct. at 2567 (first quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); and then quoting 5 U.S.C. § 706(2)(A)).  "This presumption is a strong one, and an 'agency bears a "heavy burden"' in proving that Congress intended to preclude all judicial review."  *Duncan v. Muzyn*, 833 F.3d 567, 576 (6th Cir. 2016) (first quoting *Mach Mining, LLC v. EEOC*, 575 U.S 480, 486 (2015); and then quoting *Abbott Laboratories*, 387 U.S. at 140).  Still, a challenger to agency action must first traverse several threshold barriers to obtain APA review.  Review is unavailable "to the extent that . . . (1) statutes preclude review or (2) agency action is committed to agency discretion by law."  5 U.S.C. §§ 701(a)(1) and (2) (cleaned up).  Reviewable agency action must be "final" and "for which there is no other adequate remedy in a court are subject to judicial review."  5 U.S.C. § 704.  DHS asserts that the States fail to surpass any of these threshold barriers.  Doc. No. 29 at PageID 709–20.

### 1.      Committed to Agency Discretion

Section 701(a)(2) "has caused confusion and controversy since its inception."  *Barrios Garcia v. Dep't of Homeland Sec.*, 25 F.4th 430, 445 (6th Cir. 2022) (quoting Viktoria Lovei, *Revealing the True Definition of APA § 701(a)(2) by Reconciling "No Law to Apply" with the Nondelegation Doctrine*, 73 U. Chi. L. Rev. 1047, 1050 (2006)).  A "formalistic" interpretation of "committed to agency discretion" seemingly contradicts the APA's "abuse of discretion" standard of review.  *Id.*  For this reason, "[t]he Supreme Court has . . . rejected a literal reading of

§ 701(a)(2)," *id.*, and has construed the exception "narrow[ly]," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). An agency decision is only committed to its "discretion," and is therefore unreviewable, "where the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting *Webster v. Doe*, 486 U.S. 592, 599–600 (1988)).

Agency nonenforcement decisions are among the "limited category" of discretionary and unreviewable agency actions. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, --- U.S. ---, 140 S. Ct. 1891, 1905 (2020). In *Heckler v. Chaney*, the Supreme Court held that "an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)." 470 U.S. 821, 832 (1985). This is principally because nonenforcement decisions are based on a "balancing of factors which are peculiarly within [the agency's] expertise" and unsuitable for judicial administration. *Id.* at 831.

DHS insists that the Permanent Guidance is the type of nonenforcement action described in *Chaney* and thus is a decision committed to its discretion. Doc. No. 29 at PageID 709. Central to this argument is DHS's view that the Permanent Guidance is but an extension of its prosecutorial discretion. *Id.* at PageID 709–13. It explains that Congress endowed the agency with significant discretion to decide when, how, and against whom to bring enforcement proceedings. *Id.* The flip side of the power to bring enforcement is declination. *Id.* Adopting a policy instructing its officials on how to deploy their discretion is, in DHS's telling, tantamount to a discretionary nonenforcement decision. *Id.*

The States do not necessarily disagree that DHS has discretion to *bring* enforcement proceedings. Doc. No. 4 at PageID 66. Instead, the States assert that DHS's discretion is not unlimited and is bounded by important statutory commands, namely 8 U.S.C. §§ 1226(c) and

1231(a)(1)(A). *Id.* at PageID 76–78. Their contention is that the Permeant Guidance's assertion of discretion contravenes those mandates. *Id.*

The Court, as explained below, agrees with the States. DHS's Permanent Guidance purports to introduce an extra-statutory balancing scheme to govern each step of the enforcement process. Doc. No. 4-1 at PageID 100 (explaining the Permanent Guidance applies to decisions made through "apprehension and removal"). While DHS may exercise unquestioned discretion over some aspects of the enforcement process, *see, e.g.*, *AADC*, 525 U.S. at 483 ("At each stage [of the removal process] the Executive has discretion to abandon the endeavor"), Congress has instructed it to follow certain steps when it comes to detention of criminal aliens pending removal proceedings and execution of removal orders. The Permanent Guidance's totality-of-the-circumstances analysis is far more than a nonenforcement decision. *Cf. Regents*, 140 S. Ct. at 1906 (declining to apply the *Chaney* presumption to DHS's revocation of the Deferred Action for Childhood Arrivals ("DACA") program because it was "not simply a non-enforcement policy"). Rather, it changes the substantiative standard ERO officials apply when making bond determinations under 8 U.S.C. § 1226(c)(1) and removal decisions under 8 U.S.C. § 1231. That decision was not one left to DHS's discretion.

### a. Heckler v. Chaney

DHS relies on *Chaney* for the proposition that "decisions concerning enforcement" are unsuitable for judicial review. Doc. No. 29 at PageID 709 (citing *Chaney*, 470 U.S. at 831). In *Chaney*, the Supreme Court flipped the regular presumption of APA review on its head. *Chaney*, 470 U.S. at 831. An agency nonenforcement action is only reviewable "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 833.

*Chaney* involved whether incarcerated persons could compel the FDA to recommend enforcement actions to stop states from using specific lethal-injection drugs in violation of the Federal Food, Drug, and Cosmetic Act ("FDCA"). *Id.* at 823–24. Under the FDCA's enforcement provision, the Secretary is only "authorized to conduct examinations and investigations." *Id.* at 835 (cleaned up) (quoting 21 U.S.C. § 372). The Court determined that the FDCA "charges the Secretary only with recommending prosecution; any criminal prosecutions must be instituted by the Attorney General." *Id.* Such language fully "committed" the decision not to recommend prosecution to the FDA Secretary's discretion. *Id.* at 835, 837.

The *Chaney* Court was clear, however, that its "narrow" exception to general presumption of reviewability applied to *non*enforcement decisions. *Id.* at 831, 837 ("This recognition of the existence of discretion is attributable in no small part to the general unsuitability for judicial review of agency decisions to *refus*e enforcement" (emphasis added)). Nonenforcement decisions are a product of policy-based decisions that are unsuitable for judicial review. *Id.* at 831–32 ("An agency generally cannot act against each technical violation of the statute it is charged with enforcing. The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities" (citation omitted)). Agency nonaction does not involve an "exercise [of] coercive power over an individual's liberty or property rights . . . . [But] when an agency does act to enforce . . . [t]he action at least can be reviewed to determine whether the agency exceeded its statutory powers." *Id.* at 832 (emphasis removed) (citing *FTC v. Klesner*, 280 U.S. 19, 50 (1929)).

DHS suggests that *Chaney* extends beyond one-shot enforcement decisions and applies to enforcement policies like the Permanent Guidance that could lead to non-enforcement. Doc. No. 29 at PageID 709–13. There is little, if any, support for this view, considering that *Chaney* focused

31

on policy-based factors underpinning a one-off instance of nonenforcement. *Cf. Regents*, 140 S. Ct. at 1906 (declining to apply *Chaney* where DHS's DACA policy went beyond "a passive non-enforcement policy"). But even if the Court were to apply the *Chaney* presumption in this case, it would find it rebutted by the specific "legislative direction in the [IIRIA's] statutory scheme that [DHS] administers." *Chaney*, 470 U.S. at 833.

### b. Textual Analysis

Determining whether the relevant statutes provide a "judicially manageable" standard begins with the text. *Chaney*, 470 U.S. at 830. Courts engaged in statutory interpretation "must give effect to the clear meaning of statutes as written." *Kentucky v. Biden*, 23 F.4th 585, 603 (6th Cir. 2022); (quoting *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, --- U.S. ---, 137 S. Ct. 1002, 1010 (2017)). Each word of the statute must be given "'its ordinary, contemporary, common meaning,' while keeping in mind that '[s]tatutory language has meaning only in context.'" *Id.* (first quoting *Star Athletica*, 137 S. Ct. at 1010; and then quoting *Graham Cnty. Soil & Water Conserv. Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 415 (2005)). Courts must not "woodenly interpret a legal text 'in a vacuum,' but instead discern 'the meaning of a statement' in a law from the 'context in which it is made.'" *United States v. Tate*, 999 F.3d 374, 378 (6th Cir. 2021) (first quoting *Abramski v. United States*, 573 U.S. 169, 179 (2014); and then quoting *United States v. Briggs*, --- U.S. ---, 141 S. Ct. 467, 470 (2020)).

### i. § 1226(c)(1)

Section 1226 divides removable noncitizens into two categories: "criminal aliens" and all others. 8 U.S.C. §§ 1226(a), (c). "Criminal aliens" are those noncitizens convicted of an "aggravated felony" as described in 8 U.S.C. § 1226(c)(1)(A)–(C) or close relatives of a terrorist and those thought likely to engage in terrorism, § 1226(c)(1)(D). *See Nielsen v. Preap*, --- U.S. ---, 139 S. Ct. 954, 960 (2019) (identifying covered noncitizens under § 1226(c)(1)). The "Attorney

General *shall* take into custody" criminal aliens "when the alien is released" and may release the criminal alien "only if" the limited circumstances of § 1226(c)(2) apply.  8 U.S.C. § 1226(c)(1), (2).

It is first important to identify when in the removal process § 1226(c) comes into play. Section 1226(a) "provides that DHS may arrest and detain the alien 'pending a decision on whether the alien is to be removed from the United States.'"  *Guzman Chavez*, 141 S. Ct. at 2240 (quoting 8 U.S.C. § 1226(a)).  Or the Attorney General, "[e]xcept as provided in subsection (c) and pending such decision," may release the noncitizen on bond.  8 U.S.C. § 1226(a).  "Pending"—when used as a preposition like in § 1226(a)—means "during," "while in the process of," or "awaiting." *Pending*, *American Heritage Dictionary of the English Language* (4th ed. 2000).  So, § 1226(a) permits DHS to arrest and detain a noncitizen "during" or while he or she "awaits" removal proceedings.  The implication is that § 1226(a) does not authorize arrest and detention unless and until removal proceedings have begun.

Section 1226, of course, says more.  "Aliens who are arrested and detained may generally apply for release on bond or conditional parole."  *Guzman Chavez*, 141 S. Ct. at 2280 (citing § 1226(a)(2)).  "The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien."  8 U.S.C. § 1226(b).  In other words, the Attorney General may decide at will whether to detain or release on bond a non-criminal alien "awaiting" removal proceedings.  *See, e.g.*, *Preap*, 139 S. Ct. at 960 ("But while 8 U.S.C. § 1226(a) generally permits an alien to seek release [pending their removal proceeding], that provision's sentence on release states that all this is subject to an exception that is set out in § 1226(c)").

Section 1226(c)—entitled "detention of criminal aliens"—drops the permissive "may." Instead, the "Attorney General shall take into custody any" criminal alien "when the alien is released." 8 U.S.C. § 1226(c). Because a "criminal alien" is someone who previously "committed" an offense listed in subsections (A)–(C), "when the alien is released" refers to release from the custody of the law enforcement agency that detained the criminal alien after commitment of a covered offense. *See Preap*, 139 S. Ct. at 965.

Section 1226(c) only refers to when the law enforcement agency and DHS exchange custody of the criminal alien. It does not state when, and for how long, DHS "shall take custody" of the criminal alien. 8 U.S.C. § 1226(c). But, of course, § 1226(c) is an exception to § 1226(a), and the two provisions must be read in tandem. Indeed, the Supreme Court has construed § 1226 in just this way on several occasions. *See Preap*, 139 S. Ct. at 960 (describing § 1226(c) as an exception to the general rule that noncitizens arrested under § 1226(a) can petition for bond); *see also id.* at 966 ("We read each of subsection (c)'s two provisions—paragraph (1) on arrest, and paragraph (2) on release—as modifying its counterpart sentence in subsection (a)"); *see also id.* ("The text of § 1226 itself contemplates that aliens arrested under subsection (a) may face mandatory detention under subsection (c)"). Section 1226, therefore, provides that DHS must detain "criminal aliens" pending their removal proceeding; all other noncitizens may be released on bond. *See Jennings*, 138 S. Ct. at 846 ("And together with § 1226(a), § 1226(c) makes clear that detention of aliens within its scope must continue 'pending a decision on whether the alien is to be removed from the United States'" (quoting 8 U.S.C. § 1226(c))); *Demore*, 538 U.S. at 517–18 ("Section 1226(c) mandates detention *during removal proceedings* for a limited class of deportable aliens" (emphasis added)).

DHS argues that "shall" really means "may." Doc. No. 29 at PageID 710. The consequence of this reading is that DHS "may" release "criminal aliens" pending their removal proceeding as if they were non-criminal aliens covered by § 1226(a). *Id.* at PageID 723.[14] This interpretation, however, reads § 1226(c) out of the statute.

Part of DHS's argument is based on the Supreme Court's recognition that DHS has plenary authority to enforce the immigration laws. *See, e.g.*, *AADC*, 525 U.S. at 483. Citing the volume of potentially removable noncitizens in the United States (11 million) and Congress's decision not to appropriate sufficient funds to upgrade DHS's enforcement capabilities, DHS asserts that it must make hard choices and prioritize the removal of certain non-citizens over others. Doc. No. 29 at PageID 724–25. It insists that prosecutorial discretion principles give agencies authority to selectively chose when to enforce laws despite the legislature's use of seemingly mandatory language. *Id.* at PageID 710–11 (citing *Castle Rock v. Gonzalez*, 545 U.S.748, 761 (2005)). Both arguments are misguided.

No doubt that DHS has discretion to choose whom to enforce the immigration laws against. *See, e.g.*, *AADC*, 525 U.S. at 483 ("At each stage [of the removal process] the Executive has discretion to abandon the endeavor"). Even the States acknowledge that. Doc. No. 4 at PageID 66. But extending that prosecutorial discretion principle to § 1226(c) mistakes the statute for what it is: a bond provision. *See Jennings*, 138 U.S. at 837 ("Section 1226(a) sets out the default rule: The Attorney General may issue a warrant for the arrest and detention of an alien . . . [and] may release the alien" unless that alien is covered by § 1226(c)(1)'s "carveout"). Congress—citing high rates of abscondment and recidivism concerns—enacted § 1226(c) to mandate that criminal

---

[14] DHS makes this argument in response to the States' contention that § 1226(c) also determines which non-citizens must be subject to enforcement actions. Doc. No. 4 at PageID 77–78; Doc. No. 29 at PageID 723. But the knock-on effect of reading § 1226(c) as permissive, rather than mandatory, would also allow ERO officials to ignore the statute while making custody determinations.

aliens be detained during their enforcement proceedings.  *See Preap*, 139 S. Ct. at 960 ("Section 1226(c) was enacted as part of the [IIRIRA], and it sprang from a 'concer[n] that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers.'" (quoting *Demore*, 538 U.S. at 513).  DHS cites no authority allowing it to discard Congress's judgment on who should be mandatorily detained after removal proceedings have commenced.  Doc. Nos. 29, 34.

DHS's reliance on *Castle Rock* is also misplaced.  That case involved a criminal law statute dealing with the enforcement of restraining orders.  *Castle Rock*, 545 U.S. at 758–59.  Specifically, the statute provided "[a] peace officer *shall* use every reasonable means to enforce a restraining order" and "*shall* arrest, or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of a restrained person" upon probable cause "[t]he restrained person has violated or attempted to violate any provision of a restraining order."  *Id.* (emphasis in original).  The question was whether the statute's use of "shall" made enforcement mandatory.  *Id.* at 760.

The Supreme Court said no.  *Id.* at 761.  "The deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands" does not mean law enforcement officials are entirely deprived of prosecutorial discretion.  *Id.* (citing *Chicago v. Morales*, 527 U.S. 41 (1999)).  "[C]ommon sense" dictates "that all police officers must use some discretion" in choosing whether to enforce a law.  *Id.* (quoting *Morales*, 527 U.S. at 62).  "The practical necessity for discretion is particularly apparent" when the "circumstances of the violation" counsel against enforcement.  *Id.* at 761–62.

*Castle Rock* is inapplicable.  The question here is not—as it was in that case—whether a statute's use of "shall" removes law enforcement officer's discretion.  Rather, § 1226 does not apply until enforcement proceedings have been, or will be, brought.  *See, e.g.*, *Jennings*, 138 U.S.

at 837 ("Section 1226(a) sets out the default rule: The Attorney General may issue a warrant for the arrest and detention of an alien . . . [and] may release the alien" unless that alien is covered by § 1226(c)(1)'s "carveout"); *see also* 8 C.F.R. § 1003.14 ("[N]o charging document [*i.e.*, a Notice to Appear] is required to be filed with the Immigration Court to commence bond proceedings"). Congress mandated that criminal aliens must be detained pending their removal proceedings. *Cf. Preap*, 139 S. Ct. at 970 ("[T]he Secretary's failure to make an arrest immediately upon a covered alien's release would not have exempted the alien from mandatory detention under § 1226(c)"). This straight-forward command provides a "judicially manageable" standard to gauge DHS's exercise of discretion against.

ii.    § 1231(a)(1)(A)

DHS makes the same interpretative mistakes with 8 U.S.C. § 1231(a)(1)(A). Doc. No. 29 at PageID 721. This provision states that DHS "shall remove the alien from the United States within a period of 90 days" from "when an alien is ordered removed." 8 U.S.C. § 1231(a)(1)(A). A noncitizen "shall be detain[ed]" during the removal period. 8 U.S.C. § 1231(a)(2); *Guzman Chavez*, 141 S. Ct. at 2281 ("During the removal period, detention is mandatory" (citing 8 U.S.C. § 1231(a)(2))). Under no circumstances may "criminal aliens" be released during the removal period. 8 U.S.C. § 1231(a)(2).

"DHS routinely holds aliens under these provisions when geopolitical or practical problems prevent it from removing an alien within the 90-day period." *Guzman Chavez*, 141 S. Ct. at 2291 (citing *Zadvydas*, 533 U.S. at 684–86). Section 1231(a)(1)(C) recognizes that if removal is not accomplished during the removal period, it "shall be extended . . . if the alien fails or refuses to make timely application in good faith for travel or other documents" or otherwise obstructs removal. 8 U.S.C. § 1231(a)(1)(C). DHS may also release, and place under supervision,

noncitizens with a final removal order who were not removed during the 90-day period.  8 U.S.C. § 1231(a)(3).

The States argue that DHS "must" remove non-citizens with final removal orders within 90 days absent application of one of § 1231's enumerated exceptions.  Doc. No. 4 at PageID 76. DHS again reads "shall" permissively.  Doc. No. 29 at PageID 721.  It contends that the mandatory language must be flexible enough to afford ERO officials removal discretion.  *Id.* at PageID 723.

But this interpretation contradicts § 1231(a)(2)'s mandatory detention language.  8 U.S.C. § 1231(a)(2).  Noncitizens with final removal orders, especially those meeting the criminal alien definition, must be detained during the removal period.  *Guzman Chavez*, 141 S. Ct. at 2281. Congress left no flexibility for DHS to release some noncitizens during the removal period.

Congress was also not ignorant of the fact that removal may not be practicable within 90 days.  *See, e.g.*, *Guzman Chavez*, 141 S. Ct. at 2291.  That is why it set forth certain factors for DHS to consider before enrolling a noncitizen into the post-removal period.  8 U.S.C. § 1231(a)(3). Section 1231(a)(3) explicitly directs DHS to promulgate regulations to assess whether a non-citizen should be released on bond during the post-removal period but prior to their removal.  DHS obliged and, through notice-and-comment rulemaking, created a litany of considerations for ERO officials to apply before granting a post-removal bond.  8 C.F.R. §§ 241.4(e), (f) (factors include whether "[t]he detainee is presently a non-violent person"; whether "[t]he detainee is not likely to pose a threat to the community following release"; and factors concerning the noncitizen's propensity to commit crime, including "ties to the United States such as the number of close relatives residing here lawfully").

DHS has discretion to decide whether one of § 1231(a)(1)(A)'s exceptions apply.  But that discretion does not mean it can ignore the exceptions that Congress instructed it to follow.  *Cf.*

*TRW, Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent" (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980))).  For that reason, § 1231 too provides a manageable standard to judge the Permanent Guidance against.

### c. The Permanent Guidance is Contrary to 8 U.S.C. §§ 1226(c)(1) and 1231

Like the January 20 memo and Interim Guidance, the Permanent Guidance intends to guide ERO officials' decision-making through "apprehension and removal."  Doc. No. 4-1 at PageID 100; Doc. No. 27-9 at PageID 508; Doc. No. 27-10 at PageID 512.  This includes custody and removal decisions.  Doc. No. 4-1 at PageID 100.  The Permanent Guidance's public safety priority category requires ERO officials to weigh aggravating (*i.e.*, "gravity of the offense," "nature and degree of harm") alongside mitigating (*i.e.*, "age," mental health, family ties) factors before making "apprehension and removal" decisions.  *Id.*  Such factors are to be applied at each stage of the removal process.  *Id.*

This balancing analysis is acceptable at certain points in the removal process.  For instance, the statute concerning Notices to Appear—8 U.S.C. § 1229a—sets forth the contents of a valid charging document.  But the statute does not mandate when, or against whom, DHS must issue Notices to Appear.  8 U.S.C. § 1229a.  This is because "[f]or more than a century, Congress has afforded the Attorney General (or other executive officials) discretion to allow otherwise removable aliens to remain in the country."  *Niz-Chavez v. Garland*, --- U.S. ---, 141 S. Ct. 1474, 1478 (2021).

Once the wheels of the removal process began to turn, however, Congress made some decisions non-discretionary.  As explained above, once DHS decides to initiate removal

proceedings against a non-citizen whose conviction or terrorist association makes them a "criminal alien," DHS must detain that person for the duration of their removal proceeding. 8 U.S.C. § 1226(c). Congress also set forth enumerated exceptions to its general command that DHS "shall remove" non-citizens within 90 days from when their removal order became final. 8 U.S.C. § 1231.

The Permanent Guidance displaces the custody and removal factors Congress intended DHS officials to consider for its extra-textual totality-of-the-circumstances analysis. Doc. No. 4-1 at PageID 100. ERO officials cannot simultaneously comply with what is required by 8 U.S.C. §§ 1226(c) and 1231 and the Permanent Guidance. Here is why.

### i.  § 1226(c)(1)

The Secretary explains that ERO officials "should not rely on the fact of conviction or the result of a database search alone" when making an enforcement-related decision. Doc. No. 4-1 at PageID 101. This includes custody decisions. *Id.* at PageID 100. The Permanent Guidance instead requires a weighing of aggravating and mitigating factors before making a custody decision. *Id.* Congress, however, thought otherwise. *See Jennings*, 138 S. Ct. at 846 ("And together with § 1226(a), § 1226(c) makes clear that detention of aliens within its scope must continue 'pending a decision on whether the alien is to be removed from the United States' (quoting 8 U.S.C. § 1226(a)).

Recall that § 1226(c) mandates that non-citizens who have "committed" certain enumerated offenses be detained during the removal proceedings. Section 1226(c)(A)–(C) refer to 8 U.S.C. §§ 1182 and 1227 to define what criminal convictions warrant mandatory detention. Section 1227 establishes that non-citizens convicted of certain criminal offenses "shall . . . be removed." Included are, *inter alia*, crimes of "moral turpitude," "controlled substance traffick[ing]," "aggravated felonies," or "for which the aggregate sentences to confinement were

5 years or more."  8 U.S.C. §§ 1227(a)(2)(A)–(C).  Congress provided for some consideration of

mitigating factors.  For example, a non-citizen 18 years of age or younger who commits a crime

of "moral turpitude" is not barred from the statute's general prohibition.  8 U.S.C.

§ 1227(a)(2)(A)(ii)(I).[15]  Minor exceptions aside, Congress directed DHS to detain criminal aliens

during their removal proceeding based on the nature of their conviction.  8 U.S.C. § 1226(c).  The

Permanent Guidance's direction to examine factors outside the statute to make custody

determinations contradicts Congress's express mandate.

  Strange results follow if the outcome were otherwise.  Take "aggravated felonies" for

example.  That term serves two purposes.  First, commission of an "aggravated felony"[16] is

grounds for removal per 8 U.S.C. § 1227(a)(2)(A)(iii).  *Sessions v. Dimaya*, --- U.S. ---, 138 S.Ct.

1204, 1210, 1211 (2018) ("[R]emoval is a virtual certainty for an alien found to have an aggravated

felony conviction").  Noncitizens convicted of "aggravated felonies" must also be detained

pending their removal proceedings.  8 U.S.C. § 1226(c)(1)(B) (cross referencing 8 U.S.C.

§ 1227(a)(2)(A)(iii)).  It would not make sense if DHS could, on one hand, seek removal because

a noncitizen committed an aggravated felony but, on the other, release the noncitizen on bond

pending their removal proceeding.  *Cf. Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 254 (6th Cir.

2020) ("Interpretations of a statute which would produce absurd results are to be avoided if

alternative interpretations consistent with the legislative purpose are available" (citation omitted)).

The Court cannot sanction such a construction of § 1226(c).

---

[15] Section 1182(a)(2) explains that most of the same offenses as those listed in § 1227 render a non-citizen ineligible for a visa or admission into the United States.  8 U.S.C. § 1182(a).

[16] Section 1227(a)(2)(A)(iii) refers the reader to the INS's definitional section to define "aggravated felonies," 8 U.S.C. § 1101(a)(43), which in turn incorporates various acts defined in the federal criminal code.

### ii.  § 1231(a)(1)(A)

Same with § 1231(a)(1)(A).  There Congress made removal within 90 days mandatory absent application of an explicit exception.  *See Guzman Chavez*, 141 S. Ct. at 2282 ("If no exception applies, an alien who is not removed within the 90-day removal period will be released subject to supervision" (first citing 8 U.S.C. § 1231(a)(3); and then 8 C.F.R. § 241.5)).  Congress even directed DHS to come up with post-removal period supervised release conditions.  8 U.S.C. §§ 1231(a)(3), (a)(6).  Notably, DHS did so through notice-and-comment rulemaking.  *See* 8 C.F.R. §§ 241.4, 241.5.

The Permanent Guidance is an end-run around § 1231.  It permits ERO officials to engage in an extra-textual balancing analysis to make removal decisions.  Doc. No. 4-1 at PageID 100.  Application of the Permanent Guidance to removal period detention decisions expressly contradicts 8 U.S.C. § 1231(a)(2).  The Permanent Guidance allows noncitizens to be released on removal-period and post-removal bond based on factors Congress did not intend DHS to consider and in contrast to DHS's own regulations.  8 U.S.C. § 1231(a)(3); 8 U.S.C. §§ 241.4, 241.5.  For that reason, the Permanent Guidance also contravenes § 1231.

DHS argues that even if promulgation of the Permanent Guidance was not a decision "committed to agency discretion," the INA still prohibits judicial review.  Doc. No. 29 at PageID 715–18 (citing 5 U.S.C. § 701(a)(1)).  For the reasons below, the Court disagrees.

### 2.  Precluded by Statute

"Under § 701(a)(1), the federal courts cannot review an agency action when statutes preclude judicial review."  *Barrios Garcia*, 25 F.4th at 442 (internal quotations omitted).  Yet there is "a 'strong presumption' favoring review of administrative action."  *Mach Mining*, 575 U.S. at 486 (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986)).  An "agency bears a 'heavy burden' in attempting to show that Congress 'prohibit[ed] all judicial review' of

the agency's compliance with a legislative mandate." *Id.* (alterations in original) (quoting *Dunlop*

*v. Bachowski*, 421 U.S. 560, 567 (1975)).

DHS points to three provisions that it claims bar judicial review: 8 U.S.C. §§ 1252(b)(9);

1226(e); and 1231(h).  Doc. No. 29 at PageID 715–19.  Furthermore, DHS contends that the INA's

structure and context precludes review.  Doc. No. 38 at PageID 975–77; *see Block v. Cmty.*

*Nutrition Inst.*, 467 U.S. 340, 345 (1984).  The Court disagrees; neither these provisions, the INA's

context, nor its structure precludes APA review.

Section 1252(b)(9) provides:

> Judicial review of all questions of law and fact, including
> interpretation and application of constitutional and statutory
> provisions, arising from any action taken or proceeding brought to
> remove an alien from the United States under this subchapter shall
> be available only in judicial review of a final order under this
> section.  Except as otherwise provided in this section, no court shall
> have jurisdiction, by habeas corpus under section 2241 of Title 28
> or any other habeas corpus provision, by section 1361 or 1651 of
> such title, or by any other provision of law (statutory or
> nonstatutory), to review such an order or such questions of law or
> fact.

"Section 1252(b)(9) bars review of claims arising from 'action[s]' or 'proceeding[s]' brought to

remove an alien." *Regents*, 140 S. Ct. at 1907 (quoting 8 U.S.C. § 1252(b)(9)).  It presents no

jurisdictional bar if the challenging parties "are not asking for review of an order of removal; they

are not challenging the decision to detain them in the first place or to seek removal; and they are

not . . . challenging any part of the process by which their removability will be determined."

*Jennings*, 138 S. Ct. at 841 (plurality opinion).  Rather, it "consolidate[s] judicial review of

immigration proceedings into one action in the court of appeals, but it applies only with respect to

review of an order of removal under subsection (a)(1)." *I.N.S. v. St. Cyr*, 533 U.S. 289, 313–14

(2001) (cleaned up) (citing 8 U.S.C. § 1252(b)).

"[C]hang[ing] the process for deciding who to remove," as DHS argues, is not equivalent to the type of one-off adjudication referred to in § 1252(b)(9). Doc. No. 38 at PageID 976. Section 1252(b)(9) "channel[s] judicial review over final orders of removal to the courts of appeals." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016) (citing *Elgin v. Dep't of Treasury*, 567 U.S. 1, 9 (2012)). This provision does not disturb the APA's general presumption of review, nor foreclose challenges as to DHS's immigration policy, as it "simply provides for the consolidation of issues to be brought in petitions for judicial review." *St. Cyr.*, 533 U.S. at 313 (cleaned up). The States seek to invalidate the DHS's immigration policy, not contest a discrete removal decision. Doc. No. 1. Section 1252(b)(9) is inapplicable. *See, e.g.*, *Regents*, 140 S. Ct. at 1906–07 (finding that states could challenge recission of DACA even though it affected who DHS chose to remove because Section 1252(b)(9) did not bar review).

Section 1226(e) is also no bar to review. It provides that:

> The [Secretary's] discretionary judgment regarding the application of [1226] shall not be subject to review. No court may set aside any action or decision by [DHS] under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.

8 U.S.C. § 1226(e). "[Section 1226(e)] does not block lawsuits over 'the extent of the Government's detention authority under the "statutory framework" as a whole.'" *Preap*, 139 S. Ct. at 962 (quoting *Jennings*, 138 S. Ct. at 841); *see also Demore*, 538 U.S. at 517. Rather, it only applies to challenges to single removal actions. *See Preap*, 139 S. Ct. at 961–62. The States' challenge to the Permanent Guidance implicates "the Government's detention authority . . . as a whole," *id.* at 963, and purports to alter the criteria ERO officials apply to make detention determinations. *See, e.g.*, Doc. No. 4-1 at PageID 101 ("Our personnel should not rely on the fact of conviction . . . alone"). Thus, Section 1226(e) does not bar review.

Neither does Section 1231(h). It reads:

> Nothing in this section shall be construed to create any substantive
> or procedural right or benefit that is legally enforceable by any
> party against the United States or its agencies or officers or any
> other person.

8 U.S.C. § 1231(h).  Section 1231(h) "simply forbids courts to construe that section to create any
. . . procedural right or benefit that is legally enforceable" and is only "limit[ed to] the
circumstances in which judicial review of deportation decisions is available." *Zadvydas*, 533 U.S.
at 687–88 (internal quotations omitted).  The States bring their claim under the APA, 5 U.S.C.
§ 704, rather than challenge a specific deportation decision.  *Cf. Zadvydas*, 533 U.S. at 687–88
(Section 1231(h) did not preclude a noncitizen's habeas corpus claim).  Moreover, the context of
the statute indicates that "party" likely refers to a noncitizen challenging their final removal order.
Section 1231(h) funnels removal order appeals from the immigration courts to the circuit courts of
appeal to prevent collateral challenges.  *See, e.g.*, H.R. Rep. No. 104-828, at 219 (1996) ("This
provision is intended . . . to prohibit the litigation of claims by aliens who have been ordered
removed from the U.S. that they be removed at a particular time or to a particular place").  Section
1231(h) does not bar the States' claims because they are not a "party" challenged a particular
removal order.

No particular provision of the INA precludes judicial review of the Permanent Guidance.
Thus, the remaining structure and legislative context of the statute cannot overcome the "'strong
presumption' favoring judicial review of administrative action." *Mach Mining*, 575 U.S. at 486
(quoting *Bowen*, 476 U.S. at 670).  Congress intended to bar noncitizens' collateral claims arising
from their removal orders; the States' challenge of a broad enforcement policy does not qualify as
such a claim.  *Cf. J.E.F.M.*, 837 F.3d at 1033–34 (demonstrating that Congress intended only to
preclude review of noncitizens' challenges to specific removal decisions outside of the petition for
review of a final removal order).

DHS's reliance on *Block* is misplaced. Doc. No. 29 at PageID 716 (citing *Block*, 467 U.S. at 346–47). That case involved a statute authorizing the Secretary of Agriculture to make milk market orders that set a price floor that dairy handlers must pay to producers. *Block*, 467 U.S. at 341–42. The statute's review scheme only allowed diary handlers (*i.e.*, parties forced to pay the price set by the Secretary) to challenge milk market orders and lacked a general judicial review provision. *Id.* at 346. Consumers (end-users of the milk product) challenged a particular milk market order under the APA. *Id.* at 344. The Supreme Court held the consumers' suit was barred because Congress established a "complex and delicate administrative scheme" only permitting dairy handlers to contest milk market orders. *Id.* at 348. Allowing consumers to sue would frustrate that clear purpose. *Id.* at 347–48.

This case is different because the States are not challenging discrete removal orders. Sections 1226(e), 1231(h), and 1252(b)(9) all seek organize judicial review of removal orders. *See St. Cyr*, 533 U.S. at 513–14; *J.E.F.M.*, 837 F.3d at 1031. Unlike the dairy consumers who wanted to challenge milk market orders as if they were handlers, the States here contest a general immigration enforcement policy unrelated to the individual removal orders covered by INA's judicial review provisions. *See Preap*, 139 S. Ct. at 962.

The Court must now assess whether the Permanent Guidance is "final" agency action.

### 3.    Final Agency Action

Only "final" agency action is subject to judicial review under the APA. 5 U.S.C. § 704. Two conditions make for a "final" agency action. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corp. of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett*, 520 U.S. at 177–78). DHS concedes that the Permanent

Guidance "mark[s] the consummation" of its decision making process. Doc. No. 29 at PageID 713. The Court will, therefore, focus on *Bennett*'s second prong.

*Hawkes* instructs courts to consider the "pragmatic" consequences of agency action to determine finality. 578 U.S. at 599 (quoting *Abbott Laboratories*, 387 U.S. at 149). "The underlying rationale of the Supreme Court's 'pragmatic' approach to finality is to prevent unnecessary judicial intervention into agency proceedings." *Berry v. U.S. Dep't of Lab.*, 832 F.3d 627, 634 (6th Cir. 2016) (first quoting *Abbott Laboratories*, 378 U.S. at 149–52; and then citing *Ciba-Geigy Corp. v. E.P.A*, 801 F.2d 430, 436 (D.C. Cir. 1986)). Final agency action must have a "'sufficiently direct and immediate' impact on the aggrieved party." *Id.* at 633 (quoting *Abbott Laboratories*, 378 U.S. at 152).

DHS argues that the Permanent Guidance is not final agency action because it "does not alter any person or entity's legal rights or obligations." Doc. No. 29 at PageID 713. DHS points to Section VII of the Permanent Guidance stating, "This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural." Doc. No. 4-1 at PageID 104. DHS insists that the Permanent Guidance lacks legal effect because it does not compel its officers to take any enforcement action or alter the criteria for non-citizen removability. Doc. No. 29 at PageID 714.

DHS also contends that any harm incurred by the States because of the Permanent Guidance does not make the agency action final. *Id.* (citing *Parsons v. U.S. Dep't of Justice*, 878 F.3d 162 (6th Cir. 2017)). Its view is that any state expenditure made on or to non-citizens is independent of the Permanent Guidance. *Id.* This, DHS argues, does not mean the Permanent Guidance has a legal effect. *Id.* The Court disagrees on both counts.

First, noncitizens. As explained above, the Permanent Guidance displaces the statutory custody and removal factors set forth in 8 U.S.C. §§ 1226(c) and 1231. *See supra* § III(B)(1)(c). Changing the standards by which agency decisions are made constitutes a legal effect. *See, e.g.*, *Barrios Garcia*, 25 F.4th at 441 n.3 (observing agency action was final when it began adjudicating visa applications under a new policy). Under the Permanent Guidance, § 1226(c) custody determinations must now be made using a totality-of-the-circumstances approach, not the categorical analysis Congress instructed DHS to apply. *Cf. Nat. Res. Def. Council v. E.P.A.*, 643 F.3d 311, 320 (D.C. Cir. 2011) (explaining agency action was final when it "altered the legal regime" and bound the policy's administrators). Same with § 1231. ERO officials may use the Permanent Guidance to make non-removal decisions for reasons outside the parameters of the removal statute. Section VII's boilerplate language notwithstanding, *see Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (assigning little weight to disclaimer in an agency policy stating, "The policies set forth in this paper are intended solely as guidance, do not represent final Agency action, and cannot be relied upon to create any rights enforceable by any party"), the Permanent Guidance changes the criteria for non-citizen custody and removal decisions.

The Permanent Guidance has more than just an incidental effect on the States. DHS and the States engage in an immigration cost-sharing partnership. Doc. No. 1 at PageID 9–15; *see also Texas*, 2021 WL 3683913, at *25 (finding states must devote more Emergency Medicaid resources to non-citizens when detentions and removals decline); *Arizona*, 2021 WL 2787930, at *7 (finding that Arizona incurred community supervision cost on non-citizens whose detainers were lifted). Each commits resources to non-citizens whether for care and education or through criminal justice and immigration enforcement administration. Doc. No. 1 at PageID 9–15. The States established that they are subject to a mandatory duty to make education and healthcare expenditures on non-

citizens. *Id.* Their law enforcement agencies support DHS's mission by identifying, and detaining, non-citizens who committed crimes in their jurisdictions. *See supra* § I(B). DHS cannot so easily dismiss how its administration of the immigration laws impacts the States considering that Congress enacted § 1226(c) in response to high rates of non-citizen abscondment and strain on state resources. *Demore*, 538 U.S. at 518 ("Congress adopted [§ 1226(c)] against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens. . . . Criminal aliens . . . formed a rapidly rising share of state prison populations as well"). A decline in non-citizens detained or removed by DHS shifts a corresponding cost to the States. Doc. No. 4 at PageID 72–74; Doc. Nos. 4-8, 4-9.

DHS's citation to *Parsons* is unavailing. There, the Department of Justice ("DOJ") named fans of a music group called "Juggalos" "a loosely-organized hybrid gang" in an annual report. 878 F.3d at 165. A group of Juggalos sued the DOJ to retract the designation after state and local law enforcement detained them suspecting they were criminal gang members. *Id.* at 166. But the Sixth Circuit concluded that the DOJ's report was not final agency action because it did not commit the agency to take any action against the plaintiffs. *Id.* at 168. The court explained that actions taken by unrelated third-party law enforcement agencies "[were] not direct consequences of the [r]eport." *Id.* (quoting *Flue-Cured Tobacco Coop. Stabilization Corp. v. U.S. Env't Prot. Agency*, 313 F.3d 852, 860 (4th Cir. 2002)). "[I]ndependent actions taken by third parties" in response to agency action cannot be "legal consequences." *Id.* (quoting *Flue-Cured Tobacco*, 313 F.3d at 860).

Here the States have drawn a direct line between DHS's action and their harm. Doc. No. 1 at PageID 9–15. No intermediary is involved. *Id.* *Parsons* turned on the DOJ's relative responsibility for the third-party law enforcement agents who acted in response to its report. 878

F.3d at 168. DOJ's action was not the immediate cause of the harm. *Id.* The States have shown here that they are harmed when DHS adopts a policy that results in fewer non-citizens being detained and removed. Doc. No. 1 at PageID 9–15. Accordingly, the Court finds the Permanent Guidance is final agency action.

### 4.    Zone of Interests

A final threshold barrier remains for the States. APA plaintiffs must demonstrate the "interest [they] assert [is] . . . 'arguably within the zone of interests to be protected or regulated by the statute'" alleged to be violated. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). "Whether a plaintiff comes within the 'zone of interests' is an issue . . . determine[d] using traditional tools of statutory interpretation." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (citations omitted). Courts "apply the test in keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'" *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). The Supreme Court has "always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff.'" *Id.* For that reason, the zone of interests test "is not meant to be especially demanding." *Id.* (quoting *Clarke*, 479 U.S. at 399).

DHS contends the States fail this test and, in particular, points to 8 U.S.C. § 1231(h) to show why. Doc. No. 29 at PageID 719–20. Section 1231(h) provides that "[n]othing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." 8 U.S.C. § 1231(h). DHS reads this subsection as Congress's way of ensuring that "no entity can enforce," or claim a valid interest under, § 1231. Doc. No. 29 at PageID 720.

50

But as the States point out, the Supreme Court has instructed lower courts to avoid narrowly focusing on fragments of a statute to determine whether a litigant has an interest to be vindicated. Doc. No. 34 at PageID 912 (citing *Clarke*, 479 U.S. at 401). Instead, the Court must look at a particular statute within the "overall context" of the whole law. *See Clarke*, 479 U.S. at 401. This is in part to avoid conflating the zone of interests test with the more rigorous private-right-of-action examination. *See Lexmark*, 572 U.S. at 127; *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). Courts do not require any "indication of congressional purpose to benefit the would-be plaintiff." *Match-E-Be-Nash*, 567 U.S. at 225 (quoting *Clarke*, 479 U.S. at 399).

Congress had the states in mind when enacting §§ 1226(c) and 1231. *See, e.g.*, *Demore*, 538 U.S. at 518. Both provisions were designed, *inter alia*, to strengthen the federal immigration detention and removal system to aid the states. *Id.* at 518–19. Congress found that noncitizens— particularly those who were convicted of a crime—absconded at high rates during their removal proceedings and often committed additional offenses. *Id*. at 519 ("Once released, more than 20% of deportable criminal aliens failed to appear for their removal hearings" (citing S. Rep. 104-48, at 2). As the States show here, they must expend more criminal justice resources on non-citizens when federal immigration detentions and removals decline. Doc. No. 1 at PageID 9–15. The States depend on the federal government to defray the costs of unlawful immigration because they cannot enforce the immigration laws themselves. *See Arizona*, 567 U.S. at 397 ("The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States"). This Article III injury is sufficient to demonstrate the States are within the INA's zone of interests. *Cf. DAPA*, 809 F.3d at 163 (concluding that Texas satisfied the zone of interests test under the INA "as a result of the same injury that gives it Article III standing").

### 5.      Conclusion

The Court finds that the Permanent Guidance is subject to judicial review under the APA. Onto the merits.

## IV.     Preliminary Injunction

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet*, 305 F.3d at 573 (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)).  The district judge "is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citation omitted).  But, if an injunction should issue, the district court must make a specific finding of irreparable harm.  *See D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) ("[T]his circuit has held that a district court abuses its discretion 'when it grants a preliminary injunction without making specific findings of irreparable injury'" (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982))).

### A.      Likelihood of Success on the Merits

### 1.      Count I: Contrary to Law

As explained above, *supra* § III(B)(1)(c), the Permanent Guidance is unlawful for two reasons.  First, it displaces § 1226(c)'s mandate that "criminal aliens" are to be detained based on the nature of their convictions pending their removal proceedings for a balancing test based on factors Congress did not intend for it to consider.  Second, DHS authorizes ERO officials to make removal decisions under the Permanent Guidance's balancing test and, in effect, introduces a non-statutory exception to § 1231.  Little else need be said.  There is a strong likelihood the States prevail on their Count I.  Doc. No. 1 at PageID 15.

2.      **Count II: Arbitrary and Capricious**

"The APA directs courts to 'hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 407 (6th Cir. 2013) (quoting 5 U.S.C. § 706(2)(A)). A decision is arbitrary or capricious under the APA if the agency

> has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

Arbitrary and capricious review is "'narrow': [the Court] determine[s] only whether the Secretary examined 'the relevant data' and articulated 'a satisfactory explanation' for his decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com.*, 139 S. Ct. at 2569 (quoting *State Farm*, 463 U.S. at 43). "Courts enforce this principle with regularity when they set aside agency regulations which, though well within the agencies' scope of authority, are not supported by the reasons that the agencies adduce." *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998) (citations omitted). "A court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Com.*, 139 S. Ct. at 2573 (first citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978); and then citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)). "[Courts] will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Home Builders*, 551 U.S. at 658 (quoting *State Farm*, 463 U.S. at 63). "[T]he role of courts in reviewing arbitrary and capricious challenges is to 'simply ensur[e] that the agency has acted within a zone of reasonableness.'" *Biden v. Missouri*,

--- U.S. ---, 142 S. Ct. 647, 654 (2022) (quoting *F.C.C. v. Prometheus Radio Project*, --- U. S. --- ,141 S. Ct. 1150, 1158 (2021)).

The States advance several reasons why DHS acted arbitrarily in adopting the Permanent Guidance.  Doc. No. 4 at PageID 78–83.  Their complaints can be divided into two groups: failure to consider important factors and failure to offer a reasoned explanation.  *Id.*; Doc. No. 34 at PageID 883–86.  The States identify three factors they say DHS gave insufficient attention to: criminal alien recidivism; the relationship between mandatory detention and successful removals; and costs imposed on the States.  Doc. No. 4 at PageID 78–83.  They also believe DHS's resource constraint rationale is really a pretext to reduce detentions and removals.  Doc. No. 34 at PageID 883–86.

DHS disputes each charge.  Doc. No. 29 at PageID 724–29; Doc. No. 38 at PageID 983– 989.  It contends that the Considerations Memo addressed, and resolved, each of the States' concerns.  Doc. No. 29 at PageID 726.  DHS found that noncitizens, as compared to U.S. citizens and legal immigrants, have a lower propensity to commit crime.  *Id.*; Doc. No. 27-2 at PageID 455. Its view is that Congress's definition of "aggravated felony" is a poor proxy to determine which criminal noncitizens are likely to reoffend.  Doc. No. 27-2 at PageID 455.  Instead, DHS believes that a totality of the circumstances approach better identifies recidivist risks.  *Id.*  While DHS acknowledged that states incur some "second-order effects" from its immigration enforcement decisions, it concluded that such costs are marginal at best considering the off-setting benefits of immigration.  *Id.* at PageID 456.  DHS contends that, considering the agency's resource constraints, prioritizing the most serious offenders for apprehension and removal is a reasonable policy decision.  Doc. No. 38 at PageID 986.

The Court will review the arguments in turn.

### a.    Failure to Consider Important Aspects of the Problem

In its order enjoining the Interim Guidance, the Texas district court faulted DHS for failing to consider criminal alien recidivism, costs imposed on the states, and how the decline in detentions could frustrate removals. *Texas*, 2021 WL 3683913, at *48–51. DHS drafted the Considerations Memo with these critiques in mind. Doc. No. 27-2 at PageID 452. It now uses the Considerations Memo in this litigation to show how it evaluated each of the factors flagged by the Texas district court. *Id.*; Doc. No. 29 at PageID 724–29. On closer review, however, the Considerations Memo sidesteps the issues raised by the Texas district court and still does not "reasonably explain" its policy shift. *See, e.g.*, *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) ("[W]hen [an agency's] new policy rests upon factual findings that contradict those which underlay its prior policy[,] . . . a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy" (citing *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996))).

### i.    Recidivism

Congress recognized that criminal alien abscondment and recidivism are serious problems. *See Demore*, 538 U.S. at 518 ("Congress adopted [§ 1226(c)] against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens"); *supra* § I(A). Prior to enactment of § 1226(c), "20% of deportable criminal aliens failed to appear for their removal hearings." *Demore*, 538 U.S. at 519 (citing S. Rep. 104-48, at 23). Another study preceding the IIRIRA found that 77% of noncitizens identified as criminal aliens were arrested more than once before their removal proceedings began, while 45% were arrested multiple times. *Id.* at 518. Section 1226(c)'s mandatory detention program was meant to offload from the states to the federal government the rising cost of detaining criminal aliens and expedite the removal process. *Id.* at 518–20. Implicit was the understanding that criminal alien recidivism imposed a cost on

communities throughout the country.  S. Rep. No. 104-48, at 7, 9.  Mandatory detention of criminal aliens was Congress's solution.  *See Demore*, 538 U.S. at 519.

Under the Interim Guidance, noncitizens convicted of an "aggravated felony" were priority targets if they presented a public safety risk.  Doc. No. 27-10 at PageID 515.  The Texas district court observed that this meant noncitizens were only prioritized if they committed an aggravated felony and were a public safety risk.  *Texas*, 2021 WL 3683913, at *47.  This, the court found, ignored the Supreme Court's recognition that "all criminal illegal aliens or 'deportable aliens pose high risks of recidivism.'"  *Id.* (emphasis omitted) (quoting *Demore*, 538 U.S. at 518).  DHS did not explain why it thought criminal aliens who had not been convicted of an aggravated felony were less likely to recidivate, and why this justified deprioritization.  *Id.*  The Texas district court therefore found that the Interim Guidance gave no consideration to the recidivist risk presented by criminal aliens.  *Id.*

DHS attempts to address that criticism by removing the "aggravated felony" criteria from the public safety analysis.  Doc. No. 27-2 at PageID 454 ("The updated guidance addresses the district court's concern by calling for a context-specific consideration of aggravating and mitigating factors, the seriousness of an individual's criminal record, the length of time since the offense, and evidence of rehabilitation").  It argues that by allowing ERO officials to consider a variety of aggravating and mitigating factors, they can better identify, and target, noncitizens who truly present a public safety risk.  *Id.*  That analysis, DHS submits, addresses any recidivism concerns and shows it did consider recidivism when drafting the Permanent Guidance.  *Id.* ("These factors are to be weighed in each case to assess whether a noncitizen poses a current threat to public safety, including through a meaningful risk of recidivism").

But that conclusion does not follow from, and is contradicted by, the explanations offered in the Considerations Memo. *Id.* at PageID 453–55. First, DHS stated that it removed "aggravated felony" from the public safety analysis because stakeholders felt the definition was hard to apply. *Id.* at PageID 454. Second, DHS concluded that recidivism should not factor into a public safety analysis based on findings that undocumented immigrants commit crimes at a lower rate than U.S. citizens and legal immigrants. *Id.* at PageID 455.

DHS's "internal and external stakeholders . . . raised concerns about whether the focus on individuals convicted of 'aggravated felonies' was both over- and under-inclusive." *Id.* at PageID 454. The phrase could include crimes like filing a false tax return, while excluding more serious crimes like murder and sexual assault depending on how the state statute was written. *Id.* Therefore, DHS explained, it removed "aggravated felony" from the public safety analysis to avoid this problem. *Id.*

This reason has nothing to do with criminal alien recidivism. All it shows is that DHS concluded its officers were bogged down by how a crime was defined at the expense of the other public safety factors. *Id.* at PageID 454. Efficiency, not predictiveness of recidivism, motivated this change. *Id.* Omitting "aggravated felony" from the public safety factors makes it less likely that recidivism is considered in the public safety analysis. The Interim Guidance's inclusion of "aggravated felony" at least captured a subset of criminal aliens Congress considered to be recidivist risks. *See Texas*, 2021 WL 3683913, at *47; *see also, e.g.*, *Zadvydas*, 533 U.S. at 713 (Kennedy, J., dissenting) ("The risk to the community posed by the mandatory release of aliens who are dangerous or a flight risk is far from insubstantial; the motivation to protect the citizenry from aliens determined to be dangerous is central to the immigration power itself"). Now without that anchor, the public safety analysis is open-ended and farther astray from the factors Congress

instructed DHS to apply.  *Cf. Huisha-Huisha v. Mayorkas*, --- F.4th ---, 2022 WL 628061, at *2 (D.C. Cir. Mar. 4, 2022) (explaining that although the Executive wields "considerable authority over immigration[,] . . . Congress has sometimes limited executive discretion in such ways").

DHS also argues it considered recidivism by citing to a study comparing crime rates by citizenship.  Doc. No. 27-2 at PageID 455 (citing Michael T. Light et al., *Comparing Crime Rates Between Undocumented Immigrants, Legal Immigrants, and Native-Born U.S. Citizens in Texas*, Proceedings of the Nat'l Academy of the Sciences (Dec. 12, 2020)).  This study concluded that undocumented immigrants in Texas commit crimes at a far lower rate than legal immigrants and U.S. Citizens.  Doc. No. 27-29 at PageID 580.  That finding was true across all types of crimes. *Id.* at PageID 580–81.  DHS contends the study proves the Texas district court's concerns about recidivism were unfounded.  Doc. No. 27-2 at PageID 455.

Valid as the study's conclusions may be, DHS misses the point.  The Texas district court, the States here, and Congress were all concerned about *criminal alien* recidivism, not noncitizen crime rates generally.  Doc. No. 34 at PageID 887–88; *Demore*, 538 U.S. at 520–21; *Texas*, 2021 WL 3683913, at *47.  DHS cannot rely on this study to show it considered criminal alien recidivism in drafting the Permanent Guidance.

The study itself compares crimes rates among *total* populations of undocumented immigrants, legal immigrants, and U.S. citizens.  Doc. No. 27-29 at PageID 580.  The authors, however, do not analyze repeat criminal offender rates among the three populations.  *Id.*  Nor do the authors indicate that total population crime rates are predictive of recidivism rates.  Doc. No. 27-29.  It was thus unreasonable for DHS to extrapolate the study's conclusions about total population crime rate to criminal alien recidivist rates. *Cf. Michigan v. E.P.A.*, 576 U.S. 743, 750

(2015) ("[T]he process by which [the agency] reaches [its] result must be logical and rational" (quoting *Allentown Mack*, 522 U.S. at 374)).

DHS's explanation is also undone by its own finding that criminal aliens to present a recidivism risk.  A 2019 ICE enforcement and removals report determined that

> Of the 123,128 ERO administrative arrests in FY 2019 with criminal convictions or pending criminal charges, the criminal history for this group represented 489,063 total criminal convictions and pending charges as of the date of arrest, which equates to an average of four criminal arrests/convictions per alien, *highlighting the recidivist nature of the aliens that ICE arrests*.

U.S. Immigration & Customs Enforcement, *Fiscal Year 2019 Enforcement and Removal Operations Report* 12 (2020) ("2019 ICE Report") (emphasis added).  DHS's approach to criminal alien recidivism has undergone a significant shift between ICE's observations in 2019 and the Consideration Memo.  Not providing a "reasoned explanation" for how it arrived at its updated view is arbitrary and capricious.  *Fox Television Stations*, 556 U.S. at 515–16 ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position. . . .  [W]hen, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy . . . a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy"); *State Farm*, 463 U.S. at 57 ("[A]n agency changing its course must supply a reasoned analysis" (quoting *Greater Boston Television Corp. v. F.C.C.*, 444 F.2d 841, 852 (D.C. Cir. 1971))).

Neither proffered explanation shows DHS considered criminal alien recidivism when drafting the Permanent Guidance.  Doc. No. 27-2 at PageID 444–45.  DHS has failed to "consider an important aspect of the problem."  *State Farm*, 463 U.S. at 43.

### ii.    Cost to the States

"The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States.  [They] bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397.   Immigration "ha[s] a discernable impact on traditional state concerns," considering that "unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service." *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982).

Immigration policy continues to impact the states.  In *Regents*, the Supreme Court faulted DHS for not considering how rescinding DACA would cost States tax revenue. 140 S. Ct. at 1914. The DAPA litigation in the Fifth Circuit showed that DHS must also consider the drain on state resources when adopting a policy that makes noncitizens newly eligible for benefits.  *DAPA*, 809 F.3d at 180–81.  More recently, the Fifth Circuit vacated DHS's termination of its MPP program in part because the agency did not adequately consider the decision's financial impact on Texas. *MPP*, 20 F.4th at 968–69, 990 ("[T]he Government responds that DHS had no obligation to consider the States' reliance interests at all.  Yet again, that 'contention is squarely foreclosed by *Regents*'" (quoting *Texas v. Biden*, 10 F.4th 538, 553 (5th Cir. 2021))).

The Texas district court, in the Interim Guidance litigation, determined that DHS gave no consideration to how the States were affected by its policy.  *Texas*, 2021 WL 3683913, at *49–50. It faulted DHS for providing no "relevant data" to show how its prioritization scheme would improve public safety and conserve criminal justice resources.  *Id.* at *49.

DHS responded to those criticisms in the Considerations Memo.  Doc. No. 27-2 at PageID 456.  While it acknowledged that the states might experience some fiscal effect from a change in its enforcement policies, any such impact would be "marginal" and "downstream."  *Id.* at PageID 457–58.  DHS explained that "it is challenging" to measure the effect its policies have on state

budgets due to the myriad of variables at play. *Id.* at 457. Part of any change is due to "decisions that state and local governments are themselves making." *Id.* Any costs, DHS opined, might even be offset by positive effects of immigration, such as greater labor force participation and tax contribution. *Id.* Despite some cost to the states, DHS concluded that they are outweighed by the benefits of a prioritization scheme. *Id.* at PageID 458.

DHS again examined the problem at a general level when specifics were demanded. The States have shown that their criminal justice expenditures increase when DHS's detention and removal of noncitizens decrease. Doc. No. 1 at PageID 9–15; Doc. No. 34 at PageID 895–902. This push-pull relationship is not new, as *Regents* and the DAPA and MPP litigations demonstrate. The states play an essential role in identifying removable noncitizens by investigating and prosecuting state crimes. *See* 8 C.F.R. § 287.7. DHS relies on the states to honor detainer requests so it can take custody of its enforcement targets. *See* Ice Detainer Policy, at 3.

DHS only considered whether its enforcement policies generally influence state expenditures. Doc. No. 27-2 at PageID 458. It gave no explanation of how its policy—that relaxes mandatory detention standards set by Congress—might increase state criminal justice expenses. *Id.* For that reason, DHS "entirely failed to consider" an important consequence of its policy. *State Farm*, 463 U.S. at 43.

### b. Failure to Offer Reasoned Explanation

"The reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com.*, 139 S. Ct. at 2575–76. An agency must "examine the relevant data and articulate a satisfactory explanation for its action." *Fox Television Stations*, 556 U.S. at 513 (quoting *State Farm*, 463 U.S. at 43).

DHS cites resource constraints as the principal rationale for the Permanent Guidance. Doc. No. 27-2 at PageID 447–48, 459. It explains that its removal docket has ballooned by over 400% since 2010. *Id.* at PageID 448. Over 3 million noncitizens are in removal proceedings or have final orders of removal, but there are only 6,500 ERO officers available to manage those cases. *Id.* DHS only has the capacity to detain about 26,800 noncitizens—or 1% of noncitizens in removal proceedings—at any given time. *Id.*

Prioritization, in DHS's view, is the best way to allocate its resources. *Id.* at PageID 459. It also believes it leads to more efficient enforcement outcomes. *Id.* For instance, between February and August 31, 2021, while the Interim Guidance was effective, DHS detained 6,046 noncitizens who committed aggravated felonies compared to just 3,575 during that same period in 2020. *Id.*

Taking DHS's resource constraints at face value, that justification does not explain why it was necessary for DHS to relax the mandatory detention standards that Congress instructed it to apply. 8 U.S.C. §§ 1226(c) and 1231(a)(2). The Considerations Memo only mentions total detention capacity. Doc. No. 27-2 at PageID 448. It does not suggest that DHS is taking in more noncitizens subject to § 1226(c) mandatory detention than it can house. *Id.*

Based on DHS's representations, it seems the opposite is true: DHS has residual capacity to detain more criminal aliens under the Permanent Guidance. ICE detentions have steadily declined since the onset of the COVID-19 pandemic, falling from a high of 19,174 detained noncitizens in March 2020 to 4,844 as of March 2022.[17] Since the Permanent Guidance went into

---

[17] U.S. Immigration & Customs Enforcement, *FY 2022 ICE Statistics*, Tab 3 (last visited Mar. 21, 2022), https://www.ice.gov/detain/detention-management (hereinafter "FY 2022 ICE Statistics"); U.S. Immigration & Customs Enforcement, *FY 2020 Ice Statistics*, Tab 3, https://www.ice.gov/detain/detention-management (last visited Mar. 21, 2022). Court orders requiring ICE to maintain stricter detention standards to comply with COVID-19 safety protocols were responsible for some of the decline in

effect, ICE has detained, per month and on average, 3,980 noncitizens with a criminal conviction, 611 noncitizens pending criminal charges, and 241 noncitizens with no criminal record.[18]  This shows DHS was not under such a resource crunch that it needed to relax the mandatory detention standard.

Nor does DHS's claim that it apprehended more aggravated felons with the Interim Guidance than without it explain why departure from the § 1226(c) standard was warranted.  If anything, it suggests that under the Permanent Guidance there will be an uptick of enforcement proceedings brought against criminal aliens.  Doc. No. 27-2 at PageID 459.  It was paradoxical for DHS, on one hand, to claim resource constraints prevented it from detaining more criminal aliens, but, on the other, insist that an increase in criminal alien apprehension showed its prioritization scheme is effective.  *See State Farm*, 463 U.S. at 43 (noting a rule is arbitrary and capricious if the agency "offered an explanation for its decision that runs counter to the evidence before [it]").

There is also a significant "mismatch" between the Considerations Memo's discussion of §§ 1226(c) and 1231(a)(2) mandatory detentions and the Permanent Guidance.  *Dep't of Com.*, 139 S. Ct. at 2575.  The Secretary "recognized that [8 U.S.C. §§ 1226(c)(1) and 1231(a)(2)] place constraints on [DHS's] authority to release noncitizens from ICE custody while the Department is pursuing their removal or during the statutory removal period."  Doc. No. 27-2 at PageID 460.  He explained that the Permanent Guidance is "fully consistent" with these provisions and does "not purport to override them."  *Id.* at PageID 461.  But, as explained above, the Permanent Guidance neither makes such a disclaimer nor includes any such carveout.  Doc. No. 4-1 at PageID 100

---

detentions.  *See Fraihat v. U.S. Customs & Immigration Enf't*, 445 F. Supp. 3d 709, 751 (C.D. Cal. 2020), *rev'd and remanded by* 16 F.4th 613 (9th Cir. 2021).

[18] FY 2022 ICE Statistics, Tab 3.  DHS subdivides its detained population between those in Customs and Border Patrol and ICE custody.  *Id.*  ICE detention data reflects interior (as opposed to border) enforcement and removal and necessarily includes noncitizens in ICE custody that have committed a state crime.  *Id.*

(applying through "apprehension and removal"); *id.* at PageID 104 ("This guidance is Department-wide. Agency leaders as to whom this guidance is relevant to their operations *will implement* this guidance accordingly" (emphasis added)). DHS's position is that the Permanent Guidance reflects DHS's discretion at all steps of the removal process. Doc. No. 29 at PageID 725. Neither the Permanent Guidance nor its predecessor policies indicate there are phases of the removal process where its directions do not apply. Doc. No. 4-1 at PageID 100, 104; Doc. No. 27-9 at PageID 507; Doc. No. 27-10 at PageID 512. Offering a belated rationale cannot remedy the Permanent Guidance's deficiencies.

There is a strong likelihood the States will prevail on their Count II. Doc. No. 1 at PageID 17.

### 3.    Count III: Notice and Comment

Agencies have the choice to act either through adjudication or rulemaking. *See, e.g.*, *SEC v. Chenery Corp.*, 332 U.S. 194, 201–02 (1947). When an agency intends to make a rule—that is, "an agency statement of general or particular applicability and future effect," 5 U.S.C. § 551(4)—it must follow the procedures set forth by 5 U.S.C. § 553. Generally, a rule may only be promulgated after the agency engages in notice-and-comment. 5 U.S.C. § 553(b).[19] Rules necessitating notice-and-comment are called legislative rules. *See, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) ("Rules issued through the notice-and-comment process are often referred to as 'legislative rules' because they have the 'force and effect of law'" (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979))). But "interpretative rules" and "general statements

---

[19] Notice-and-comment rulemaking requires that, before a rule can have a binding legal effect, the agency "shall" publish notice of the proposed rulemaking in the Federal Register, justify the rule under legal authority, and adequately describe "terms or substance of the proposed rule or a description of the subjects and issues involved" to give the public an opportunity to weigh in before final adoption. 5 U.S.C. § 553(b).

of policy" are exempted from the APA's notice-and-comment requirement. 5 U.S.C. § 553(b)(A); *see, e.g.*, *Kisor v. Wilkie*, --- U.S. ---, 139 S. Ct. 2400, 2420 (2019).

Determining when an agency has adopted a legislative rule, an interpretative rule, or general statement of policy is a consideration filled with considerable "smog." *Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975). This case is no different. Indeed, the States contend the Permanent Guidance's "substantive effect," especially that borne by the States in the form of additional public expenditures, makes it a legislative rule. Doc. No. 34 at PageID 893. DHS emphasizes that its lack of binding, legal effect means it is a general statement of policy exempt from notice-and-comment. Doc. No. 29 at PageID 730–31.

Defining the two types of agency action will help.[20] "For one, legislative rules have the 'force and effect of law,'" *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018) (quoting *Perez*, 575 U.S. at 96), and policy statements do not, *Dyer v. Sec'y Health & Hum. Servs.*, 889 F.2d 682, 685 (6th Cir. 1989). "Legislative rules impose new rights or duties and change the legal status of regulated parties; interpretive rules articulate what an agency thinks a statute means or remind parties of pre-existing duties." *Mann Constr., Inc. v. United States*, --- F.4th ---, 2022 WL 619822, at *3 (6th Cir. Mar. 3, 2022) (citing *Tenn. Hosp. Ass'n*, 908 F.3d 1042). "An agency action that purports to impose legally binding obligations or prohibitions on regulated parties— and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014) (Kavanaugh, J.). "A statement is also likely to be considered binding if it narrowly

---

[20] The Permanent Guidance does not purport to "advise the public of the agency's construction" of the immigration statutes and, therefore, cannot be classified as an interpretative rule. *See, e.g.*, *Perez*, 575 U.S. at 96–97 ("[T]he critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers'" (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995))).

circumscribes administrative discretion in all future cases, and if it finally and conclusively determines the issues to which it relates." *Dyer*, 889 F.2d at 685 (citing *Cleveland Cliffs Iron Co. v. Interstate Com. Comm'n*, 664 F.2d 568, 575 (6th Cir. 1981)). "An agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule—is a general statement of policy." *Golden Living Ctr.—Mtn. View v. Sec'y Health & Hum. Servs.*, 832 F. App'x. 967, 973 (6th Cir. 2020) (quoting *Nat'l Min. Ass'n*, 758 F.3d at 252); *see also Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (describing general statements of policy as "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power" (quoting *Chrysler*, 441 U.S. at 302 n.31)).

Courts focus on several factors to differentiate legislative rules and general statements of policy. "The most important factor concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Min. Ass'n*, 758 F.3d at 252 (citations omitted). Agency action that establishes a "binding norm" on regulated parties or the agency "determinative of the issues or rights to which it is addressed" is a legislative rule. *CropLife Am. v. E.P.A.*, 329 F.3d 876, 881 (D.C. Cir. 2003) (citations omitted) (observing that an agency press release that "reflect[ed] an obvious change in established agency practice, creates a 'binding norm'" and was a legislative rule); *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987) (concluding that an agency policy that imposed obligations and limited its enforcement discretion was a legislative rule). How the agency characterizes the document matters too. *See, e.g., S. Forest Watch, Inc. v. Jewell*, 817 F.3d 965, 972–73 (6th Cir. 2016) (explaining that although an agency's internal operations manual used "mandatory language," it was only intended to assist agency

personnel administer the law, "not to create additional obligations beyond the statutory mandates").

The States contend that the Permanent Guidance has a two-pronged legal effect: (1) it subjects noncitizens to a relaxed detention and removal standard and (2) it binds DHS officials to follow the policy instead of the text of the detention and removal statutes. Doc. No. 4 at PageID 83–88; Doc. No. 34 at PageID 891–94. The States think this unwinds Congress's express mandate in 8 U.S.C. §§ 1226(c) and 1231(a). Doc. No. 4 at PageID 87. No longer will criminal aliens be detained based on the nature of their conviction, 8 U.S.C. § 1226(c)(1), removed within 90 days absent application of an express exception, 8 U.S.C. § 1231(a)(1)(A), or detained during the removal period, 8 U.S.C. § 1231(a)(2). Doc. No. 4 at PageID 87. DHS officials now must make those detention and removal decisions using the Permanent Guidance's balancing test. *Id.*

DHS focuses on the Permanent Guidance's text. Doc. No. 29 at PageID 732. It points out that the Permanent Guidance specifically states that "this guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* (quoting Doc. No. 4-1 at PageID 104). Moreover, DHS emphasizes that the Permanent Guidance only purports to guide its officials' congressionally delegated discretion. *Id.* at PageID 730.

The States, in the Court's view, have it right. DHS established a "binding norm" on both noncitizens and its officials by displacing the detention and removal standards set forth by Congress. *CropLife*, 329 F.3d at 881; *cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (An agency "may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted" (internal quotation marks omitted) (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988))). No longer will criminal aliens face

mandatory detention pending their removal only based on whether they committed a crime referenced in 8 U.S.C. § 1226(c)(1).  Doc. No. 4-1 at PageID 100–01.  Noncitizens with final orders of removal could be released under supervision pending execution of their removal order based on factors outside 8 U.S.C. § 1231.  *Id.*  For noncitizens subject to mandatory detention pending their removal under 8 U.S.C. § 1231(a)(2), they could be given supervised release pending execution of their removal order thanks to the Permanent Guidance.  *Id.*

DHS relies on the Permanent Guidance's disclaimer that the policy does not prohibit nor compel agency officials to take a particular action.  Doc. No. 4-1 at PageID 102 ("The civil immigration enforcement guidance does not compel an action to be taken or not taken.  Instead, the guidance leaves the exercise of prosecutorial discretion to the judgment of our personnel").  The implication is that ERO officials could revert to the statutory detention and removal tests and ignore the Permanent Guidance.  Doc. No. 38 at PageID 991.  But whether a policy "genuinely [leaves] the agency and its decision-makers free to exercise discretion[,]" *Ctr. for Auto Safety v. N.H.T.S.A.*, 452 F.3d 798, 806 (D.C. Cir. 2006) (quoting *CropLife*, 329 F.3d at 883), or is "applied by the agency in a way that indicates it is binding," *Gen. Elec. v. E.P.A.*, 290 F.3d 377, 383 (D.C. Cir. 2002) (citation omitted), makes all the difference.

In *DAPA*, DHS argued that the program was a general statement of policy because, on its face, it stated that application reviewers were free to exercise their discretion.  809 F.3d at 171–72.  The district court found, and the Fifth Circuit agreed, that this statement rang hollow.  *Id.* at 172.  DAPA administrators were compelled to follow a step-by-step review process that nearly always resulted in approval.  *Id.* at 172–75.  The Fifth Circuit observed that a policy can still introduce a binding norm despite discretion-preserving language.  *Id.* at 171–72.

So too with the Permanent Guidance. Examine the language of the public safety balancing test. Doc. No. 4-1 at PageID 100–01. The Secretary explains that "our personnel *must* evaluate the individual and the totality of the facts and circumstances and exercise their judgment accordingly." *Id.* at PageID 101 (emphasis added). He adds that "personnel should not rely on the fact of conviction or the result of a database search alone." *Id.* Section VI—entitled "Implementation of Guidance"—reads, "This guidance is Department-wide. Agency leaders as to whom this guidance is relevant to their operations *will implement* this guidance accordingly." *Id.* at PageID 104 (emphasis added). Compliance does not appear optional.

Practically too ERO officials must follow the Permanent Guidance instead of the statutory mandates. Section 1226(c) mandatory detention only requires a determination based on the nature of the noncitizen's conviction. 8 U.S.C. § 1226(c)(1). A noncitizen subject to mandatory detention pending removal their proceeding can appeal that decision to an immigration judge. *See, e.g.*, *Jennings*, 138 S. Ct. at 838 n.1. But the scope of the immigration judge's review is limited. He or she looks to whether the noncitizens committed an offense cross-referenced in § 1226(c)(1). *See In re Joseph*, 22 I. & N. Dec. at 802 (explaining that immigration judges do not have jurisdiction to make custody or bond decisions but can determine whether the noncitizen is covered by "regulatory provisions which would deprive the Immigration Judge of bond jurisdiction"). Does the immigration judge now have to apply the Permanent Guidance during *Joseph* hearings? Do ERO officials now have to amplify their reasoning for mandatory detention? *See* 8 C.F.R. § 236.1(g) (noting that issuance of a Notice of Custody Determination, Form I-286, is optional). The Secretary is silent on consequential, downstream questions like this. He should have, but failed to, promulgate the Permanent Guidance through notice-and-comment. 5 U.S.C. § 553(b).

DHS argues that even if the Permanent Guidance has a binding effect, it is a mere procedural rule and still exempt from notice-and-comment.  Doc. No. 29 at PageID 731 (citing 5 U.S.C. § 553(b)(A).  "'Procedural rules' . . . are 'primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties.'"  *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) (quoting *Batterton v. Marshall*, 648 F.2d 694, 702 n.34 (D.C. Cir. 1980)).  The "statutory exception for procedural rules 'was provided to ensure that agencies retain latitude in organizing their internal operations.'"  *Nat'l Sec. Couns. v. C.I.A.*, 931 F. Supp. 2d 77, 106 (D.D.C. 2013) (quoting *Batterton*, 648 F.2d at 707).

"The 'critical feature' of a procedural rule 'is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency.'"  *Nat'l Mining Ass'n*, 758 F.3d at 250 (quoting *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000)).  "[T]he distinction between substantive and procedural rules is 'one of degree' depending upon 'whether the substantive effect is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA.'"  *Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.* ("*EPIC*"), 653 F.3d 1, 5–6 (D.C. Cir. 2011) (quoting *Lamoille Valley R.R. Co. v. ICC*, 711 F.2d 295, 328 (D.C. Cir. 1983)).  "[T]he exception for procedural rules is narrowly construed and cannot be applied 'where the agency action trenches on substantial private rights and interests.'"  *Mendoza*, 754 F.3d at 1023 (first quoting *EPIC*, 653 F.3d at 6; then quoting *Batterton*, 648 F.2d at 708).

What differentiates a substantive rule from a procedural one is even more "murky" than separating legislative rules from interpretative rules and general statements of policy.  *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. N.L.R.B.*, 466 F. Supp. 3d 68, 89 (D.D.C. 2020).  The Supreme

Court has not directly weighed in on the question but has described procedural rules as agency "housekeeping." *Chrysler*, 441 U.S. at 310. Nor has the Sixth Circuit offered a definition of procedural rule. Among circuit courts that have, there is a difference of opinion between the D.C. and Fifth Circuits. The Fifth Circuit applies a "substantial impact" test focused on whether the rule "modifies substantive rights." *DAPA*, 809 F.3d at 176 ("An agency rule that modifies substantive rights and interests can only be nominally procedural, and the exemption for such rules of agency procedure cannot apply" (quoting *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984)). The D.C. Circuit has rejected that test in favor of a more functional analysis that asks whether the rule imposes "derivative," "incidental," or "mechanical" burdens upon regulated individuals. *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1051 (D.C. Cir. 1987); *see also Kaspar Wire Works, Inc. v. Sec'y of Lab.*, 268 F.3d 1123, 1132 (D.C. Cir. 2001) (noting the D.C. Circuit has "expressly rejected" the Fifth Circuit's substantial impact standard).

What procedural rule test the Court applies is of no importance. The text of the APA resolves this issue. Nonlegislative rules, like interpretative rules, general statements of policy, and procedural rules, are all exceptions to the general requirement that an agency may only adopt rules through notice-and-comment procedures. 5 U.S.C. § 553(b). Because the Court has found the Permanent Guidance is a legislative rule subject to notice and comment, it necessarily cannot be a procedural rule.

There is a strong likelihood the States prevail on their notice-and-comment claim.

## B. Remaining Preliminary Injunction Factors

### 1. Irreparable Harm

The second preliminary injunction factor asks whether the movant "is likely to suffer irreparable harm in the absence of preliminary relief." *Platt v. Bd. of Comm'rs on Grievances & Discipline of the Ohio Sup. Ct.*, 769 F.3d 447, 453 (6th Cir. 2014) (quoting *Winter v. Nat. Res.*

*Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). "To merit a preliminary injunction, an injury 'must be both certain and immediate,' not 'speculative or theoretical.'" *Sumner Cnty. Schs.*, 942 F.3d at 327 (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)). "An injury is irreparable if it is not 'fully compensable by monetary damages.'" *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 852 (6th Cir. 2017) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)).

The States have carried their burden to show irreparable harm. Doc. No. 1 at PageID 9–15; Doc. No. 4 at PageID 93–94; Doc. No. 34 at PageID 914–15. They have demonstrated that they share the cost of immigration enforcement with DHS. Doc. No. 1 at PageID 9–15; Doc. No. 4-14 at PageID 271. When detentions and removals decrease, as they have since the Permanent Guidance became effective, more noncitizens are released into the States' jurisdictions and consume State resources. Doc. No. 1 at PageID 9–15; *see also supra* footnotes 17 & 18 (summarizing ICE detention statistics showing consistent downward trend in removals, particularly since the Permanent Guidance became effective). The States have no choice but to devote expenses to criminal justice, Emergency Medicaid, and education. Doc. No. 1 at PageID 9–15. DHS's displacement of the § 1226(c) mandatory detention standard, in particular, makes it more likely that criminal aliens will be released into the States. ICE observed in 2019 that criminal aliens are likely to recidivate. *See* 2019 ICE Report, at 12. The States directly bear the cost of apprehension, prosecution, and possible incarceration and supervision. *Cf. New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (explaining that agency action irreparably harmed State-plaintiffs by reducing Medicaid revenue and federal funding). Because the APA prohibits money damages, 5 U.S.C. § 702, the States are unable recover the increased costs caused by the Permanent Guidance. This factor tips in the States' favor.

### 2.    Balance of the Equities and the Public Interest

The remaining two preliminary injunction elements—balance of the equities and the public interest—merge when the government is a defendant.  *See Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  DHS contends that an injunction of the Permanent Guidance would impair the Executive's "historic discretion" to enforce the immigration laws.  Doc. No. 29 at PageID 733 (quoting *Texas*, 14 F.4th at 341).  An injunction, in its view, would also create inefficiency and confusion in the agency.  *Id.* at PageID 734.  DHS insists that prioritization has allowed a more orderly allocation of its resources and resulted in more targeted enforcement against the worst offenders.  *Id.*  It believes an injunction would cause its staff to "ping pong" between different sets of guidances without a clear direction. *Id.*; Doc. No. 27-30 at PageID 592; Doc. No. 27-31 at PageID 602.

DHS has, however, proven capable of adapting its enforcement program to court orders. When the Texas district court issued a restraining order of the January 20 Memo, for example, DHS instructed ERO officials to "return to normal removal operations."  Doc. No. 4-4 at PageID 149; Doc. No. 4-17 at PageID 340.  Compliance with the law cannot bend to efficiency.  While the Executive has substantial authority to enforce the immigration laws, *see Arizona*, 567 U.S. at 396, it must do so within the bounds set by Congress, *see Preap*, 139 S. Ct. at 960.

The public interest favors a lawful application of the immigration laws.  As the Supreme Court has explained, "[t]here is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings IIRIRA established, and "permit[s] and prolong[s] a continuing violation of United States law."  *Nken*, 556 U.S. at 436 (quoting *AADC*, 525 U.S. at 490).  More so, "'the public interest lies in a correct application' of the federal constitutional and statutory provisions upon which the claimants have brought this claim."  *Coal. to Def. Affirmative Action v. Granholm*, 473

F.3d 237, 252 (6th Cir. 2006) (quoting *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991)).

Each of the preliminary injunction factors weigh in the States' favor. *Winter*, 555 U.S. at 20. Therefore, the Court will enjoin the Permanent Guidance subject to the limitations set forth in this remainder of this Order.

### C.    Scope of the Injunction

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, --- U.S. ---, 137 S. Ct. 2080, 2087 (2017) (citations omitted). A district court's power to issue a preliminary injunction is drawn from its equitable authority to preserve the status quo among the parties pending a trial on the merits. *See, e.g.*, *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) ("The Judiciary Act of 1789 conferred on the federal courts jurisdiction over 'all suits . . . in equity.' We have long held that "[t]he 'jurisdiction' thus conferred . . . is an authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries" (alterations in original) (first quoting § 11, 1 Stat. 78; and then quoting *Atlas Life Ins. Co. v. W.I. S., Inc.*, 306 U.S. 563, 568 (1939))); *see also* Fed. R. Civ. P. 65(a). Because preliminary injunctions were historically used to cease the defendant's harmful conduct, *see* Samuel L. Bray, *Multiple Chancellors: Reforming the Nationwide Injunction*, 131 Harv. L. Rev. 417, 427 (2017) (explaining that courts at equity took care to ensure injunctions did not affect the rights of nonparties), "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

The States seek a nationwide injunction.  Doc. No. 1 at PageID 21; Doc. No. 34 at PageID 896–97.  They argue that no less will do because DHS's continued enforcement of the Permanent Guidance in non-Plaintiff States will perpetuate their harm.  Doc. No. 34 at PageID 896–97.  The States think it illogical to permit DHS to administer an unlawful policy after they demonstrated irreparable harm.  *Id.*

Two principles support the States' request.  First, the APA requires reviewing courts to "set aside" unlawful agency action.  5 U.S.C. § 706(2).  The States have shown there is a strong likelihood they will prove the Permanent Guidance is unlawful.  Enjoining the rule pending a merits adjudication ensures that DHS cannot enforce the policy unless and until it has been found lawful.  *Cf. Pennsylvania*, 930 F.3d at 575–76 ("[O]ur APA case law suggests that, at the merits stage, courts invalidate—without qualification—unlawful administrative rules as a matter of course, leaving their predecessors in place until the agencies can take further action. . . .  [B]y enjoining enforcement of the Rules we provide a basis to ensure that a regulation that the States have shown likely to be proven to be unlawful is not effective until its validity is finally adjudicated" (citations omitted)).  A nationwide preliminary injunction prevents administration of a likely unlawful policy.

Immigration law demands uniform application across the country.  Congress has instructed that "the immigration laws of the United States should be enforced vigorously and uniformly."  Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115(1).  The Supreme Court too has described immigration law as a "comprehensive and unified system."  *Arizona*, 567 U.S. at 401.  For this reason, courts have observed "nationwide injunctions are especially appropriate in the immigration context."  *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir.), *as amended* (June 15, 2017), *vacated and remanded on other grounds sub nom.*, *Trump v.*

*Int'l Refugee Assistance*, --- U.S. ---, 138 S. Ct. 353 (2017); *see also, e.g.*, *MPP*, 20 F.4th at 1004 (upholding nationwide injunction of DHS's MPP policy); *New York*, 969 F.3d at 88 (recognizing that "the law, as it stands today, permits district courts to enter nationwide injunctions" but limiting an injunction of DHS's public charge rule to the states within its jurisdiction); *Hawai'i v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017) ("Because this case implicates immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights"), *rev'd on other grounds*, --- U.S. ---, 138 S. Ct. 2392 (2018); *DAPA*, 809 F.3d at 187–88 (upholding nationwide injunction of DAPA to preserve the uniformity of immigration law).

Nationwide injunctions face significant skepticism, too. Justice Thomas has opined that "[t]he English system of equity did not contemplate universal injunctions," and the remedy cannot trace its roots to any statute or rule of procedure. *See Hawai'i*, 138 S. Ct. at 2426–27 (Thomas, J., concurring). He thinks injunctions may only bind the parties to instant dispute. *Id.* at 2427 ("American courts' tradition of providing equitable relief only to parties was consistent with their view of the nature of judicial power"). Justice Gorsuch has criticized district courts' use of the equitable remedy as stifling the emergence of differing views among the circuits. *Dep't of Homeland Sec. v. New York*, --- U.S. ---, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("The traditional system of lower courts issuing interlocutory relief limited to the parties at hand may require litigants and courts to tolerate interim uncertainty about a rule's final fate and proceed more slowly until this Court speaks in a case of its own. But that system encourages multiple judges and multiple circuits to weigh in only after careful deliberation, a process that permits the airing of competing views that aids this Court's own decisionmaking process" (citing *Hawai'i*, 138 S. Ct. at 2428–29 (Thomas, J., concurring))). That any district judge in the country can enjoin the federal government from acting on a nationwide basis creates an "asymmetric" challenger

advantage.  *Id.* at 601 ("If a single successful challenge is enough to stay the challenged rule across the country, the government's hope of implementing any new policy could face the long odds of a straight sweep, parlaying a 94-to-0 win in the district courts into a 12-to-0 victory in the courts of appeal.  A single loss and the policy goes on ice—possibly for good, or just as possibly for some indeterminate period of time until another court jumps in to grant a stay").

A panel of the Sixth Circuit recently voiced the same concerns about nationwide injunctions.  *Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446, 473–74 (6th Cir.), *vacated on other grounds*, 19 F.4th 890 (6th Cir. 2021) (*en banc*).  Though the *Gun Owners* panel left the precise scope of the injunction to the district court on remand, the court instructed that it "may not exceed the bounds of the four states within the Sixth Circuit's jurisdiction and, of course, encompasses the parties themselves." *Id.* at 474.  The court recognized that the federal government had prevailed on the same issue in two other circuits and wanted to avoid an "absurd" exercise where the government had to win every case brought against it for its view to prevail.  *Id.*  Plus, the court had no authority to "overrule the decision of a sister circuit (or for a district court within our circuit to do so)." *Id.* (citing *Nixon v. Kent Cnty.*, 76 F.3d 1381, 1388 (6th Cir. 1996)).

It is against this backdrop that the Court crafts the preliminary injunction here.  "[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Califano*, 442 U.S. at 702 (citing *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 414–20 (1977)).  An injunction must be tailored to the nature of the conduct established at this stage in the litigation.  *See, e.g.*, *Trump v. Int'l Refugee Assistance Project*, --- U.S. ---, 137 S. Ct. 2080, 2087 (2017) (explaining that a court "need not grant the total relief sought [in a preliminary injunction] by the applicant but may mold its decree to meet the exigencies of the particular case").

Much of the criticism of nationwide injunction concerns their geographical scope.  But the Court must keep in mind that an injunction is supposed to prevent the defendant from continuing unlawful conduct while a trial on the merits is held.  *See, e.g.*, *Nken*, 556 U.S. at 428.  The appropriate scope of an injunction is dictated by the reach of the offending party as much as, if not more so than, the physical location of the injured plaintiff.

DHS's Permanent Guidance applies without respect to state borders.  Doc. No. 4-1 at PageID 98.  A noncitizen apprehended in one state might be detained in an ICE facility in another state during their removal proceeding.  *See, e.g.*, Dora Schriro, U.S. Customs & Immigration Enforcement, *Immigration Detention Overview and Recommendations* 6 (2009), https://www.ice.gov/doclib/about/offices/odpp/pdf/ice-detention-rpt.pdf.  There is no indication in the record that the Permanent Guidance can be applied on a state-by-state basis.  Attempting to make DHS do so would create a patchwork immigration enforcement system.  *See Arizona*, 567 U.S. at 401 (describing immigration enforcement as a "comprehensive and unified system")

The Permanent Guidance is directed to all ICE and ERO officials responsible for immigration enforcement across the country.  Doc. No. 4-1 at PageID 98, 104.  There is no carveout for regional offices or particular detention facilities.  *Id.*  All ICE staff must follow the policy.  *Id.*  Therefore, the Court enjoins application of the Permanent Guidance in the manner described below on a nationwide basis.

### V.  Conclusion

For the foregoing reasons, the Court: (1) **DENIES** DHS's motion to dismiss, or alternatively for judgment on the pleadings (Doc. No. 29); and (2) **GRANTS** the States' motion for a preliminary injunction (Doc. No. 4).  It is hereby **ORDERED** that:

1. Pursuant to Fed. R. Civ. P. 65(a), Defendants United States Department of Homeland Security, Alejandro Mayorkas, in his official capacity as Secretary of the Department of Homeland Security, all their respective officers, agents, servants, employees,

attorneys, and other persons who are in active concert or participation with them are hereby **ENJOINED** and **RESTRAINED** from taking the following actions:

a.    Enforcing and implementing Section II of the Permanent Guidance (entitled "Civil Immigration Priorities") (Doc. No. 4-1) to make, determine, or adjudicate noncitizen custody decisions pending removal proceedings contrary to 8 U.S.C. § 1226(c)(1);

b.    Enforcing and implementing Section II of the Permanent Guidance (entitled "Civil Immigration Priorities") (Doc. No. 4-1) to authorize the release of, whether on bond, supervision, or otherwise, a noncitizen with a final order of removal during the removal period in violation of 8 U.S.C. § 1231(a)(2); and

c.    Enforcing and implementing Section II of the Permanent Guidance (entitled "Civil Immigration Priorities") (Doc. No. 4-1) to delay, continue, or stay the execution of a noncitizen's final order of removal to the extent that no other provision in 8 U.S.C. § 1231, or any other provision of the U.S. Code, justifies the noncitizen's continued presence in the United States beyond the period set forth in 8 U.S.C. § 1231(a).

d.    This Order does not limit or restrain DHS from enforcing or implementing the Permanent Guidance in a manner not prohibited herein.

2.    This Preliminary Injunction Order applies on a nationwide basis and in every place, territory, or jurisdiction where DHS has authority to enforce the Permanent Guidance.

3.    This Order shall be effective pending a resolution of the merits of the States' complaint unless, and until, further order from this Court, the U.S. Court of Appeals for the Sixth Circuit, or the United States Supreme Court states otherwise.

**IT IS SO ORDERED.** Date:

      March 22, 2022                      s/Michael J. Newman          
                                           Hon. Michael J. Newman
                                           United States District Judge