UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
DAYTON DIVISION

| | |
|---|---|
| **STATE OF ARIZONA, et al.**<br><br>Plaintiffs,<br><br>v.<br><br>**JOSEPH R. BIDEN, et al.**<br><br>Defendants. | Case No. 3:21cv00314<br>The Honorable Michael J. Newman |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR A STAY
PENDING APPEAL AND FOR AN ADMINISTRATIVE STAY**

**INTRODUCTION**

The States' opposition reflects a fundamental misunderstanding of federal immigration operations and demonstrates why this Court should grant a stay while Defendants seek relief in the Sixth Circuit. At the very least, this Court should grant an administrative stay to allow due consideration by the Sixth Circuit.

Last week, the Court issued a nationwide injunction forcing the Department of Homeland Security ("DHS") to abruptly modify guidance given to all U.S. Immigration and Customs Enforcement ("ICE") personnel concerning the apprehension and removal of noncitizens. As Defendants explained in their motion for a stay pending appeal, ECF No. 49, the Court's opinion relied on multiple errors of law, several of which the States concede. The States do not dispute Defendants' fundamental argument: that DHS lacks the resources to arrest, detain, or remove all of the noncitizens described in the various statutory provisions they cite and that DHS necessarily must and may exercise discretion not to take such enforcement actions in certain scenarios. The States' sole argument, then, is that DHS is precluded from acknowledging and sensibly responding

1

to what both Defendants and the States agree on, and from issuing guidance to enforcement personnel on how to proceed in light of those constraints. But given that the Parties agree that DHS may exercise its discretion, and given that Congress expressly charged *the Secretary* with the responsibility to set national immigration enforcement priorities, 6 U.S.C. § 202(5), there is nothing unlawful in the Secretary's policy that provides guidance to immigration officials on the exercise of discretion that all parties agree they have.

In addition, the States do not engage with the series of operational harms identified by Defendants; the States barely even allude to the declaration of the senior enforcement officer submitted in support of the stay motion. As Defendants previously illustrated, this Court's injunction has disrupted DHS practices that go back decades and has already sowed confusion among ICE immigration enforcement personnel. This Court's injunction will thus likely continue to require DHS to divert additional resources to ensure that its personnel understand the legal and policy framework governing their enforcement decisions. Critically, this disruption, and the attendant resource expenditure, may be for naught: if the Sixth Circuit agrees with the Defendants that the enforcement guidance at issue falls squarely within DHS's historic discretion over law enforcement decisions, and thus vacates the Court's preliminary injunction, DHS personnel may revert back to considering the September Guidance in full. The Court's injunction establishes a whipsaw effect, all to address a handful of speculative injuries asserted by three States.

The Court should stay its injunction pending an appeal of the injunction, or at a minimum, the Court should administratively stay its injunction for 7 days so that Defendants may seek relief in the Court of Appeals. Defendants—agencies and officers of a co-equal branch of government—should be given an opportunity to exhaust avenues for emergency relief before they are forced to abandon their considered policy in the sensitive area of immigration law.

## ARGUMENT

In deciding a motion to stay, the Court "balance[s] four 'interrelated' factors: (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood

that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *SawariMedia, LLC v. Whitmer*, 963 F.3d 595, 596 (6th Cir. 2020) (internal quotation marks omitted). Further, the decision of whether to grant a stay is "an exercise of judicial discretion." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citation omitted). Here, the balance of those factors favors the entry of a stay.[1]

### I. Balancing of the Equities Favor a Stay.

The Court's nationwide preliminary injunction has already imposed, and will likely continue to impose, significant burdens on DHS. Most fundamentally, the Court's injunction—requiring an abrupt nationwide change in immigration enforcement policy—imposes significant operational burdens on DHS. ICE's Enforcement and Removal Operations ("ERO") component is principally responsible for the "identif[ication] and apprehe[nsion of] removable noncitizens," and the removal of "noncitizens with final orders of removal from the United States." Declaration of Daniel Bible ("Bible Decl."), ECF No. 49-1, ¶ 5, PAGEID 1179-80. ERO "employs approximately 6,000 immigration officers nationwide," and DHS invested substantial resources in training those officers, and other DHS personnel, concerning the Secretary's September Guidance. *Id.* ¶¶ 6, 17, PAGEID 1180, 1184. This educational effort was essential; DHS delayed the effective date of the September Guidance by sixty days to provide sufficient time for officers to review and understand the September Guidance prior to its implementation. *See Guidelines for the Enforcement of Civil Immigration Law* (the "September Guidance") at 6, PAGEID 448 (providing for a comprehensive

---

[1] Defendants are likely to succeed on the merits for the reasons explained below. But, regardless, the States cite the wrong standard in stating that "the moving party *must* prove a likelihood of success on the merits" for a court to grant a stay. *See* Plaintiffs' Opposition to Stay Pending Appeal and Administrative Stay ("Pls. Opp'n"), ECF No. 53, at 2, PAGEID 1210. Rather, a court is to balance the different factors and has discretion to enter a stay. *SawariMedia*, 963 F.3d at 596; *Nken*, 556 U.S. at 433.

3

implementation process: training; process for reviewing effective implementation; data collection; and case review process).

The States do not dispute Defendants' interpretation of the terms of the Court's injunction.[2] Defendants understand the injunction to prohibit: *first,* reliance on the September Guidance to decline to take custody, upon receiving advance and official notice of their release from the criminal custody of non-DHS authorities, of individuals who are currently in removal proceedings, and for whom DHS had previously made an affirmative § 1226(c) determination; *second*, reliance on the September Guidance when deciding whether to release certain detained individuals from DHS custody during the removal period; and *third*, reliance on the September Guidance to delay, continue, or stay the removal of anyone with a final order of removal in DHS custody.

The Court's injunction, under Defendants' interpretation, required an abrupt, nationwide modification to implementation of the September Guidance, altering the guidance for DHS personnel when enforcing the immigration laws. And as noted by ERO's Acting Deputy Executive Associate Director, "implementation of [the Court's] order is resulting in confusion among the ERO workforce." *See* Bible Decl. ¶ 17, PAGEID 1184; *id.* ¶ 45, PAGEID 1196 ("The Court's order and preliminary injunction inject considerable confusion into the stay adjudication process because many of the factors militating in favor of declining to enforce a removal order under the [September Guidance] were also considered as part of DHS's discretionary decision-making before the memorandum took effect."). The Court's order may continue to create confusion among DHS's nationwide workforce, requiring ICE to invest resources to ensure that immigration officers are aware of the legal framework under which they must make daily, sensitive enforcement decisions. Importantly, these burdens may prove unnecessary: if the Sixth Circuit agrees that the Court's interpretation of the relevant statutes conflicts with decades of relevant Supreme Court

---

[2] Contrary to the States' suggestion, Pls.' Opp'n at 4, PAGEID 1212, Defendants do not understand the reference to "custody decisions" in section 1a of the injunction to limit that section's scope to release determinations. Defendants highlighted the term's meaning to illustrate the Court's error in construing both the statute and DHS's practice. *See* Defs.' Stay Mot. at 12, PAGEID 1170.

precedent, and thus vacates the Court's injunction, DHS personnel may continue following the September Guidance in full.

The States are wrong to suggest that the few days it took for Defendants to file a comprehensive stay motion, with an accompanying declaration, somehow shows that the Court's injunction is not burdensome. For one, Defendants moved for an administrative stay within hours of the Court's decision to grant a preliminary injunction, underscoring the harms it would cause. *See* Emergency Motion for an Administrative Stay, ECF No. 45, PAGEID 1147-49. Further, Defendants did not take an unjustified amount of time in filing a stay motion. Defendants filed their motion less than a week later, which is reasonable given the need to assess the scope of the Court's injunction and its cascading effects on the agency. And far from undermining Defendants' asserted harms, the few days it took to file a stay motion confirmed that those harms are real. *See generally* Bible Decl., PAGEID 1178-1200. By requiring an abrupt change in policy, the Court's injunction has imposed, and will likely continue to impose, meaningful burdens on DHS. In any event, if the issue is a question of due diligence, there should be no question the Court should grant a stay or, at least, an administrative stay of 7 days; the States waited nearly two months to file their motion for a preliminary injunction to enjoin the September Guidance. *See* Combined Mot. for Prelim. Inj. and Mem. in Support of Mot. for Prelim. Inj., ECF No. 4 (Nov. 23, 2021), PAGEID 55.

Aside from operational burdens associated with abrupt policy changes in general, the States fail to rebut Defendants' evidence of the injunction's disruption of longstanding DHS practice and operations. Without addressing the declaration of Daniel Bible, the States incorrectly assert that DHS merely needs to return to its practices of "four months ago" or, at the very least, the practices of the past Administration. *See* Pls.' Opp'n at 3-4, PAGEID 1211-12. In fact, the Court's injunction is inconsistent with DHS law enforcement practices, and its understanding of prosecutorial discretion, going back decades. *See, e.g.*, Considerations Memo at 18-19, ECF No. 27-2, PAGEID 460-61; Meissner Mem. at AR32, ECF No. 27-4, PAGEID 474. Mr. Bible—with nearly a quarter century experience in various immigration enforcement roles, Bible Decl. ¶ 3, PAGEID 1178-

5

79—explained in detail how the Court's injunction affects the agency's work, operations, and, ultimately, the execution of its mission to enforce the nation's immigration laws. The States do not engage with, much less dispute, the harms identified in Mr. Bible declaration, citing it only once for the proposition that the agency has to divert resources to address border security. *See* Pls.' Opp'n at 12-13, PAGEID 1220-21.

All three portions of the Court's injunction contribute to this disruption of DHS operations. For section 1.a of the Court's injunction, relating to 8 U.S.C. § 1226(c), Mr. Bible, explained that, "[h]istorically, DHS has, as an operational matter, generally determined whether the mandatory custody provisions of 8 U.S.C. § 1226(c) apply *after* a noncitizen is arrested and booked into ICE custody." *Id*. ¶ 25, PAGEID 1187. In terms of section 1.b of the Court's injunction, relating to the release of detained individuals during the removal period, Mr. Bible emphasized that DHS long understood that mandatory detention under § 1231(a)(2) applies solely to a subset of individuals demarcated in the statutory text: "DHS has historically understood § 1231(a)(2) as authorizing the detention of noncitizens during the removal period, but prohibiting the release during the removal period only of those detained noncitizens found inadmissible under § 1182(a)(2) or (a)(3)(B) or deportable under § 1227(a)(2) or (a)(4)(B)." *Id*. ¶ 38, PAGEID 1193. Finally, as for section 1.c of the injunction, concerning DHS's discretion in delaying, continuing, or staying final orders of removal for individuals in ICE detention, Mr. Bible again underscored DHS's historical practices: "DHS has long considered its stay authority discretionary and exercised its authority to stay noncitizen's removal following case-by-case evaluation, consistent with the statutory standard, since before the [September Guidance] took effect." *Id*. ¶ 44, PAGEID 1195.

Likewise, as this operational reality demonstrates, the Court's injunction intrudes on Executive authority in this sphere. The States are dismissive of this argument, refusing to even engage and instead making the conclusory statement that the September Guidance is unlawful. *See* Pls.' Opp'n at 8-9, PAGEID 1216-17. But the Executive Branch's constitutional authority and statutory responsibility to develop and implement its immigration enforcement priorities cannot be disputed. *See* 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a)(3); *see also Reno v. American-Arab Anti-*

*Discrimination Comm. ("AADC")*, 525 U.S. 471, 483-84 (1999). Here, the injunction "is not merely an erroneous adjudication of a lawsuit between private litigants, but an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assistance Project,* 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers); *see Heckler v. Lopez*, 463 U.S. 1328, 1330 (1983) (Rehnquist, J., in chambers); *see also Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978) (per curiam). In particular, the injunction intrudes on "'an indubitable and a Constitutional power'" of the Executive's "prosecutorial discretion." *Texas v. United States*, 14 F.4th 332, 340-41 (5th Cir.), *vacated*, 24 F.4th 407 (5th Cir. 2021). "The injury to the executive's daily exercise of this historic discretion is irreparable in the basic sense of the word; there is no way to recover the time when its exercise of discretion is being enjoined during the pendency of the appeal." *Id*.

In the end, a stay is necessary to prevent the continuation of these harms while the Sixth Circuit addresses the merits of the Court's preliminary injunction. These harms outweigh the speculative, unsupported injuries alleged by the Plaintiff States. In their response, the States devote only a single, short paragraph to their alleged harms, stating that the September Guidance "means more criminal aliens will remain in the States," allegedly causing "the States to bear more . . . costs" relating to law enforcement, health care, and education. Pls.' Opp'n at 13, PAGEID 1221. But the September Guidance was in effect, in full, for nearly four months, and yet the States still fail to identify a *single* noncitizen who (i) resides in a Plaintiff State, (ii) would have been subject to an enforcement action but for the portions of the September Guidance that the Court enjoined, and (iii) has committed a crime requiring State law enforcement resources, or has relied on State health care or education resources, after the September Guidance went into effect. The States provided no meaningful evidence of harm with their preliminary injunction motion, and here again fail to provide that evidence. The Court should not sustain an injunction requiring an abrupt change to the nationwide policies of a co-equal branch of government, based on such speculative, unsupported harms alleged by the three Plaintiff States, which have no judicially cognizable interest in the manner of enforcing immigration laws to begin with. *Sure-Tan, Inc. v. NLRB*, 467

U.S. 883, 897 (1984). At a minimum, the States have failed to show that the equities counsel in favor of a nationwide injunction because established principles of equity require that relief extend no further than injuries shown by the plaintiff as a result of an established violation. *See* Defendants' Motion for a Stay Pending Appeal ("Defs.' Stay Mot."), ECF No. 49, at 17, PAGEID 1175. On the contrary, on the record before the Court, the balance of equities heavily favors Defendants, and the injunction should be stayed.

  **II. Defendants are likely to prevail on appeal.**

The States' brief in opposition highlights that their dispute with the September Guidance is not that it is contrary to law, but rather contrary to the States' policy preferences. Repeatedly, the States admit that DHS retains discretion to decline to arrest, to detain, or to remove under the statutes the States invoke. In this respect, the States "recognize that resource limitations may keep individual ICE officers from making specific arrests" and that "ICE officers retain discretion to make these types of decisions," Pls.' Opp'n at 4, PAGEID 1212. And the States do not dispute that ICE's custody and removal decisions may be guided by "operational constraints," *id.* at 11, PAGEID 1219, such as resource limitations, or "foreign policy realities," *id.* at 12, PAGEID 1220. The States thus concede that DHS must and may exercise discretion not to take such enforcement actions.

  *A. Plaintiffs do not engage with Defendants' statutory arguments.*
   i. Section 1226(c)(1) does not impose a judicially enforceable mandate.

The States acknowledge that DHS cannot arrest everyone described in § 1226(c)(1)(A)-(D), and they do not object that individual DHS officers will necessarily make decisions about which persons described in the statute will actually be arrested. *See* Pls.' Opp'n at 10-11, PAGEID 1218-19. In other words, they agree that DHS retains discretion regarding enforcement of § 1226(c)(1). The States' concession is inconsistent with this Court's holding, but consistent with the Supreme Court's recognition in *Nielsen v. Preap* that the "duty" in § 1226(c)(1) to "arrest criminal aliens upon their release" is *not* to be "enforced by courts." 139 S. Ct. 954, 969 n.6 (2019) (emphases omitted). Because resource constraints and other enforcement considerations

8

necessarily prevent DHS from arresting everyone described in § 1226(c)(1), including those in criminal detention, DHS must be able to exercise its discretion to set priorities to guide which of those described in the statute it will arrest. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) (observing that resource constraints and circumstantial impossibility support interpreting a "shall arrest" statute as not imposing a judicially enforceable duty); *id.* at 762 (noting the "practical necessity for discretion"). Thus, to the extent that this Court's order limits Defendants in what officers may consider when making arrest decisions, it intrudes on Defendants' ability to exercise a residuum of prosecutorial discretion that the statute has not extinguished. *See* Defs.' Stay Mot., at 12-13, PAGEID 1170-71 (explaining that taking custody of a noncitizen from a non-DHS law enforcement agency constitutes an arrest of the noncitizen); Bible Decl. ¶ 26, PAGEID 1188 (explaining how "an ICE officer must appear at the [law enforcement agency's] facility and make an arrest" before taking custody of an individual being released from criminal custody).

    ii. Section 1231(a)(2) does not impose a judicially enforceable mandate.

  The States make nothing more than a conclusory argument that the September Guidance violates § 1231(a)(2). *See* Pls.' Opp'n at 5, PAGEID 1213 ("'shall' . . . is mandatory"). But even as the States acknowledge that the second sentence of § 1231(a)(2) means (as DHS has maintained in this litigation and in the Considerations Memorandum) that DHS has no discretion during the 90-day removal period to release detained noncitizens with specified criminal convictions, it ignores the corollary that DHS retains discretion to release others. Pls.' Opp'n at 5, PAGEID 1213; *see* Bible Decl. ¶ 38, PAGEID 1193 (discussing DHS's longstanding application of § 1231(a)(2)). The States ignore the significance of the linguistic distinctions between the first and second sentences of § 1231(a)(2), and the implications of those differences in light of *Castle Rock*. The first sentence, properly understood, does not impose a judicially enforceable mandate on DHS. And the States offer no answer to Defendants' argument that the contrary reading, adopted by the States and the Court, would make the second sentence nugatory. *See* Bible Decl. ¶ 38, PAGEID 1193.

   iii. Section 1231(a)(1) does not impose a judicially enforceable mandate.

The States acknowledge both that DHS "has discretion to abandon removal proceedings," Pls.' Opp'n at 6, PAGEID 1214, and that DHS may properly exercise that discretion in certain circumstance, such as to accommodate "foreign policy realities," *id.* at 12, PAGEID 1220. But, without reference to any statutory text, the States assert that Congress "created exceptions" to DHS's uncontested discretion to abandon removal proceedings. *Id.* at 6, PAGEID 1214. To the extent that the Court's ruling limits DHS's discretion to abandon or defer removal—discretion expressly recognized by the Supreme Court—it is likely to be reversed on appeal. *See AADC*, 525 U.S. at 483-84 (affirming that the Executive has "discretion to abandon" "execut[ing] removal orders"); *see also Arizona v. United States*, 567 U.S. 387, 396 (2012) (a "principal feature of the removal system is the broad discretion exercised by immigration officials").[3]

 B. *Defendants are likely to prevail on the other issues as well.*

The States likewise fail to engage with Defendants' argument that the Court overstepped its role in the arbitrary and capricious analysis. "Judicial review under [the arbitrary-and-capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* Indeed, the States' reliance on recidivism perfectly illustrates both the States' and this Court's error. In developing the September Guidance, namely its aggravating and mitigating factors, DHS *expressly* considered the issue of recidivism, and "exercised its expert judgment and experience to identify those factors that make an offender particularly more likely or less likely to recidivate." Considerations Memo

---

[3] The States' reference to the government's brief in earlier litigation gets them nowhere. As that brief explains, Congress has, from time to time, used appropriations bills to direct DHS to prioritize removals in certain ways. *See* Pet. Br., *United States v. Texas* (DAPA), 2016 WL 836758 at *4 (U.S. Mar. 1, 2016) (citing Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, H.R. 2029, Div. F, Tit. II, 114th Cong., 1st Sess. 256; DHS Appropriations Act, 2009, Pub. L. No. 110-329, Div. D, Tit. II, 122 Stat. 3659). The States have pointed to no such law currently in effect and, in any event, the September Guidance instructs DHS personnel to consider (among other things) the severity of the offense when deciding which cases to pursue for removal.

at 13, PAGEID 455. The agency relied on information from the United States Sentencing Commission, as well as its own experience enforcing immigration law. It considered relevant literature on the topic, while acknowledging that empirical data on recidivism particularly within the noncitizen population is incomplete because law enforcement agencies generally do not track "legal status." *Id.* Moreover, the agency judged that the question of recidivism is not a binary question, because, in its judgment, "[n]ot all offenses present the same risk to public safety." *Id.* (noting that "while an individual with a substance abuse addiction may be highly likely to recidivate and be convicted again for a simple controlled substance offense, that individual may pose a smaller risk to public safety than an individual who has committed a recent violent assault").

The Court faulted the agency for also considering the difficulty of applying the "aggravated felony" definition, because that concern, the Court said, did not speak to recidivism at all. *See* Order at 57, PAGEID 1124, ECF No. 44. But the agency identified two problems with the aggravated felony definition. One problem, as the Court recognized, was the difficulty of applying the definition. *See* Consideration Memo at 12, PAGEID 454. But the other problem was that the aggravated felony category "was both over- and under-inclusive" and was an "imperfect proxy for severity of offense," *id.,* which the agency considered an important aspect of the public safety analysis. The Court ignored this part of the agency's analysis.

The Court also faulted the agency for relying on a particular academic article which, in the Court's view, compared the wrong populations for drawing any strong inference about "criminal alien recidivism." Order at 58, PAGEID 1125. But the Court's error in this respect was double. For one, the Court overstated the purpose for which the agency relied on the article. The agency started by noting that empirical data on the particular subject was generally poor because of the failure to control for the precise issue—recidivism by legal status. Considerations Memo. at 13, PAGEID 455. It then noted that the limited literature that did control for legal status "indicates"— not proves or establishes—"that undocumented noncitizens are *less* likely to recidivate." *Id.* For another, the Court erred by substituting its own consideration of the article for the agency's. It was not unreasonable for the agency to draw inferences from the data available, recognizing the data's

11

inherent limitations. The Court further erred in its evaluation of the 2019 ICE Report. Order at 59, PAGEID 1126. As that report reflects, during fiscal year 2019, resource constraints forced ICE to prioritize its interior enforcement efforts by focusing on "criminal aliens [with] extensive criminal histories with multiple convictions or pending charges." 2019 ICE Report at 12, https://perma.cc/E3MS-DLEP. The data on this subset of noncitizens "*that ICE arrests*"—that is, those with "multiple convictions or pending charges"—had a "recidivist nature." *Id.* (emphasis added). Contrary to the Court's assessment, DHS not only did not contradict that conclusion, it made the exact same point, by "identify[ing] those factors that make an offender particularly more likely or less likely to recidivate," Considerations Memo. at 13, PAGEID 455, including the presence of "a serious prior criminal record," September Guidance at 3, ECF No. 4-1, PAGEID 100.

The States endorse these errors and add their own, contending that the agency "denied that recidivism is a problem worth addressing." Pls.' Opp'n at 7, PAGEID 1215. That is incorrect: the agency identified recidivism as central to the question whether someone was a public safety threat. Considerations Memo at 12-13, PAGEID 454-55. But the essential point is that all of these decisions—the nature and extent of the consideration of recidivism, what factors to use to assess it, how to evaluate academic and other evidence—are committed to the Secretary. The evidence before the Secretary "hardly led ineluctably to just one reasonable course of action," but instead "called for value-laden decisionmaking and the weighing of incommensurables under conditions of uncertainty." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2571 (2019). "[T]he choice between reasonable policy alternatives in the face of uncertainty was the Secretary's to make," *id.* at 2570, and "[b]y second-guessing the Secretary's weighing of risks and benefits," the Court impermissibly "substitutes [its] judgment for that of the agency," *id.* at 2571. Neither the Plaintiffs, nor this Court, may supplant the Secretary's judgment about whether the September Guidance's aggravated and mitigating factors are the most effective way to focus efforts on public safety threats, including likely recidivists. *See id.*

Nor do Plaintiffs engage with the other arguments that Defendants raise with respect to the States' remaining claims. In determining that the September Guidance was final agency action, the Court failed to focus on whether any legal consequences flowed from the policy, as distinct from its practical effects. *See* Defs.' Mem. of P.&A. in Opp'n to Pls.' Mot. for Prelim. Inj., at 24, ECF No. 28 ("PI Opp'n"), PAGEID 648 (citing *Parsons v. U.S. Dep't of Just.*, 878 F.3d 162, 168 (6th Cir. 2017)). The Court likewise erred in determining that the States have a judicially cognizable interest in immigration enforcement against noncitizens, notwithstanding the Supreme Court's statement to the contrary. *See* PI Opp'n at 15, PAGEID 639 (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). As to standing, the Court was wrong to attribute the actions of third parties to Defendants, which defeats the States' theory of standing. *See* PI Opp'n at 15-16, PAGEID 639-40. And on the States' notice and comment claim, the Court failed to recognize that DHS's statement of policy is exempt from notice-and-comment requirements. *See* PI Opp'n at 40, PAGEID 664 (citing *Lincoln v. Vigil*, 508 U.S. 182, 196-97 (1993)); *see also* September Guidance at 5, PAGEID 102 ("The civil immigration enforcement guidance does not compel an action to be taken or not taken. Instead, the guidance leaves the exercise of prosecutorial discretion to the judgment of our personnel.").

At bottom, Defendants are likely to prevail on the merits in any appeal. And, given the harms previously discussed, this Court should grant a stay.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that the Court issue a stay pending appeal or, in the alternative, issue an administrative stay of 7 days so that Defendants may seek relief from the Sixth Circuit.

Dated: March 31, 2022                      Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

/s/Michael F. Knapp
MICHAEL F. KNAPP
  CA Bar No. 314104
Trial Attorney
ADAM D. KIRSCHNER
  IL Bar. No. 6286601
Senior Trial Counsel
BRIAN C. ROSEN-SHAUD
  ME Bar No. 006018
KUNTAL CHOLERA
  DC Bar No. 1031523
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 353-9265
Fax: (202) 616-8460
Email: Michael.F.Knapp@usdoj.gov
        Adam.Kirschner@usdoj.gov
        Brian.C.Rosen-Shaud@usdoj.gov
        Kuntal.Cholera@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, D.C. 20044

Courier Address
1100 L Street NW, Room 11020
Washington, D.C. 20005

EREZ REUVENI
  CA Bar No. 264124
Assistant Director
U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Email: Erez.R.Reuveni@usdoj.gov

*Counsel for Defendants*

14

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on March 31, 2022.

                                        */s/ Michael F. Knapp*
                                        MICHAEL F. KNAPP